UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| LORI ANN YANCEY, et al., | ) | |
|---|---|---|
| Plaintiffs, | ) ) ) | |
| v. | ) ) | No.: 3:04-CV-556<br>3:04-CV-610 |
| MARTY CARSON, et al., | ) ) | CONSOLIDATED<br>(VARLAN/SHIRLEY) |
| Defendants. | ) | |

**MEMORANDUM OPINION**

These two consolidated § 1983 actions arose from the shooting of plaintiff Deputy Hubert Dean (John) Yancey by his partner, Deputy Marty Carson, during a police raid on a Scott County meth lab. The major dispute is whether the shooting was an unfortunate accident or murder. Currently pending is the defendants' motion for summary judgment [Doc. 30.] For the reasons that follow, the motion will be granted with respect to defendants Jim Carson, Robby Carson, Donnie Phillips, Carl Newport, and Scott County. In all other respects, the motion will be denied.

I. *Factual Background*

There are profound disputes of fact between the plaintiffs' and defendants' versions of events in this case. The following factual allegations are taken from deposition

testimony[1], affidavits, and written reports and will be considered in the light most favorable to the plaintiffs.

Plaintiff John Yancey and defendant Marty Carson were both officers of the Scott County Sheriff's Department who worked together as partners, sharing the same vehicle, beginning in November 2003. [Doc. 33-2, pp.14-15.] Marty Carson's father, Jim Carson, was the Sheriff of Scott County at the time. Plaintiff Lori Ann Yancey testified that her husband intended to run for Sheriff of Scott County in 2006 against Marty Carson. [Doc. 33-4, pp.121-22.]

On the evening of November 28, 2003, Officer Yancey requested that Officers Donnie Phillips and Carl Newport meet him and Officer Marty Carson at a food court near Williams Creek Road. [Doc. 33-2, pp.18-19.] According to Marty Carson, an informant of Officer Yancey had told him that a person on the FBI Ten Most Wanted list would be coming to Scott County to operate a meth lab at a trailer on Williams Creek Road. [*Id.*] Plaintiff Lori Yancey contends that it was Marty Carson who instigated the raid on the trailer and that on the previous night, November 27, 2003, Marty Carson had gone to the trailer without Yancey. [Doc. 33-2, p.105.]

After meeting at the food court on November 28, Marty Carson drove Yancey to the suspected residence on Williams Creek Road to do a "knock and talk." Officers Phillips and

---

[1] All page references to depositions will be to the actual deposition page number - not the docket entry page number. Also, for the sake of clarity, the Court will at times refer to the parties or witnesses by their first names given the multitude of and commonality of the relevant names and individuals.

Newport followed in a separate vehicle. John Yancey had informed Phillips that they were looking for a man named Mark, who was on the Most Wanted list. Phillips had a laptop in his vehicle and he typed in the name "Mark" to pull up arrest records in Scott County, and the only "Mark" on Williams Creek Road was a man named Mark New. Officer Yancey contacted his informant by cell phone to get more information on the suspect. He had determined from a computer description of Mark New that he was not the person identified by the informant. [Doc. 33-2, pp.18-19.] Defendants contend that it was John Yancey who was insistent upon going to the Williams Creek Road residence that night because he and Marty had just completed a meth certification school. [*Id.* at p.19.] Defendants contend that both Marty Carson and Deputy Phillips tried to talk John Yancey out of going to the meth lab that late in the day, but John got them to agree to accompany him. [*Id.*]

Marty and John pulled into the driveway first and parked their vehicle in front of a window at one end of the trailer. [Doc. 33-5, pp.11-12.] John exited the vehicle and went to where the owner of the residence, Ryan Clark, was in the yard. [*Id.*] Phillips and Newport then arrived and Phillips went over to John and Clark, and Newport went around to the other side of the trailer. [*Id.*] While John talked to Clark, Marty walked up to the back porch, then knocked on the door. [Doc. 33-2, pp.19-20.] Nicole Windle answered the door. It was cold and snowing, so Marty Carson asked her if he could come in, and Nicole Windle let him in. [*Id.*] Officer Phillips also walked up to the back porch. [*Id.*]

While Marty was talking to Ms. Windle, he noticed a closed door down the hallway to the right of the back door. [*Id.*] Marty Carson asked Ms. Windle if anyone else was in the trailer, and she said, "No." [*Id.*] Marty claimed that he heard someone in the back bedroom and further claimed that headlights from his police vehicle were shining through the back window of the trailer, and he could see movement in light through cracks in the closed door. [*Id.*] He testified that he told Ms. Windle to get into the kitchen area and hollered for the suspects in the back room to "come out now." [*Id.* at 20-21.] A male voice, Mark Rector, was heard from the bedroom to say, wait, that he would be out in a minute. Marty Carson ordered the suspect to come out immediately with his hands up. Marty testified that he then heard a female voice screaming, "He's got a gun! He's got a gun! He is going to kill you! He is going to kill me! He is going to kill us all! Get away from the window." [*Id.*] In response to this screaming, Marty Carson stuck his head out the back door and purportedly told the officers outside, "Don't come in! He's got a gun!" Nicole Windle claims she did not hear Marty yell "Don't come in! He's got a gun!", but "Boys, they are in here. Come in here." According to Ryan Clark and Pennie Carpenter, both Clark and Windle had been up doing meth for 20 straight days without sleep. [Doc. 33, p.55.] Windle claimed that, whatever Marty yelled outside, John came into the trailer and followed Marty down the hall toward the back bedroom. [Doc. 41-6, pp.13-15.] Marty denies that John was directly behind him.

Marty testified that as he was walking down the short hallway from the back door to the bedroom, the door opened partially and he could see the outline of a figure who appeared

4

to be holding a gun. [Doc. 33-2, pp.20-21.] He then darted into a bathroom immediately to the left of the bedroom door. [*Id.*] He testified that it was pitch dark in the bathroom, but he saw what he believed to be the barrel of a gun come into view in the bathroom door, which then began to point in his direction. [*Id.*] Marty fired one shot into the middle of the doorway and then heard John yell, "Please help, I'm shot." Windle claims that after Officer Yancey came into the trailer, she backed out of the way and out of the line of sight. [*Id.* at 18-19.] She claims that she heard a lot of stomping and bumping noises like someone wrestling or being dragged out of the bedroom door, followed immediately by a gunshot. [*Id.* at 16-19.] After Marty heard John say he was shot, Marty entered the hall from the bathroom, looked at the bedroom door, which was now closed, and kneeled over John who was on the floor. [Doc. 33-2, pp.22, 89.] After seeing John's eyes roll back in his head, Marty tried to pull his prone body from the trailer, but he was too heavy. [*Id.* at 22, 84.] Marty believed John's injury to be fatal, and he fled the trailer. [*Id.* at 22, 84, 89.] According to Marty, he heard only one shot, but in his terrified state was not sure whether another shot had been fired by the suspect out of the bedroom, which was what he assumed had occurred. [Doc. 33-2, pp.22-23, 34-36, 63, 65-68, 73-75.]

All of the witnesses in the trailer (Marty Carson, Nicole Windle, Mark Rector, and Pennie Carpenter) each have a different recollection of what lights were on. According to Marty Carson, the bathroom was pitch dark and the hallway darkened. [Doc. 33-2, pp.20-21, 23-25, 54-55, 67-68.] Windle testified that the bathroom light, the stove light in the kitchen, and the porch light outside were on, but the hallway light was out. [Doc. 33-7, pp.11, 25, 58.]

5

Mark Rector was not really looking for lights as he and Pennie fled out of the trailer, but recalls the hall light, a kitchen light, and the back porch light being on. Pennie's recollection was that the bedroom and hall lights were off, but she could see from the kitchen into the hallway. [Doc. 33-7, pp.6-7, 11.]

When Marty exited the trailer, he saw Carl Newport now standing in the back yard and yelled at him to take cover because Marty believed that the suspect had a gun. [Doc. 33-6, pp.11-12.] The two of them hid behind trees. [*Id.*] Marty then went to Phillips's cruiser behind Marty's vehicle, told Phillips that John had been shot and to "get the shotgun, I'm going back in and get John." [Doc. 33-5, pp.17-21.] Phillips said to wait for back-up which was arriving. [*Id.*] Marty then went back into the trailer with another deputy to get John. According to Windle's testimony, it was eight to ten minutes before the deputies came in and did CPR on John for a time. Marty and another deputy performed CPR on John until paramedics arrived.

It is undisputed that only one bullet was ever fired in the trailer, and that was the shot fired by Marty Carson that hit John Yancey. The weapon used was a Glock .40 that actually belonged to John Yancey. [Doc. 33-2, p.7.] There is no evidence in the record that a shotgun was ever fired in the trailer. Nor was a shotgun ever found. Marty told Detective Lewellan that he fired one round from his weapon and believed that the subject did have a shotgun and had fled into the woods. [*Id.* at p.23.] Marty admits that after he came out of the bathroom he reholstered his weapon and attempted to move John Yancey, even though he knew that the occupants of the bedroom were still in the bedroom at that time. [*Id.* at p.86.] After

6

Carson fled the trailer, he and the other two officers somehow allowed the two occupants of the bedroom to escape. Marty testified that he took cover behind a tree, and that he was not even observing the back of the trailer. He testified that at that point he thought there was a real possibility that John Yancey had been shot with a shotgun. [*Id.* at pp.89-90.]

After John Yancey was shot, Ms. Windle testified that she went into the bathroom under the supervision of another officer. She was using the bathroom when she noticed a gun behind the toilet. She testified that she told the officer, "There's a gun right here," and he said, "Ok, just leave it." The gun was laying behind the toilet. It was not laying on its side, but was up on its tip and butt in a triangle shape. Windle testified that she could tell that it had been set there. [Doc. 41-6, pp.29-30.] The gun turned out to be Yancey's Glock .31 pistol. [Doc. 33-3.]

Defendant Marty Carson cannot explain how that weapon made it into the bathroom. He testified that Yancey did not throw anything into the bathroom, and he did not hear anything land on the floor. However, Marty Carson testified that Yancey's weapon was not in his holster when Carson reached Yancey in the hallway. [Doc. 33-2, p.112.] This gun was found approximately six to seven feet from the doorway of the bathroom through which Mr. Yancey was shot. TBI agents arrived at the scene approximately 45 minutes after the shooting, and once the TBI arrived, it became their case. [Doc. 33-11, pp.35-36.]

Detective Robby Carson assisted the TBI agent in doing interviews. [Doc. 33-13, pp.7-8, 11-12.] Later, the TBI did in-depth interviews. Sheriff Jim Carson arrived on the scene about five minutes before the TBI got there. [Doc. 33-11, pp.15-17.] Marty was sitting

7

in a vehicle getting warm when his father arrived and got into the car with his son. [*Id.*] Marty related to Jim the following: Marty was going into a back bedroom in the trailer; the door was partially opened; he went in a darkened bathroom when he saw what he thought was a shotgun barrel coming out of the bedroom and into the bathroom; and he fired one shot. [Doc. 33-11, pp.15-17.] The Sheriff asked Marty whether Marty's shot could have been the one that hit John, but Marty did not know. [*Id.*] Sheriff Carson and Detective Lewellan then looked around the trailer for a bullet hole from which Marty's shot could have exited, but found none. [Doc. 33-12, pp.35-36.] At that point in time, the defendants did not know whether Marty or the suspect who fled the trailer had shot John. [Doc. 33-13, pp.7-15.]

It was concluded after an autopsy that it was Marty Carson's bullet which had killed John Yancey. It was not until the next day that it was learned for certain that it was Marty's shot that had killed John, and three deputies, including Phillips, went to Lori Yancey's house to tell her. Lori Yancey believes that it is suspicious that on the night of the shooting, Robby Carson told her at the hospital that John had been shot by a shotgun and the assailant had fled into the woods, but then on Saturday she was told that the bullet that killed John came from Marty's gun. [Doc. 33-4, pp.56-58.] By the next night, the information Lori Yancey had been given was that Marty had shot John, but he still thought there was a suspect who fled the trailer armed with a shotgun, and John had been hit with cross-fire. [*Id.* at p.57.] Two days later, Robby Carson told Lori Yancey that no shotgun had ever been found. [*Id.* at p.57-58.]

Lori Yancey testified that it was her opinion that the Sheriff's Department, the TBI, and the District Attorney's Office all conspired to hide the cause of John Yancey's death. [*Id.* at p.118.] It is the plaintiffs' theory that Marty Carson murdered her husband in order to remove his competition for the up-coming 2006 Sheriff's election.

After this motion was briefed, plaintiff submitted two notarized, hand-written declarations signed by former prisoners in the Scott County Jail suggesting an alternative theory of murder. Both former prisoners claim they formerly worked for Marty Carson as drug couriers or "cookers" and that the Carson family is highly involved in the production of methamphetamine in Scott County. They contend that Marty keeps 90% of the profits realized by his "cookers" and that one of the declarants overheard Marty Carson stating that John Yancey "would be taken care of." The other declarant says that Marty Carson attempted to hire him to kill John Yancey. [Docs. 48, 52.]

The defendants contend first that even if plaintiffs' version of the events is true and Marty Carson simply murdered his partner John Yancey, then it was not done "under color of state law," and no claim under 42 U.S.C. § 1983 would lie. Second, defendants contend that plaintiffs' conspiracy theory, which would involve all of the individual defendants as well as the TBI and the Attorney General, is simply too preposterous to believe.

## II. *Summary Judgment Standards*

Pursuant to Rule 56, summary judgment shall be rendered when requested if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). It is the burden of the party seeking summary judgment to show the court that, under uncontradicted facts, the moving party is entitled to judgment as a matter of law. Summary judgment is intended to provide a quick, inexpensive means of resolving issues as to which there is no dispute regarding the material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). In assessing the validity of a summary judgment motion, the court must construe the evidence in a light most favorable to the opponent of the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, an opponent to a motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but must set forth through competent and material evidence specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." [*Id.*] Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an essential element of that party's case, and on which the party will bear the burden of proof at trial. *Catrett*, 477 U.S. at 322.

III. *Under Color of State Law*

As the defendants have noted, § 1983 creates a cause of action against individuals who violate federal law while acting "under color of state law." *See* 42 U.S.C. § 1983. "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Adkins*, 487 U.S. 42, 49 (1988). The under color of law determination rarely depends upon a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether or not the officer acts in accordance with his or her duty. *See, e.g., Martinez v. Colon*, 54 F.3d 980, 986-89 (1st Cir.), *cert. denied*, 116 S.Ct. 515 (1995). Instead, one must examine "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties." [*Id.*] "The key determinant is whether the actor, at the time in question, proposes to act in an official capacity or to exercise official responsibilities pursuant to state law." [*Id.*] The United States Court of Appeal for the Seventh Circuit has noted that the fundamental question is "whether [the officer's] actions related in some way to the performance of a police duty." *Gibson v. City of Chicago*, 910 F.2d 1510, 1517 (7th Cir. 1990).

The Court finds that in this case Officer Marty Carson was acting under color of state law at the time he shot Officer Yancey. They were wearing police uniforms and they were carrying out their duties as police officers in attempting to carry out a methamphetamine bust. Even if it was defendant Marty Carson's intent to murder his partner, as alleged by

11

plaintiff, he was nevertheless doing so under color of state law. *See, e.g., United States v. Lanier*, 520 U.S. 259, 271 (1997) (state judge acting under color of Tennessee law in sexually harassing persons appearing before him). Accordingly, the Court concludes that plaintiffs have satisfied the color of state law portion of a § 1983 claim.

## IV. *Plaintiffs' Conspiracy Claim*

Defendants contend that plaintiffs' conspiracy theory, that is that the defendants lured Officer Yancey into a trap and murdered him so as to eliminate him from the Sheriff's race and then conspired with the TBI and the Attorney General to cover up the murder, is simply so preposterous that no reasonable jury could believe it. Apparently, plaintiffs have conceded that their conspiracy theory is not viable since they now concede that they have not developed sufficient admissible evidence against defendants Jim Carson, Robby Carson, Donnie Phillips, and Carl Newport to resist their motions for summary judgment. Therefore, those four individual defendants are entitled to summary judgment, and the claims against them will be dismissed.

In addition, with respect to the claims against Scott County, a governmental entity can be held liable under § 1983 only where a policy or custom attributable to the governmental entity caused the violation of plaintiff's constitutional rights. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 477-79 (1985). Plaintiffs have failed to allege a custom or policy attributable to Scott County which caused John Yancey's death. Specifically, there is no supportable allegation that Scott County does not have a custom or policy of permitting officers to

murder their partners. Accordingly, the motion for summary judgment of Scott County also will be granted. To the extent that plaintiffs attempt to bring state law claims against Scott County, the Court declines to exercise its supplemental jurisdiction over those claims.

Finally, with respect to the § 1983 claim against defendant Marty Carson, the Court finds that there are questions of material fact which remain to be determined. Marty Carson's testimony appears to indicate that when he started down the hall toward the bedroom doorway, no other officers were behind him. Ms. Windle's testimony, on the other hand, was that the two officers went down the hallway, one behind the other. Some witnesses testified that there were many lights on in the trailer; others that there were virtually none. Marty Carson testified that the bedroom door opened and he saw a figure with a gun. Ms. Windle testified that the bedroom door never opened. No explanation is given for how Officer Yancey's gun got from his holster to being propped against the bathroom wall behind the commode. Who placed it there and why is a complete mystery.

From defendant Marty Carson's statements, it appears that he believed that a shot was fired other than his own. Yet there is no physical evidence that any other shot was fired or that any of the suspects had a shotgun. There is no explanation for why Officer Carson would reholster his gun and turn his back to the bedroom door if he thought that there was a suspect behind it with a shotgun who had just shot his partner. Also unanswered is how two suspects were able to flee the trailer, which only had two exits, while there were at least three officers on the scene. Finally, plaintiffs have submitted the declarations of two former prisoners in the Scott County jail suggesting that they either overheard Marty Carson stating

that John Yancey would be taken care of or that Marty Carson attempted to hire the declarant to kill John Yancey.

Based upon all of the foregoing, the Court finds that questions of fact remain for the jury such as to preclude the entry of summary judgment as to defendant Marty Carson.

## V. *Plaintiffs' Loss of Consortium Claims*

Plaintiffs also bring loss of consortium claims. Under 42 U.S.C. § 1983, no guidance is provided in how to evaluate damages. However, if § 1983 is

> deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the Constitution and statutes of the State or in the court having jurisdiction of such civil or criminal causes held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause.

42 U.S.C. § 1988. It is undisputed that in this case Tennessee law would be controlling and therefore Tennessee civil damages law should be applied.

In Tennessee, in a wrongful death action, a spouse or child of the decedent may receive damages for the loss of consortium, which is included in the pecuniary value of the decedent's life. *Hunter v. Ura*, 163 S.W.3d 686, 705 (Tenn. 2005); *Jordan v. Baptist Three Rivers Hospital*, 984 S.W.2d 593, 601-02 (Tenn. 1999). The Court concludes that plaintiffs are entitled to seek loss of consortium damages under Tennessee law and therefore pursuant to 42 U.S.C. §§ 1983 and 1988.

## VI. *Conclusion*

In light of the foregoing, defendants' motion for summary judgment [Doc. 15] will be granted in part and denied in part. The motion will be granted with respect to defendants Jim Carson, Robby Carson, Donnie Phillips, Carl Newport, and Scott County, Tennessee, and this action will be dismissed as to them. In all other respects, the motion will be denied.

Order accordingly.

                                                  s/ Thomas A. Varlan
                                                  UNITED STATES DISTRICT JUDGE