THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE, TENNESSEE


LORI ANN YANCEY, ET AL.,           :
                                   :
         PLAINTIFF,                :              NO. 3:04-CV-556/610
                                   :
    VS.                            :              JURY TRIAL –
                                   :              NOVEMBER 9, 2007
MARTY CARSON, ET AL.,              :
                                   :
         DEFENDANT.                :


     TRANSCRIPT OF PROCEEDINGS BEFORE THE HONORABLE THOMAS A.

VARLAN, U.S. DISTRICT JUDGE, ON NOVEMBER 9TH, 2007.


APPEARANCES:


          ON BEHALF OF THE PLAINTIFF:

            HERBERT S. MONCIER, ESQ.
            DAVID S. WIGLER, ESQ.
            KNOXVILLE, TENNESSEE


          ON BEHALF OF THE DEFENDANT:

            JOHN C. DUFFY, ESQ.
            KNOXVILLE, TENNESSEE



          COURT REPORTER:

          DONNETTA KOCUBA, RPR-RMR
          800 MARKET STREET, SUITE 132
          KNOXVILLE, TENNESSEE  37902
          (865) 524-4590

# INDEX

COURT'S RULING – INVESTIGATION OF MARTY CARSON:  3

RECESSES:  54, 122, 172, 218

DEFENDANT'S MOTION FOR MISTRIAL:  103

COURT'S RULING ON MOTION FOR MISTRIAL:  122

DISCUSSION RE:  REBUTTAL TESTIMONY:  195

DISCUSSION RE:  AUTOPSY REPORT:  210

DISCUSSION RE:  EXHIBIT P-38A – PARTIAL DIAGRAM
OF INSIDE OF TRAILER:  212

DISCUSSION RE:  EXHIBITS P-55 AND P-56 –
LETNER/GUNTER STATEMENTS:  214

JURY CHARGE CONFERENCE:  218

| DEFENDANT'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ROBERT CARSON, JR. | 6 | 9 | | |
| STEVE VINSANT | 18 | 35 | 46, 55 | 50 |
| JOSEPH BABB (DEPOSITION) | 56 | | | |
| WILLIAM PAUL PHILLIPS | 82 | 131 | | |
| SARAH DAVIS | 160 | 164 | 170 | 170 |
| JAMES CARSON | 172 | 177 | 189 | |

| PLAINTIFF'S EXHIBITS: | INTRODUCED | RECEIVED |
|---|---|---|
| P-42  AUTOPSY REPORT | 19 | |
| P-42A COMPLETE AUTOPSY FINAL REPORT | 43 | |
| P-55  LETNER/GUNTER STATEMENTS | 134 | |
| P-56  LETNER/GUNTER STATEMENTS | 134 | |

1   (WHEREUPON, FRIDAY, NOVEMBER 9TH, 2007, COURT CONVENED

2   WITHOUT THE JURY AT 9:12 A.M.)

3   THE COURT:  ALL RIGHT.  GOOD MORNING, EVERYONE.  BEFORE

4   WE CALL THE NEXT WITNESS, LET THE COURT ADDRESS ONE OF THE MATTERS

5   THAT WE WERE DISCUSSING YESTERDAY AFTERNOON.  AT THE

6   SUPPLEMENTAL AND FINAL PRETRIAL CONFERENCE THE COURT HAD

7   GRANTED IN PART AND DENIED IN PART PLAINTIFF'S MOTION IN LIMINE

8   REGARDING THE INVESTIGATION OF MARTY CARSON.  THAT WAS DOCUMENT

9   71 BROUGHT BY THE PLAINTIFF.

10  THE COURT DECLINED TO PRECLUDE ANY TESTIMONY OF THE DISTRICT

11  ATTORNEY OR HIS ASSISTANT OR TBI AGENTS, BUT AGREED THAT EVIDENCE

12  AS TO THE CHARGING DECISIONS AND THE ABSENCE OF PROSECUTION FOR

13  THE MURDER OF JOHN YANCEY WOULD BE EXCLUDED.  AMONG OTHER

14  THINGS, THE COURT BASED IT'S RATIONALE ON RULES 402 AND 403 OF THE

15  FEDERALS OF EVIDENCE AND SIXTH CIRCUIT CASE LAW, HOLDING THAT AS A

16  GENERAL RULE EVIDENCE THAT CRIMINAL CHARGES WERE NOT BROUGHT IS

17  INADMISSIBLE IN A CIVIL CASE ARISING OUT OF THE SAME EVENTS AS THE

18  CRIMINAL CHARGES.

19  THE DEFENDANT ASKED THE COURT TO RECONSIDER THIS RULING,

20  CONTENDING THE DOOR HAS BEEN OPENED TO SUCH QUESTIONING BY

21  PLAINTIFF'S COUNSEL'S CROSS-EXAMINATION OF THE DEFENDANT IN THIS

22  CIVIL ACTION, MARTY CARSON.

23  THE COURT HAS REVIEWED ITS NOTES AND PORTIONS OF THE

24  TRANSCRIPT OF THAT CROSS-EXAMINATION.  TWO STATEMENTS OR

25  QUESTIONS IN THAT CROSS-EXAMINATION ARE PROBLEMATIC.

1    FIRST IS WHEN PLAINTIFF'S COUNSEL WAS INQUIRING ABOUT DISTRICT

2    ATTORNEY PHILLIPS' STATEMENTS AT A POST SHOOTING PRESS CONFERENCE,

3    THE QUESTION WAS PREFACED AS, "AFTER YOU SAW THE PROSECUTOR

4    JUSTIFY IN YOUR ACCIDENTAL SHOOTING BY BEING BLINDED BY THE LIGHT,"

5    THEN THE QUESTION WENT ON.  THE SECOND IS WHEN PLAINTIFF'S COUNSEL

6    ASKED "AS LONG AS YOUR DADDY WAS IN CHARGE OF SCOTT COUNTY, YOU

7    WEREN'T GOING TO BE CHARGED, WERE YOU?"

8    WHILE THESE QUESTIONS TOUCH UPON THE ISSUE OF THE CHARGING

9    DECISION, THE COURT FINDS THEY ARE NOT ENOUGH FOR THE COURT TO

10   ENTERTAIN A REVERSAL OF ITS PREVIOUS RULING ON PLAINTIFF'S MOTION IN

11   LIMINE.  THE COURT IS STILL OF THE BELIEF THAT RULES 402 AND 403 AND

12   SIXTH CIRCUIT CASE LAW PRECLUDE TESTIMONY AS TO THE EVIDENCE OF

13   NON-PROSECUTION.

14   IN PARTICULAR, EVEN IF THE QUESTIONING BY PLAINTIFF'S COUNSEL

15   SOMEHOW OPENED THE DOOR AND MADE SUCH EVIDENCE RELEVANT, WHICH

16   THE COURT IS NOT CONVINCED IT HAS, THE COURT WOULD STILL CONCLUDE

17   THAT THE CONSIDERATIONS OF RULE 403 WOULD NONETHELESS PRECLUDE

18   THE INTRODUCTION OF SUCH TESTIMONY, BECAUSE THE PREVIOUSLY RULED

19   UPON CONSIDERATIONS – BECAUSE OF THE PREVIOUSLY RULED UPON

20   CONSIDERATIONS OF UNFAIR PREJUDICE AND CONFUSION OF THE ISSUES.

21   FOR EXAMPLE, AMONG OTHER THINGS, IF EVIDENCE WERE INTRODUCED

22   AS TO NON-PROSECUTION, THAT MIGHT IN TURN OPEN THE DOOR TO SUCH

23   THINGS AS ALL OF THE PROSECUTORIAL DISCRETIONARY FACTORS TAKEN

24   INTO CONSIDERATION AS WELL AS CONSIDERATION OF NEWER ADDITIONAL

25   EVIDENCE ADDUCED THROUGHOUT THE TESTIMONY OF THIS TRIAL.  THE

1    RESULT COULD BE THE PLAYING OUT OF BOTH THE OLD AND POTENTIALLY

2    NEW DECISION-MAKING PROCESS AS TO THE BRINGING OR NOT BRINGING OF

3    CRIMINAL CHARGES, VARIOUS CONSIDERATIONS, THAT MAKE SUCH

4    EVIDENCE INADMISSIBLE UNDER RULES 402 AND 403 AND RELEVANT SIXTH

5    CIRCUIT CASE LAW.

6           HAVING SAID ALL THAT, EVEN BEFORE PLAINTIFF'S COUNSEL'S

7    QUESTIONING OF MR. CARSON, THE COURT HAD NOT AND WILL NOT

8    PRECLUDE QUESTIONING AS TO HOW AND BY WHOM CRIMINAL

9    INVESTIGATIONS ARE CONDUCTED, PARTICULARLY AS THAT RELATES TO THE

10   ABSENCE OF INVESTIGATIONS INTO ALLEGED DRUG ACTIVITIES OF THE

11   DEFENDANT.  AND THE COURT BELIEVES SUCH TESTIMONY IS SUFFICIENT, IN

12   ANY EVENT, TO REBUT, IF NECESSARY, ANY INFERENCES TO BE DRAWN BY

13   PLAINTIFF'S COUNSEL'S QUESTIONING OF MR. CARSON.

14          ARE WE READY FOR OUR NEXT WITNESS, MR. DUFFY?

15                 MR. DUFFY:  YES, YOUR HONOR.

16                 THE COURT:  WHO WOULD THAT BE?

17                 MR. DUFFY:  ROBBY CARSON.

18                 THE COURT:  WE'LL BRING OUR JURY IN.  YOU CAN GET YOUR

19   NEXT WITNESS.

20          (JURY CONVENED IN COURTROOM AT 9:23 A.M.)

21                 THE COURT:  GOOD MORNING, MR. CARSON.

22                 THE WITNESS:  GOOD MORNING, SIR.

23                 THE COURT:  GOOD MORNING, EVERYONE.  THANK YOU.  I THINK

24   WE HAVE MS. KOCUBA HELPING US OUT THIS MORNING, INSTEAD OF MS.

25   OWENS, SO WE WELCOME HER TO THE COURTROOM THIS MORNING.  MR.

1    DUFFY, CAN YOU ANNOUNCE YOUR NEXT WITNESS?

2              MR. DUFFY:  DEFENDANT RECALLS ROBBY CARSON.

3              THE COURT:  MR. CARSON, YOU HAVE BEEN PREVIOUSLY SWORN

4    AS A WITNESS IN THIS CASE, SO, MR. DUFFY, YOU MAY PROCEED WITH YOUR

5    QUESTIONING.

6              MR. DUFFY:  THANK YOU, YOUR HONOR.

7         ROBERT CARSON, JR., DEFENDANT'S WITNESS, PREVIOUSLY SWORN

8                        DIRECT EXAMINATION

9    BY MR. DUFFY:

10   Q      MR. CARSON, WHEN MR. MONCIER CALLED YOU IN THE PLAINTIFF'S

11   CASE, DO YOU RECALL BEING ASKED ABOUT – QUESTIONS ABOUT THE DOOR

12   BEING OPENED, THE RECTOR (PHONETIC) DOOR, THE BEDROOM DOOR?

13   A      YES.

14   Q      AND WHETHER MARTY HAD TOLD YOU THAT HE WAS WALKING DOWN

15   THE HALL AND SAW THE DOOR OPEN?

16   A      YES, I DO.

17   Q      WHAT WAS IT THAT YOU WERE – YOUR UNDERSTANDING THAT MARTY

18   DID TELL YOU?  WHAT DID HE TELL YOU ON THAT?

19             MR. MONCIER:  IF IT PLEASE THE COURT, THIS WOULD BE

20   HEARSAY ON HIM SAYING NOW OR TRYING TO REPEAT WHAT HE ALREADY

21   TESTIFIED TO WHEN WE PRESENTED THAT AS A PARTY-OPPONENT

22   STATEMENT.  I DON'T KNOW WHAT HE'S TRYING TO DO –

23             THE COURT:  I UNDERSTAND THE OBJECTION.  WHAT'S YOUR

24   RESPONSE, MR. DUFFY?

25             MR. DUFFY:  THIS MATTER HAS BEEN GONE INTO EXTENSIVELY,

1    THE STATEMENTS ARE IN EVIDENCE, HAVE BEEN DISCUSSED BY MANY, MANY

2    WITNESSES.

3              THE COURT:  WELL, THE QUESTION IS, CAN THEY BE DISCUSSED

4    ON DIRECT EXAMINATION BY THIS WITNESS, BECAUSE WE'RE NOT – THE

5    PARTY-OPPONENT EXCEPTION WOULD NOT APPLY, AS YOU SAID WITH

6    RESPECT TO OTHER WITNESSES.

7              MR. DUFFY:  THE MATTER IS ALREADY IN EVIDENCE.

8              THE COURT:  WELL, THEN, IF IT IS THEN WE DON'T NEED HIM TO

9    TESTIFY AS TO IT AGAIN.  I MEAN, YOU CAN ASK HIM ABOUT – YOU DON'T

10   NEED TO ASK HIM WHAT WAS SAID; YOU CAN ASK HIM ABOUT THAT.

11             MR. DUFFY:  OKAY.

12   Q     WHAT DID YOU REPORT TO THE – WELL, LET ME ASK YOU, DID YOU

13   PROVIDE INFORMATION TO THE TBI ABOUT YOUR DISCUSSIONS WITH MARTY?

14   A      NO, I DIDN'T.  ACTUALLY, TBI SPECIAL AGENT VINSANT WAS PRESENT

15   WHEN WE INTERVIEWED MARTY.

16   Q     ALL RIGHT.  AND THAT'S THE INTERVIEW THAT YOU WERE SPEAKING OF

17   WHEN MR. MONCIER WAS ASKING YOU QUESTIONS?

18   A      YES.

19             THE COURT:  GO AHEAD.

20   Q     AND DURING THAT INTERVIEW WAS THERE – WHAT WAS YOUR

21   UNDERSTANDING OF WHETHER THAT DOOR WAS EVER OPENED OR NOT?

22             MR. MONCIER:  I OBJECT TO HIS UNDERSTANDING, YOUR HONOR.

23   HE'S ALREADY TESTIFIED.

24             THE COURT:  I'M GOING TO SUSTAIN THE OBJECTION.

25             MR. DUFFY:  TRYING TO THINK ANOTHER WAY TO ASK HIM.

1              MR. MONCIER:  IS MR. –

2              THE COURT:  LET'S LET MR. DUFFY ASK HIS NEXT QUESTION.

3    Q       WITHOUT SAYING WHAT WAS SAID, DID YOU HEAR – LET ME ASK YOU,

4    WERE YOU PRESENT WHEN MR. CARSON WAS DEPOSED?

5    A       YES, I WAS.

6    Q       AND WERE YOU PRESENT WHEN MR. CARSON GAVE HIS STATEMENT TO

7    THE TENNESSEE BUREAU OF INVESTIGATION?

8    A       I WAS PRESENT AT ONE OF THE INTERVIEWS WITH TBI, BUT NOT THE

9    SECOND ONE THAT THEY DID.

10   Q       AND, INCIDENTALLY, HOW MANY INTERVIEWS WERE THERE OF MARTY

11   WITH THE TBI?

12   A       WELL, SIR, THERE WAS THE FIRST ONE, WAS WHEN STEVE VINSANT AND

13   I INTERVIEWED HIM THE NEXT MORNING, AFTER THE INCIDENT OCCURRED,

14   AND THEN I UNDERSTAND THAT HE WAS INTERVIEWED BY SPECIAL AGENT

15   VINSANT AND SPECIAL AGENT DAVID SLAGLE AT A LATER DATE.  THOSE ARE

16   THE ONLY INVESTIGATION – OR INTERVIEWS THAT I'M AWARE OF THAT THE

17   TBI DID WITH HIM.

18   Q       AND WHEN YOU SAY INTERVIEWED THE NEXT MORNING, WHAT TIME OF

19   DAY ARE WE TALKING ABOUT?

20   A       IT WAS BEFORE DAYLIGHT.  IT WAS MAYBE AROUND FOUR O'CLOCK.

21   I'M NOT SURE.

22   Q       DO YOU KNOW IF MARTY HAD HAD ANY SLEEP?

23   A       NO, I DON'T KNOW IF HE DID OR NOT.

24   Q       IN HIS DEPOSITION DID MARTY TESTIFY AS TO ANYTHING

25   INCONSISTENT ABOUT THE OPENING OR NOT OPENING OF THE DOOR THAN HE

1   DID IN THE STATEMENTS TO YOU?

2   A      WHAT TESTIMONY?  I DON'T UNDERSTAND WHAT TESTIMONY.

3   Q      IN HIS DEPOSITION TESTIMONY THAT YOU WERE PRESENT FOR, WITH

4   RESPECT TO HIS EXPLANATION OF WHAT HE OBSERVED IN THE HALLWAY IN

5   CONNECTION WITH THE BACK ROOM BEDROOM DOOR, COMPARING THAT

6   TESTIMONY TO THE STATEMENT THAT HE GAVE YOU INITIALLY THAT YOU

7   TESTIFIED ABOUT WHEN MR. MONCIER CALLED YOU, WAS THERE ANY –

8   A      NO.  BASICALLY SAID THE SAME THING BOTH TIMES.

9           MR. DUFFY:  THAT'S ALL.

10          THE COURT:  CROSS-EXAMINATION.

11                              CROSS-EXAMINATION

12  BY MR. MONCIER:

13  Q      MR. CARSON, WHEN I WAS ASKING YOU QUESTIONS, I WAS ASKING YOU

14  QUESTIONS ABOUT YOUR STATEMENTS AT THE HOSPITAL, WHEN YOU WERE

15  AT THE HOSPITAL, AND MR. CARSON AND SHERIFF JIM CARSON CAME TO THE

16  HOSPITAL AND LORI YANCEY WAS THERE.  YOU RECALL THAT, DON'T YOU?

17  A      YES, I DO.

18  Q      OKAY.  AND YOU TESTIFIED THAT YOUR UNDERSTANDING AT THAT

19  TIME WAS THAT THE BACK DOOR HAD NOT BEEN OPENED PRIOR TO THE TIME

20  OF THE SHOTGUN BEING SLIPPED THROUGH IT, AND YOU HAD NOT HEARD

21  THAT AT THAT TIME, CORRECT?  THAT'S WHAT YOU TESTIFIED TO?

22  A      I TESTIFIED THAT I TOLD LORI THAT AT THE HOSPITAL THAT NIGHT?  I

23  DON'T –

24  Q      NO.  YOU TESTIFIED IN DIRECT EXAMINATION IN THIS CASE THAT YOU

25  HAD NOT HEARD THAT THE BACK DOOR HAD BEEN OPENED AND THEN SHUT

1    AND THEN OPENED A SECOND TIME.  THAT'S REALLY WHAT YOUR TESTIMONY

2    WAS.

3    A      NO, I DON'T RECALL HEARING ANYTHING LIKE THAT THAT NIGHT.

4    Q      HUH?

5    A      I DON'T RECALL HEARING ANYTHING LIKE THAT OR SAYING ANYTHING

6    LIKE THAT ABOUT THAT NIGHT UP THERE AT THE HOSPITAL.  THE ONLY THING

7    THAT I KNEW ABOUT THAT WAS THAT, WELL –

8    Q      THERE HAD BEEN A SHOTGUN POINTED THROUGH THE DOOR?

9    A      NO, I DIDN'T KNOW THAT AT THAT TIME.

10   Q      WELL, ISN'T IT A FACT THAT YOU TOLD LORI THAT A MAN WITH A

11   PUMPKIN BALL – THAT JOHN-JOHN HAD BEEN SHOT BY A MAN WITH A

12   PUMPKIN BALL AND THE MAN HAD FLED INTO THE WOODS WITH JOHN-JOHN'S

13   GUN?  ISN'T THAT WHAT YOU TOLD HER?

14   A      NO, I DIDN'T TELL HER THAT.  I DIDN'T KNOW WHERE – WHETHER THEY

15   HAD A GUN OR WHETHER THEY DIDN'T.  I STILL DON'T KNOW IF THEY HAD A

16   GUN.

17   Q      SO IS YOUR MEMORY OF WHAT YOU LEARNED AND HEARD THAT NIGHT

18   SOMEWHAT FOGGY?

19   A      WELL, I'D SAY IT IS A LITTLE BIT.  THERE WAS A LOT GOING ON UP

20   THERE THAT NIGHT.

21   Q      OKAY.  SO YOU MAY HAVE SAID OR HEARD SOME THINGS THAT YOU'RE

22   – WHAT YOU'RE SAYING, YOU JUST WEREN'T THAT SURE OF AT THAT TIME; IS

23   THAT YOUR TESTIMONY?

24   A      NO, I'M NOT SAYING THAT AT ALL.  I'M SAYING, WHAT YOU'RE SAYING

25   THAT I SAID, I DON'T REMEMBER SAYING.  I SAID I BELIEVE THAT I MAY HAVE

1  TOLD LORI THAT WE THOUGHT THAT HE'D BEEN SHOT WITH A PUMPKIN BALL,

2  AND THAT WAS SOMETHING THAT THE MEDICAL EXAMINER, POSSIBLY

3  SPECIAL AGENT VINSANT AND I, DECIDED WHEN WE LOOKED AT THAT X-RAY.

4  Q      WELL, YOU TALKED TO THE SHERIFF THERE AT THE HOSPITAL, DIDN'T

5  YOU?

6  A      NO, I DIDN'T TALK TO HIM.  HE, WHEN HE CAME –

7  Q      OR HE TALKED TO YOU?

8  A      HE TALKED TO ME.

9  Q      OH, OKAY.  AND HE HAD BEEN VISITING WITH HIS SON FOR ABOUT TWO

10 HOURS AT THAT POINT IN TIME, HADN'T HE?

11 A      I DON'T KNOW HOW LONG HE'D BEEN VISITING WITH HIS SON.

12 Q      SO YOU WERE GETTING YOUR INFORMATION THROUGH MARTY'S

13 FATHER, CORRECT?

14 A      NO.  HE MADE ONE STATEMENT TO ME, AND THAT WAS ALL.

15 Q      WELL, MARTY TALKED TO YOU AT THE HOSPITAL, TOO, DIDN'T HE?

16 A      NO, I NEVER TALKED TO MARTY.

17 Q      SO YOU WERE GETTING YOUR INFORMATION THROUGH MARTY'S

18 DADDY?

19 A      NO, I WASN'T.  THE ONLY THING THAT THE SHERIFF TOLD ME WAS THAT

20 THERE WAS A POSSIBILITY MARTY SHOT THE GUY.  THAT'S WHAT HE TOLD

21 ME.  THAT'S THE ONLY THING HE SAID.  I NEVER DID TALK TO MARTY.

22 Q      WELL, NOW, YOU JUST TESTIFIED AS TO MARTY'S STATEMENTS AT THE

23 DEPOSITION.  YOU WERE WITH MARTY AND YOU DID HEAR WHAT HE SAID AT

24 THE DEPOSITION, DIDN'T YOU?

25 A      YES, I DID.

1   Q       YOU HEARD MARTY AT THE DEPOSITION, AT PAGE 74, SAY THAT HE

2   DIDN'T FIRE A WARNING SHOT, HE INTENTIONALLY SHOT AT THE PERSON

3   WITH THE INTENT TO KILL HIM.  YOU HEARD HIM SAY THAT, DIDN'T YOU?

4   A       IF IT'S IN THERE, I HEARD HIM SAY IT, 'CAUSE I WAS THERE.

5   Q       WELL, DO YOU REMEMBER?

6   A       NO, I DON'T REMEMBER THAT.  BUT I'M TELLING YOU, IF HE SAID IT AND

7   IT'S IN THAT, THEN I WAS THERE.

8   Q       WHY WOULD YOU ANSWER MR. DUFFY'S QUESTIONS JUST A MOMENT

9   AGO EVERYTHING WAS CONSISTENT IN HIS DEPOSITION WHEN YOU DON'T

10  REMEMBER WHAT WAS IN HIS DEPOSITION?

11  A       WELL, I DO REMEMBER WHAT WAS IN HIS DEPOSITION, NOT THE WHOLE

12  THING.  BUT WHAT YOU JUST ASKED, IF HE HAD A SAID THAT, I WOULD HAVE

13  REMEMBERED IT.

14  Q       YOU WOULDN'T HAVE?

15  A       NO, I SAID I WOULD HAVE. IF IT'S IN THERE, I WOULD HAVE

16  REMEMBERED IT.  OH, LET ME BACK UP ON THAT.  IF IT'S IN THERE, I WAS

17  PRESENT; WHETHER I WOULD HAVE REMEMBERED OR NOT, I DON'T KNOW.

18  THERE MAY BE A LOT OF THINGS IN THERE I DON'T REMEMBER.  IF I READ IT, I

19  MIGHT SAID – REALIZED I HAD FORGOTTEN ABOUT THOSE.  IT'S BEEN FOUR

20  YEARS AGO WHEN THIS INCIDENT OCCURRED.

21  Q       PAGE 74, "QUESTION:  A WARNING SHOT, IS THAT WHAT YOU WERE

22  INTENDING?

23          "ANSWER:  NO, IT WAS NOT A WARNING SHOT, SIR.

24          "QUESTION:  YOU EXPECTED TO HIT SOMEONE?

25          "ANSWER:  YES, I DID."

1          MR. DUFFY:  YOUR HONOR, I OBJECT.  THIS IS BEYOND THE SCOPE

2    OF MY EXAMINATION.  YOU KNOW, WAS FOCUSED ON ONE MATTER ONLY,

3    AND THAT WAS THE DOOR.

4          MR. MONCIER:  I COULD HAVE SWORN I HEARD HIM TESTIFY THAT

5    EVERYTHING MARTY SAID IN HIS DEPOSITION WAS CONSISTENT.

6          THE COURT:  I BELIEVE THE TESTIMONY WAS MORE AS MR. DUFFY

7    RECALLS IT, IT WAS ON THAT PARTICULAR POINT.  WHY DON'T YOU MOVE ON?

8    THANK YOU.

9    Q      WELL, WITH REGARD TO WHAT YOU REMEMBER MARTY SAYING ABOUT

10   THE FACT OF WHEN HE WENT UP TO THE DOOR, DO YOU REMEMBER MARTY

11   SAYING IN HIS DEPOSITION THAT BEFORE HE WENT TO THE DOOR THAT YOU

12   JUST SPOKE ABOUT HE HAD MS. WINDLE GO INTO THE KITCHEN?  DO YOU

13   REMEMBER THAT?

14   A      YES, I DO.

15   Q      SO MS. WINDLE COULD NOT SEE WHAT HAPPENED IN THE HALL

16   PURSUANT TO THE INSTRUCTIONS THAT MARTY HAD GIVEN TO MS. WINDLE,

17   CORRECT?

18   A      I WAS ONLY IN THAT TRAILER FOR ABOUT TWO OR THREE MINUTES.  I –

19   Q      NO, NO.  I'M NOT ASKING YOUR CONCLUSION.  ACCORDING TO WHAT

20   MARTY TOLD YOU, MS. WINDLE WAS INSTRUCTED TO GO TO A PART OF THE

21   TRAILER TO WHERE SHE COULD NOT SEE WHAT WAS HAPPENING IN THOSE

22   TWO OR THREE FEET THAT MARTY WAS IN, CORRECT?

23   A      WELL, I –

24         MR. DUFFY:  YOUR HONOR, I OBJECT.  I THINK THIS IS JUST

25   ARGUMENTATIVE.

1      THE COURT:  I'LL OVERRULE THE OBJECTION.

2   Q      THAT'S WHAT HE SAID IN HIS DEPOSITION, ISN'T IT?

3   A      I BELIEVE IT IS.  I DON'T BELIEVE, THOUGH, IN HIS DEPOSITION HE SAID

4   IT WAS WHERE SHE COULDN'T SEE WHAT WAS GOING ON.

5   Q      NO.  HE SAID HE JUST –

6   A      HAD HER GO TO THE KITCHEN.

7   Q      – HAD HER GO IN THE KITCHEN?

8   A      YES.

9   Q      NOW, MARTY TOLD YOU THAT WHILE HE WAS IN THE – EXCUSE ME.

10  MARTY, IN HIS DEPOSITION, SAID THAT WHILE HE WAS IN THE HALL HE DID

11  NOT USE HIS RADIO BECAUSE HE DID NOT WANT TO GIVE UP HIS POSITION TO

12  THE PEOPLE THAT WERE IN THE BACK BEDROOM, CORRECT?

13  A      I BELIEVE SO.

14  Q      NOW, HOW WAS HE GOING TO GIVE UP HIS POSITION TO THE PEOPLE IN

15  THE BACK BEDROOM AS HE WAS TELLING THEM TO COME OUT BY USING HIS

16  RADIO?

17  A      WELL, I DON'T KNOW.

18  Q      WELL, MARTY ALSO TOLD YOU IN HIS DEPOSITION THAT BEFORE HE

19  SAW THE BARREL COME INTO VIEW ABOUT SIX INCHES THAT HE HAD BEEN IN

20  THE BATHROOM FOR APPROXIMATELY TWO MINUTES, CORRECT?

21  A      HE MAY HAVE SAID THAT.  I DON'T RECALL.

22  Q      YOU DON'T RECALL THAT?

23  A      NO, I DON'T.  I MEAN, AS FAR AS TWO MINUTES?  I DON'T RECALL THAT.

24  I KNOW HE HAD BEEN IN THE BATHROOM.

25  Q      EXCUSE ME?

1   A       I SAID I REMEMBER HIM TELLING US THAT HE WENT INTO THE

2   BATHROOM AND THAT'S WHERE HE WAS WHEN THE SHOT WAS FIRED.  HOW

3   LONG HE WAS IN THERE, I DON'T REMEMBER.  IT COULD HAVE BEEN A FEW

4   SECONDS, HE COULD HAVE SAID TEN SECONDS, HE COULD HAVE SAID TEN

5   MINUTES.  I DON'T KNOW.  I DON'T REMEMBER.

6   Q       DO YOU REMEMBER, AT PAGE 62, AT LINE 25, HIM BEING ASKED THE

7   QUESTION, "DURING THE TIME THAT YOU DESCRIBED AS TWO MINUTES THAT

8   YOU WERE STANDING IN THE BATHROOM, AFRAID FOR YOUR LIFE, DID YOU

9   SEE ANYTHING, OBJECT OR ANY OTHER PERSON, EXIT FROM THE BEDROOM

10  DOORWAY?

11      "ANSWER:  I SEEN WHAT I BELIEVED TO BE THE BARREL OF A GUN."

12  A       YES, I RECALL THAT.

13  Q       SO YOU DO RECALL THAT HE SAID HE HAD BEEN IN THE BATHROOM FOR

14  APPROXIMATELY TWO MINUTES?

15      MR. DUFFY:  I OBJECT TO THAT CHARACTERIZATION OF THAT

16  TESTIMONY.

17      THE COURT:  SUSTAIN THE OBJECTION.

18  Q       NOW, YOU SAID THAT MARTY'S DEPOSITION WAS CONSISTENT WITH

19  WHAT MARTY HAD TOLD YOU EARLIER, BUT, AS I RECALL YOUR TESTIMONY

20  EARLIER, YOU SAID THAT THIS PULLING THE TRIGGER MAY HAVE BEEN AN

21  ACCIDENT.  DO I RECALL YOUR SAYING THAT?

22  A       NO, I DIDN'T SAY THAT.

23  Q       WELL, MARTY DENIED, IN HIS DEPOSITION, THAT PULLING THE TRIGGER

24  WAS AN ACCIDENT, DIDN'T HE?

25  A       I DON'T KNOW.  YOU'D HAVE TO SHOW THAT TO ME.  I DON'T

1   REMEMBER WHAT MARTY SAID.

2                MR. DUFFY:  YOUR HONOR, ONCE AGAIN, THIS IS OUTSIDE THE

3   SCOPE.  WE'RE JUST GOING TO ALL KINDS OF DIFFERENT MATTERS.

4                THE COURT:  WELL, I BELIEVE YOU'VE ALREADY ASKED HIM

5   WHAT HE SAID IN THAT REGARD IN HIS DEPOSITION.

6                MR. MONCIER:  WELL, NOT WITH REGARD TO THE ACCIDENT,

7   YOUR HONOR.

8                THE COURT:  YOU ASKED HIM JUST A MOMENT, AT PAGE 74,

9   WHETHER HE SAID IN HIS DEPOSITION HE INTENTIONALLY SHOT THE PERSON

10  WITH THE INTENT TO KILL.  I'LL SUSTAIN THE OBJECTION.

11               MR. MONCIER:  YES, SIR.

12  Q      LET ME SEE IF I UNDERSTAND.  YOU'RE HAVING A DIFFICULT TIME

13  REMEMBERING WHAT MARTY SAID IN THE CALMNESS OF A DEPOSITION IN

14  WHICH YOU WERE SITTING RIGHT THERE, BUT THEN IT'S DIFFICULT TO

15  REMEMBER WHAT WAS SAID AT THE HOSPITAL AND THAT NIGHT, BECAUSE

16  EVERYTHING WAS GOING ON.  IS THAT WHAT I'M UNDERSTANDING YOU TO

17  SAY?

18  A      I SAID I DON'T REMEMBER EVERYTHING WAS GOING ON UP THERE, BUT I

19  DID TELL YOU THE CONVERSATION I HAD WITH THE SHERIFF, AND I DIDN'T

20  HAVE A CONVERSATION WITH MARTY.  AND IF I HAD A CONVERSATION WITH

21  LORI, WHICH I DON'T REMEMBER, I'M SURE WHAT I WOULD HAVE CONVEYED,

22  AND SHE'S TALKING ABOUT THE PUMPKIN BALL, THAT I MAY HAVE TOLD HER

23  THAT, I MAY HAVE.  I DON'T REMEMBER.  BUT IF I DID, IT WAS BECAUSE

24  AGENT VINSANT, THE MEDICAL EXAMINER, AND I HAD LOOKED AT THE X-

25  RAY, AND WE FELT THAT THERE WAS A POSSIBILITY THAT IT WAS A SLUG

1    FROM A PUMPKIN BALL.  AND IT SEEMS THAT SOMEWHERE ALONG THE LINE

2    DURING THAT TIME THAT I LEARNED – AND IT MAY HAVE BEEN FROM AGENT

3    VINSANT, I DON'T KNOW – THAT THERE WAS A SHOTGUN SUPPOSED TO HAVE

4    BEEN INVOLVED.

5         SPECIAL AGENT VINSANT WAS DOWN AT THAT TRAILER, NOT ME.  HE

6    KNEW A LOT ABOUT IT BEFORE HE GOT TO THE E.R.  I KNEW NOTHING ABOUT

7    IT.  WHEN I GOT UP THERE, I DIDN'T EVEN KNOW WHO'D BEEN SHOT.

8    Q    DID YOU TALK TO ROBBY LEWALLEN?

9    A    WHO?

10   Q    MR. LEWALLEN, DETECTIVE LEWALLEN.

11   A    RANDY LEWALLEN?

12   Q    YES.

13   A    NO.  I DIDN'T SEE RANDY UNTIL THE NEXT DAY.

14            THE COURT:  THANK YOU.  ANY REDIRECT?

15            MR. DUFFY:  NO, YOUR HONOR.

16            THE COURT:  ALL RIGHT.  THANK YOU, MR. CARSON.  YOU MAY BE

17   EXCUSED.  CALL YOUR NEXT WITNESS.

18            MR. DUFFY:  STEVE VINSANT.  MAY THIS WITNESS GO, YOUR

19   HONOR?

20            THE COURT:  ANY REASON THIS WITNESS CANNOT TRAVEL BACK?

21            MR. MONCIER:  NO, YOUR HONOR.  WE RELEASE HIM.

22            THE COURT:  ALL RIGHT.  YOU MAY GO, MR. CARSON.

23        (WITNESS EXCUSED.)

24            THE COURT:  ALL RIGHT.  MR. VINSANT, YOU HAVE BEEN

25   PREVIOUSLY SWORN AS A WITNESS IN THE CASE?

1    THE WITNESS:  YES, SIR.  THANK YOU.

2    THE COURT:  IF YOU'LL PLEASE BE SEATED, AND, MR. DUFFY, YOU

3    MAY PROCEED WITH QUESTIONING.

4    MR. DUFFY:  THANK YOU, YOUR HONOR.

5    STEVE VINSANT, DEFENDANT'S WITNESS, PREVIOUSLY SWORN

6    DIRECT EXAMINATION

7    BY MR. DUFFY:

8    Q    YOU ARE STILL STEVE VINSANT?

9    A    I AM.

10   Q    AND YOU'RE STILL AN AGENT WITH THE TENNESSEE BUREAU OF

11   INVESTIGATION?

12   A    YES, SIR.

13   THE COURT:  MR. VINSANT, WOULD YOU SPELL YOUR LAST NAME,

14   SINCE WE HAVE A DIFFERENT COURT REPORTER FROM LAST TIME?

15   THE WITNESS:  MY LAST NAME IS SPELLED V-I-N-S-A-N-T.

16   THE COURT:  THANK YOU.

17   Q    IN CONNECTION WITH THE TBI INVESTIGATION OF THIS MATTER, DID

18   YOU INTERVIEW POTENTIAL WITNESSES?

19   A    YES, SIR.

20   Q    WERE YOU ASKED TO INTERVIEW A WITNESS BY THE NAME OF MARK

21   CHITWOOD?

22   A    I DID INTERVIEW MR. CHITWOOD.

23   Q    MR. CHITWOOD, HOW – IS HE EMPLOYED?

24   A    HE'S A TROOPER WITH THE TENNESSEE HIGHWAY PATROL.

25   Q    NOW, IF A WITNESS HAD INFORMATION BACK THEN TO TELL YOU THAT

1    MARTY CARSON WAS BEING INVESTIGATED BY JOHN YANCEY FOR

2    METHAMPHETAMINE USE OR DISTRIBUTION AT THE TIME MR. YANCEY WAS

3    SHOT, WOULD THAT HAVE BEEN SOMETHING YOU WOULD HAVE BEEN

4    INTERESTED IN?

5    A      YES, SIR.

6    Q      DID MARK CHITWOOD TELL YOU THAT JOHN YANCEY WAS

7    INVESTIGATING MARTY CARSON?

8    A      NO, HE DID NOT.

9    Q      DID MARK CHITWOOD PROVIDE – TELL YOU ANY INFORMATION ABOUT

10   MARTY CARSON BEING INVOLVED IN METHAMPHETAMINE?

11   A      NO, SIR.

12   Q      DID MARK CHITWOOD PROVIDE YOU ANY INFORMATION ABOUT MARTY

13   ACCEPTING PAYOFFS OR THAT KIND OF THING FROM DRUG DEALERS?

14   A      NO, SIR.

15           MR. DUFFY:  NOW, COULD I SEE, PLEASE, EXHIBIT – WHAT'S THE

16   NUMBER OF THE AUTOPSY, AUTOPSY REPORT?

17           COURTROOM DEPUTY:  FORTY-TWO.

18           MR. DUFFY:  FORTY-TWO?  I'VE GOT IT HERE.

19           THE COURT:  IT'S ALREADY IN EVIDENCE?

20           MR. DUFFY:  YES, SIR.

21           THE COURT:  PUT IT ON THE SCREEN.

22           MR. DUFFY:  THIS HAS BEEN INTRODUCED, I BELIEVE, ALREADY.

23           THE COURT:  PLAINTIFF'S 42; IS THAT WHAT WE SAID?

24           MR. DUFFY:  YES, YOUR HONOR.

25           THE COURT:  PLAINTIFF'S EXHIBIT 42 ALREADY IN EVIDENCE.

1    Q       DO YOU RECOGNIZE THIS DOCUMENT, MR. VINSANT?

2    A       YES, SIR.

3    Q       NOW, AS FAR AS THE DISTANCE OR RANGE OF THE FIREARM FROM MR.

4    YANCEY'S BODY AT THE TIME OF DISCHARGE, WHAT DID THE MEDICAL

5    EXAMINER, WHAT INFORMATION DID SHE PROVIDE TO YOUR INVESTIGATION

6    IN THAT REGARD?

7    A       THE JACKET MR. YANCEY WAS WEARING HAD BEEN COLLECTED BY US

8    AND SHE DIDN'T HAVE THAT, WAS UNABLE TO MAKE ANY DETERMINATION AS

9    TO – A DISTANCE DETERMINATION WHEN YOUR BULLET WAS FIRED.

10                  MR. MONCIER:  OBJECTION, HEARSAY.

11                  MR. DUFFY:  THIS IS IN EVIDENCE.

12                  THE COURT:  THE DOCUMENT'S IN EVIDENCE.  HE CAN TALK

13   ABOUT THE DOCUMENT.  OVERRULED.

14   Q       GO AHEAD, SIR.

15   A       AGAIN, SHE WAS UNABLE TO MAKE ANY –

16                  MR. MONCIER:  OBJECTION, YOUR HONOR TO THE HEARSAY.

17                  THE COURT:  WELL, FIRST OF ALL, STAND – I'M SORRY, MR.

18   MONCIER, I CAN'T SEE YOU.  IF YOU'LL STAND WHEN YOU MAKE YOUR

19   OBJECTIONS.

20                  MR. MONCIER:  I'M SORRY.  OBJECTION TO THE HEARSAY, AS TO

21   WHAT SHE WAS ABLE TO DO.

22                  THE COURT:  WELL, HE CAN TESTIFY AS TO WHAT'S IN THE

23   REPORT.  I'M NOT SURE I UNDERSTOOD THE QUESTION AND ANSWER.  YOU

24   CAN ASK A QUESTION ABOUT THE REPORT.  MAY BE OBJECTIONABLE FOR HIM

25   TO SURMISE THINGS FROM THE REPORT.

1    Q       DID THE MEDICAL EXAMINER PROVIDE INFORMATION FOR YOUR

2    INVESTIGATION THAT THE EXAMINATION OF THE SKIN SURROUNDING THE

3    GUNSHOT WOUND, OF ENTRANCE, REVEALS NO EVIDENCE OF CLOSE-RANGE

4    FIRING?

5    A       WOULD YOU REPHRASE – WOULD YOU ASK THE QUESTION AGAIN, SIR?

6    I'M SORRY.  I DIDN'T QUITE UNDERSTAND YOU.

7    Q       WAS THE INFORMATION THAT WAS PROVIDED YOU BY THE MEDICAL

8    EXAMINER THAT WAS FOR YOUR OFFICIAL INVESTIGATION, DID IT INCLUDE

9    THAT HER EXAMINATION OF THE SKIN SURROUNDING THE GUNSHOT WOUND

10   AT THE ENTRANCE REVEALS NO EVIDENCE OF CLOSE-RANGE FIRING?

11   A       THAT IS CORRECT.

12   Q       NOW, WHAT WOULD YOU EXPECT TO SEE IF THERE WERE CLOSE-RANGE

13   FIRING?

14              MR. MONCIER:  HE'S NOT AN EXPERT WITNESS, YOUR HONOR.  I

15   OBJECT.

16   Q       HAVE YOU SEEN FEW OR HAVE YOU INVESTIGATED FEW OR MANY

17   INCIDENTS WHERE A QUESTION WAS RAISED AS TO THE DISTANCE OF THE

18   FIREARM?

19              MR. MONCIER:  OBJECTION, YOUR HONOR.

20              THE COURT:  SAME OBJECTION?

21              MR. MONCIER:  YES, SIR.

22              THE COURT:  I'LL OVERRULE IT FOR NOW.  GO AHEAD.

23   A       WHICH QUESTION, SIR?

24   Q       HAVE YOU INVESTIGATED MANY CASES WHERE AN ISSUE WAS RAISED

25   AS TO THE DISTANCE THE FIREARM WAS FROM THE VICTIM?

1      MR. MONCIER:  OBJECT TO THE LEADING QUESTION NOW, IN

2  ADDITION TO MY FORMER OBJECTION.

3      MR. DUFFY:  FEW OR MANY?

4      THE COURT:  ALL RIGHT.  I'LL OVERRULE THE OBJECTION.

5  A      I CAN THINK OF PERHAPS SIX OR SEVEN INSTANCES WHERE

6  DETERMINATION HAS BEEN AN ISSUE, DISTANCE DETERMINATION.

7  Q      AND HAVE YOU RECEIVED TRAINING IN CONNECTION WITH THAT ISSUE?

8  A      I HAVE.

9  Q      DO YOU KNOW WHAT TO LOOK FOR ON THE BODY OF A VICTIM IN

10  ORDER TO MAKE ASSESSMENT OF WHETHER THERE HAS BEEN A CLOSE-

11  RANGE DISCHARGE OF A FIREARM?

12  A      I DO.

13  Q      WHAT TYPES OF THINGS DO YOU LOOK FOR?

14      MR. MONCIER:  OBJECTION, YOUR HONOR.

15      THE COURT:  SAME OBJECTION?

16      MR. MONCIER:  YES, SIR.

17      THE COURT:  MR. DUFFY, LET'S – I MEAN, THIS WITNESS IS NOT AN

18  EXPERT WITNESS.  CERTAINLY HE'S ENTITLED, WITHIN HIS AREA OF

19  EXPERTISE, TO DISCUSS WHAT HE DID.  YOU ARE GETTING SOMEWHAT

20  THEORETICAL, WHICH MIGHT DELVE INTO PERCEIVED EXPERT OPINION

21  TESTIMONY.

22      MR. DUFFY:  WELL, WHAT DOES HE LOOK FOR?  IS THAT –

23      THE COURT:  WELL, LET'S ASK IN THE CONTEXT OF THIS

24  INVESTIGATION AND WHAT HE DID, DID HE LOOK FOR SOMETHING, WHAT DID

25  HE LOOK FOR.

1          MR. DUFFY:  YES, YOUR HONOR.

2    Q       IN CONNECTION WITH THIS PARTICULAR INVESTIGATION, DID YOU

3    RECEIVE THE CLOTHES OF MR. YANCEY?

4    A       YES.

5    Q       AND DID YOU INSPECT THOSE CLOTHES?

6          MR. MONCIER:  OBJECTION, YOUR HONOR.  SAME OBJECTION.

7          THE COURT:  DID HE INSPECT THE CLOTHES IN THIS CASE?  I'LL

8    OVERRULE THE OBJECTION.

9          MR. MONCIER:  YES.  MAY I REMAIN STANDING?

10          THE COURT:  NO.

11   A       YES, SIR, I DID EXAMINE THE CLOTHES.

12   Q       AND WHAT OBSERVATIONS DID YOU MAKE ABOUT MR. YANCEY'S

13   CLOTHES?

14   A       THE JACKET IS THE ITEM THAT I'VE LOOKED AT MOST CLOSELY.  I

15   COULD SEE NO EVIDENCE OF A CLOSE OR CLOSE CONTACT OR CLOSE

16   CONTACT FIRING OF A WEAPON.

17   Q       HOW FAR AWAY FROM THE VICTIM WOULD THE GUN HAVE BEEN THEN?

18          MR. MONCIER:  PLEASE THE COURT, I OBJECT ONCE AGAIN TO THIS

19   ENTIRE LINE OF QUESTIONING ON THE SAME BASIS.

20          THE COURT:  DID HE EXAMINE – ASK HIM WHETHER HE MADE

21   THOSE DETERMINATIONS OR DID HE MAKE ANY EXAMINATION IN THAT

22   REGARD WITH RESPECT TO THIS INVESTIGATION, PLEASE.

23   Q       WERE YOU ABLE TO MAKE ANY DETERMINATIONS REGARDING THE

24   DISTANCE OF THE FIREARM FROM THE BODY OF JOHN YANCEY.

25          MR. MONCIER:  WELL, ONCE AGAIN, YOUR HONOR, THAT'S EXPERT

1    TESTIMONY.  IT REQUIRES SPECIALIZATION THAT HE DOES NOT HAVE.  THEY

2    DIDN'T DO THAT IN THIS CASE.

3              THE COURT:  WELL, THAT'S WHAT I'M TRYING – OKAY.  FIRST OF

4    ALL, THAT'S A SPEAKING OBJECTION.

5              MR. MONCIER:  YES, IT IS A SPEAKING OBJECTION.

6              THE COURT:  OKAY.  LET ME SEE COUNSEL UP AT THE SIDE BENCH

7    FOR A MOMENT.  EXCUSE US, MEMBERS OF THE JURY.

8         (DISCUSSION AT BENCH OFF THE RECORD.)

9              THE COURT:  GO AHEAD, MR. DUFFY.

10   Q      WHAT DID YOU DO IN CONNECTION WITH – WELL, LET ME ASK YOU

11   FIRST, WAS THAT AN IMPORTANT FACT THAT YOU WERE LOOKING FOR, THE

12   DISTANCE OF THE FIREARM?

13   A      IT WAS IMPORTANT TO THE INVESTIGATION.

14   Q      WHAT DID YOU DO IN ORDER TO MAKE A DETERMINATION, IF ANY,

15   WHETHER ONE COULD BE MADE, ABOUT THE DISTANCE OF THE FIREARM?

16   A      THE JACKET IN QUESTION WAS SENT TO OUR LAB IN NASHVILLE, AND

17   THE REQUEST WAS MADE OF THEM TO PROVIDE SOME DISTANCE

18   DETERMINATION.

19   Q      WHAT TYPES OF TESTS WERE DONE ON THE CLOTHING OF MR. YANCEY?

20   A      THERE WOULD HAVE BEEN A TEST DONE TO –

21             MR. MONCIER:  OBJECT, YOUR HONOR.  HE HAS NO PERSONAL

22   KNOWLEDGE OF THIS.  THIS IS ALL HEARSAY.

23             THE COURT:  MR. DUFFY?

24             MR. DUFFY:  THIS IS ALL INFORMATION PROVIDED.  HE

25   REQUESTED THE EXAMINATIONS TO BE DONE.  HE CAN TESTIFY AS TO WHAT

1   EXAMINATIONS WERE DONE AND WHAT HE DID IN RESPONSE TO THAT

2   INFORMATION.

3              THE COURT:  I AGREE WITH THAT.  BUT THE OBJECTION NOW IS TO

4   WHAT THOSE SHOWED, SO I'LL SUSTAIN THE OBJECTION TO THE QUESTION AS

5   ASKED, WHICH IT WAS – LET ME JUST SUSTAIN THE OBJECTION TO THE

6   QUESTION AS ASKED.  GO AHEAD AND ASK YOUR NEXT QUESTION.

7              MR. DUFFY:  ALL RIGHT.

8              THE COURT:  BASED ON WHAT YOU TOLD ME, YOUR NEXT

9   QUESTION WOULD LOGICALLY BE, "WHAT DID YOU DO," BUT YOU DIDN'T –

10  THAT WASN'T THE QUESTION.

11             MR. DUFFY:  I THOUGHT I DID ASK HIM WHAT HE DID.

12             THE COURT:  GO AHEAD AND TRY IT AGAIN.

13  Q       WHAT DID YOU DO TO MAKE A DETERMINATION OF THE DISTANCE THE

14  FIREARM MIGHT HAVE BEEN FROM MR. YANCEY?

15  A       I EXAMINED THE WOUND ON MR. YANCEY, AND THERE WAS NO

16  EVIDENCE OF CONTACT OR CLOSE CONTACT FIRING OF A WEAPON.  THERE

17  WAS NO EVIDENCE ON THE JACKET TO THE NAKED EYE.  THE JACKET WAS

18  PROVIDED TO OUR CRIME LAB WITH A REQUEST THAT THEY MAKE ATTEMPT

19  TO GIVE US A DISTANCE DETERMINATION ON HOW FAR AWAY THE WEAPON

20  WAS WHEN  IT WAS FIRED.

21  Q       AND WHAT KIND OF TESTS WERE PERFORMED TO MAKE THAT

22  DETERMINATION?

23             MR. MONCIER:  ONCE AGAIN, YOUR HONOR, I OBJECT TO THE

24  HEARSAY.  HE DOESN'T KNOW THAT.

25             MR. DUFFY:  WELL, HE VERY WELL DOES KNOW THAT.  I MEAN,

1   MR. MONCIER CAN ASK HIM IF –

2           THE COURT:  I'LL OVERRULE THE OBJECTION.  GO AHEAD.

3   ANSWER.

4   A       TEST WOULD HAVE BEEN DONE TO DETERMINE THE PASSAGE OF – TO

5   DETECT LEAD AROUND THE TEAR IN THE FABRIC.  THAT PROVED THAT A

6   BULLET HAD PASSED THROUGH.  THEN THERE WAS ALSO A TEST DONE TO TRY

7   AND DETECT GUNPOWDER RESIDUE, AND DEPENDING ON THE PATTERN OF

8   THE GUNPOWDER RESIDUE, THE LAB CAN MAKE A DETERMINATION OF THE

9   DISTANCE THE WEAPON WAS – HOW FAR AWAY IT WAS WHEN IT WAS FIRED.

10  Q       ALL RIGHT, SIR.  AND WAS THERE ANY GUNPOWDER RESIDUE?

11  A       YES.

12          MR. MONCIER:  OBJECTION, YOUR HONOR.  THAT'S HEARSAY.

13          THE COURT:  IF HE'S JUST SAYING WHAT THE REPORT SHOWED, IT

14  WOULD BE HEARSAY.  IF YOU'RE ASKING ABOUT HIS EXAMINATION, IT'S NOT

15  HEARSAY.

16          MR. DUFFY:  ALL RIGHT.

17  Q       ARE YOU SPEAKING OF YOUR EXAMINATION NOW OR –

18  A       NO, SIR, I'M NOT.  I CAN'T DETERMINE IN THE FIELD A DISTANCE

19  DETERMINATION BASED ON WHAT I'VE JUST TESTIFIED TO.

20  Q       ALL RIGHT.  WERE YOU PROVIDED ANY INFORMATION THAT WAS

21  INCONSISTENT WITH THE MEDICAL EXAMINER'S STATEMENT THAT

22  "EXAMINATION OF THE SKIN SURROUNDING THE GUNSHOT WOUND OF

23  ENTRANCE REVEALS NO EVIDENCE OF CLOSE-RANGE FIRING"?

24  A       NO.

25          MR. MONCIER:  OBJECTION, YOUR HONOR, TO THE HEARSAY.

1      MR. DUFFY:  HE DID RECEIVE INFORMATION BECAUSE – I DON'T

2  BELIEVE THAT WOULD BE HEARSAY, YOUR HONOR.

3      THE COURT:  OVERRULE THE OBJECTION.

4  Q     DID YOU RECEIVE INFORMATION CONSISTENT OR INCONSISTENT WITH

5  THAT DETERMINATION BY THE MEDICAL EXAMINER?

6  A     I RECEIVED NO INFORMATION THAT WAS INCONSISTENT WITH WHAT

7  THE MEDICAL EXAMINER PROVIDED.

8  Q     NOW, WHAT WAS THE DISTANCE THAT PERSONS COULD BE SIDE-BY-

9  SIDE – WHAT WAS THE WIDTH OF THE HALLWAY IN THE TRAILER; DO YOU

10  RECALL?

11  A     OFFHAND, NO.  I CAN LOOK AT THE – BEAR WITH ME.

12  Q     ARE YOU PERHAPS LOOKING FOR THIS?  IT'S BEEN ADMITTED.

13      (DIAGRAM OF TRAILER)

14  A     I'M LOOKING FOR – YEAH, I'M LOOKING FOR THAT.  THANK YOU.

15      (PAUSE)

16  A     (CONTINUING)  YOU'RE LOOKING AT WHAT – AND I'M GUESSING HERE.

17  THERE IS NO – OH, I'M SORRY.  IT IS IN THAT ONE, FOUR FEET ELEVEN INCHES

18  WIDE.  I BEG YOUR PARDON.

19  Q     NOW, WERE YOU IN THE TRAILER THAT NIGHT OF NOVEMBER 28TH?

20  A     YES, SIR.

21  Q     WERE THERE OBJECTS IN THAT HALLWAY THAT WOULD HAVE

22  AFFECTED THE ABILITY TO WALK WITHIN THAT ENTIRE WIDTH, FOUR FEET,

23  11?

24  A     YES.

25  Q     WHAT WAS THE WIDTH OF THAT HALLWAY THAT A PERSON COULD

1    WALK IN?

2    A       YOU PROBABLY LOST A FOOT AND A HALF, TWO FEET, THAT IS, WITH

3    THE OTHER ITEMS NEAR THE WASHER.

4    Q       NOW, IF THERE WAS A SCUFFLING AND A GUNSHOT IN THAT HALLWAY,

5    WITH MR. YANCEY BEING SHOT IN THE HALLWAY, WAS ANYTHING LIKE THAT

6    REFLECTED ON MR. YANCEY'S CLOTHES?

7                MR. MONCIER:  OBJECTION, YOUR HONOR.

8                THE COURT:  BASIS?

9                MR. MONCIER:  OPINIONS.

10               THE COURT:  I'LL SUSTAIN THE OBJECTION.  YOU CAN ASK HIM

11   WHAT WAS ON MR. YANCEY'S CLOTHES.  I'M NOT GOING TO PRECLUDE THOSE

12   TYPES OF QUESTIONS, BUT THEORETICAL OPINION TESTIMONY I WILL.

13   Q       WELL, WHAT WAS ON MR. YANCEY'S CLOTHES ON THE NIGHT IN

14   QUESTION?

15               MR. MONCIER:  REPETITIOUS, YOUR HONOR.

16               THE COURT:  I'LL OVERRULE THAT OBJECTION.  SINCE THE COURT

17   SUGGESTED HE COULD ASK IT, I'LL LET HIM ASK IT.

18   A       THERE WAS, OF COURSE, A TEAR IN THE SHOULDER, THERE WAS

19   CONSIDERABLE AMOUNT OF BLOOD, BUT THERE WAS NOTHING ELSE OF

20   INTEREST NOTED.

21   Q       IF AN INDIVIDUAL HAD SHOT JOHN YANCEY IN A HALLWAY, WOULD

22   THERE HAVE BEEN GUNSHOT RESIDUE ON HIS CLOTHES?

23               MR. MONCIER:  OBJECTION, YOUR HONOR.  STANDING UP,

24   OBJECTION, SAME OBJECTION.

25               THE COURT:  I DO THINK WE'VE ALREADY GONE INTO WHAT WAS

1  ON IT, AND SO I'LL SUSTAIN THAT OBJECTION.

2           MR. DUFFY:  ALL RIGHT.

3  Q      NOW, DID YOU INTERVIEW A NICOLE WINDLE THAT EVENING?

4  A      YES, SIR.

5  Q      AND WHAT DID MS. WINDLE TELL YOU IN CONNECTION WITH THE

6  NUMBER OF OFFICERS THAT WERE IN THAT TRAILER AT THE TIME SHE HEARD

7  A GUNSHOT?

8           MR. MONCIER:  OBJECTION, YOUR HONOR, HEARSAY.

9           MR. DUFFY:  LET'S SEE.  WE'VE HAD ONE, TWO, THREE –

10          THE COURT:  LET'S JUST RESPOND TO THAT OBJECTION.

11          MR. DUFFY:  I AM.  THERE HAVE BEEN THREE STATEMENTS OTHER

12 THAN HER VIDEO DEPOSITION PRESENTED IN THIS CASE ON THAT ISSUE.

13 WHATEVER HEARSAY OBJECTION WOULD BE WAIVED WITH MR. MONCIER.

14          THE COURT:  I'M NOT SURE ABOUT THAT.  I'LL SUSTAIN THE

15 OBJECTION TO HEARSAY.

16 Q      DID YOU DETERMINE WHETHER – STRIKE THAT.  LET ME GO TO

17 ANOTHER THING.  WITH RESPECT TO HER INTERVIEW, IN ANY EVENT, WERE

18 YOU PRESENT WHEN SHE GAVE A SUBSEQUENT INTERVIEW IN FEBRUARY OF

19 '04 AT THE DISTRICT ATTORNEY GENERAL'S OFFICE?

20 A      I DON'T THINK SO.

21 Q      ALL RIGHT.  HAVE YOU SEEN OR HAVE YOU REVIEWED OR VIEWED

22 THAT VIDEO TAPE SEGMENT THAT SHE GAVE TO THE DISTRICT ATTORNEY

23 AND – I DON'T REMEMBER WHO THE TBI AGENT WAS.

24 A      I THINK IT WAS SAC BOB DENNY WHO PARTICIPATED IN THAT

25 INTERVIEW; AND, NO, I'M NOT.

1    Q        ALL RIGHT.  WHO IS BOB DENNY, BY THE WAY?

2    A        HE IS THE SPECIAL AGENT IN CHARGE FOR THE UPPER EAST REGION OF

3    THE TBI.

4    Q        ALL RIGHT.  WHERE IS HE IN THE HIERARCHY OF THINGS?

5    A        HE IS MY SUPERVISOR.

6    Q        ALL RIGHT.  SORRY.  DID YOU LEARN THAT SOMEONE WAS LOOKING

7    FOR A PERSON NAMED MARK NEW?

8    A        AT THE TIME OF THE SHOOTING?  YES, SIR.  THAT WAS THE

9    INFORMATION I HAD ON MY WAY IN.

10   Q        DO YOU HAVE ANY IDEA WHAT THE SOURCE OF THAT INFORMATION

11   WAS?

12   A        NO.

13   Q        NOW, IF SUSPECTS – IF PERSONS  WHO WERE INSIDE A TRAILER ESCAPED

14   INTO THE WOODS, WHAT WOULD YOU EXPECT WITH RESPECT TO WHETHER

15   OFFICERS WHO ARRIVED ON THE SCENE WHERE THERE HAS BEEN A SHOOTING

16   DEATH IN THAT TRAILER, WHAT WOULD YOU EXPECT OF THE OFFICERS WHO

17   CAME ON THE SCENE TO DO TO SEARCH FOR THE SUSPECTS?

18                   MR. MONCIER:  OBJECTION, 701 AND 702 OPINIONS, YOUR HONOR.

19                   THE COURT:  WELL, I BELIEVE I HAVE BEEN CONSISTENT IN

20   EXCLUDING SUCH TYPE OF TESTIMONY; IT'S POSSIBLE I HAVEN'T BEEN.  BUT I

21   BELIEVE THE APPROPRIATE TESTIMONY IS WITHIN THIS WITNESS'S PERSONAL

22   KNOWLEDGE.

23                   MR. DUFFY:  ALL RIGHT.

24                   THE COURT:  NOT HIS OPINION ABOUT WHAT HE EXPECTS

25   OFFICERS TO DO.

1   Q      WERE THERE OTHER PERSONS SEARCHING FOR THOSE SUSPECTS?

2   A      YES.

3   Q      AND DO YOU KNOW IF THEY WERE ABLE TO FIND THOSE SUSPECTS AS A

4   RESULT OF THE SEARCH?

5   A      NO.  OH, I'M SURE THEY WERE NOT ABLE TO FIND THEM.

6   Q      WAS THERE ANYTHING OUT OF THE ORDINARY, IN YOUR EXPERIENCE,

7   THAT THESE SUBJECTS WERE BEING SEARCHED FOR?

8   A      NO.

9   Q      AS A PART OF YOUR INVESTIGATION, DID YOU ATTEMPT TO CONTACT

10  LORI YANCEY?

11  A      YES.

12  Q      HOW DID YOU DO THAT?

13  A      IF I REMEMBER CORRECTLY, I LEFT A MESSAGE WITH HER FATHER,

14  ASKING HER TO CONTACT ME.  GOING TO HER HOME, THERE WAS NO ONE

15  THERE; I LEFT A BUSINESS CARD ON THE DOOR.  AND I ALSO THINK I LEFT A

16  MESSAGE ON HER ANSWERING MACHINE.

17  Q      DID MS. YANCEY EVER CONTACT YOU AFTER YOU DID THESE THINGS?

18  A      NO, SIR.

19  Q      ABOUT A YEAR AFTER THIS INCIDENT – WELL, LET ME ASK YOU.  ARE

20  YOU AWARE WHETHER MS. YANCEY RAN AN AD IN THE NEWSPAPER ASKING

21  FOR WITNESSES TO CONTACT HER ATTORNEY?

22  A      IT SEEMS I DO HAVE A RECOLLECTION OF THAT.

23  Q      AS A RESULT OF THAT AD, DID ANYONE CONTACT YOU?

24  A      NO, SIR.

25          MR. MONCIER:  CONTACT HOW?

1          MR. DUFFY:  HIM.

2          MR. MONCIER:  IN AN AD ASKING – EXCUSE ME.  I OBJECT.  IT'S

3    IRRELEVANT, YOUR HONOR.

4          THE COURT:  OVERRULE THE OBJECTION.

5    Q    DID ANYONE PROVIDE, DID MR. MONCIER'S OFFICE OR ANYONE ELSE,

6    PROVIDE INFORMATION AFTER THAT AD RAN?

7    A    NO, SIR.

8          MR. MONCIER:  YOUR HONOR?

9          THE COURT:  I INTERPRET THAT QUESTION TO BE TO THIS

10   INDIVIDUAL.

11         MR. MONCIER:  THAT'S CORRECT.  COULD WE MAKE IT CLEAR?

12         THE COURT:  IS THAT HOW YOU INTERPRETED THE QUESTION?

13         THE WITNESS:  YES, SIR.

14         THE COURT:  OKAY.  THANK YOU.

15   Q    NOW, WHEN THIS MATTER WAS BEING INVESTIGATED, WAS THERE ANY

16   PUBLICITY IN THE COMMUNITY, IN THE SCOTT COUNTY AREA, ABOUT THAT?

17   A    YES, SIR.

18   Q    THAT IT WAS BEING INVESTIGATED?

19   A    YES, SIR.

20   Q    HOW WOULD YOU DESCRIBE THAT PUBLICITY?

21   A    A CONSIDERABLE AMOUNT OF MEDIA COVERAGE, RADIO, TELEVISION

22   AND NEWSPAPERS.

23   Q    NOW, DID ANY WITNESSES BY THE LAST NAME OF "BABB" COME

24   FORWARD AND PROVIDE YOU ANY INFORMATION?

25   A    NO, SIR.

1   Q        HOW ABOUT A NICK LETNER?

2   A        NO, SIR.

3   Q        OR LONNIE GUNTER?

4   A        NO, SIR.

5   Q        OR DONNA TERRY?

6   A        NO, SIR.

7   Q        SPEAKING OF MR. RICHARD BABB, IN JUNE OR JULY, IN THE SUMMER OF

8   THIS YEAR, DID ANYONE CONTACT YOU ABOUT INFORMATION THAT RICHARD

9   BABB SUPPOSEDLY HAD?

10  A        NO, SIR.

11  Q        HOW MUCH EXPERIENCE HAVE YOU HAD INVESTIGATING SUSPECTS

12  CHARGED WITH CRIMES?

13  A        I HAVE BEEN IN LAW ENFORCEMENT SINCE 1977, 30 YEARS, SO I GUESS

14  QUITE A BIT.

15  Q        IS IT COMMON FOR SUSPECTS OF CRIMES TO IMPLICATE THE OFFICERS

16  PROSECUTING?

17              MR. MONCIER:  OBJECTION, YOUR HONOR.  ONCE AGAIN, THESE

18  QUESTIONS ARE IMPROPER.

19              THE COURT:  MR. DUFFY, YOUR RESPONSE?

20              MR. DUFFY:  THAT'S NOT AN OPINION QUESTION; THAT'S ASKING

21  FOR HIS EXPERIENCE OVER THE YEARS OF TIME THAT HE'S BEEN A TBI AGENT.

22  THAT'S NOT AN OPINION QUESTION.

23              THE COURT:  YOUR RESPONSE TO THAT, MR. MONCIER?

24              MR. MONCIER:  RESPONSE IS, THAT UNDER 402, IT IS IRRELEVANT;

25  AND, UNDER 403, IT OPENS UP A WHOLE NEW AREA OF CROSS-EXAMINATION

1    OF HIM THAT WILL GO INTO NEW AREAS THAT WE HAVE PREVIOUSLY NOT

2    GONE INTO.

3              THE COURT:  I'LL OVERRULE THE OBJECTION.  YOU MAY ASK.

4    Q      IS IT COMMON FOR SUSPECTS CHARGED WITH CRIMES TO IMPLICATE

5    THE OFFICERS WHO PROSECUTE THEM?

6    A      IT WOULD BE – I GUESS IT COULD BE CHARACTERIZED AS COMMON FOR

7    INDIVIDUALS WHO HAVE BEEN ARRESTED OR CHARGED WITH CRIMES TO

8    MAKE ALLEGATIONS ABOUT THE OFFICERS OF IMPROPER CONDUCT, OF

9    EXCESSIVE FORCE, THINGS ALONG THOSE LINES.

10   Q      AND IN CONNECTION WITH SUSPECTS WHO ARE CHARGED WITH

11   OFFENSES, ARE YOU – ARE YOU EVER CONTACTED BY THEM OR THEIR

12   LAWYERS WITH RESPECT TO A REQUEST TO PROVIDE INFORMATION IN

13   EXCHANGE FOR CHARGES BEING REDUCED?

14   A      IF I UNDERSTAND YOUR QUESTION CORRECTLY, YES, SIR.

15   Q      AND WHY WOULD THEY DO THAT?

16             MR. MONCIER:  OBJECTION, YOUR HONOR.  SPECULATION ON HIS

17   PART.

18   Q      WHY, IN YOUR EXPERIENCE, HAVE SUSPECTS CONTACTED YOU IN THAT

19   CONNECTION?

20             MR. MONCIER:  IF IT PLEASE THE COURT, IT'S IRRELEVANT,

21   NUMBER ONE; AND, NUMBER TWO, IT IS SPECULATION ON HIS PART.

22             THE COURT:  I OVERRULE THE OBJECTION.

23             MR. DUFFY:  I'M SORRY?

24             THE COURT:  I OVERRULED THE OBJECTION.

25   Q      GO AHEAD, SIR.  IN YOUR EXPERIENCE, WHY HAS IT BEEN THAT

1    SUSPECTS HAVE CONTACTED, OR THROUGH THEIR ATTORNEYS, HAVE

2    CONTACTED YOU ABOUT THAT?

3    A        IT'S GENERALLY IN ORDER TO LESSEN THE PUNISHMENT THAT THEY

4    MAY RECEIVE FOR A CRIME THEY'RE INVOLVED IN.

5    Q        DID NICOLE WINDLE'S ATTORNEY CONTACT YOU OR ATTORNEY

6    GENERAL PHILLIPS?

7    A        WHO WAS HER ATTORNEY?  I'M SORRY.

8    Q        NICOLE WINDLE.

9    A        WHO WAS HER ATTORNEY?

10   Q        TOM BARKLEY.

11   A        I'M SORRY.  I DON'T REMEMBER.

12   Q        ALL RIGHT.

13   A        I DON'T REMEMBER WHO HE CONTACTED.

14           MR. DUFFY:  I BELIEVE THAT'S ALL THE QUESTIONS I HAVE.

15           THE COURT:  THANK YOU.  CROSS-EXAMINATION.

16                           CROSS-EXAMINATION

17   BY MR. MONCIER:

18   Q        SO AS I UNDERSTAND YOUR TESTIMONY IT'S PRETTY COMMON OR IT IS

19   COMMON, WHEN A PERSON IS ARRESTED, TO MAKE ALLEGATIONS AGAINST

20   AN OFFICER FOR USING EXCESSIVE FORCE?

21   A        WELL, AGAIN, IT'S A FAIRLY – IT CAN BE CHARACTERIZED AS COMMON

22   FOR PEOPLE UNDER ARREST OR FACING CHARGES TO MAKE ALLEGATIONS,

23   TRUE OR NOT, AGAINST THE OFFICERS WHO HAVE ARRESTED THEM.

24   Q        WELL, IN FACT, YOU KNOW THAT NICK LETNER AND MR. GUNTER, WHEN

25   THEY WERE ARRESTED FOR ESCAPE, WEREN'T MAKING ALLEGATIONS

1    AGAINST MR. CARSON FOR USING EXCESSIVE FORCE AGAINST HIM; YOU

2    KNOW THAT?

3    A       I'M NOT FAMILIAR WITH THAT CASE, SIR.

4    Q       WELL, IS IT COMMON FOR THE TBI TO TAKE STATEMENTS FROM

5    WITNESSES WHO SAY THE SHERIFF'S SON IS INVOLVED IN DIRTY – IN THE

6    METHAMPHETAMINE BUSINESS IN THE COMMUNITY; IS THAT COMMON?

7    A       I WOULD SAY THAT'S UNCOMMON.

8    Q       IT'S UNCOMMON.  PRETTY SIGNIFICANT ALLEGATIONS, AREN'T THEY?

9    A       YES, SIR.

10   Q       PARTICULARLY WHEN THEY DON'T HAVE ANY RELATIONSHIP TO THE

11   THING THEY ARE BEING ASKED ABOUT, THAT IS, AN ESCAPE, CORRECT?

12   A       YES.

13   Q       PRETTY SIGNIFICANT EVENT, ISN'T IT?

14   A       THAT WOULD BE SIGNIFICANT INFORMATION, YES, SIR.

15   Q       WELL, NOW, WERE YOU AWARE THAT THERE WERE ALLEGATIONS MADE

16   IN 2001 THAT MARTY CARSON WAS INVOLVED IN METHAMPHETAMINE

17   TRAFFICKING IN SCOTT COUNTY, TENNESSEE?  WERE YOU AWARE OF THAT?

18   A       NO, SIR.

19   Q       NOBODY BROUGHT THAT TO YOUR ATTENTION?

20   A       NO, SIR.  IT WAS NOT MY ASSIGNED AREA AT THAT TIME.

21   Q       UNTIL THIS DAY, HAS ANYBODY BROUGHT THAT TO YOUR ATTENTION?

22   A       IT WAS BROUGHT TO MY ATTENTION WHEN RICHARD BABB WAS

23   ATTACKED.

24   Q       FOR THE FIRST TIME?

25   A       FOR THE FIRST TIME.

1   Q        WHO BROUGHT THAT TO YOUR ATTENTION?

2   A        MR. BABB'S ATTORNEY, HOWARD ELLIS.

3   Q        WELL, HAVE YOU SEARCHED THE RECORDS OF THE TBI TO SEE IF

4   THERE'S OTHER PEOPLE THAT HAD PROVIDED THE TBI INFORMATION THAT

5   MARTY CARSON WAS INVOLVED IN METHAMPHETAMINE IN THE SCOTT

6   COUNTY AREA?

7   A        AFTER READING A NEWSPAPER ACCOUNT YESTERDAY, I BELIEVE IT

8   WAS, SIR, YEAH, I DID PULL THOSE RECORDS.

9   Q        YOU DID?

10  A        I DID.

11  Q        AND YOU FOUND OTHER ACCOUNTS?

12  A        I FOUND THE ACCOUNT THAT YOU'RE DESCRIBING, MR. LETNER AND

13  MR. –

14  Q        NO.  I'M NOT TALKING ABOUT JUST –

15  A        OH, I'M SORRY.

16  Q        HAVE YOU SEARCHED THE DATABASE OF THE TBI TO FIND OTHER

17  COMPLAINTS?

18  A        OH, NO, SIR, I HAVE NOT.

19  Q        YOU HAVEN'T.  WELL, YOU KNEW ABOUT THIS SOME THREE MONTHS

20  AGO.  IS IT YOUR TESTIMONY THAT YOUR INVESTIGATION IS ON-GOING?

21              MR. DUFFY:  OBJECT TO THE DOUBLE QUESTIONING.

22              MR. MONCIER:  EXCUSE ME.

23  Q        AGAIN, I TAKE IT THAT YOU'RE INVESTIGATING THINGS AS THEY HAVE

24  BEEN BROUGHT OUT IN THIS TRIAL CONCERNING THIS; IS THAT CORRECT?

25  A        YES.

1    Q      YOU'RE HEARING A LOT YOU HAVEN'T HEARD BEFORE, HAVEN'T YOU?

2           THE COURT:  MR. MONCIER, LET'S BE MINDFUL OF THE COURT'S

3    PRETRIAL ORDER.

4           MR. MONCIER:  YES, SIR.  OKAY.

5           THE COURT:  LET'S MOVE ON.

6    Q      BUT NOW YOU KNEW APPROXIMATELY TWO MONTHS AGO –

7           THE COURT:  THE COURT, JUST AGAIN FOR THE RECORD, I DON'T

8    THINK I'VE SAID IT YET TODAY, BUT LET ME SAY THAT THE QUESTIONS OF

9    ATTORNEYS OF EITHER SIDE ARE NOT EVIDENCE IN THIS CASE.  THE EVIDENCE

10   IS THE TESTIMONY OF THE WITNESSES AND DOCUMENTS THAT THE COURT

11   LETS INTO EVIDENCE.  THANK YOU.

12   Q      YOU KNEW TWO MONTHS AGO THAT THERE WERE ALLEGATIONS THAT

13   MARTY CARSON WAS INVOLVED IN METHAMPHETAMINE TRAFFICKING IN THE

14   SCOTT COUNTY AREA PRIOR TO JOHN-JOHN'S YANCEY'S DEATH; IS THAT

15   CORRECT?

16   A      I LEARNED THAT INFORMATION DURING THE FIRST WEEK OR TEN DAYS

17   OF OCTOBER.

18   Q      NOW,  I WANT TO SWITCH, IF I COULD, BACK TO THE TESTIMONY THAT

19   YOU HAVE GIVEN US WITH REGARD TO THE AUTOPSY, AND WE HAVE NOT

20   GONE ON TO THAT.  YOU DO HAVE YOUR FILE WITH YOU?

21   A      I DO, SIR.  I APOLOGIZE.  I HAVE IT, OBVIOUSLY, NOT VERY WELL

22   ORGANIZED, BUT I DO HAVE IT.

23          THE COURT:  DO YOU WANT TO PUT SOMETHING ON THE SCREEN,

24   MR. MONCIER?

25          MR. MONCIER:  YES, YOUR HONOR.  WE HAVE PLACED A

1    SUMMARY OF THE AUTOPSY THAT HE HAS JUST GIVEN HIS TESTIMONY ABOUT

2    OF THE EXAMINATION.

3    Q        WERE YOU PRESENT AT THE AUTOPSY, SIR?

4    A        NO, SIR, I WASN'T.

5    Q        BUT YOU RECEIVED THE AUTOPSY REPORT, OF COURSE?

6    A        I DID, YES, SIR.

7    Q        SO THE JURY KNOWS, I WANT TO SHOW YOU THE AUTOPSY FINAL

8    REPORT, AND IN PARAGRAPH ONE IT SAYS –

9                 MR. DUFFY:  YOUR HONOR, I OBJECT.  THE DOCUMENT THAT I

10   COVERED WITH THE WITNESS WAS STIPULATED AS EVIDENCE.  THIS HAS NOT

11   BEEN STIPULATED AS EVIDENCE, AND I OBJECT TO MR. MONCIER ATTEMPTING

12   TO MAKE IT EVIDENCE BY READING IT.

13                 MR. MONCIER:  I JUST WANT TO ASK HIM IF THIS IS WHAT HE

14   LEARNED.  IT IS TRUE HE JUST –

15                 MR. DUFFY:  I OBJECT.

16                 THE COURT:  I UNDERSTAND THE BASIS OF THE OBJECTION.  YOU

17   CAN ASK HIM WHAT HE LEARNED, BUT UNLESS THE DOCUMENT IS IN

18   EVIDENCE, YOU CAN'T JUST READ FROM THE DOCUMENT AND ASK HIM IF

19   THAT'S WHAT HE LEARNED.  MERELY ASK HIM WHAT HE LEARNED AND USE

20   THAT DOCUMENT AS AN AID YOURSELF FOR YOUR QUESTIONING.

21                 MR. MONCIER:  OKAY.  THANK YOU.

22                 MR. DUFFY:  WELL, YOUR HONOR, I STILL OBJECT.  HE OBJECTED

23   ANYTIME  I ASKED THIS WITNESS WHAT HE LEARNED.

24                 THE COURT:  WELL, RIGHT NOW I'M DEALING WITH THE

25   OBJECTION OF THIS DOCUMENT.  YOU CANNOT SHOW HIM THE DOCUMENT

1    AND ASK HIM A QUESTION ABOUT THE DOCUMENT AT THIS POINT IN TIME, SO

2    I SUSTAIN THAT OBJECTION.  LET'S HEAR THE NEXT QUESTION AND SEE IF

3    THERE'S AN OBJECTION TO THAT.

4    Q       YOU DID SEE THE WOUND ON JOHN-JOHN'S BODY, DIDN'T YOU?

5    A       YES, SIR.

6    Q       AND WHEN YOU SAW THE WOUND ON JOHN-JOHN'S BODY, DID YOU

7    DETERMINE THAT IT WAS APPROXIMATELY 12.5 INCHES BENEATH THE TOP OF

8    THE HEAD; IN OTHER WORDS, DOWN THIS WAY, APPROXIMATELY 12.5 INCHES?

9    A       THAT WOULD BE ACCURATE.

10   Q       AND DID YOU ALSO DETERMINE THAT IT WAS APPROXIMATELY EIGHT

11   INCHES TO THE LEFT OF THE ANTERIOR MIDLINE OF THE ARM?  THAT WOULD

12   BE LIKE THIS, APPROXIMATELY EIGHT INCHES?

13   A       YES, SIR.

14   Q       AND WHERE ON JOHN-JOHN'S CHEST WAS IT APPROXIMATELY THAT THE

15   BULLET ENTERED THE CHEST?

16   A       IT ENTERED THROUGH THE ARM.

17   Q       OKAY.  AND WHERE, APPROXIMATELY?

18   A       WELL, SOMEWHERE IN THIS AREA, SIR.

19   Q       AND THEN IT WENT FROM A LEFT TO RIGHT TRAJECTORY; IS THAT

20   CORRECT?

21   A       YES, SIR.

22   Q       NOW, ALSO DID YOU NOTICE THAT THE RING OF THE ABRASION – OF

23   COURSE, YOU KNOW THE RING OF ABRASION OF A WOUND, DON'T YOU?

24   A       YES, SIR, I UNDERSTAND THAT.

25   Q       WHEN A BULLET GOES INTO A BODY, IT WILL LEAVE A RING AROUND

1    WHERE IT GOES IN, AN ABRASION?

2    A       RIGHT.

3    Q       IF THE BULLET GOES IN AT AN ANGLE, THAT ABRASION WILL BE

4    LARGER ON THE RIGHT SIDE THAN THE OTHERS GOING ALONG THE SIDE OF

5    THE ANGLE, CORRECT?

6    A       YES, SIR, IT WOULD BE.

7    Q       AND IN THIS CASE DID YOU OBSERVE THAT THE ANGLE BETWEEN TWO

8    O'CLOCK AND SEVEN O'CLOCK, LOOKING AT THE CLOCK, BETWEEN TWO

9    O'CLOCK AND SEVEN O'CLOCK, IN OTHER WORDS, THAT WOULD BE THE RIGHT

10   SIDE OF THE ENTRY WOUND; IS THAT CORRECT, AS YOU LOOK AT IT?

11   A       WELL, I KNOW THIS FROM THE REPORT AND FROM MY DISCUSSIONS

12   WITH THE PATHOLOGIST.  MY EXAMINATION OF THE WOUND, IT REQUIRES

13   MUCH CLOSER EXAMINATION TO DETERMINE THOSE ABRASION RINGS.

14   Q       BUT YOU KNOW, BECAUSE THAT'S WHAT YOU WERE TOLD ABOUT THIS

15   ABRASION, YOU TALKED ABOUT?

16   A       YES.

17              MR. DUFFY:  YOUR HONOR, HE OBJECTED TO ANY TIME I –

18              THE COURT:  I'LL SUSTAIN THE OBJECTION.  THE JURY DISREGARD

19   THE LAST QUESTION AND ANSWER.  TRY TO FOCUS ON THIS WITNESS'S

20   OBSERVATIONS AND CONDUCT.

21              MR. MONCIER:  YES, YOUR HONOR.

22   Q       NOW, YOU WERE CONCERNED ABOUT THE FACT THAT THE BULLET

23   WENT FROM THE RIGHT OF THE BODY TO THE LEFT OF THE BODY, CORRECT?

24   A       YES, SIR.

25   Q       YOU WERE SO CONCERNED ABOUT THAT THAT YOU DREW A DIAGRAM

1   OF THAT IN A SUBSEQUENT INTERVIEW WITH MR. CARSON, POINTING OUT TO

2   HIM THAT THE ANGULATION OF THE BULLET WAS OPPOSITE FROM THE PLACE

3   WHERE HE SAID HE SAW THE SHOTGUN, CORRECT?

4   A       YES, SIR.

5   Q       AND YOU POINTED OUT ON THE VIDEO?

6   A       YES, SIR.

7   Q       YOU POINTED OUT ON THE VIDEO THAT THAT WAS WHERE THE

8   SHOTGUN WAS, CORRECT?

9   A       YES, SIR.

10  Q       THAT WOULD HAVE BEEN POINTING TO THE CENTER OF THE DOOR,

11  CORRECT?

12  A       YES, SIR.

13  Q       AND THAT WOULD HAVE BEEN POINTING IN THE DIRECTION OF JOHN-

14  JOHN'S BODY, CORRECT?

15  A       YES.

16  Q       AND YOU TRIED TO GET HIM TO EXPLAIN THAT AFTER DRAWING IT FOR

17  HIM AND DEMONSTRATING, CORRECT?

18  A       YES, SIR.

19  Q       AND ALL HE COULD SAY WAS HE WAS SCARED?

20  A       YES, SIR.

21  Q       TROUBLED YOU, DIDN'T IT?

22  A       IT DID.

23  Q       TROUBLES YOU TODAY, DOESN'T IT?

24  A       IT DOES

25              MR. MONCIER:  CAN I SPEAK TO MR. WIGLER AS TO WHY HE PUT A

1    BOOK IN FRONT OF ME, YOUR HONOR?

2            THE COURT:  YOU MAY.

3    Q      YOU DID RECEIVE THE FINAL REPORT; IS THAT CORRECT?

4    A      THE AUTOPSY REPORT?

5    Q      YES.

6    A      YES, SIR.

7            MR. MONCIER:  YOUR HONOR, WE WOULD NOW OFFER THE

8    COMPLETE AUTOPSY REPORT, UNDER 803(6).

9            THE COURT:  MR. DUFFY, GIVE YOU A CHANCE TO LOOK AT THAT

10   AND RESPOND.

11           MR. MONCIER:  YES.

12           THE COURT:  DO YOU HAVE ANYTHING FURTHER OF THIS

13   WITNESS?

14           MR. MONCIER:  YES, I DID HAVE SOME OTHER QUESTIONS.

15           THE COURT:  ALL RIGHT.  WELL, LET'S MR. DUFFY LOOK AT THE

16   RULE AND THE REPORT, AND WE'LL TAKE THAT UP LATER.

17           MR. MONCIER:  YES.

18           THE COURT:  THANK YOU.  WE'LL MARK THIS FOR

19   IDENTIFICATION AS PLAINTIFF'S EXHIBIT 42A, COME BACK TO IT LATER.

20   Q      NOW, I BELIEVE THAT WE COVERED THIS EARLIER, BUT I WANT TO ASK

21   YOU AGAIN.  IN THE STATEMENT THAT YOU TOOK FROM MR. CARSON AT 3:18

22   ON THE MORNING OF NOVEMBER THE 29TH OF 19 – OF 2003, MR. CARSON TOLD

23   YOU THAT THE HALL LIGHT WAS ON, CORRECT?

24   A      I BELIEVE THAT'S CORRECT, SIR.

25   Q      I WOULD NOW LIKE TO DIRECT MY QUESTIONS TO YOU WITH REGARD

1    TO THE LABORATORY AND YOUR EXAMINATION OF THE COAT IN QUESTION.

2    IT IS A FACT – IS IT NOT – THAT THE MATERIAL OF THE JACKET IS WHAT'S

3    KNOWN AS A WEATHER-RETARDANT MATERIAL; IS THAT CORRECT?

4    A       YES, SIR.

5    Q       AND IT IS YOUR EXPERIENCE – IS IT NOT – THAT WEATHER-RETARDANT

6    MATERIAL DOES NOT ABSORB GUNSHOT RESIDUE SUCH AS CLOTH DOES,

7    CORRECT?

8    A       IT'S MY UNDERSTANDING OF IT, IT'S BEEN DESCRIBED TO ME, AS NOT

9    THE BEST MATERIAL FOR THE ABSORPTION OF THOSE ITEMS.

10   Q       OKAY.  SO WHEN YOU TESTIFIED THAT IN CLOTH YOU CAN FIND BURN

11   MARKS AND THE ABSORPTION OF A FIREARM, THAT IS NOT THE CASE WHEN

12   YOU HAVE A CASE WEATHER-RETARDANT MATERIAL SUCH AS THIS

13   PARTICULAR JACKET.  THAT'S YOUR UNDERSTANDING, ISN'T IT?

14   A       IT WOULD BE MY UNDERSTANDING.  THERE WOULD STILL BE SOME

15   EVIDENCE THERE.  IT MAY NOT BE AS PRONOUNCED AS WITH CLOTH.

16   Q       AND BASICALLY WHAT WAS DETERMINED FROM THE EXAMINATION IS

17   THAT THERE MAY HAVE BEEN TWO FEET OR MORE DISTANCE BETWEEN THE

18   PERSON AND THE FIRER OF THE WEAPON THAT KILLED JOHN-JOHN; IS THAT

19   CORRECT?

20   A       YES, SIR.

21   Q       AND, OF COURSE, MR. CARSON TOLD YOU HE WAS STANDING IN THE

22   BATHROOM WHEN HE DID THIS; IS THAT CORRECT?

23   A       YES, SIR.

24   Q       IT ALSO TROUBLED YOU, AGENT VINSANT, THAT JOHN-JOHN WOULD

25   HAVE ACTUALLY BEEN STANDING IN THE DOORWAY, IMMEDIATELY OUTSIDE

1   THE DOOR THAT MR. CARSON SAID WAS OPENED AND THAT LITTLE SHOTGUN

2   WAS STICKING THROUGH, THAT TROUBLED YOU, DIDN'T IT?

3   A     YES, SIR.  SURE.

4   Q     TROUBLES YOU TODAY, DOESN'T IT?

5   A     YES, SIR.

6   Q     IT ALSO TROUBLED YOU THAT, AFTER MR. YANCEY WAS SHOT, THAT

7   AGENT – THAT MR. CARSON SAID HE WENT DOWN AND HE KNEELED DOWN TO

8   HIM WITH HIS BACK TOWARD WHERE HE SAID HE KNEW THERE WAS A

9   SHOTGUN?  THAT TROUBLED YOU, DIDN'T IT?

10  A     YES, SIR.

11  Q     THOSE WERE INCONSISTENCIES THAT YOU BELIEVED AN ATTORNEY

12  LIKE ME MIGHT TAKE ISSUE WITH, RIGHT?

13  A     CERTAINLY THOSE WERE INCONSISTENCIES.

14  Q     THE FACTS DIDN'T MEET THE STORY, DID THEY?

15  A     NO, SIR.

16  Q     BY THE WAY, THAT FIRST STATEMENT THAT YOU TOOK FROM MR.

17  CARSON ON NOVEMBER THE 29TH, AT 3:18 IN THE MORNING, MR. CARSON

18  DIDN'T TELL YOU THAT BEFORE HE WENT BACK TO HIS BEDROOM THAT HE

19  YELLED OUT TO THE OFFICERS, "DON'T COME IN.  HE'S GOT A GUN"?  HE

20  DIDN'T TELL YOU THAT, DID HE?

21  A     IF YOU COULD GIVE ME JUST A MOMENT TO REVIEW THE STATEMENT,

22  SIR.  I DON'T REMEMBER EXACTLY WHAT WAS SAID IN THAT PARTICULAR

23  REGARD.

24  Q     OKAY.  I BELIEVE IT'S ABOUT THE SECOND PARAGRAPH OF THAT – OF

25  WHAT HAPPENED BEFORE HE FIRED THE SHOT.

1    A    NOW, YOUR QUESTION WAS, DID HE SAY – DID HE TELL THEM NOT TO

2    COME IN?

3    Q    YES.  BEFORE HE FIRED THE SHOT.

4    A    NO, SIR, I DON'T SEE THAT.

5    Q    NOW, HE DID TELL YOU THAT AFTER HE FIRED THE SHOT HE WENT

6    OUTSIDE AND HE SAID, "HE HAS A GUN"?

7    A    RIGHT.

8    Q    BUT THAT HAPPENED AFTER THE SHOT?

9    A    AFTER THE SHOT WAS FIRED, YES.

10   Q    MR. CARSON NEVER TOLD YOU HE PULLED THAT TRIGGER

11   ACCIDENTALLY, DID HE?

12   A    NO, SIR.

13   Q    HE INTENDED TO SHOOT WHOEVER IT WAS HE SHOT?

14   A    MAY I ELABORATE WITH THE ANSWER JUST A BIT?

15   Q    IF HE DIDN'T TALK ABOUT THAT, I HAVE A FEELING YOU'RE GOING TO

16   TALK ABOUT THINGS THE MAYBE HE DIDN'T TALK ABOUT IN HIS DEPOSITION,

17   SO I'M GOING TO WITHDRAW THE QUESTION.

18   A    VERY GOOD.

19           THE COURT:  THANK YOU, MR. MONCIER.  ANY REDIRECT?

20           MR. DUFFY:  YES, YOUR HONOR.  MAY WE APPROACH?

21       (DISCUSSION AT BENCH OFF THE RECORD.)

22                       REDIRECT EXAMINATION

23   BY MR. DUFFY:

24   Q    DESPITE THE AREAS THAT TROUBLED YOU IN MR. CARSON'S

25   STATEMENT, THERE WERE OTHER AREAS – WERE THERE OTHER AREAS THAT

1    REASSURED YOU ABOUT YOUR INVESTIGATION?

2    A      I'M CONFIDENT IN THE INVESTIGATION.  THERE WERE AREAS OF THE

3    INVESTIGATION THAT I FELT – OR THE INFORMATION PROVIDED TO US WAS

4    VERY ACCURATE AND SOME OF THE INFORMATION WAS NOT.

5    Q      ALL RIGHT, SIR.

6              MR. MONCIER:  YOUR HONOR, MAY I PLEASE RESPECTFULLY ASK

7    TO INQUIRE INTO ONE MATTER THAT WAS NOT ON THE PAGE THAT I HAD IN

8    FRONT OF ME BEFORE HE DOES ANY REDIRECT?  MAY I HAVE THAT PRIVILEGE,

9    PLEASE?

10             THE COURT:  NO, LET'S JUST WAIT AND SEE.  I'LL GIVE SOME

11   OPPORTUNITY, IF YOU NEED –

12             MR. MONCIER:  WELL, IT COULD BE RE –

13             THE COURT:  I UNDERSTAND.  I'LL GIVE SOME LEEWAY.  LET'S

14   DON'T INTERRUPT MR. DUFFY'S REDIRECT.  I'LL CONSIDER IT AS PART OF

15   RECROSS, REMIND ME OF THAT.

16             MR. MONCIER:  THANK YOU.

17   Q      MR. MONCIER HAS ASKED YOU ABOUT THE COMPLETE AUTOPSY AND

18   ASKED THAT IT BE MADE AN EXHIBIT.  DID YOU REVIEW THIS AUTOPSY?

19   A      YES, SIR, I DID.

20   Q      AND DID YOU SIMILARLY RECEIVE A REPORT FROM AN AGENT ROYCE?

21   A      YES.

22   Q      CONCERNING THE FIREARMS?

23   A      YES, SIR.

24   Q      AND WAS THAT REPORT PREPARED IN THE ORDINARY COURSE OF HIS

25   BUSINESS AS A TBI LAB TECHNICIAN?

1   A      YES.

2   Q      AND DID MR. MONCIER ASK YOU ABOUT THE CONCLUSION OF THAT

3   REPORT, THE DISTANCE OF THE FIREARM, JUST A MINUTE AGO?

4   A      I'M NOT CERTAIN IF THE DISTANCE WAS BROUGHT UP OR NOT.  I

5   APOLOGIZE.

6   Q      WHAT WAS THE DISTANCE THAT THE FIREARM COULD HAVE BEEN

7   FROM JOHN YANCEY THAT MR. ROYCE CONCLUDED IN HIS REPORT OF

8   REGULARLY CONDUCTED BUSINESS ACTIVITY?

9   A      TWO FEET OR FURTHER AWAY.

10  Q      WOULD THAT BE CONSISTENT WITH YOUR EXAMINATION OF MR.

11  YANCEY'S BODY AND CLOTHING?

12  A      YES, IT WOULD.

13  Q      HOW LONG DO YOU THINK THAT YOU ASKED QUESTIONS OF MARTY

14  CARSON?

15  A      I'M SORRY.  I DON'T REMEMBER.  WE WERE PROBABLY THERE FOR A

16  COUPLE OF HOURS.  THAT'S AN ESTIMATE.

17  Q      DO YOU KNOW HOW MANY DIFFERENT PERSONS HAVE QUESTIONED

18  MARTY CARSON ABOUT THIS MATTER?

19  A      NO.

20  Q      WHEN AN OFFICER IS SHOT AT THE SCENE OF A LAW ENFORCEMENT

21  ACTIVITY SUCH AS THIS, WOULD THE TBI ALWAYS INVESTIGATE THAT?

22  A      AGAIN, IT DEPENDS ON THE JURISDICTION.  YOUR MAJOR

23  MUNICIPALITIES IN TENNESSEE HAVE THEIR OWN INTERNAL AFFAIRS WHO

24  DEAL WITH IT, SOME OF YOUR LARGER COUNTIES DO.  YOUR RURAL TOWNS

25  AND RURAL COUNTIES, PERHAPS NOT THAT THEY CAN'T DO IT, BUT THEY

1    SIMPLY DON'T HAVE THE EXPERTISE OR THE EXPERIENCE OF THE LAB

2    TECHNICIANS THEY CAN BRING IN TO DO A THOROUGH JOB.  SO ORDINARILY,

3    IN THOSE CASES, WE DO.

4    Q        AND WHAT WOULD A LAW ENFORCEMENT OFFICER EXPECT, A LAW

5    ENFORCEMENT OFFICER IN A RURAL COMMUNITY – LET ME REPHRASE THAT.

6    WOULD IT BE GENERALLY KNOWN IN THE LAW ENFORCEMENT COMMUNITY

7    IN RURAL AREAS THAT WHEN AN OFFICER IS SHOT THAT MATTER WILL BE

8    INVESTIGATED BY THE TENNESSEE BUREAU OF INVESTIGATION?

9    A        I THINK THAT'S FAIR, YES, SIR.

10   Q        DID YOU DO A THOROUGH INVESTIGATION INTO THIS MATTER?

11             MR. MONCIER:  OBJECTION.  IT'S A CONCLUSION, SELF-SERVING,

12   LEADING QUESTION.

13             THE COURT:  OVERRULE THE OBJECTION.

14   A        YES, SIR, I BELIEVE SO.

15             MR. DUFFY:  THAT IS ALL I HAVE.

16             THE COURT:  THANK YOU.  ANY RECROSS?

17             MR. MONCIER:  FIRST OF ALL, WITH REGARD TO THE REDIRECT –

18   OR RECROSS, I DID NOT ASK HIM ABOUT THE CHITWOOD SHEET THAT I WOULD

19   LIKE TO ASK HIM ABOUT.

20             THE COURT:  ALL RIGHT.  I'LL ALLOW YOU, AND I'LL GIVE MR.

21   DUFFY LEEWAY TO COME BACK UP –

22   Q        WITH REGARD TO –

23             MR. MONCIER:  EXCUSE ME, YOUR HONOR.

24             THE COURT:  GO AHEAD AND ASK ABOUT THAT, THEN ASK ABOUT

25   ANYTHING THAT WOULD MORE APPROPRIATELY BE ON RECROSS.

1                                    RECROSS EXAMINATION

2       BY MR. MONCIER:

3       Q       WITH REGARD TO TROOPER CHITWOOD, TROOPER CHITWOOD TOLD YOU

4       THAT JOHN-JOHN YANCEY HAD TOLD HIM THAT JOHN-JOHN DID NOT TRUST –

5                       MR. DUFFY:  I OBJECT, YOUR HONOR.  THIS IS HEARSAY.

6                       MR. MONCIER:  WELL, HE WENT INTO THIS, YOUR HONOR, AS TO

7       WHAT MR. –

8                       MR. DUFFY:  I DID NOT GO INTO WHAT HE SAID.

9                       THE COURT:  ALL RIGHT.  THERE'S NO WAY I CAN TELL WITHOUT

10      HEARING IN MORE DETAIL, SO LET'S GO AHEAD AND TAKE A MORNING BREAK,

11      AND LET ME DISCUSS THIS WITH COUNSEL.

12              (JURY RECESSED AT 10:32 A.M.)

13                      THE COURT:  ALL RIGHT.  GO AHEAD, MR. MONCIER.  WHAT DO

14      YOU WANT TO INQUIRE INTO?

15                      MR. MONCIER:  I WAS GOING TO INQUIRE INTO HIS REPORT OF HIS

16      INTERVIEW WITH TROOPER CHITWOOD.  HE WROTE THAT, "CHITWOOD STATES

17      THAT YANCEY HAD TOLD HIM HE," YANCEY, "DID NOT TRUST MARTY CARSON,

18      THAT THERE WAS A RIVALRY BETWEEN THEM."  THAT'S WHAT MR. CHITWOOD

19      HAD REPORTED.

20              "MR. CHITWOOD WENT ON TO REPORT THAT HE DID NOT TRUST ROBBY

21      CARSON OR ANY OF THE SHERIFF'S DEPARTMENT AND THAT HE BELIEVED IT

22      WAS A REASONABLE POSSIBILITY THAT JOHN-JOHN HAD BEEN SET UP."

23              THAT'S WHAT MR. CHITWOOD REPORTED – OR IS REPORTED IN HIS

24      STATEMENT; THAT MR. DUFFY CALLED THIS WITNESS SUPPOSEDLY TO

25      SUGGEST THAT MR. CHITWOOD DID NOT SAY THAT THAT HE KNEW ABOUT

1  YANCEY NOT TRUSTING CARSON.  AND IT ALSO GOES TO HIS THOROUGH

2  INVESTIGATION TESTIMONY HE JUST GAVE.

3  THE COURT:  MR. DUFFY?

4  MR. DUFFY:  YOUR HONOR, I TENDER THE STATEMENT AS A

5  NARRATIVE OF THE STATEMENT.  WHAT IT IS, IT'S – SO YOU CAN SEE THE

6  ENTIRE STATEMENT.  MR. CHITWOOD HAS TESTIFIED AS TO WHAT HE – OR

7  INFORMATION THAT HE HAD IN CONNECTION WITH THIS MATTER THAT HE

8  CONSIDERED RELEVANT.  HE WAS ASKED ABOUT IT AND TESTIFIED.  THE

9  MATTERS WHICH HE – THAT MR. MONCIER IS GOING INTO NOW ARE BOTH

10  HEARSAY AND NOT RELEVANT, THE RIVALRY.

11  HE DOESN'T TRUST THEM BECAUSE THEY TAKE CREDIT, HE SAYS, THE

12  CARSONS TAKE CREDIT FOR ALL THE BUSTS AND ALL THE HIGH-PROFILE

13  NEWS ACCOUNTS, CRIMINAL ACTIVITIES FOR WHICH THE NEWS IS THERE, THE

14  CARSONS TAKE CREDIT FOR IT.

15  THESE STATEMENTS ARE FULL OF INNUENDO, THEY ARE NOTHING

16  MORE THAN THE WITNESS'S OPINIONS.  THEY WOULD NOT BE ADMISSIBLE IF

17  THE WITNESS WERE TESTIFYING ON THE STAND, LIVE.  SO THEY ARE

18  OBJECTIONABLE BOTH AS HEARSAY, AS IRRELEVANT, AS CERTAINLY MORE

19  PREJUDICIAL THAN WHATEVER REMOTE PROBATIVE VALUE THEY COULD

20  HAVE, AND WE OBJECT.

21  THE COURT:  MR. MONCIER?

22  MR. MONCIER:  MY RESPONSE IS THAT HE CALLED THIS WITNESS

23  TO SAY THAT MR. CHITWOOD WOULD NOT GIVE HIM ANY INFORMATION, THAT

24  YANCEY WAS CONCERNED ABOUT MARTY CARSON, AND HERE IN HIS REPORT

25  IT STATES THAT YANCEY TOLD HIM THAT –

1          THE COURT:  WELL, I'M LOOKING AT MY NOTES.  I BELIEVE IT WAS

2    MORE SPECIFIC.  IT SEEMS LIKE MR. DUFFY'S QUESTIONS WERE DIRECTED

3    MORE PARTICULARLY TO WHAT MR. CHITWOOD TESTIFIED TO DURING THE

4    PLAINTIFF'S CASE-IN-CHIEF.

5          I WROTE DOWN, "INTERVIEWED MR. CHITWOOD.  DID MR. CHITWOOD

6    TELL YOU ABOUT METH OR DISTRIBUTION ABOUT – DID MR. CHITWOOD TELL

7    YOU ABOUT MARTY CARSON BEING INVESTIGATED BY MR. YANCEY FOR

8    METH USE OR DISTRIBUTION AND DID HE TELL YOU ANYTHING ABOUT METH

9    INVOLVEMENT AND DID HE TELL YOU ANYTHING ABOUT PAYOFFS FROM

10   DRUG DEALERS?"  THOSE ARE THE THREE QUESTIONS THAT I WROTE DOWN

11   THAT MR. DUFFY ASKED HIM ABOUT AND THOSE DID SEEM, IN EFFECT, IN

12   DIRECT RESPONSE, A REBUTTAL TO WHAT MR. CHITWOOD HAD ALREADY

13   TESTIFIED ABOUT.

14         MR. MONCIER:  THAT'S CORRECT, YOUR HONOR.  AND IT IS TRUE

15   THAT THOSE THREE QUESTIONS ARE NOT REFERRED TO IN HIS STATEMENT.

16   BUT CHITWOOD DID TELL HIM THAT YANCEY HAD TOLD CHITWOOD THAT HE

17   DIDN'T TRUST CARSON, AND THAT GOES CONTRARY TO EVERYTHING THAT

18   HAS BEEN SAID BY CARSON AND EVERYONE ELSE IN THIS CASE OF WHAT

19   GREAT AND CLOSE FRIENDS THEY WERE AND, YOU KNOW, HOW CLOSELY

20   THEY WORKED TOGETHER AND ALL OF THIS OTHER TESTIMONY.

21         THE COURT:  I'M GOING TO EXCLUDE IT FOR PURPOSES OF THE

22   RECROSS EXAMINATION OF THIS WITNESS.  IF YOU WANT TO TRY TO BRING IT

23   IN THROUGH REBUTTAL, I'LL CONSIDER IT THEN.

24         MR. MONCIER:  YES.

25         THE COURT:  BUT I'M EXCLUDING IT ON HEARSAY GROUNDS FOR

1    NOW, AS WELL AS NOT IN RESPONSE – OR WITHIN THE SCOPE OF THE

2    QUESTIONS THAT WERE ASKED OF THIS WITNESS ON DIRECT EXAMINATION.

3                    MR. MONCIER:  OKAY.  MY OTHER QUESTION WAS, WHAT TIME DID

4    HE ARRIVE AT THE SCENE?  I DON'T THINK ANYBODY'S ESTABLISHED THAT,

5    AND THAT'S ALL I WANTED TO ASK HIM.

6                    THE COURT:  THAT'S THE ONLY QUESTION, REMAINING QUESTION,

7    YOU HAVE OF THIS WITNESS?

8                    MR. MONCIER:  YES, SIR.

9                    THE COURT:  ALL RIGHT.  WHO'S YOUR NEXT WITNESS, MR.

10   DUFFY?

11                   MR. DUFFY:  WE WILL READ FROM THE DEPOSITION OF JOSEPH

12   BABB.

13                   THE COURT:  ARE THERE QUESTIONS ABOUT WHAT IS TO BE READ

14   FROM THERE OR HAS THAT BEEN WORKED OUT?  YOU DON'T KNOW OR –

15                   MR. MONCIER:  I'LL GET MR. WIGLER.

16                   THE COURT:  I DON'T WANT TO BRING THE JURY BACK IN AND

17   THEN WE HAVE ONE QUESTION OF THIS WITNESS, THEN WE BRING UP THE

18   BABB DEPOSITION, AND THEN WE HAVE TO SEND THEM BACK OUT BECAUSE

19   OF ISSUES.

20                   MR. DUFFY:  I'M CONFIDENT THAT MR. WIGLER WILL REPORT

21   THAT THERE'S NO – WE'VE RESOLVED ANY ISSUES.

22                   THE COURT:  OKAY.  THAT'S FINE.  IF NOT, THEN LET ME KNOW

23   BEFORE WE BRING THE JURY BACK IN.  THEN DO YOU HAVE OTHER LIFE

24   WITNESSES?

25                   MR. DUFFY:  YES.

1          THE COURT: OKAY.

2          MR. DUFFY: ACTUALLY, LET ME REPHRASE THAT. SINCE MR.

3    WIGLER HAS BEEN AROUND MR. MONCIER, SAY THAT IT IS MY

4    UNDERSTANDING FROM LAST I INQUIRED FROM MR. WIGLER THAT THEY ARE

5    RESOLVED.

6          THE COURT: ALL RIGHT. LET'S GO AHEAD AND TAKE ABOUT A

7    FIVE OR TEN-MINUTE MORE RECESS.

8          (RECESS HAD 10:38 A.M.; RECONVENED WITHOUT JURY 10:52 A.M.)

9          THE COURT: LET'S GO AHEAD AND BRING OUR JURY IN, PLEASE.

10         (JURY RECONVENED IN COURTROOM AT 10:54 A.M.)

11         THE COURT: THANK YOU. MR. MONCIER, FURTHER QUESTIONS?

12              RECROSS EXAMINATION (CONTINUED)

13   BY MR. MONCIER:

14   Q    IN TERMS OF OUR TIMELINE FOR THE EVENING OF NOVEMBER THE 28TH

15   OF 2003, FROM YOUR FILE CAN YOU DETERMINE WHEN IT WAS THAT YOU

16   ARRIVED AT THE WILLIAMS CREEK ROAD RESIDENCE?

17   A    AS BEST I CAN TELL, SIR, ABOUT 9:55, AROUND TEN P.M.

18   Q    TEN P.M.?

19   A    YES, SIR.

20   Q    AND, OF COURSE, THE ACTUAL INCIDENT WAS APPROXIMATELY EIGHT

21   O'CLOCK OR SHORTLY AFTER EIGHT O'CLOCK?

22   A    EIGHT TO 8:30 IS MY UNDERSTANDING, YES, SIR.

23   Q    I DIDN'T ASK YOU TO LOOK IN YOUR FILE FOR THIS; IF YOU CAN FIND IT

24   FAIRLY QUICKLY. DO YOU KNOW WHAT TIME IT WAS THAT YOU WENT TO THE

25   HOSPITAL?

1    A       I BELIEVE THERE'S A NOTE IN HERE, SIR, THAT I WAS CALLED TO THE

2    HOSPITAL BY DR. HUFF AT AROUND MAYBE 11:00 P.M.?

3    Q       I DON'T KNOW.  THAT WAS A BLIND QUESTION I ASKED YOU.  I'M NOT

4    SURE.

5    A       CAN YOU GIVE ME JUST A SECOND, AND I WILL SEE IF I CAN FIND THAT,

6    SIR.  AND I APOLOGIZE FOR NOT BEING ABLE TO PUT MY HANDS ON IT

7    IMMEDIATELY.

8    Q       THAT'S OKAY.

9    A       YEAH, I'M SHOWING A NOTE HERE AT 10:17 I WAS ON MY WAY TO THE

10   HOSPITAL.

11   Q       SO YOU HAD FIRST GONE TO THE SCENE, THEN YOU WENT TO THE

12   HOSPITAL?

13   A       YES, SIR.

14            MR. MONCIER:  OKAY, SIR.

15            THE COURT:  ALL RIGHT.  THANK YOU.  MR. VINSANT, YOU MAY

16   BE EXCUSED.

17            THE WITNESS:  YES, SIR.

18            MR. DUFFY:  YOUR HONOR, AS MR. MONCIER WAS GRANTED

19   LEAVE, THERE IS A MATTER I FORGOT TO ASK HIM ABOUT.

20            THE COURT:  WELL, GO AHEAD AND ASK REAL QUICK, SEE IF

21   THERE'S AN OBJECTION

22                        REDIRECT EXAMINATION

23   BY MR. DUFFY:

24   Q       WERE THERE INCONSISTENCIES IN OTHER WITNESSES' STORIES?

25   A       YES.

1    Q       DID THEIR FACTS FIT THE CASE?

2              MR. MONCIER:  I OBJECT TO THE QUESTION, YOUR HONOR.

3              THE COURT:  WELL, I'M AFRAID IT'S GOING TO OPEN UP A WHOLE

4    OTHER LINE.  THAT'S NOT THE SAME QUESTION, SO –

5              MR. DUFFY:  THAT'S ALL.

6              THE COURT:  LET'S END THE EXAMINATION OF THIS WITNESS AT

7    THIS TIME.  THANK YOU, MR. VINSANT.

8              MR. DUFFY:  THANK YOU, YOUR HONOR.

9         (WITNESS EXCUSED.)

10             THE COURT:  ALL RIGHT.  MR. DUFFY, YOU MAY CALL YOUR NEXT

11   WITNESS.

12             MR. DUFFY:  WE'RE GOING TO, UNFORTUNATELY, READ FROM THE

13   DEPOSITION OF JOSEPH BABB.

14             THE COURT:  AND I BELIEVE MR. WIGLER IS GOING TO PLAY THE

15   ROLE OF MR. JOSEPH BABB.  COME ON UP TO THE WITNESS STAND, PLEASE,

16   MR. WIGLER; APPRECIATE YOUR DOING THAT.  AND MR. DUFFY, IF YOU'LL

17   JUST ANNOUNCE WHO THE WITNESS IS, WHEN THE DEPOSITION WAS TAKEN,

18   AND THEN WHO IS ASKING THE QUESTIONS.

19             MR. DUFFY:  THIS IS WITNESS JOSEPH BABB, WHOSE DEPOSITION

20   WAS TAKEN JULY 24, 2007.  THESE QUESTIONS ARE BY MYSELF.

21             JOSEPH BABB, DEFENDANT'S WITNESS, BY DEPOSITION

22                          DIRECT EXAMINATION

23   BY MR. DUFFY:

24   Q       ON PAGE FIVE, LINE 13:  "ALL RIGHT.  YOU, AS I – YOU ARE THE – WHAT

25   IS YOUR RELATIONSHIP TO RICHARD BABB?

1    A    "I'M HIS NEPHEW.

2    Q    AND LET ME ASK – OR IF I MISS PART OF THE DESIGNATION, PLEASE

3    FEEL FREE TO TELL ME, MR. WIGLER.

4    A    I'LL TRY TO DO THAT.

5    Q    PAGE SEVEN, LINE 13: "DO YOU HAVE ANY PERSONAL KNOWLEDGE OF

6    HOW THAT OCCURRED?  THAT IS, WERE YOU THERE AT THE TRAILER ON

7    NOVEMBER 28TH OF 2003 WHEN THE INCIDENT OCCURRED?

8    A    "NO, SIR.

9    Q    "WHEN, PRIOR TO THAT TIME, HAD YOU HAD ANY CONTACT WITH ANY

10   SCOTT COUNTY SHERIFF'S DEPUTIES?

11   A    "YES, SIR.

12   Q    "WHEN, PRIOR TO NOVEMBER 28TH, WOULD YOU HAVE HAD ANY

13   CONTACT WITH A SCOTT COUNTY SHERIFF'S DEPUTY, INCLUDING JOHN

14   YANCEY, OR MARTY CARSON, OR ANYONE ELSE?

15   A    "ABOUT THREE WEEKS BEFORE JOHN'S DEATH.

16   Q    "OKAY.

17   A    "I CAN'T GIVE AN EXACT DATE BECAUSE  I QUITE DON'T REMEMBER.

18   Q    PAGE 12, LINE TEN:  "WHEN DID YOU FIRST MEET OR TALK TO, BY PHONE

19   OR OTHERWISE, HOWARD ELLIS?

20   A    "I CAN'T REMEMBER WHAT DATE I MET WITH HIM.  IT WASN'T THAT

21   LONG AGO THOUGH.  BUT I COME IN HERE WITH MY UNCLE TO MEET HIM AND

22   EVERYTHING, SO I CAN GO AHEAD AND SIGN THE PAPERWORK.  I CAN'T

23   REMEMBER THEM DATES.

24   Q    "WELL, GIVE ME A BALLPARK.  ARE WE TALKING ABOUT A WEEK AGO ,

25   A MONTH AGO?

1  A        "I GUESS IT'S BEEN PROBABLY ABOUT A MONTH AGO.

2  Q        "AND WHAT PAPERWORK WAS IT THAT YOU WERE TO SIGN?

3  A        "WELL, I HAD FILLED OUT MY DEPOSITION, BUT I WOULD NOT SIGN IT.

4  MY STATEMENT.  I WOULD NOT SIGN IT BECAUSE, AT THAT TIME, I WAS NOT

5  COMING FORWARD.

6  Q        "DID SOMEONE WRITE OUT A STATEMENT FOR YOU TO SIGN?

7  A        "NO, SIR.  I WROTE MY OWN STATEMENT OUT.

8  Q        "YOU WROTE IT OUT IN YOUR OWN HANDWRITING?

9  A        "YES, SIR.

10  Q        "WELL, WHAT DID YOU DO WITH THAT STATEMENT THAT YOU DID NOT

11  WANT TO SIGN?

12  A        "TURNED IT IN TO MR. WIGLER TO START WITH.

13  Q        "BEFORE YOU SIGNED IT?

14  A        "BEFORE I SIGNED IT.  AND I – THERE WAS REASONS AND

15  CIRCUMSTANCES WHY I WOULD NOT SIGN.  AND I WENT AHEAD AND WROTE

16  IT OUT FOR HIM AND GIVE IT TO HIM ANYWAY BECAUSE THAT'S WHAT HE

17  REQUESTED.

18  Q        "BACK TO MEETING WITH HOWARD ELLIS.  WAS THAT HERE IN HIS

19  OFFICES THAT YOU AND RICHARD –

20  A        " YES, SIR.

21  Q        "– CAME TO?  AND HOW WAS THAT MEETING ARRANGED?

22  A        "I WAS JUST – MY UNCLE CAME BY MY HOUSE, TOLD ME I NEEDED TO

23  COME MEET WITH HOWARD ELLIS, AND I JUST GOT IN THE CAR AND WE COME

24  DOWN HERE TOGETHER.  IS IT WAS PRIMARILY MY UNCLE, THE ONE THAT

25  COME AND GOT ME TO COME DOWN HERE.

1  Q        "WELL, DID YOU ASK, 'WHO'S HOWARD ELLIS?  WHY ARE WE MEETING

2  WITH HIM?'

3  A        "NO, SIR, I DIDN'T.

4  Q        "DID YOU KNOW MR. ELLIS PRIOR TO THIS?

5  A        "NO, SIR.

6  Q        "ALL RIGHT.  WHEN YOU ARRIVED, YOU AND RICHARD, AND I TAKE IT

7  MR. ELLIS WERE HERE; IS THAT RIGHT?

8  A        "YES, SIR.

9  Q        "AND WHO ELSE WAS PRESENT?

10 A        "THAT WAS IT, SIR.

11 Q        "IS THAT THE TIME AND PLACE WHERE YOU WROTE OUT A STATEMENT

12 OR DID YOU DO THAT AT HOME?

13 A        "I DID THAT PRIOR WITH MR. WIGLER.

14 Q        "WHEN DID YOU WRITE OUT A STATEMENT FOR MR. WIGLER?

15 A        "I DON'T QUITE REMEMBER THEM DATES THAT I WROTE IT OUT, BUT IT

16 WAS PROBABLY – I WANT TO SAY ABOUT TWO TO THREE WEEKS PRIOR TO ME

17 COMING IN HERE AND SIGNING MY STATEMENT IN FRONT OF MR. ELLIS.

18 Q        "SO WE'RE TALKING ABOUT SIX TO SEVEN WEEKS AGO?  IF YOU –

19 A        "I BELIEVE SO.

20 Q        "OKAY.  HAVE YOU EVER MET LORI YANCEY?

21 A        "NOT UNTIL TODAY.

22 Q        "HOW MANY OTHER OCCASIONS HAVE YOU MET WITH HOWARD ELLIS?

23 WE HAVE THE ONE MONTH AGO, AND WE HAVE TODAY OBVIOUSLY.

24 A        "I THINK IT WAS YESTERDAY WE MET.

25 Q        "AND WHAT WAS THE PURPOSE OF THAT MEETING?

1   A       "JUST TO GO OVER MY DRESS CODE AND EVERYTHING.  WHAT I SHOULD

2   AND SHOULDN'T WEAR.

3   Q       "WELL, WHAT DID YOU GO OVER CONCERNING YOUR TESTIMONY?

4   A       "I DON'T THINK WE DID GO OVER ANYTHING ABOUT MY TESTIMONY

5   YESTERDAY.  IT WAS JUST ABOUT MY DRESS CODE.

6   Q       "YOU MET YESTERDAY HERE IN THIS LAW OFFICE, RIGHT?

7   A       "(WITNESS MOVES HIS HEAD UP AN DOWN.)

8   Q       "AND THE ONLY PURPOSE OF THIS MEETING WAS TO DISCUSS WHAT

9   YOU WERE GOING TO WEAR TODAY?

10  A       "YES, SIR, BECAUSE I'VE NEVER BEEN TO A DEPOSITION OR EVEN IN

11  COURT FOR THAT MATTER, SO I DIDN'T HAVE A CLUE AS TO WHAT I WAS

12  SUPPOSED TO WEAR.

13  Q       "WELL, WHAT DID MR. ELLIS TELL YOU WAS GOING TO OCCUR?

14  A       "JUST – HE JUST SHOWED ME WHERE THE COURT REPORTER WAS GOING

15  TO BE AND, YOU KNOW, HOW TO SIT – SIT UP STRAIGHT AND STUFF LIKE THAT.

16  AND MAKE SURE I LOOK PEOPLE IN THE EYE, ANSWER APPROPRIATELY.

17  THAT'S PRETTY MUCH WHAT WE WENT OVER YESTERDAY.

18  Q       "WHO ELSE WAS HERE YESTERDAY?

19  A       "JUST ME AND MR. ELLIS.

20  Q       "AND DID MR. ELLIS – WELL, WHAT CAPACITY DID MR. ELLIS SAY HE

21  WAS ACTING IN OR HOW WAS HE CONNECTED WITH THIS LAWSUIT?

22  A       "I DON'T UNDERSTAND –

23  Q       "ALL RIGHT.  WELL –

24  A       "– THE QUESTION.

25  Q       "– WHAT DID HE TELL YOU – I MEAN DID HE SAY, 'WELL, I'M

1  REPRESENTING LORI YANCEY,' OR 'I'M DOING THIS FOR LORI'?  DID HE SAY

2  ANYTHING ONE WAY OR THE OTHER?

3  A      "I DON'T THINK WE DISCUSSED THAT.

4  Q      "OKAY.  HAVE YOU EVER MET WITH DAVID WIGLER?

5  A      "YES, SIR, I HAVE.

6  Q      "WOULD THAT HAVE BEEN THE SIX TO SEVEN WEEKS AGO?

7  A      "YES, SIR.

8  Q      "YOU MET HIM ON THE OCCASION THAT YOU GAVE HIM THE

9  STATEMENT?

10 A      "YES, SIR.

11 Q      "WHO WAS AT THAT MEETING?

12 A      "IT WAS ME, MR. WIGLER, AND MY UNCLE.

13 Q      "WAS THAT IN KNOXVILLE?

14 A      "NO, IT WAS HERE IN ONEIDA"

15 Q      MOVING TO PAGE 19, LINE 13:  "AND WHO OF THOSE WOULD YOU HAVE

16 MET PREVIOUSLY," SPEAKING OF THE PERSONS IN THE ROOM.

17 A      "I'VE MET MR. CARSON BEFORE AND I'VE MET MR. DONNIE PHILIPS

18 BEFORE.

19 Q      "OKAY.  ANYONE ELSE?

20 A      "I THINK THAT'S PRETTY MUCH IT.

21 Q      "ALL RIGHT.  THE FIRST TIME THAT YOU MET – WELL LET ME ASK THIS.

22 WERE – WAS DONNIE PHILIPS WITH MARTY ON THE TIMES THAT YOU MET HIM

23 OR DID HE EVER MEET – RUN ACROSS HIM SEPARATELY

24 A      "THERE WAS A FEW TIMES THEY WAS TOGETHER, BUT MOSTLY

25 SEPARATELY.

1   Q       "ALL RIGHT.  THE FIRST TIME YOU MET WITH EITHER OF THEM, TELL ME

2   HOW THAT OCCURRED.

3   A       "I HADN'T LIVED – I HADN'T BEEN IN AND OUT OF ONEIDA VERY LONG,

4   AND MY UNCLE DOESN'T HAVE A DRIVER'S LICENSE, SO I DRIVE HIM

5   EVERYWHERE.  AND THIS WAS ABOUT THREE WEEKS BEFORE MR. YANCEY'S

6   DEATH I MET BOTH OF THEM.

7   Q       "OKAY.  WHAT WERE THE CIRCUMSTANCES?  DID YOUR UNCLE SAY,

8   'HEY, I NEED A RIDE?'

9   A       "SOMETIMES.  SOMETIMES HE WOULD ASK FOR IT AND SOMETIMES HE'D

10  JUST SAY, 'LET'S GO IN THE CAR AND GO.'

11  Q       "WELL, I'M TALKING ABOUT THREE – THE FIRST TIME THAT YOU EVER

12  MET EITHER MARTY CARSON OR DONNIE PHILIPS.

13  A       "IT WAS JUST, 'LET'S GO IN THE CAR AND GO.' AND –

14  Q       "OKAY.  DID YOU KNOW, PRIOR TO ENCOUNTERING THEM, THAT YOU

15  WERE GOING TO MEET A SCOTT COUNTY SHERIFF'S DEPUTY?

16  A       "NO SIR.

17  Q       "HE JUST SAID, 'LET'S GET IN THE CAR AND GO,' AND –

18  A       YES, SIR.

19  Q       "– TOLD YOU WHERE TO GO?

20  A       "YES, SIR.

21  Q       "WHERE DID HE TELL YOU WHERE TO GO?

22  A       "I DON'T KNOW THE NAME OF THE CEMETERY, BUT IT'S ON – I GUESS

23  IT'S SAND CUT CEMETERY, IS WHAT EVERYBODY CALLS IT.  I DON'T KNOW IF

24  THAT'S THE ACTUAL NAME OR NOT.  THAT'S WHERE I WAS TOLD TO TAKE HIM.

25  Q       "OKAY.  AND THIS WAS IN NOVEMBER OF 2003 OR THREE WEEKS BEFORE

1    MR. YANCEY'S DEATH?

2    A        "YES, SIR.

3    Q        "OKAY.  WHERE IS THIS CEMETERY?  WHAT ROAD OR ROADS?

4    A        :I DON'T KNOW THE NAME OF THE ROAD IT'S ON.  I JUST KNOW YOU GO

5    UNDER THE UNDERPASS LIKE YOU'RE GOING THE BACK WAY TO OAK PARK

6    APARTMENTS.  IT'S ON THE RIGHT BEFORE YOU CLIMB THE HILL.  I DON'T

7    KNOW THE NAME OF THE ROAD.

8    Q        "IS IT HERE IN ONEIDA?

9    A        "YES, SIR.

10   Q        "DID YOU ASK YOUR UNCLE, 'WHY ARE WE GOING TO A CEMETERY?

11   A        "NO, SIR.

12   Q        "COULD – DID YOU KNOW YOU WERE GOING TO A CEMETERY BEFORE

13   YOU ARRIVED?

14   A        "NO, SIR.

15   Q        "OKAY.  TELL ME WHAT HAPPENED WHEN YOU ARRIVED AT THE

16   CEMETERY.

17   A        "AS USUAL, I'M USUALLY THE ONE THAT SITS IN THE CAR AND JUST

18   WAITS BECAUSE ALL I DID WAS DRIVE.  I DRIVE – WHEREVER MY UNCLE TELLS

19   ME TO DRIVE HIM, I DRIVE HIM.  AND HE WAS TALKING TO MR. CARSON.  AND

20   HE TALKED TO HIM FOR A GOOD FEW MINUTES.

21   Q        "OKAY.  SO YOU'RE SITTING IN THE VEHICLE AND RICHARD, YOUR

22   UNCLE, GETS OUT AND GOES OVER AND TALKS WITH MARTY CARSON?

23   A        "YES, SIR.

24   Q        "AND WHERE WAS MARTY WHEN YOU ARRIVED AT THE CEMETERY?  I

25   MEAN IS HE IN A VEHICLE, OUT AMONGST THE GRAVES, OR –

1   A       "UH –

2   Q       "– WHAT WAS HE DOING?

3   A       "– IT WAS DARK, SO I BELIEVE HE WAS SITTING IN HIS VEHICLE.

4   Q       "OKAY.  I TAKE IT, FROM YOUR BEING IN THE VEHICLE AND RICHARD

5   BEING OUT OF THE VEHICLE, THAT YOU PROBABLY DIDN'T HEAR THE

6   DISCUSSION BETWEEN RICHARD AND MARTY?

7   A       "NO, SIR.

8   Q       "WHAT DID RICHARD TELL YOU ABOUT THAT DISCUSSION?

9   A       "HE HAD COME BACK TO THE CAR, BUT HE DIDN'T TELL ME NOTHING

10  ABOUT THE DISCUSSION AT ALL.

11  Q       "SO, AS OF THAT POINT THAT YOU DROVE OFF FROM THE CEMETERY,

12  YOU DID NOT KNOW WHY YOU HAD DRIVEN YOUR UNCLE TO A CEMETERY TO

13  MEET SOMEONE?

14  A       "WE DIDN'T LEAVE AFTER THAT.

15  Q       "OH, ALL RIGHT.  AT WHAT POINT IN TIME DID YOU FIND OUT ANYTHING

16  ABOUT WHY YOUR UNCLE WANTED TO MEET WITH THE INDIVIDUAL WHO

17  TURNED OUT TO BE MARTY CARSON?

18  A       "IT WAS A FEW MINUTES LATER, MARTY HAD WALKED UP TO THE

19  PASSENGER SIDE WINDOW OF THE VEHICLE WE WAS DRIVING, AND HE WAS

20  TALKING TO UNCLE.  I TRY – I TRY NOT TO GET TOO INVOLVED IN THE

21  SITUATIONS WHEN HE'S DOING WHATEVER.  ALL I DO IS DRIVE.  BUT I HEARD

22  UNCLE TELL HIM THAT – MY UNCLE RICHARD – THAT HE COULDN'T DO THAT

23  FOR HIM.  AND I DIDN'T EXACTLY – I WAS KIND OF JUST PAYING ATTENTION

24  TO – I WAS ON MY OWN LITTLE WORLD, YOU KNOW.  AND I KIND OF HAD THE

25  RADIO OF THE CAR UP A LITTLE BIT, AND I REACHED DOWN THERE AND CUT

1  THE RADIO OF THE CAR OFF.  AND MARTY HAD HANDED MY UNCLE A HAND

2  TOWEL.  I DON'T REMEMBER WHAT COLOR IT WAS.  I BELIEVE IT WAS WHITE,

3  BUT IT WAS DARK.  I'M NOT FOR SURE.  MY UNCLE JUST HANDED IT BACK TO

4  HIM AND TOLD HIM, 'NO, THAT WE WOULDN'T DO IT.

5     "AND IT WASN'T UNTIL AFTER THAT UNCLE HAD HANDED ME AN

6  ENVELOPE.  AND HE KIND OF REACHED OVER AND NUDGED ME AND HANDED

7  ME AN ENVELOPE, AND TOLD ME THERE WAS FIVE THOUSAND DOLLARS

8  APIECE IN THERE, WHICH MADE IT 10 THOUSAND CASH IN THE ENVELOPE, FOR

9  ME TO DRIVE HIM TO SHOOT MR. YANCEY.  WELL I LAUGHED AT HIM AND I

10  THROWED THE ENVELOPE BACK AT HIM BECAUSE I THOUGHT IT WAS A LOAD

11  OF CROCK.

12  Q     "ARE YOU TALKING ABOUT HIM BEING RICHARD?

13  A     "UH-HUH.  AND –

14  Q     "DID YOU LOOK IN THE ENVELOPE?

15  A     "NO, SIR, I DIDN'T.  I JUST TOOK UNCLE'S WORD FOR IT.  UNCLE SAID HE

16  HAD NOT COUNTED IT, IT WAS FOR SURE THERE.

17  Q     "ALL RIGHT.  AND WERE YOU ABLE TO SEE THE PERSON WHO YOUR

18  UNCLE WAS TALKING TO STANDING OUTSIDE THE PASSENGER SIDE OF THE

19  VEHICLE?

20  A     "YES, SIR.

21  Q     "DID YOU – NOW, PRIOR TO THAT TIME, YOU HAD NEVER SEEN THIS MAN

22  BEFORE?

23  A     "NO, SIR.

24  Q     "NOR KNOW WHO HE WAS?

25  A     "NO, SIR.

1    Q        "AND I TAKE IT THIS PERSON MADE NO INQUIRY OF YOUR UNCLE ABOUT

2    WHO YOU WERE?  WHO'S THIS PERSON DRIVING THE VEHICLE?

3    A        "NOT IN MY PRESENCE, BUT I – I'M PRETTY SURE HE PROBABLY DID ASK,

4    A NEW FACE BEING AROUND.  I'M PRETTY SURE HE WOULD HAVE ASKED.

5    Q        "WHY ARE YOU PRETTY SURE?

6    A        'I WAS IN MY VEHICLE, AND IT WAS A DIFFERENT DRIVER.  I MEAN MOST

7    PEOPLE WILL ASK WHO THE NEW FACE IS.  AND SO THAT'S WHY I FIGURED

8    THAT HE HAD ASKED.

9    Q        "YOU'RE – YOU JUST BELIEVE THAT HE WOULD HAVE ASKED, YOUR

10   BEING A NEW FACE?

11   A        "YES, SIR.

12   Q        "YOU DIDN'T TALK TO – RICHARD DIDN'T SAY ANYTHING ONE WAY OR

13   ANOTHER ABOUT IT?

14   A        "NOT UNTIL AFTER WE LEFT.

15   Q        "WELL, SO WAS THIS ENVELOPE IN THE TOWEL THAT –

16   A        "NO, SIR.

17   Q        "– MARTY HANDED YOUR –

18   A        "NO, SIR.

19   Q        "ALL RIGHT.  ALL RIGHT.  SO, HE HANDS A TOWEL IN, YOUR UNCLE

20   GIVES HIM THE TOWEL BACK AND SAYS, 'CAN'T – I CAN'T DO THAT'?

21   A        "YES, SIR.

22   Q        "AND WHAT OCCURS NEXT?

23   A        "WELL, AFTER HE HANDS THE TOWEL BACK IS WHEN MY UNCLE

24   NUDGES ME AND HANDS ME THE ENVELOPE.  AND THEN HE TELLS ME ABOUT

25   WHAT'S IN THAT ENVELOPE, WHAT WE'VE GOT TO DO, AND I THINK IT WAS A

1   LOAD OF CROCK.  AND I WAS LAUGHING ABOUT IT, AND THROWED IT BACK IN

2   HIS LAP AND TOLD HIM, YOU KNOW, 'NO.'  YOU KNOW, I DIDN'T KNOW – AT

3   THAT TIME I WAS NEW.  I DIDN'T KNOW WHAT TO BELIEVE.

4   Q      "AT THAT TIME YOU WERE NW.  NEW AT WHAT?

5   A      "I GUESS YOU CAN CALL IT – MY UNCLE WAS A CI, A CONFIDENTIAL

6   INFORMANT.  AND I WAS NEW TO THAT TYPE OF THING.  THAT AREA.  YOU

7   KNOW, I'VE NEVER DONE ANYTHING LIKE THAT BEFORE.  NEVER DROVE

8   ANYBODY TO TALK TO THE LAW OR, YOU KNOW, ANYTHING LIKE THAT

9   BEFORE.  SO THAT WAS PRETTY MUCH MY FIRST TIME.

10  Q      "NOW, YOUR UNCLE'S ACTIVITIES AS A CONFIDENTIAL INFORMANT, I

11  TAKE IT THAT WOULD BE BASED ON WHAT YOUR UNCLE TOLD YOU?

12  A      "YES, SIR.  AND THERE WAS MANY INCIDENCES – MANY INCIDENCES

13  AFTERWARDS TOO.

14  Q      "MANY INCIDENCES AFTERWARDS THAT –

15  A      "AFTER THAT MEETING.

16  Q      "WHAT?

17  A      "THAT I DROVE MY UNCLE TO TALK TO MR. CARSON.  THERE'S MANY

18  TIMES THAT WE'VE WENT AND DID CERTAIN THINGS FOR HIM, AS MY UNCLE

19  BEING THE CI.  AND I'M THE ONE THAT ALWAYS DROVE HIM.

20  Q      "DID THIS CONTINUE AFTER JOHN YANCEY'S DEATH?

21  A      "YES, SIR.

22  Q      "UP UNTIL WHEN DID YOU DRIVE YOUR UNCLE AROUND TO MEET – TO,

23  AMONGST OTHER THINGS, MEET MARTY CARSON?

24  A      "I THINK IT WAS A FEW WEEKS BEFORE THIS LAST ELECTION, IS THE

25  LAST TIME I DROVE HIM TO DO ANYTHING OF THAT MATTER.

1    Q        "AND DID – WAS – DID YOU DRIVE YOUR UNCLE TO MEET WITH ANY

2    OTHER LAW ENFORCEMENT OFFICERS?"

3            (CELL PHONE RINGING.)

4            MR. DUFFY: I APOLOGIZE, YOUR HONOR. I DON'T KNOW HOW

5    THAT HAPPENED.

6            MR. WIGLER: COULD YOU REPEAT THE QUESTION? TWENTY-SIX,

7    LINE 18.

8    Q        "DID YOU DRIVE YOUR UNCLE TO MEET WITH ANY OTHER LAW

9    ENFORCEMENT OFFICERS?

10   A        "I BELIEVE I HAVE, BUT I DON'T KNOW WHICH ONES THEY WAS

11   BECAUSE, YOU KNOW, DIFFERENT MEETING PLACES WAS – YOU KNOW, THEY

12   WAS ALL DARK, YOU KNOW, AND MY WINDOWS IN MY VEHICLE WAS DARK

13   TINTED. THE WAY I WAS TOLD TO PARK, SOMETIMES IT WAS HARD TO SEE

14   WHO HE WAS MEETING WITH.

15   Q        "OKAY. AT THE TIME THAT YOUR UNCLE NUDGED YOU AND HANDED

16   YOU THE ENVELOPE, IS MARTY STILL STANDING THERE OUTSIDE THE

17   PASSENGER –

18   A        "YES, SIR.

19   Q        " – SIDE DOOR? SO, YOU LAUGHED, THREW THE ENVELOPE – OR TOSSED,

20   OR WHATEVER YOU SAID, BACK OVER TO YOUR UNCLE. AND WHAT

21   HAPPENED NEXT?

22   A        "WELL, MARTY HANDED THE HAND TOWEL BACK IN THROUGH THE

23   PASSENGER SIDE OF THE WINDOW. AND MY UNCLE HAD IT IN HIS HAND, AND

24   HE TOLD HIM AGAIN HE WAS GOING TO REFUSE – HE REFUSES TO DO THAT

25   FOR HIM. AND EVENTUALLY I HAD TO – I INTERVENED. I WAS IN THE DARK

1    BECAUSE I DIDN'T KNOW EXACTLY WHAT THEY WAS TALKING ABOUT.  SO

2    RIGHT THERE, IN FRONT OF BOTH OF THEM, I JUST ASKED THEM, 'WHAT'S IN

3    THE HAND TOWEL?  WHAT'S GOING ON?'  COME TO FIND OUT, THERE WAS A

4    REVOLVER IN THAT HAND TOWEL.

5    Q       "AND HOW DID YOU COME TO FIND THAT OUT?

6    A       "THE FACT THAT RICHARD KEPT SHOVING IT OUT THE WINDOW AND

7    THEY KEPT PUSHING IT BACK IN.  I JUST GRABBED THE TOWEL AND THROWED

8    IT OVER.

9    Q       "OKAY.

10   A       "JUST OUT OF CURIOSITY.

11   Q       "DO YOU KNOW MUCH ABOUT FIREARMS?

12   A       "NOT REALLY, NO, SIR.

13   Q       "WELL, IT SOUNDS LIKE AT LEAST YOU KNOW THE DIFFERENCE

14   BETWEEN A REVOLVER AND A SEMIAUTOMATIC?

15   A       "YES, SIR.

16   Q       "WHAT COLOR WAS THIS REVOLVER?

17   A       "IT WAS DARK.  IT COULD HAVE EVEN BEEN ANYWHERE FROM

18   GUNMETAL GRAY TO BLACK.

19   Q       "WHAT KIND OF HANDLE?

20   A       'I CAN'T TELL YOU.  I DON'T – I DON'T REMEMBER.

21   Q       "COULD YOU TELL WHAT CALIBER IT WAS?

22   A       "NO, SIR.

23   Q       "HOW LONG WAS THE BARREL?

24   A       "AT LEAST THREE, MAYBE THREE AND A HALF TO FOUR INCHES,

25   APPROXIMATELY.

1   Q      "WHAT DID YOU DO OR SAY WHEN YOU FLIPPED THE TOWEL OVER AND

2   SAW THAT IT WAS A REVOLVER?

3   A      "I KIND OF WAS IN SHOCK ACTUALLY.  IT KIND OF FREAKED ME OUT,

4   YOU KNOW, BECAUSE I DON'T DEAL WITH A LOT OF WEAPONRY LIKE THAT.

5   AND IT JUST KIND OF, YOU KNOW, KIND OF FREAKED ME OUT A LITTLE BIT

6   BECAUSE I DIDN'T UNDERSTAND WHAT WAS GOING ON AT THE TIME.  THAT

7   THIS, YOU KNOW – THIS WAS STILL BETWEEN THEM AT THE MOMENT.  AND I

8   WAS JUST – I WAS TRYING TO JUST GET INTO THE CONVERSATION, TRYING TO

9   FIND OUT WHAT WAS GOING ON.

10  Q      "SO WHAT DID YOU SAY OR DO AFTER YOU FLIPPED THE TOWEL OVER

11  AND SAW THAT IT WAS A REVOLVER?

12  A      "THEN, WHEN I ASKED UNCLE WHAT WAS GOING ON, HE HAD

13  EXPLAINED TO ME THE SITUATION AND THE CONVERSATION THAT HE HAD

14  WITH MR. MARTY CARSON, AND EVERYTHING.  AT THAT TIME, I WAS ABOUT

15  READY JUST TO BAIL.  I WAS – KIND OF GOT – I GOT – KIND OF GOT REAL

16  NERVOUS ABOUT THE WHOLE SITUATION.

17  Q      "WAS MARTY STANDING THERE TO – AT THE SIDE OF YOUR VEHICLE

18  WHEN RICHARD WAS RELATING THIS INFORMATION?

19  A      "YES, SIR.

20  Q      "DID MARTY SAY ANYTHING?

21  A      "HE – I – I LOOKED AT MARTY AND I ASKED HIM, I SAID, 'MR. CARSON –'

22  BECAUSE RICK HAD TOLD ME WHO HE WAS DURING THIS CONVERSATION.

23  AND I ASKED HIM, I SAID – I WAS TRYING TO GET THE FINAL DETAILS ON

24  EVERYTHING.  AND I ASKED HIM WAS THIS TRUE, YOU KNOW, WHAT RICK HAD

25  SAID.  HE DIDN'T DENY IT.  HE DIDN'T TELL ME NO, BUT HE DIDN'T ANSWER

1    YES NEITHER.

2    Q        "WAS WHAT TRUE?  WHAT DID YOU ASK?

3    A        "RICHARD TOLD ME THAT THEY WAS TRYING TO PAY ME TO DRIVE HIM

4    – BECAUSE I ASKED HIM ABOUT THE WHOLE CONVERSATION AND

5    EVERYTHING.  AND HE EXPLAINED EVERYTHING BECAUSE MY UNCLE DON'T

6    HIDE NOTHING FROM ME.  AND – BUT HE WAS GOING TO GIVE US FIVE

7    THOUSAND DOLLARS APIECE AND THE HANDGUN.  HE WAS GOING TO PAY ME

8    FIVE THOUSAND TO DRIVE RICHARD, AND WAS GOING TO PAY RICHARD FIVE

9    THOUSAND DOLLARS TO SHOOT MR. YANCEY.

10   Q        "NOW, THAT, I TAKE IT, WAS – YOUR UNCLE EXPLAINED THAT TO YOU

11   AT SOME LATER POINT IN TIME OR RIGHT –

12   A        "RIGHT THEN –

13   Q        "– THERE WHERE YOU WERE SITTING –

14   A        "– AND THERE.

15   Q        "SO HE GOES INTO THIS EXPLANATION.  MARTY IS STANDING THERE,

16   OUT TO THE SIDE OF THE VEHICLE?

17   A        "YES, SIR.

18   Q        "OKAY.  DID – DURING THIS WHOLE TIME FROM WHEN MARTY CAME UP

19   TO THE VEHICLE UNTIL YOU ALL LEFT, DID YOU – DID MARTY SAY ANYTHING?

20   A        "HE WAS – HE WAS TALKING TO UNCLE.  HE NEVER SAID NOTHING TO

21   ME PERSONALLY.  ALL THE CONVERSATION WAS BETWEEN HIM AND UNCLE

22   UP UNTIL WHEN UNCLE HAD EXPLAINED TO ME ABOUT THE WHOLE

23   SITUATION, ABOUT ME DRIVING AND US GETTING PAID.  AND I – I ASKED BOTH

24   OF THEM.  I ASKED THEM, I – BECAUSE I THOUGHT THEY WAS PULLING MY

25   LEG, YOU KNOW, BECAUSE MY UNCLE HAS GOT A BAD HABIT ABOUT, YOU

1  KNOW, PULLING PRANKS AND STUFF.  AND HE'S GOT – YOU KNOW, HE'S DONE

2  IT WITH SEVERAL OF THE LAW BEFORE, YOU KNOW, AND TRYING TO GET ME

3  BROKE IN TO BEING NEW, YOU KNOW, TO SCOTT COUNTY.  AND SO I FIGURED

4  HE – YOU KNOW, I HADN'T LIVED HERE VERY LONG AND I FIGURED IT WAS

5  JUST A PRANK.  BUT I ASKED THEM BOTH, SAID WAS THEY PULLING MY LEG.

6  AND RICHARD LOOKED AT ME AND SAID, 'NO.'  HE SAID, 'MR. CARSON WAS

7  BEING SERIOUS.'  AND I ASKED MR. CARSON AND THEN AGAIN, HE DIDN'T SAY,

8  'YES,' OR HE DIDN'T SAY, 'NO.'  HE DIDN'T ANSWER.

9          Q       SO, AS I UNDERSTAND IT, WHATEVER DISCUSSION TOOK PLACE

10  BETWEEN MARTY CARSON AND YOUR UNCLE, YOU DIDN'T HEAR ANY OF IT?

11  A       "IT DIDN'T INVOLVE ME AT ALL.  LIKE I SAID, I WAS JUST WHAT THEY

12  CALL THE WHEEL MAN.

13  Q       "RIGHT.

14  A       "I'M JUST – I'M JUST THE ONE THAT DRIVES.

15  Q       "AND AS I UNDERSTAND IT, YOU DIDN'T HEAR ANYTHING THAT MARTY

16  CARSON SAID THAT NIGHT?

17  A       "UH – UH – BECAUSE THEY WAS OUTSIDE THE VEHICLE AT FIRST, AND

18  WHEN THEY COME TO THE VEHICLE, I HAD THE RADIO UP.  AND THEY WAS

19  TALKING AMONGST THEMSELVES, AND I WAS JUST KIND OF DOING MY OWN

20  THING, YOU KNOW.  JUST STARING OFF INTO SPACE TRYING TO AVOID BEING

21  DRUG INTO ANY CONVERSATION.

22  Q       "WHEN YOU STARTED OUT THAT ANSWER, YOU WENT, 'UH, UH.'  WAS

23  THAT A NO?

24  A       "YEAH.

25  Q       "YES, SIR, THAT WAS A NO?

1   A       "YES SIR.

2   Q       "THAT'S WHY WE AVOID THE UH-HUH AND HUH-UH'S.

3   A       "YES, SIR.

4   Q       "IT CAN GET CONFUSING.  ALL RIGHT.  AFTER THE DISCUSSION BETWEEN

5   YOU AND YOUR UNCLE OCCURRED, AS YOU'VE DESCRIBED, WAS THAT

6   PRETTY MUCH IT?  DID YOU ALL LEAVE FROM THAT POINT?

7   A       "UH – UH – NO, SIR, WE DIDN'T.  WE STAYED PROBABLY ANOTHER 30

8   MINUTES.  I BELIEVE – I BELIEVE MR. CARSON WAS GETTING KIND OF

9   FRUSTRATED TOWARDS MY UNCLE.  AND I BELIEVE IT WAS OVER THE – OVER

10  WHAT MY UNCLE HAD TOLD ME.  AND I MEAN THEY ARGUED FOR A FEW

11  MINUTES AT LEAST.  AND IT WAS OVER THE FACT THAT MY UNCLE WOULD

12  NOT TAKE THE GUN AND THE HAND TOWEL.

13  Q       "HAD – AFTER YOU HAD FLIPPED IT OVER AND SEEN THAT IT WAS A

14  REVOLVER, I TAKE IT YOUR UNCLE HANDED IT BACK TO MARTY?

15  A       "HE FLIPPED THE TOP OF THE TOWEL BACK OVER AND HANDED IT BACK

16  TO MR. CARSON, YES.

17  Q       "AND MR. CARSON TOOK IT AT THAT POINT?

18  A       "YES, SIR.

19  Q       "AND THEN FOR THE NEXT HALF HOUR, THERE WAS SOME ARGUING

20  BETWEEN THE TWO OF THEM?

21  A       "YES, SIR.  AND I DID HEAR SOME OF THAT.  I HAD TURNED THE RADIO

22  BACK UP BECAUSE, YOU KNOW, LIKE I SAID, I WAS IN SHOCK.  I DIDN'T KNOW

23  WHAT WAS GOING ON.  SO – AND I HEARD THEM ARGUING SO I KIND OF CUT

24  THE RADIO BACK DOWN.  AND IT WAS OVER THE MONEY.  IT WAS OVER THE

25  MONEY.  MY UNCLE WAS ACCUSING HIM OF DOING SOME STUFF.  I CAN'T

1    REMEMBER WHAT IT WAS.  BUT HE ALSO HAD TOLD HIM THAT I – WHERE I DID

2    GET IN ON WHAT HE WAS TELLING HIM WAS THAT – THAT HE – THERE WAS NO

3    AMOUNT OF MONEY THAT COULD MAKE HIM DO WHAT HE HAD ASKED OF US

4    TO DO AND EVERYTHING.  AND THAT'S – HE HAD HANDED THE ENVELOPE

5    BACK TO MR. CARSON.

6    Q      "ALL RIGHT.  SO YOUR UNCLE RETURNED TO MARTY THE ENVELOPE,

7    THE TOWEL, THE REVOLVER, SAYS, 'I CAN'T DO THIS NO MATTER HOW MUCH

8    MONEY YOU PAY ME.'  ANYTHING ELSE OCCUR BEFORE YOU ALL LEFT?

9    A      "NO, SIR.  MR. CARSON, AFTER THAT LAST INCIDENT, HAD LEFT, HAD

10   WENT TO HIS VEHICLE, AND PULLED OUT.  WE SAT THERE – WELL, IT WAS

11   DURING THAT 30 MINUTES.  I GUESS IT WAS THE LAST FIVE OR 10 MINUTES, WE

12   HAD SAT THERE AND WAS TALKING ABOUT WHAT WAS GOING ON.  MY UNCLE,

13   YOU KNOW, HE WAS SHOWING INTEREST IN THAT HE COULDN'T BELIEVE

14   THAT SOMEBODY HAD WANTED TO PAY HIM TO KILL SOMEBODY.  HANDED

15   HIM A REVOLVER AND MONEY.  I MEAN WE WAS JUST GOING OVER THAT AND

16   IT WAS JUST – MY UNCLE WAS KIND OF IN SHOCK.  I WAS TOO.

17   Q      "LET ME ASK YOU THIS.  DID YOUR UNCLE SAY ANYTHING ABOUT WHO

18   IT WAS THAT MARTY CARSON WAS WANTING HIM TO KILL?

19   A      "YES, SIR.  THAT HE HAD – THAT'S – I HAD SEEN – I HAD CUT THE CAB

20   LIGHT ON FOR A FEW MINUTES AND I SEEN MR. CARSON'S NAME TAG.  SO I

21   TOOK THAT TO BE MR. MARTY CARSON THAT RICK WAS TALKING ABOUT

22   LATER ON.  AND HE WAS JUST – RICK WAS MAD, TO BE HONEST WITH YOU.  HE

23   WAS REAL IRATE.  HE HAD STARTED SCREAMING AND HOLLERING.  I

24   COULDN'T EVEN HAVE – I TRIED TO JUST BE QUIET AND TRIED NOT TO TALK

25   NO MORE ABOUT THE INCIDENT – THE INCIDENT.  BECAUSE HE'S – HE GETS

1   UPSET.  YOU CAN'T TALK TO HIM ABOUT STUFF.  AND I KIND OF JUST – KIND

2   OF JUST QUIETENED DOWN AND KEPT MY MOUTH SHUT UNTIL WE GOT HOME.

3   BUT HE HAD EXPLAINED THAT – YOU KNOW, HE WAS TELLING ME WHO – WHO

4   WAS IN THE VEHICLE AND EVERYTHING.  AND HE COULDN'T BELIEVE THAT

5   THEY WAS THAT WAY.  AND HE JUST KEPT – HE JUST KEPT ON.  HE WAS IRATE.

6   Q        "YOU SAID YOU SAW A NAME TAG WITH CARSON ON IT.  WELL, WHAT

7   WAS MR. CARSON WEARING?

8   A        "HE WAS WEARING A – AT THAT TIME, HE WAS WEARING A – I GUESS IT'S

9   KIND OF A BEIGE OR BROWN COLORED LIKE YOU FIND, LIKE THE DEPUTY

10  SHERIFFS WEAR, THE UNIFORM.  AND THAT'S PRETTY MUCH WHAT I SAW.  I

11  COULDN'T TELL WHAT ELSE HE WAS WEARING BESIDES THAT.

12  Q        "SO, AT WHAT POINT IN TIME DID YOU FIRST HEAR MENTION THE NAME

13  OF JOHN YANCEY, OR JOHN-JOHN YANCEY, OR –

14  A        "THAT'S WHEN UNCLE HAD EXPLAINED TO ME WHO I WAS SUPPOSED TO

15  DRIVE HIM TO KILL.

16  Q        "OKAY.

17  A        "AND I HAD MET – LIKE I SAID BEFORE, I HAD MET MR. YANCEY

18  PREVIOUSLY ON SEVERAL SOCIAL OCCASIONS.  AND UNCLE HAD EXPLAINED

19  TO ME WHAT WAS GOING ON.  AND THAT'S WHO I WAS SUPPOSED TO DRIVE

20  HIM – AT THAT TIME, HE SAID THAT'S WHO I WAS SUPPOSED TO DRIVE HIM TO

21  GO SEE, IS HOW UNCLE PUT IT TO ME.

22  Q        "AND THIS IS SOMETHING YOUR UNCLE HAS EXPLAINED TO YOU AS YOU

23  ALL ARE ON THE WAY HOME?

24  A        "NO, HE EXPLAINED IT TO ME RIGHT THERE IN FRONT OF MR. CARSON,

25  LIKE I SAID EARLIER.

1    Q        "ALL RIGHT.

2    A        "MR. CARSON WAS STILL STANDING AT THE PASSENGER SIDE OF THE

3    VEHICLE."

4    Q        AND MOVING TO PAGE 41, LINE 35:  "NOW, WHY WAS IT, DURING ALL

5    THIS TIME, THAT YOU ARE DRIVING RICHARD?

6    A        "HE DOESN'T HAVE A DRIVER'S LICENSE.  I'M THE ONLY ONE IN THE

7    FAMILY WITH A LICENSE.  AND WE WAS OFF AND ON STAYING TOGETHER,

8    AND I WAS – I DID A LOT OF HORSEBACK RIDING.  SO WE WAS PRETTY MUCH

9    INSEPARABLE.  SO, IT WAS PRETTY MUCH, WE WAS TOGETHER ALL THE TIME.

10   WHEN HE NEEDED TO DRIVE, IT WAS ME.  AND HE DIDN'T TRUST NOBODY ELSE

11   TO DRIVE HIM."

12   Q        MOVING TO 43, LINE 18:  "OTHER THAN THE DISCUSSION WITH YOUR

13   UNCLE ABOUT THE FIVE THOUSAND DOLLARS APIECE TO DRIVE AND SHOOT

14   JOHN YANCEY RESPECTIVELY, DO YOU HAVE ANY OTHER INFORMATION

15   RELATED TO OR HAS A BEARING ON WHAT HAPPENED TO MR. YANCEY ON

16   NOVEMBER 28, 2003 OUT AT THAT TRAILER?

17   A        "NO, SIR.  JUST WHAT I'VE TOLD YOU TODAY IS THE ONLY INFORMATION

18   I HAVE AT ALL.  AND JUST THE FACT THAT UNCLE WAS DOING CI WORK FOR

19   MR. CARSON.  AND I BELIEVE THAT'S THE REASON HE HAD WENT TO MY

20   UNCLE WITH THIS PROPOSITION IS BECAUSE MY UNCLE WAS ALREADY DOING

21   SOME CI WORK FOR HIM LONG BEFORE I COME ALONG.  SO, OTHER THAN

22   THAT, NO, I DON'T HAVE NOTHING ELSE TO ADD TO THAT.  ALL EXCEPT, YOU

23   KNOW, WE'D GO MAKE THE DRUG DEALS, AND I KNOW I MAKE – YOU'RE

24   GOING TO HAVE TO EXCUSE ME, I'VE BEEN SICK.  THERE IS SOMETHING ELSE

25   THOUGH.  WE DID NOTICE – WE HAD GOT TO NOTICING EVERY TIME WE DID DO

1   THESE DRUG DEALS, WE WOULD TAKE HIM THE DRUGS BACK.  THE PEOPLE

2   WE'D BUY OFF OF NEVER GOT BUSTED.  THEY'D NEVER – I MEAN THEY'D

3   NEVER – WHAT WE – WHAT WE'D GIVE TO MR. CARSON WOULD NEVER BE

4   BROUGHT UP.  THEY'D NEVER – THERE WAS NEVER NO LAW INVOLVED DOWN

5   THERE.  I MEAN THERE WAS NEVER – THEY NEVER DID ANY DRUG BUSTS ON

6   THE PEOPLE WE WAS BUYING THE DRUGS FROM.  AND I THOUGHT THAT WAS

7   KIND OF STRANGE.  BUT I MEAN WE'D TAKE THE DRUGS BACK TO MR.

8   CARSON, BUT THE PEOPLE WAS NEVER PICKED UP ON CHARGES FOR THAT.

9   Q       "TO YOU KNOWLEDGE, WAS THE INFORMANT WORK THAT RICHARD DID,

10  DID IT ALL INVOLVE BEING GIVEN MONEY BY MARTY CARSON AND

11  PURCHASING DRUGS?

12  A       "YES, SIR.

13  Q       "AS OPPOSED TO SELLING THEM, FOR EXAMPLE?

14  A       "MOST OF THE – MOST OF THE WORK THAT WE DID, THAT I DROVE HIM

15  TO DO, WE – THE MONEY WAS GIVEN TO MY UNCLE IN ADVANCE, WHETHER IT

16  BE THEY DROPPED IT OFF BY THE HOUSE OR I'D HAVE TO TAKE HIM

17  SOMEWHERE TO MEET AND PICK THIS MONEY UP.  AND THEN I'D TAKE HIM TO

18  GO DO THE DEALS.  LIKE I SAID EARLIER, IF WE DON'T – WASN'T NOTHING

19  THERE, WE'D HAVE TO BRING THE MONEY BACK AND RETURN IT TO MR.

20  CARSON.

21  Q       "YOU –

22  A       "BECAUSE THAT'S WHAT WAS REQUIRED OF US TO DO.

23  Q       "YOU SAY, 'MOST OF IT.'  YOU'RE TALKING ABOUT ALL OF IT, AREN'T

24  YOU?

25  A       "YES, SIR.

1   Q        "OKAY.

2   A        "BUT THERE'D BE SEVERAL PLACES WE'D HAVE TO GO.  AND THERE'D

3   BE SEVERAL PLACES THAT WOULD BE DRY.  WHAT THEY CALL DRY.

4   WOULDN'T HAVE NO DRUGS.  OR WE'D HIT ONE PLACE AND GET A LITTLE OF

5   SOMETHING.  SO, I MEAN THE DRUGS AND THE MONEY WAS ALWAYS

6   RETURNED TOGETHER, OR IF IT WAS JUST THE DRUGS, IF WE USED UP ALL THE

7   MONEY, WAS ALWAYS RETURNED TOGETHER AT THE SAME TIME."

8   Q        PAGE 47, LINE 7: "OKAY.  OTHER THAN MR. ELLIS, MR. WIGLER, TODAY

9   MR. MONCIER, WHO ELSE HAVE YOU TALKED ABOUT CONCERNING THE

10  SUBJECTS THAT WE HAVE TALKED ABOUT TODAY?

11  A        "NO ONE.

12  Q        "HAVE YOU BEEN PROMISED, EITHER EXPRESSLY OR IMPLICITLY, THAT

13  YOU WILL RECEIVE ANY KIND OF A BENEFIT IN CONNECTION WITH YOUR

14  TESTIMONY TODAY?

15  A        "NO, SIR.

16  Q        "ANY KIND OF MONEY, PROPERTY, ANYTHING OF VALUE?

17  A        "NO, SIR.

18  Q        "SOME FAVOR TO EITHER YOU OR RICHARD?

19  A        "NO, SIR.

20  Q        "LET ME HAVE JUST A MINUTE.  YOU MAY BE FREE TO GO," AND THEN

21  I'M ASKING ANOTHER QUESTION AFTER A BREAK.  "MR. BABB, DO I

22  UNDERSTAND THAT YOU ALWAYS – YOU AND RICHARD ALWAYS MET MARTY

23  AT THIS CEMETERY?

24  A        "YES, SIR.  WE'VE USUALLY MET AT THE CEMETERY AT THE BEGINNING

25  OF MOST OF THE DEALS WHERE WE WAS BUYING, WHETHER IT BE THE METH,

1   PILLS, WHAT HAVE YOU, FOR THESE BUSTS.  BUT SOMETIMES WE WOULDN'T

2   MEET BACK THERE.  SOMETIMES WE'D – THEY'D HAVE SOMETHING ELSE

3   COME UP AND I'D HAVE TO TAKE HIM BY – UNCLE TO THE SHERIFF'S

4   DEPARTMENT AND STUFF LIKE THAT.

5   Q     "WAS THERE EVER ANYONE WITH MARTY AT THE CEMETERY?

6   A     "I'VE SEEN MR. PHILIPS A COUPLE TIMES, AND THEN THERE'S BEEN –

7   THERE WAS A BUNCH OF TIMES WHERE THE PERSON THAT WAS WITH HIM

8   NEVER CRAWLED OUT OF THE VEHICLE.  AND USUALLY, IF WE WAS AT THE

9   CEMETERY, I'D PULL UP BEHIND THEM, I COULDN'T SEE – SEE INTO THE

10   VEHICLE.  BUT THERE WAS – THEY – THERE WAS USUALLY ALWAYS

11   SOMEBODY WITH HIM.

12   Q     "WELL, THERE WASN'T ANYBODY WITH HIM ON THE OCCASION WHEN

13   HE WAS – GAVE YOUR BROTHER – YOUR UNCLE THE FIVE THOUSAND

14   DOLLARS TIMES TWO, WAS THERE?

15   A     "YES, SIR, THERE WAS.

16   Q     "OH, THERE WAS?  WHO WAS THAT?  OR WAS IT SOMEBODY YOU

17   COULDN'T SEE?

18   A     "IT WAS SOMEBODY I COULDN'T SEE.  THEY WAS OUT OF THE VEHICLE."

19   IS THAT NOT THE END?

20   Q     "THEY WAS OUT OF THE VEHICLE, BUT I REMEMBER – "

21   A     "THEY WAS OUT OF THE VEHICLE, BUT I REMEMBER MY UNCLE WAS

22   TELLING ME IT WAS MR. PHILIPS.  I BELIEVE HE SAID IT WAS."

23   Q     THEN MOVING TO PAGE 50, LINE THREE:  "SO YOU ON OCCASION, WOULD

24   TAKE RICHARD TO THE SHERIFF'S DEPARTMENT?

25   A     "IF THERE WAS SOMETHING HAD COME UP AND THEY COULDN'T MEET

1  US BACK AT THE CEMETERY OR THERE WAS A FEW OTHER PLACES WE'VE HAD

2  TO MEET THEM BECAUSE SOMEBODY WOULD BE DOWN AT THE CEMETERY OR

3  TOO MUCH TRAFFIC.  IF SOMETHING HAD HAPPENED THAT THEY HAD TO GO

4  BACK TO THE STATION, I'D HAVE TO TAKE UNCLE BACK TO THE STATION TO

5  MEET BACK UP WITH THEM.

6  Q      "OKAY.  AND I TAKE IT UNCLE WOULD GO IN AND YOU WAITED OUT IN

7  THE VEHICLE?

8  A      "YES, SIR.

9  Q      "WHAT KIND OF VEHICLE WAS THAT YOU WERE DRIVING?

10  A      "A '97 OLDS BRAVADO AND A '95 – AFTER THAT, IT WAS A '95 SATURN

11  SE2 COUPE.

12  Q      "WHAT COLORS?

13  A      "THE BRAVADO WITH BLACK AND THE SE2 COUPE, IT WAS TWO-TONED.

14  AT NIGHT IT WOULD LOOK BLACK, AND IN THE DAYTIME IT SHOWED TWO

15  DIFFERENT COLOR GREENS.  IT WAS CHAMELEON PAINT JOB.

16  Q      "NOW, WHO ARE SOME OF THE PEOPLE THAT UNCLE MADE DRUG BUYS

17  FROM?

18  A      "NICK LETNER WAS ONE OF THEM.  TERRY MORROW, NICK LETNER.

19  WHAT'S HIS NAME?  KENNY – WHAT'S HIS LAST NAME?  I DON'T REMEMBER

20  HIS LAST NAME.  KENNY SOMETHING OR OTHER.  HAMMOCK.  KENNETH

21  HAMMOCK.  AND THOSE ARE THE ONLY THREE THAT I KNOW.  THERE WAS

22  PLACES I TOOK HIM WHERE I DIDN'T KNOW THE PEOPLE.  AND UNCLE TOLD

23  ME IT WAS BEST I DIDN'T – THAT I – THE PLACES WHERE I DIDN'T KNOW

24  WHERE I WAS AT, YOU KNOW, HE SAID IT WAS BEST THAT IT WAS JUST FOR ME

25  TO STAY OUT OF IT AND JUST TO DRIVE HIM.

1   Q        "JUST THOSE THREE PEOPLE?

2   A        "THOSE ARE THE THREE PEOPLE THAT I KNOW WHERE I TOOK UNCLE.

3   THERE WAS SEVERAL, SEVERAL, SEVERAL MORE THAT I TOOK HIM PLACES

4   THAT I DIDN'T KNOW – DIDN'T KNOW WHERE I WAS AT OR WHO THEY WAS OR

5   ANYTHING.

6   Q        "OKAY.  WHAT KIND OF DRUGS DID RICHARD – WELL, LET ME ASK YOU,

7   WHEN YOU WENT TO A HOUSE, BE IT LETNER'S, MORROW'S, OR HAMMOCK,

8   DID YOU WAIT OUT IN THE CAR?

9   A        "YES, SIR.

10  Q        "WHAT KIND OF DRUGS DID RICHARD COME OUT OF THE VARIOUS

11  HOUSES WITH?

12  A        "MOST OF THE TIME IT WAS METH, BUT IF – THERE WAS INSTANCES

13  WHERE WE WENT TO PURCHASE METH AND COULDN'T GET METH, WE WOULD

14  SETTLE FOR PILLS, POT, JUST WHATEVER, YOU KNOW.  THERE WAS SOMETIME

15  – SOME THINGS I DON'T KNOW, THAT HE WOULD BUY THAT HE WOULDN'T

16  EXPLAIN TO ME WHAT IT WAS.  AND MOST OF THE TIME, WE PRIMARILY WAS

17  GOING AFTER THE METH.

18  Q        "WHAT KIND OF PILLS?

19  A        "STUFF LIKE OXY'S, AND HYDRO'S, AND TYLOX'S, AND MORPHINE, AND

20  STUFF LIKE THAT."

21          MR. DUFFY:  THAT'S THE TESTIMONY OF JOSEPH BABB.

22          THE COURT:  THANK YOU, MR. DUFFY.  THANK YOU, MR. WIGLER.

23  (ATTORNEY WIGLER LEFT STAND.)

24          MR. DUFFY:  PAUL PHILLIPS.

25          THE COURT:  THANK YOU.  MR. PHILLIPS, IF YOU'LL PLEASE MAKE

1   YOUR WAY TO THE WITNESS STAND, MS. NORWOOD, MY COURTROOM

2   DEPUTY, WILL GET YOU SITUATED.

3            WILLIAM P. PHILLIPS, DEFENDANT'S WITNESS, SWORN

4            COURTROOM DEPUTY:  WOULD YOU PLEASE STATE AND SPELL

5   YOUR NAME FOR THE RECORD?

6            THE WITNESS:  MY NAME IS WILLIAM PAUL PHILLIPS, W-I-L-L-I-A-

7   M, P-A-U-L, P-H-I-L-L-I-P-S.

8                            DIRECT EXAMINATION

9   BY MR. DUFFY:

10  Q       MR. PHILLIPS, HOW ARE YOU EMPLOYED, SIR?

11  A       I'M THE DISTRICT ATTORNEY GENERAL OF THE EIGHTH JUDICIAL

12  DISTRICT, WHICH IS FIVE COUNTIES THAT INCLUDES SCOTT COUNTY, AND WE

13  HAVE OFFICES IN HUNTSVILLE, JACKSBORO, TAZEWELL AND PART-TIME

14  OFFICES IN MAYNARDVILLE AND JAMESTOWN, TENNESSEE.

15  Q       ALL RIGHT.  AND WHAT IS THE JOB OF THE DISTRICT ATTORNEY

16  GENERAL FOR A JUDICIAL DISTRICT?

17  A       THE DISTRICT ATTORNEY GENERAL FOR THE DISTRICT PROSECUTES ALL

18  CASES, ALL CRIMINAL CASES, FROM THE MOST MINOR TO THE MOST SERIOUS

19  IN THE COUNTIES IN HIS DISTRICT.  IN A METROPOLITAN COUNTY, LIKE KNOX

20  COUNTY, THE DISTRICT ATTORNEY GENERAL WILL ONLY SERVE ONE COUNTY.

21  BUT IN THE RURAL AREAS MANY TIMES THE DISTRICT ATTORNEY GENERAL

22  WILL HAVE MULTIPLE COUNTIES LIKE I HAVE, AND I HAVE FIVE, FIVE

23  COUNTIES.

24  Q       BEING CAMPBELL, UNION, SCOTT –

25  A       CLAIBORNE.

1    Q      CLAIBORNE?

2    A      AND FENTRESS.

3    Q      FENTRESS.  ALL RIGHT.

4    A      YES.

5    Q      DOES THE DISTRICT ATTORNEY GENERAL ALSO HAVE SOME

6    INVOLVEMENT IN THE EIGHTH JUDICIAL DRUG TASK FORCE?

7    A      YES.  ACTUALLY, DRUG TASK FORCES THAT ARE FUNDED BY THE

8    FEDERAL GOVERNMENT ARE CHAIRED BY DISTRICT ATTORNEYS, AND SO I

9    CHAIR THE DRUG TASK FORCE FOR THE EIGHTH JUDICIAL DISTRICT.

10   Q      AND DO MEMBERS – WELL, WHO COMPRISE, WHAT LAW ENFORCEMENT

11   OFFICERS, COMPRISE THE DRUG TASK FORCE OR DTF, FOR THE EIGHTH

12   JUDICIAL DISTRICT?

13   A      WELL, THE SHERIFFS, ALL FIVE SHERIFFS, BELONG TO THE DRUG TASK

14   FORCE.  AGENCIES CAN CHOOSE TO BELONG OR NOT BELONG, AND ALL FIVE

15   SHERIFFS BELONG AND MOST OF THE CITIES BELONG.  SO THE DRUG TASK

16   FORCE BOARD CONSISTS OF SHERIFFS AND CHIEFS.  AND THEN THE OFFICERS,

17   TYPICALLY, WE WOULD HAVE ONE OR TWO OR POSSIBLY THREE PEOPLE PAID

18   THROUGH THE GRANT WHO WORK FOR THE DRUG TASK FORCE, AND THEN

19   SOMETIMES AGENCIES WILL ASSIGN AN OFFICER TO THE DRUG TASK FORCE

20   FOR TEMPORARY PERIODS OF TIME, LIKE A COUNTY MIGHT ASSIGN AN

21   OFFICER FOR A YEAR OR SOMETHING.

22   Q      ALL RIGHT.  THE POSITION OF DISTRICT ATTORNEY GENERAL, IS THAT

23   AN ELECTED OR APPOINTED POSITION?

24   A      IT'S AN ELECTED POSITION, ALTHOUGH, WHEN I FIRST BECAME

25   DISTRICT ATTORNEY GENERAL, I WAS APPOINTED TO FILL A VACANCY, AND

1    THEN I HAVE BEEN ELECTED EVERY TIME SINCE THEN.

2    Q        AND HOW LONG, SIR, HAVE YOU BEEN THE DISTRICT ATTORNEY

3    GENERAL FOR THE EIGHTH JUDICIAL DISTRICT?

4    A        FOR 28 AND A HALF YEARS.

5    Q        DO YOU HAVE EXPERIENCE AS A PROSECUTOR PRIOR TO THAT?

6    A        YES.  FOR FOUR YEARS I WAS AN ASSISTANT DISTRICT ATTORNEY, FIRST

7    IN NASHVILLE.  I ACTUALLY STARTED WORKING FOR THE DISTRICT

8    ATTORNEY'S OFFICE IN NASHVILLE WHILE I WAS IN LAW SCHOOL, AND THEN I

9    CAME BACK HOME TO BE AN ASSISTANT DISTRICT ATTORNEY.  THEN I

10   BECAME DISTRICT ATTORNEY GENERAL AFTER I HAD BEEN AN ASSISTANT

11   FOR ABOUT FOUR YEARS.

12   Q        DESCRIBE, IF YOU WILL, FOR THE JURY, PLEASE, THE NATURE OF THE

13   RELATIONSHIP BETWEEN THE DISTRICT ATTORNEY GENERAL AND THE FIVE

14   SHERIFFS' DEPARTMENTS WITH WHOM YOU WORK.

15   A        WELL, WE HAVE A COOPERATIVE RELATIONSHIP WITH THE SHERIFF'S

16   DEPARTMENTS, BUT WE ALSO HAVE AN ARMS-LENGTH RELATIONSHIP WITH

17   THE FIVE SHERIFFS' DEPARTMENTS AND ALSO WITH THE POLICE

18   DEPARTMENTS.  BECAUSE, IN EFFECT, WE HAVE TO – WE HAVE TO PASS UPON

19   THEIR INVESTIGATIONS AT TIME, AND WE ALSO AT TIMES, UNFORTUNATELY,

20   HAVE TO PROSECUTE OFFICERS IF THEY ENGAGE IN WRONG-DOING.  SO

21   ALTHOUGH WE HAVE A COOPERATIVE RELATIONSHIP WITH POLICE

22   DEPARTMENTS AND SHERIFFS' OFFICES WITHIN OUR DISTRICT, WE TRY TO

23   HAVE AN ARMS-LENGTH RELATIONSHIP.

24           NOW, ON THE OTHER HAND, THE TBI WORKS AT OUR REQUEST.  THE TBI

25   IS AN INVESTIGATIVE AGENCY THAT IS TO BE INDEPENDENT AND

1   PROFESSIONAL AND WORK DIRECTLY FOR THE DISTRICT ATTORNEY GENERAL.

2   AND WE HAVE A CLOSER WORKING RELATIONSHIP WITH THE TBI THAN WE DO

3   WITH THE VARIOUS SHERIFFS' DEPARTMENTS AND POLICE DEPARTMENTS.

4   Q       DO YOU KNOW MARTY CARSON?

5   A       YES.

6   Q       DID YOU KNOW JOHN YANCEY?

7   A       YES.

8   Q       AND HOW IS IT THAT YOU KNOW THESE TWO INDIVIDUALS?

9   A       WELL, MARTY CARSON BECAME AN OFFICER DURING THE TIME THAT

10  HIS FATHER WAS SHERIFF,  AND THEN HE BECAME A NARCOTICS OFFICER,

11  AND HE WAS IN CHARGE OF DRUG INVESTIGATIONS FOR THE SHERIFF'S

12  DEPARTMENT.  SERGEANT YANCEY, I DON'T RECALL WHEN HE CAME WITH

13  THE SHERIFF'S DEPARTMENT, BUT HE WAS AN OFFICER WITH THE SHERIFF'S

14  DEPARTMENT.  AND FOR SOME TIME PRIOR TO HIS DEATH HE FUNCTIONED AS

15  MARTY CARSON'S PARTNER, THAT IS, MARTY CARSON AND SERGEANT

16  YANCEY ACTED AS PARTNERS.  THEY WORKED AS PARTNERS.

17          AND THEY WERE IN OUR OFFICE A LOT IN HUNTSVILLE, OUR

18  HUNTSVILLE OFFICE.  THEY – THE PATROL OFFICERS ARE NOT IN OUR OFFICES

19  A LOT, BUT THE DETECTIVES AND THE NARCOTICS OFFICERS ARE IN OUR

20  OFFICES MORE BECAUSE OF THE NATURE OF THEIR WORK.  AND SO MARTY

21  CARSON AND SERGEANT YANCEY WOULD BE IN OUR HUNTSVILLE OFFICE A

22  LOT, AND THAT'S WHERE MY MAIN OFFICE IS, SO I SAW THEM THERE A LOT

23  TOGETHER.

24  Q       WHAT KIND OF ASSISTANCE DOES THE DISTRICT ATTORNEY GENERAL

25  PROVIDE TO OFFICERS, DRUG OFFICERS, DETECTIVES, THAT SORT OF THING?

1    A       WELL, WE ASSIST THEM IN DRAFTING SEARCH WARRANTS, ARREST

2    WARRANTS, AND MANY TIMES WE EVALUATE WHETHER OR NOT THEY HAVE

3    PROBABLE CAUSE FOR SEARCH WARRANT, WHETHER OR NOT WE THINK THEY

4    HAVE SUFFICIENT EVIDENCE FOR PROSECUTION.  I MEAN, THE CASES THAT

5    ARE WORKED BY THE DETECTIVES AND THE DRUG OFFICERS ARE NOT

6    ROUTINE, THEY ARE MORE MAJOR, AND SO IT'S COMMON FOR THEM TO

7    CONFER WITH MY ASSISTANTS ABOUT WHETHER OR NOT THEY HAVE ENOUGH

8    EVIDENCE IN A PARTICULAR CASE.  IT'S COMMON FOR THEM TO ASK FOR

9    ASSISTANCE FROM OUR OFFICE IN DRAFTING SEARCH WARRANTS AND

10   ARREST WARRANTS.

11   Q       DO YOU EVER HAVE AN OCCASION TO ADVISE THEM ABOUT WHAT

12   MIGHT OUGHT TO BE DONE IN CONNECTION WITH AN INVESTIGATION?

13   A       YES.  ESPECIALLY IN MAJOR CASES.

14   Q       AND HOW WOULD THAT WORK?

15   A       WELL, THEY WOULD DISCUSS WITH US A FACT SITUATION, AND WE

16   WOULD MAKE SUGGESTIONS OF RESOURCES THAT MIGHT BE AVAILABLE

17   THROUGH THE STATE THAT COULD HELP THEM WITH THEIR INVESTIGATION.

18   AND THEN WE HAD CERTAIN WHAT, I GUESS, YOU'D CALL PROTOCOLS WITH

19   THEM.  WE CONDUCT IN-SERVICE TRAINING FOR SHERIFF'S OFFICES AND

20   POLICE DEPARTMENTS IN OUR DISTRICT.  WE TRY TO RAISE OUR

21   PROFESSIONALISM.

22           AND WE'VE ALSO TAUGHT COMMUNITY COLLEGE COURSES THAT

23   WE'VE ENCOURAGED THEM TO TAKE.  IN GENERAL, WE TRY TO INSTILL IN

24   THEM AN UNDERSTANDING THAT, WHEN THEY HAVE A MAJOR CASE, THEY

25   SHOULD ASK FOR ASSISTANCE FROM OTHER AGENCIES AS SOON AS POSSIBLE.

1      SO THE MAIN PROTOCOL THAT WE HAVE IS THAT WE WANT THEM TO

2   INVOLVE THE MEDICAL EXAMINER, WE WANT THEM TO INVOLVE THE TBI IN

3   ANY DEATH CASE, AND WE WANT THEM TO INVOLVE THE TBI IN ANY MAJOR

4   INVESTIGATION.

5   Q      HOW FREQUENTLY WERE MARTY CARSON AND JOHN YANCEY IN YOUR

6   HUNTSVILLE OFFICE IN SCOTT COUNTY?

7   A      OF COURSE, EVEN THOUGH THAT'S MY MAIN OFFICE, I'M NOT THERE

8   ALL THE TIME, I'M IN THE OTHER COUNTIES.  BUT IT SEEMED LIKE THAT I

9   WOULD SEE THEM NEARLY EVERY DAY THAT I WAS IN MY HUNTSVILLE

10  OFFICE, AND I ALSO WOULD SEE THE DETECTIVES FREQUENTLY.  THE

11  DETECTIVES AT THAT TIME WERE ROBBY CARSON, RANDY LEWALLEN AND

12  WADE CHAMBERS.  I WOULD SEE THEM FREQUENTLY.

13      BUT THE WAY WE ASSIGN WORK, SIR, IS GEOGRAPHICAL.  THERE WILL

14  BE A TEAM, THERE'S A TEAM FOR EACH COUNTY.  AND SO I HAVE AN

15  ASSISTANT WHO'S THE TEAM LEADER FOR SCOTT COUNTY, AND THEY WOULD

16  BE THERE CONFERRING WITH THAT ASSISTANT, WHO AT THAT TIME WAS

17  SARAH DAVIS.  SHE WAS THE ASSISTANT DISTRICT ATTORNEY IN CHARGE OF

18  SCOTT COUNTY.

19      AND I WOULD MAINLY PASS THEM IN THE HALLWAY AND SPEAK TO

20  THEM AND THAT SORT OF THING.  THEY WERE THERE USUALLY CONFERRING

21  WITH SARAH DAVIS.

22      ALSO THE MOST SENIOR ASSISTANT WORKED OUT OF THE HUNTSVILLE

23  OFFICE AND STILL DOES, WHOSE NAME IS JOHN GALLOWAY, WHO'S BEEN

24  WITH ME FOR 25 YEARS OR MORE.  AND BECAUSE HE WORKED OUT OF THE

25  HUNTSVILLE OFFICE LOTS OF TIMES THE DETECTIVES WOULD ALSO CONFER

1    WITH HIM.  SO IF THE NARCOTICS INVESTIGATORS HAD SARAH TIED UP, LOTS

2    OF TIMES THE DETECTIVES WOULD CONFER WITH JOHN.

3    Q       ALL RIGHT, SIR.  DID YOU HAVE OPPORTUNITY TO PERSONALLY WORK

4    WITH EITHER MARTY OR JOHN-JOHN WHEN THEY WOULD COME TO THE

5    OFFICE FOR ADVICE?

6    A       WELL, MAINLY I COACHED MY ASSISTANTS IN ALL FIVE COUNTIES, AND

7    SO USUALLY MOST OF MY INVOLVEMENT IN THE CASES WOULD BE IN

8    DISCUSSING WITH THE ASSISTANTS THE PROGRESS OF CASES.  ON ONE

9    OCCASION SERGEANT YANCEY ASKED IF HE COULD SPEAK TO ME PRIVATELY,

10   AND THIS WAS – I CAN'T TELL YOU WHEN THIS WAS.  IT WAS SOMETIME NOT

11   LONG BEFORE HIS DEATH, AND I SAID SURE.

12          AT THE TIME HE ASKED, HE AND MARTY CARSON WERE IN MY

13   ASSISTANT – SARAH DAVIS' OFFICE, WHICH IS TWO DOORS DOWN.  SO I TOOK

14   SERGEANT YANCEY INTO MY OFFICE AND CLOSED THE DOOR, BECAUSE HE

15   ASKED TO SPEAK TO ME PRIVATELY.  I DIDN'T KNOW WHAT HE WANTED TO

16   SPEAK TO ME ABOUT.

17          AND HE ASKED ME ABOUT A COLD CASE, A C-O-L-D CASE, AN UNSOLVED

18   HOMICIDE.  THE CASE HE ASKED ME ABOUT WAS FROM A PRIOR SHERIFF'S

19   ADMINISTRATION.  AND HE SAID HE THOUGHT HE MIGHT HAVE SOME LEADS

20   ON THE CASE AND WOULD I MIND IF HE WORKED ON IT.

21          AND I TOLD HIM I'D BE DELIGHTED FOR HIM, IF HE COULD MAKE

22   PROGRESS ON A COLD, UNSOLVED HOMICIDE, I'D BE DELIGHTED.  I KNEW THE

23   CASE HE WAS TALKING ABOUT, AND I THOUGHT THAT – I KNOW THAT IT WAS

24   UNDER A PRIOR SHERIFF, BECAUSE I TOLD HIM I THOUGHT THERE MIGHT NOT

25   BE A FILE IN THE SHERIFF'S DEPARTMENT.

1    WE HAD A BIG PROBLEM WITH, WHEN SHERIFFS WOULD CHANGE, FILES

2 WOULD BE LOST AND SO ON.  SO I TOLD HIM THAT HE COULD USE OUR FILE,

3 THAT WE WOULD HAVE A FILE ON THIS UNSOLVED HOMICIDE, AND THAT HE

4 COULD COPY THE FILE AND THAT THE SUPPORT STAFF WOULD GIVE HIM

5 ACCESS TO THE FILE AND ALSO THAT HE COULD COPY THE FILE AND THAT

6 WE'D HELP IN ANY WAY WE COULD.  I WAS – I TOLD HIM I WAS DELIGHTED IF

7 HE COULD MAKE PROGRESS ON AN UNSOLVED HOMICIDE.

8 Q    AT THAT TIME, WHEN MR. YANCEY IS MEETING WITH YOU ALONE IN

9 YOUR OFFICE, RIGHT BEFORE HIS DEATH, DID HE SAY ANYTHING ABOUT

10 GOING TO OPEN AN INVESTIGATION INTO MARTY CARSON?

11 A    HE DID NOT.  HE NEVER MENTIONED MARTY CARSON TO ME.  AND WHEN

12 I WOULD SEE THEM, THEY ALWAYS WERE WORKING TOGETHER AS PARTNERS.

13 BUT THIS IS THE ONLY OCCASION THAT I REMEMBER TALKING TO SERGEANT

14 YANCEY IN MY OFFICE WITH THE DOOR CLOSED, PRIVATELY, AND WE SPENT A

15 FAIR AMOUNT OF TIME DISCUSSING THIS UNSOLVED HOMICIDE.  AND, NO, HE

16 DIDN'T MENTION ANYTHING ABOUT MARTY CARSON OR ANY MISCONDUCT

17 OR ANYTHING LIKE THAT.

18 Q    DID MR. YANCEY EXPRESS CONCERN FOR HIS OWN PERSONAL SAFETY

19 IN CONNECTION WITH THAT?

20 A    NO, HE DID NOT.

21 Q    AT OTHER TIMES, OTHER THAN THIS OCCASION, WOULD YOU – HOW

22 FREQUENTLY WERE YOU IN THE HUNTSVILLE OFFICE?

23 A    YOU KNOW, THAT'S HARD TO ANSWER.  WHEN WE'RE HAVING COURT IN

24 ANOTHER COUNTY, I MIGHT BE IN ANOTHER COUNTY FOR A WEEK AT A TIME.

25 BUT I WAS IN HUNTSVILLE MORE FREQUENTLY THAN I WAS AT ANY OF THE

1    OTHER OFFICES, BECAUSE IT'S THE MAIN OFFICE.

2    Q      IF A DEPUTY OR DETECTIVE WANTED TO MEET WITH YOU PRIVATELY,

3    WOULD THEY HAVE ACCESS TO YOU?

4    A      YES.  EVERYBODY KNEW IN MY OFFICE, WHO HANDLED MY

5    SCHEDULING, AND I – IT WAS ACTUALLY FAIRLY COMMON FOR OFFICERS TO

6    ASK TO SPEAK TO ME PRIVATELY.  AND THERE WAS A LADY WHO KEPT MY

7    SCHEDULE, AND SHE WOULD SCHEDULE APPOINTMENTS FOR THEM.

8           LOTS OF TIMES THE OFFICERS WOULD SAY IN PRIVACY, "I'M APPLYING

9    FOR A JOB.  MAY I LIST YOU FOR A REFERENCE," AND THAT KIND OF THING.

10   Q      ALL RIGHT, SIR.  HAD OFFICER YANCEY EXPRESSED CONCERN FOR HIS

11   SAFETY OR THAT HE WAS SUSPECTING THAT MR. CARSON WAS INVOLVED IN

12   METHAMPHETAMINE DISTRIBUTION, IS THAT SOMETHING YOU WOULD HAVE

13   LISTENED TO?

14   A      ABSOLUTELY, ABSOLUTELY.  AND IT'S SOMETHING THAT I WOULD

15   HAVE ASKED THE TBI TO INVESTIGATE.  I WOULD HAVE ASKED FOR AN

16   OUTSIDE INVESTIGATION.

17   Q      NOW, ANY TIME THAT SAY SOME SUSPECT CHARGED WITH A CRIME

18   CLAIMS THAT A SHERIFF'S DEPARTMENT OR DETECTIVE OR NARCOTICS

19   OFFICER IS IN CAHOOTS WITH HIM, WOULD THAT NECESSARILY TRIGGER A TBI

20   INVESTIGATION?

21   A      WELL, ACTUALLY, MOST OF THE TIME IT WOULD, AT LEAST A

22   PRELIMINARY INVESTIGATION.  SOMETHING UNUSUAL HAPPENED TO US

23   ABOUT A YEAR BEFORE SERGEANT YANCEY'S DEATH, AND THAT IS WE GOT

24   HIT BY METHAMPHETAMINE LIKE A TSUNAMI.  IT WAS LIKE NOTHING THAT

25   HAD EVER HAPPENED TO US BEFORE.  AS A RESULT, WE LEARNED THAT

1    METHAMPHETAMINE AND PEOPLE WHO ARE ON METHAMPHETAMINE ARE

2    PARTICULARLY VIOLENT, PSYCHOTIC, PARANOID.

3         AND SO, AS WE STARTED BUSTING METH LABS AND TRYING TO DO

4    SOMETHING ABOUT THIS PROBLEM, WE HEARD ALL KINDS OF WILD STORIES,

5    ALIENS WERE BRINGING METHAMPHETAMINE, THE PRESIDENT OF THE UNITED

6    STATES WAS INVOLVED IN THE TRAFFIC OF METHAMPHETAMINES.  I MEAN –

7         MR. MONCIER:  YOUR HONOR, I'LL OBJECT TO ALL THIS AS

8    IRRELEVANT TO THIS PROCEEDING.

9    A    (CONTINUING)  I'M JUST SAYING THAT WE DID START GETTING SOME

10   WILD –

11        MR. MONCIER:  I WOULD NEVER SUGGEST THAT THE DISTRICT

12   ATTORNEY SHOULD STOP SPEAKING WHEN I'M SPEAKING –

13        THE COURT:  LET ME HEAR YOUR OBJECTION.

14        MR. MONCIER:  WITH ALL DUE RESPECT, MR. PHILLIPS, I OBJECT.

15        THE COURT:  ALL RIGHT.  MR. DUFFY?

16        MR. DUFFY:  YOUR HONOR, I CERTAINLY THINK IT'S RELEVANT.  I

17   BELIEVE –

18        THE COURT:  I'LL LET YOU FINISH THIS LINE OF INQUIRY.  GO

19   AHEAD AND WRAP IT UP.  I'LL OVERRULE THE OBJECTION.

20   Q    GO AHEAD MR. PHILLIPS.

21   A    I'M SORRY.  I'M NOT SURE WHAT I'M SUPPOSED TO DO.  I'M JUST – WHAT

22   I WAS TRYING TO SAY IS, UNDER NORMAL CIRCUMSTANCES WE

23   INVESTIGATED ANY ALLEGATIONS OF WRONG-DOING AGAINST OFFICERS.

24   AFTER WE STARTED HAVING A NUMBER OF PEOPLE ARRESTED WHO WERE

25   ADDICTED WITH METH, WE DID START RECEIVING SOME WILD ALLEGATIONS,

1    AND I DON'T KNOW THAT ALL OF THOSE WERE INVESTIGATED, BECAUSE, AS I

2    SAID –

3                    MR. MONCIER:  I WOULD OBJECT, YOUR HONOR, WILD

4    ALLEGATIONS.

5                    THE COURT:  I'VE OVERRULED THAT OBJECTION.  GO AHEAD.

6    A       (CONTINUING) AS I SAID, PEOPLE WHO ABUSE METH ARE PARTICULARLY

7    PSYCHOTIC, PARANOID.  IT'S THE WORST DRUG WE'VE EVER DEALT WITH.

8    Q       DID THERE COME A TIME WHERE – HAVE YOU EVER HEARD OF A

9    FELLOW BY THE NAME OF NICK LETNER?

10   A       YES.

11   Q       AND A RONNIE GUNTER?

12   A       LONNIE GUNTER?

13   Q       LONNIE GUNTER.  EXCUSE ME.

14   A       YES, YES.

15   Q       DO YOU KNOW IF THEY LEVELED ACCUSATIONS AT MARTY CARSON

16   ABOUT METHAMPHETAMINE USE?

17   A       AS I RECALL, IN 2001, THEY ESCAPED FROM THE JAIL, AND THEY MADE

18   ALLEGATIONS ABOUT BEING AFRAID AND THAT'S WHY THEY ESCAPED FROM

19   THE JAIL.  AND I ASKED FOR A TBI INVESTIGATION OF THEIR ALLEGATIONS,

20   AND THEY WERE INTERVIEWED SEPARATELY.  I KNOW ONE OF THEM WAS

21   INTERVIEWED IN THE ROANE COUNTY JAIL, AND I'M NOT SURE WHERE THE

22   OTHER ONE WAS INTERVIEWED.

23          BUT, YES, I REMEMBER HAVING THEM INTERVIEWED ABOUT

24   ALLEGATIONS THAT THEY MADE, THAT THEY ESCAPED FROM THE JAIL

25   BECAUSE THEY WERE AFRAID.

1   Q      WAS THERE SOME FURTHER INVESTIGATION AFTER THOSE STATEMENTS

2   WERE TAKEN OF MR. LETNER AND GUNTER BY THE TBI AGENTS?

3   A      YES.  CHARLIE SCOTT WAS IN CHARGE OF THE INVESTIGATION.  HE WAS

4   ASSISTED BY A TBI AGENT ASSIGNED TO MORGAN COUNTY.  THE SUPERVISOR

5   WAS BOB DENNY.  I KNOW THAT THE TWO STATEMENTS WERE NOT

6   CONSISTENT WITH EACH OTHER, AND THEY REPORTED TO ME ON THE

7   RESULTS OF THEIR INVESTIGATION, THAT THEY DID NOT FIND THE

8   ALLEGATIONS TO BE CREDIBLE.

9              MR. MONCIER:  OBJECTION, YOUR HONOR, TO THE HEARSAY.  I'D

10  ASK THAT IT BE STRICKEN.

11             THE COURT:  MR. DUFFY?

12             MR. DUFFY:  WELL, YOUR HONOR –

13             MR. MONCIER:  AND THE OPINION.

14             THE COURT:  WELL, SINCE MR. DUFFY – WE'LL ASK THE JURY TO

15  DISREGARD THE FINAL COMMENT ABOUT WHAT THEY FOUND, BEING

16  HEARSAY.  BUT GO AHEAD, MR. DUFFY.

17  Q      WELL –

18  A      THE ALLEGATIONS WERE INVESTIGATED.

19  Q      – MY QUESTION WOULD BE WHY NO FURTHER INVESTIGATION BEYOND

20  THAT WAS CONDUCTED.

21             MR. DUFFY:  THAT WOULD BE MY NEXT QUESTION, YOUR HONOR.

22             MR. MONCIER:  IT'S ALL OPINION EVIDENCE, YOUR HONOR, AND I

23  OBJECT.

24             THE COURT:  WELL, I BELIEVE THAT – WHAT'S YOUR RESPONSE,

25  MR. DUFFY?

1          MR. DUFFY:  NO.  I THINK THE PLAINTIFF'S ALLEGATIONS ARE

2   THAT MARTY CARSON'S INVOLVED IN THIS METHAMPHETAMINE BUSINESS.

3          THE COURT:  WELL, I'LL ALLOW THE WITNESS TO ANSWER.  IT'S

4   WITHIN THE REALM OF HIS RESPONSIBILITY.  HE CAN CERTAINLY TESTIFY

5   WITHIN HIS PERSONAL KNOWLEDGE AS TO WHY NO FURTHER INVESTIGATION

6   WAS CONDUCTED, SO I'LL OVERRULE THE OBJECTION.

7   Q      WHY DID YOU NOT CONDUCT A FURTHER INVESTIGATION WITH

8   RESPECT TO SPECIFICALLY THE LETNER AND GUNTER ALLEGATIONS?

9   A      THE TBI DID NOT RECOMMEND FURTHER INVESTIGATION.

10  Q      NOW, HOW DID YOU LEARN THAT JOHN YANCEY WAS SHOT ON

11  NOVEMBER 28TH?

12  A      I WAS CALLED AT HOME.  I ACTUALLY WAS IN MY HOME OFFICE, IN MY

13  OFFICE IN MY HOME, DOING SOME PAPERWORK, AND AGENT STEVE VINSANT

14  TOLD ME THAT HE WAS EN ROUTE TO INVESTIGATE A SCENE THAT A METH

15  LAB WAS BEING RAIDED OR INVESTIGATED AND THAT SERGEANT YANCEY

16  HAD BEEN SHOT AND THAT HE WAS EN ROUTE TO INVESTIGATE.  AND I ASKED

17  HIM TO KEEP ME INFORMED.

18  Q      BEFORE I GO ANY FURTHER ON THAT LINE, I JUST THOUGHT, LET ME

19  ASK YOU.  YOU SAID THE TBI DID NOT RECOMMEND FURTHER INVESTIGATION.

20  HOW DOES THE TBI AND THE DISTRICT ATTORNEY WORK TOGETHER ON

21  DECIDING WHETHER CHARGES ARE BROUGHT AGAINST A SUSPECT?

22  A      IN OUR DISTRICT THEY COME TO ME ABOUT WHETHER THEY

23  RECOMMEND CHARGES TO BE BROUGHT, AND WE REACH A CONSENSUS

24  ABOUT THAT.  IF IT'S A MAJOR CASE, THEY MAY COME TO ME ABOUT ONE

25  PARTICULAR CASE.  IF IT'S NOT, WE HAVE A QUARTERLY REVIEW.  THE

1    SUPERVISOR FOR EAST TENNESSEE COMES TO MY OFFICE AT MY REQUEST ON

2    A QUARTERLY BASIS.  ALL AGENTS WHO HAVE CONDUCTED INVESTIGATIONS

3    IN MY DISTRICT COME WITH HIM, AND WE REVIEW EVERY CASE THAT THEY

4    HAVE INVESTIGATED OVER THE PAST QUARTER; AND WE REACH A

5    CONSENSUS ON EACH CASE AS TO WHETHER THERE SHOULD BE FURTHER

6    INVESTIGATION, WHETHER THE CASE SHOULD BE CLOSED OR WHETHER

7    CHARGES SHOULD BE BROUGHT.

8          NOW, THEY COME IN BETWEEN THE QUARTERLY MEETINGS FOR

9    SPECIFIC CASES AND MAJOR CASES, BUT WE HAVE THE QUARTERLY MEETINGS

10   TO MAKE SURE WE'RE NOT OVERLOOKING ANY CASES.

11   Q      AND IN WHICH MANNER DID THE CONFERRING, IF YOU WILL, BETWEEN

12   MR. DENNY, THE AGENT IN CHARGE OF THE TBI, AND YOURSELF IN

13   CONNECTION WITH THE DEATH OF JOHN YANCEY, WAS THAT QUARTERLY OR

14   –

15   A      OH, WE HAD SPECIAL MEETINGS ABOUT THAT THAT INVOLVED BOTH

16   AGENT STEVE VINSANT – THERE WERE OTHER AGENTS WHO HELPED HIM, BUT

17   STEVE VINSANT WAS THE LEAD AGENT.  BOB DENNY WAS HIS SUPERVISOR,

18   AND WE HAD MEETINGS THAT WERE DEDICATED ONLY TO THAT, TO THAT

19   INVESTIGATION.  WE HAD SPECIAL MEETINGS.

20   Q      ALL RIGHT.  NOW, WHAT DID YOU DO UPON LEARNING OF THE

21   SHOOTING DEATH OF JOHN YANCEY?

22   A      WELL, I ASKED FOR AGENT VINSANT TO KEEP ME INFORMED, AND HE

23   CALLED ME THE NEXT MORNING.  AND, AGAIN, BY COINCIDENCE, I WAS UP

24   AND IN MY OFFICE AT HOME.  AND HE TOLD ME ABOUT THE PRELIMINARY

25   RESULTS OF THE INVESTIGATION.

1    WE DISCUSSED HAVING THE – THAT THE CRIME LABORATORY WAS

2  HAVING A TEAM WORK THE SCENE.  AND I ASKED HIM TO HAVE THE CRIME

3  LABORATORY EXPEDITE THE LAB WORK, TO GET EXPEDITED SERVICE ON THE

4  LAB WORK.  I MADE SURE THAT AN AUTOPSY WAS BEING PERFORMED.

5    AND THEN, AFTER THAT CONVERSATION WITH AGENT VINSANT, WHICH

6  WOULD HAVE BEEN ON SATURDAY, THEN I HAD CONVERSATIONS WITH BOTH

7  THE ASSISTANT DISTRICT ATTORNEY, WHO WAS ASSIGNED TO SCOTT COUNTY,

8  THE TEAM LEADER FOR SCOTT COUNTY – THAT WAS SARAH DAVIS – AND

9  WITH MY MOST SENIOR ASSISTANT DISTRICT ATTORNEY, JOHN GALLOWAY,

10  AND THEY BOTH ACTUALLY WENT OUT.  THEY WENT OUT TO THE OFFICE AND

11  TO THE SHERIFF'S OFFICE AND ASSISTED THE TBI WITH THE INVESTIGATION.

12  Q    DO YOU REMEMBER AT WHAT POINT IN TIME YOU LEARNED THAT THE –

13  THAT MARTY CARSON MAY HAVE BEEN THE ONE WHO SHOT JOHN YANCEY?

14  A    YES.  IT WAS THAT MORNING, SATURDAY MORNING.

15  Q    WHAT DID YOU DIRECT OR SUPERVISE BE DONE IN TERMS OF THE

16  REMAINDER OF THE INVESTIGATION?

17  A    WELL, I ASKED OR I INSTRUCTED REALLY STEVE VINSANT TO MAKE

18  SURE THE INVESTIGATION WAS THOROUGH, TO MAKE SURE THE LAB WORK

19  WAS EXPEDITED.  HE TOLD ME HE WAS HAVING THE CRIME LABORATORY

20  HAVE A TEAM COME OUT TO WORK THE SCENE, WHICH I APPROVED OF THAT.

21  AND I ALSO ASKED HIM OR TOLD HIM THAT I WOULD ASK HIS SUPERVISOR TO

22  MAKE SURE HE HAD ADEQUATE RESOURCES TO DO A THOROUGH

23  INVESTIGATION.

24    THEN I COMMUNICATED WITH BOB DENNY, THE SUPERVISOR, ASKING

25  TO MAKE SURE THAT AGENT VINSANT HAD ADEQUATE RESOURCES TO BE

1    THOROUGH.

2    Q       BY THE WAY, WHAT IS THE TERMINOLOGY FOR A DEATH UNDER

3    CIRCUMSTANCES LIKE MR. YANCEY'S, THE NATURE – IS THAT WHAT IS

4    KNOWN AS A HOMICIDE OR WHAT IS IT KNOWN AS?

5    A       WELL, IT'S A HOMICIDE, AND THEN YOU INVESTIGATE TO DETERMINE

6    WHETHER IT'S A CRIMINAL HOMICIDE OR NOT.

7    Q       ALL RIGHT.  WHAT IS THE DEFINITION OF A HOMICIDE FOR LAW

8    ENFORCEMENT PURPOSES?

9    A       WELL, A HOMICIDE IS A DEATH THAT OCCURS AS THE RESULT OF SOME

10   CRIME.  IT'S A DEATH THAT IS CRIMINAL AS OPPOSED TO ACCIDENTAL OR

11   SUICIDE.

12   Q       OKAY.  AND WHEN THE INVESTIGATION WAS BEGUN, WHAT INITIALLY

13   WAS BELIEVED TO HAVE OCCURRED IN CONNECTION WITH MR. YANCEY'S

14   DEATH?

15                MR. MONCIER:  OBJECTION, YOUR HONOR, AS TO WHAT WAS

16   BELIEVED TO HAVE OCCURRED.

17   Q       WELL, WHAT WAS THE INFORMATION ABOUT WHO THE SUSPECTS WERE

18   THAT COULD HAVE BEEN RESPONSIBLE FOR THE DEATH OF JOHN YANCEY?

19                MR. MONCIER:  YOUR HONOR, IT'S IRRELEVANT WHAT HIS

20   INFORMATION WAS AND IT'S HEARSAY.

21                THE COURT:  I'LL SUSTAIN ON THE HEARSAY GROUNDS.  WHY

22   DON'T WE ASK THIS WITNESS WHAT HE DID?

23                MR. DUFFY:  YOUR HONOR, IT IS NOT HEARSAY, BECAUSE IT IS

24   OFFERED FOR THE PURPOSE – YESTERDAY MR. MONCIER REFERRED TO THE

25   SCOTT COUNTY PROSECUTOR AND –

1       THE COURT:  I UNDERSTAND, I UNDERSTAND.  GO AHEAD AND ASK

2  THE QUESTION, BUT THE QUESTION AS ASKED CALLED FOR HEARSAY

3  INFORMATION.  I'LL ALLOW YOU TO ADDRESS WHAT WAS DISCUSSED

4  YESTERDAY PER OUR CONFERENCE THIS MORNING.

5       MR. DUFFY:  YES, SIR.

6  Q     WHAT WAS BEING INVESTIGATED?

7  A     THE DEATH OF SERGEANT YANCEY.

8  Q     AND HOW –

9  A     AND THE FACT THAT HE HAD BEEN SHOT BY HIS PARTNER, MARTY

10  CARSON.

11  Q     HOW DID THAT INVESTIGATION PROGRESS?

12  A     WELL, MY MAIN EMPHASIS TO THE TBI WAS THAT THEY DEVOTE

13  ADEQUATE RESOURCES, THEIR OWN RESOURCES, AND THAT THE

14  INVESTIGATION BE, BE THOROUGH AND BE ADEQUATE, AND ALSO THAT WE

15  HAVE AS MUCH INFORMATION AS POSSIBLE AS SOON AS POSSIBLE.  AND THEN

16  ULTIMATELY I ASKED THAT ALL THE RESULTS OF THEIR INVESTIGATION BE

17  PLACED UPON MY DESK ON TUESDAY AFTERNOON, WHICH THEY DID.

18       AND MY STAFF BRIEFED ME TUESDAY AFTERNOON, AND THAT'S WHEN

19  WE THEN MADE AN ANNOUNCEMENT TO THE PUBLIC.  THERE WAS A GREAT

20  CLAMOR OF MEDIA, UNDERSTANDABLY, WANTING DETAILS ABOUT THIS

21  INCIDENT, AND I FELT THAT THE TBI SHOULD CONDUCT THEIR INVESTIGATION

22  AND THAT WE SHOULD NOT MAKE ANY PUBLIC ANNOUNCEMENT UNTIL

23  AFTER SERGEANT YANCEY'S FUNERAL ON WEDNESDAY.

24       AND ON TUESDAY AFTERNOON THEY HAD THE RESULTS OF ALL THEIR

25  INVESTIGATION ON MY DESK, WHICH I REVIEWED, AND THEN WE MADE THE

1    STATEMENT ON WEDNESDAY MORNING.

2    Q       WHO DID THE TBI REPORT TO IN TERMS OF THE INVESTIGATION?

3    A       TO ME.

4    Q       WHAT MATTERS DID YOU REVIEW OR HAVE AT YOUR DISPOSAL AS PART

5    OF THIS INVESTIGATION?

6    A       DO YOU MEAN IMMEDIATELY BEFORE WEDNESDAY MORNING?

7    Q       WHAT WAS ON YOUR DESK?

8    A       OKAY.  THE STATEMENTS OF ALL, ALL THE STATEMENTS THAT THEY

9    HAD TAKEN, WHICH INCLUDED STATEMENTS FROM EVERYBODY WHO WAS

10   THERE AT THE TIME.  I HAD INFORMATION ABOUT THE STATEMENTS THAT

11   HAD BEEN MADE BY NICOLE WINDLE, RYAN CLARK, THE OFFICERS, WHAT

12   THEY HAD SAID.  I HAD PRELIMINARY RESULTS FROM THE LAB THAT THE

13   BULLET WAS CONSISTENT WITH HAVING BEEN FIRED FROM THE WEAPON

14   THAT MARTY CARSON WAS CARRYING.

15          I MEAN, I HAD EVERYTHING THAT THE TBI HAD DONE UP TO THAT

16   POINT.  AND THEN I ALSO HAD, OF COURSE, MY TWO ASSISTANTS HAD BEEN

17   THERE ASSISTING ON SATURDAY, SARAH DAVIS AND JOHN GALLOWAY, AND

18   THEY MET WITH ME AND GAVE ME THEIR INPUT.

19          AND THEN WEDNESDAY MORNING I PREPARED THE PRESS RELEASE SO

20   THAT THE – UP UNTIL THAT TIME WE HAD NOT SAID THAT THE METH COOKERS

21   WHO WERE THERE COOKING METH WERE NOT THE PEOPLE WHO HAD SHOT

22   SERGEANT YANCEY.  NOW, I WAS TOLD THAT IT HAD LEAKED OUT THAT

23   MARTY CARSON HAD ACCIDENTALLY SHOT HIS PARTNER, BUT WE HADN'T

24   MADE ANY OFFICIAL –

25          MR. MONCIER:  OBJECTION, YOUR HONOR, TO THE HEARSAY IN

1    THAT STATEMENT, ASK THAT IT BE STRICKEN.

2    A        (CONTINUING)  WE HAD NOT RELEASED ANY STATEMENT.

3                    THE COURT:  EXCUSE ME A SECOND, MR. PHILLIPS.

4                    MR. DUFFY:  YOUR HONOR, WE – I'M NOT SURE WHAT THE BASIS

5    OF THE OBJECTION IS.

6                    MR. MONCIER:  MAY WE APPROACH?

7                    MR. DUFFY:  THAT ALL THESE ARE MATTERS THAT MR. MONCIER

8    INQUIRED ABOUT WITH MARTY CARSON.

9                    THE COURT:  I'LL ALLOW THE WITNESS TO ANSWER, OTHER THAN

10   WHAT HE'D HEARD ABOUT MARTY CARSON.  I DON'T THINK THAT'S WHAT

11   THE QUESTION WAS, SO YOU MAY GO AHEAD, MR. PHILLIPS.  ASK THE JURY

12   DISREGARD THAT ONE PART OF THE ANSWER.

13   Q        MR. PHILLIPS, ORIGINALLY WE WERE DISCUSSING WHAT WAS ON YOUR

14   DESK AND THE EVENTS, I SUPPOSE, LEADING UP TO THE PRESS CONFERENCE.

15   LEAVING WHAT YOU WERE JUST SPEAKING OF, WHAT WAS THE NEXT THING

16   TO OCCUR THAT YOU CONSIDERED?

17   A        WELL, THE NEXT THING THAT OCCURRED IS, I CONFERRED WITH MY

18   ASSISTANTS AND AGENT VINSANT AND HIS SUPERVISOR, BOB DENNY, AND

19   THEN I MADE A STATEMENT ON WEDNESDAY MORNING ABOUT THE RESULTS

20   ABOUT THE INVESTIGATION UP TO THAT POINT.  AND I DON'T KNOW WHETHER

21   I'M PERMITTED TO SAY WHAT THAT WAS OR NOT.

22   Q        NO, SIR.

23   A        AND THEN AFTER THAT, FURTHER INVESTIGATION WAS DONE, AFTER

24   THAT PRESS CONFERENCE.

25   Q        WERE THERE DIFFICULTIES OR IN THE INVESTIGATION FILE THAT YOU

1   REVIEWED, INCONSISTENCIES – WELL, LET ME ASK YOU, DID YOU HAVE ANY –

2   WERE ALL THE STATEMENTS RECONCILABLE?

3   A       NO, WHICH USUALLY IS NOT THE CASE WHEN A TRAUMATIC EVENT

4   OCCURS.  BUT IT WAS ONLY AFTER THE PRESS CONFERENCE DURING, DURING

5   DECEMBER, THAT WE RECEIVED ANY INFORMATION AT ALL INDICATING THAT

6   THERE MIGHT BE SOMETHING INTENTIONAL ABOUT THIS KILLING AND THAT

7   CAUSED ME TO REITERATE TO THE TBI THE THOROUGHNESS WITH WHICH I

8   WANTED THIS TO BE INVESTIGATED.  AND I KNOW THAT I RECEIVED SOME

9   INFORMATION THAT – ABOUT TALK IN THE COMMUNITY, WHICH – RIGHT

10  BEFORE DECEMBER 24TH, BECAUSE I HAD A CONVERSATION MYSELF WITH

11  DONNIE PHILLIPS ON DECEMBER THE 24TH.

12  Q       HOW DID YOU KNOW DONNIE PHILLIPS?  WHO IS DONNIE PHILLIPS?

13  A       WELL, DONNIE PHILLIPS WAS A SERGEANT WITH THE SCOTT COUNTY

14  SHERIFF'S DEPARTMENT.  HE HAS A TWIN BROTHER, RONNIE PHILLIPS, WHO

15  WAS AN OFFICER WITH THE ONEIDA POLICE DEPARTMENT.

16  Q       ARE THEY RELATED TO YOU?

17  A       NO, THEY'RE NOT OR AT LEAST IF THEY ARE IT'S DISTANT.  ALSO,

18  BECAUSE THEY'RE IDENTICAL TWINS, I CANNOT TELL THEM APART EXCEPT

19  FOR THE UNIFORMS THAT THEY WORE.  AND I GAVE A SERIES OF CLASSES AT

20  THE LOCAL ROANE STATE CAMPUS.  WE OFFERED EVERY CRIMINAL JUSTICE

21  CLASS THAT ROAN STATE OFFERED TO A GROUP OF OFFICERS, AND I TAUGHT

22  THEM ONE AT A TIME, AT NIGHT, TAUGHT THE CLASSES ONE AT A TIME AT

23  NIGHT.

24         AND RONNIE PHILLIPS AND DONNIE PHILLIPS, I BELIEVE, TOOK ALL OF

25  MY CLASSES.  SO I KNEW THEM BETTER BECAUSE I HAD HAD THEM IN A

1    SERIES OF POLICE SCIENCE CLASSES AT THE COMMUNITY COLLEGE.

2            AND ON CHRISTMAS EVE I KNEW THE MORALE OF THE SHERIFF'S

3    DEPARTMENT WAS BAD, THAT THEY SERE STILL GRIEVING OVER THE LOSS OF

4    SERGEANT YANCEY, AND I INQUIRED AS TO WHETHER OR NOT THERE WAS

5    GOING TO BE ANY KIND OF CHRISTMAS GATHERING OF THE OFFICERS.  AND I

6    LEARNED THAT AT THE SHIFT CHANGE ON CHRISTMAS EVE FAMILY MEMBERS

7    WERE COMING IN AND THERE WAS GOING TO BE A GATHERING.

8    Q       WAS DONNIE PHILLIPS AT THAT GATHERING?

9    A       YES, YES.  AND ACTUALLY SARAH DAVIS WAS WITH ME, AND THE

10   REASON SHE WAS WITH ME IS BECAUSE, ON CHRISTMAS EVE, WE HAD A

11   VEHICULAR HOMICIDE, AND SHE AND I HAD CONFERRED ABOUT THAT CASE.

12   AND I TOLD HER I WAS GOING TO GO TO THE JAIL AND TALK TO THE OFFICERS

13   ON CHRISTMAS EVE, AND SHE SAID, "I WANT TO GO WITH YOU."

14           WHEN I SAY JAIL, I SHOULD SAY SHERIFF'S DEPARTMENT.  I'M SORRY.

15   AND SHE WANTED TO GO WITH ME, AND SHE MET ME AT THE SHERIFF'S

16   DEPARTMENT.

17   Q       WHY DID YOU WANT TO SPEAK WITH DONNIE PHILLIPS IN PARTICULAR?

18   A       WELL, I WENT THERE INITIALLY JUST TO SAY TO THE SHERIFF, TO THE

19   OFFICERS, PLEASE BE SAFE DURING THE HOLIDAYS AND PLEASE HAVE A

20   GOOD CHRISTMAS.  BUT I SAW DONNIE, AND I ASKED TO SPEAK TO HIM

21   PRIVATELY.  I TOOK HIM BACK, AND HE AGREED TO THAT, AND I TOOK HIM

22   BACK INTO AN OFFICE IN THE SHERIFF'S DEPARTMENT, AND MY ASSISTANT,

23   SARAH DAVIS, ACCOMPANIED ME.

24           WE SHUT THE DOOR, AND I ASKED DONNIE PHILLIPS WHETHER OR NOT

25   THE TBI INVESTIGATORS WERE MISSING ANYTHING, WERE THEY BEING

1  THOROUGH.  AND DONNIE SAID NO, HE SAID IT WAS AN ACCIDENT.

2  MR. MONCIER:  OBJECTION, YOUR HONOR.  ASK THAT THAT BE

3  STRICKEN, ASK THAT THE JURY DISREGARD THAT AND ASK FOR A MISTRIAL.

4  THE COURT:  WELL, LET'S DO THIS.  IT'S ABOUT TIME FOR A

5  LUNCH BREAK, ANYWAY.  FOR PRESENT PURPOSES, THE JURY WILL

6  DISREGARD ANY COMMENTS ABOUT WHAT MR. PHILLIPS, DONNIE PHILLIPS

7  TOLD THIS WITNESS.  I'LL ASK YOU TO DISREGARD THAT, AND WE'LL TAKE A

8  BREAK UNTIL 1:30, COME BACK IN THE AFTERNOON.

9  (JURY RECESSED AT 12:11 P.M.)

10  THE COURT:  MR. PHILLIPS, YOU MAY BE EXCUSED TO EAT LUNCH

11  IN DOWNTOWN KNOXVILLE AND COME BACK AT 1:30.

12  THE WITNESS:  THANK YOU.  ABOUT ONE-THIRTY?

13  THE COURT:  YES, SIR.

14  THE WITNESS:  THANK YOU, YOUR HONOR.

15  MR. MONCIER:  WOULDN'T BE ANY EX PARTE COMMUNICATIONS

16  WITH  ANY JUDGES IN THIS DISTRICT, WOULD YOU?

17  THE COURT:  EXCUSE ME?

18  MR. MONCIER:  I WAS JOKING.

19  THE WITNESS:  YOU NEED ANYTHING?

20  MR. MONCIER:  NO.  I ASKED, YOU'RE NOT GOING TO HAVE ANY EX

21  PARTE COMMUNICATIONS WITH ANY FEDERAL JUDGES IN THIS DISTRICT, ARE

22  YOU?

23  THE WITNESS:  NO, NOT UNLESS HE'LL BUY LUNCH.

24  MR. MONCIER:  FOR THE RECORD, IN CASE THAT WAS EVER TYPED

25  UP, OF COURSE, HE'S THE BROTHER OF DISTRICT JUDGE THOMAS PHILLIPS.

1          THE COURT:  ALL RIGHT.  WHAT'S YOUR NEXT MOTION, MR.

2    MONCIER?

3          MR. MONCIER:  YOUR HONOR –

4          THE COURT:  AT THE PODIUM, PLEASE.

5          MR. MONCIER:  YOUR HONOR, FIRST OF ALL, THE COURT

6    INSTRUCTED MR. DUFFY TO INSTRUCT MR. PHILLIPS NOT TO SAY THINGS, JUST

7    AS MR. PHILLIPS SAID.  I DON'T KNOW WHETHER MR. DUFFY DID THAT OR NOT.

8    BUT SECONDLY, MR. DUFFY KNEW THAT WHAT MR. PHILLIPS WOULD HAVE

9    TOLD TO GENERAL PHILLIPS WOULD BE HEARSAY.  THERE CAN BE NO BASIS

10   FOR DEPUTY PHILLIPS' STATEMENT TO GENERAL PHILLIPS ON DECEMBER THE

11   24TH INTRODUCED INTO THIS TRIAL.

12         THIRDLY, FOR MR. DUFFY TO HAVE GENERAL PHILLIPS TESTIFY THAT

13   DONNIE PHILLIPS TOLD GENERAL PHILLIPS THIS WAS AN ACCIDENT IS

14   INAPPROPRIATE AND BEYOND ANY CONDUCT THAT CAN BE JUSTIFIED IN THIS

15   CASE.  AND THE ONLY REMEDY IS TO REQUIRE A MISTRIAL OR TO INSTRUCT

16   THIS JURY TO COMPLETELY DISREGARD THIS WITNESS'S TESTIMONY,

17   DISREGARD ANY OF THAT, ANY OF THE TESTIMONY.

18         BECAUSE THAT STATEMENT NOW, YOU UNDERSTAND, GOES BACK TO

19   THIS THOROUGH INVESTIGATION THAT LED UP TO HIS PRESS CONFERENCE,

20   AND IT'S A BELL THAT CANNOT BE UNRUNG, IN MY OPINION.  I THINK MR.

21   DUFFY NEEDS TO EXPLAIN TO THE COURT WHETHER OR NOT HE INSTRUCTED

22   GENERAL PHILLIPS NOT TO SAY THINGS JUST AS GENERAL PHILLIPS SAID.

23         THE COURT:  MR. DUFFY, YOUR RESPONSE TO THIS MOTION FOR

24   MISTRIAL?

25         MR. MONCIER:  YEAH, AND ONE OTHER POINT.

1          THE COURT:  ALL RIGHT.  LET'S DO THIS.  LET'S HEAR FROM MR.

2    DUFFY –

3          MR. MONCIER:  YES, SIR.

4          THE COURT:  – AND THEN WE'LL ALLOW YOU TO RESPOND.

5          MR. DUFFY:  THE MOTION SHOULD BE DENIED, YOUR HONOR.  THE

6    TESTIMONY GENERAL PHILLIPS JUST GAVE IS ENTIRELY CONSISTENT WITH

7    THE COURT'S RULINGS.  I DID NOT KNOW THAT UTTERANCE WAS GOING TO

8    COME OUT AT THAT TIME.  ACTUALLY, WHAT I EXPECTED TO HEAR, WHEN THE

9    GENERAL SAID, "AND DONNIE PHILLIPS TOLD ME," I EXPECTED TO HEAR THE

10   WORDS, "OBJECTION," AND I HEARD NONE.

11         I WAS GOING TO TAKE THE WITNESS DIRECTLY TO A STATEMENT FROM

12   DONNIE PHILLIPS TO HIM.  THAT IS THE REASON I BROUGHT UP DONNIE

13   PHILLIPS SPECIFICALLY, WHICH IS TO INTRODUCE A PRIOR CONSISTENT

14   STATEMENT BY DONNIE PHILLIPS TO PAUL PHILLIPS TO REBUT THE EXPRESS

15   CONTENTION YESTERDAY BY MR. WIGLER THAT DONNIE HAD THIS, QUOTE,

16   NEW MEMORY.

17         AND THE EXPRESS OR IMPLIED INFERENCE THAT DONNIE PHILLIPS HAD

18   AT SOME POINT IN TIME – I BELIEVE EVEN THE QUESTION WAS STATED IN

19   TERMS OF "SO AT SOME POINT BETWEEN NOVEMBER 28TH –" WHATEVER IT

20   WAS, MARCH OF '05 OR WHATEVER "– YOUR MEMORY CHANGED AND DID GOD

21   TELL YOU THIS," AND THE EXPRESS OR IMPLIED INFERENCE TO BE DRAWN

22   WAS THAT HE HAD MADE THIS UP.

23         PAUL PHILLIPS TOLD ME THAT HE SPOKE WITH DONNIE PHILLIPS AND HE

24   REMEMBERS EXPLICITLY DONNIE PHILLIPS TELLING HIM THAT MARTY

25   HOLLERED OUT OF THE TRAILER, "DON'T COME IN.  HE'S GOT A GUN."  NOW,

1   THAT IS THE REASON I BROUGHT UP DONNIE PHILLIPS WITH THIS WITNESS, IS

2   TO INTRODUCE THE PRIOR STATEMENT THAT IS CONSISTENT WITH AND MADE

3   VERY SHORTLY AFTER, WITHIN LESS THAN A MONTH OF THE INCIDENT, THAT

4   HE MAKES THIS STATEMENT TO PAUL PHILLIPS, PRIOR TO HIM BEING SUED,

5   PRIOR TO ANY OF THAT.

6          AND IT IS BEING OFFERED UNDER WHATEVER 801(b), WHATEVER IT IS.

7   WHAT THE WITNESS TESTIFIED TO WAS THE OPINION – IF YOU WANT TO CALL

8   IT AN OPINION, I GUESS YOU COULD, THE OPINION NOT OF THE DISTRICT

9   ATTORNEY GENERAL, BUT OF DONNIE PHILLIPS, ANOTHER WITNESS.

10         MOST SIGNIFICANT, I THINK, IS THE FACT THAT – I MEAN, THE WITNESS,

11  IT WASN'T SOMETHING THAT JUST BLURTED OUT. HE SAYS DONNIE PHILLIPS

12  "TOLD ME." YOU KNOW, I JUST ASSUMED THERE WAS GOING TO BE AN

13  OBJECTION. EVERY TIME I'VE BROUGHT UP – ANY TIME A WITNESS HAS GONE

14  TO HEARSAY, IT'S OBJECTION, AND THERE WAS NO OBJECTION.

15         IN ANY EVENT, THE OPINION OF DONNIE PHILLIPS IS OF LITTLE

16  PREJUDICE IN THE CASE. OBVIOUSLY, A WITNESS CALLED BY THE DEFENSE IN

17  THEIR CASE-IN-CHIEF, WHO WAS PRESENT AT THE SCENE AND, YOU KNOW,

18  TESTIFIED, AS DID DONNIE PHILLIPS, I MEAN, OBVIOUSLY THAT PERSON

19  DOESN'T BELIEVE THAT IT WAS A MURDER. I MEAN, THAT THAT WOULD BE

20  DONNIE PHILLIPS' OPINION WOULD HARDLY BE ANY KIND OF NEWS TO ANY

21  OF THE JURORS. SO I REALLY DON'T SEE THE PREJUDICE IN IT.

22         SO THE WITNESS WAS ASKED QUESTIONS BY ME ABOUT DONNIE

23  PHILLIPS FOR THE REASON OF THE PRIOR CONSISTENT STATEMENT. WHEN

24  ASKED – WHEN TESTIFYING ABOUT THE MATTER, THE WITNESS EXPRESSLY

25  STATED THAT IT WAS HEARSAY, AND THE WITNESS IS A LAWYER, AND THE

1    WITNESS GAVE NOTICE THAT HE WAS ABOUT TO UTTER HEARSAY; THERE WAS

2    NO OBJECTION.

3          YOU KNOW, I OBVIOUSLY CAN'T – I CAN'T – I DON'T KNOW WHAT

4    EXACTLY HE IS GOING TO SAY, WHETHER HE'S GOING TO TALK ABOUT –

5    WHETHER HE'S GOING TO UTTER "AND DONNIE PHILLIPS TOLD ME THAT

6    MARTY SAID, 'DON'T COME IN, HE'S GOT A GUN,'" WHICH IS ACTUALLY

7    WHERE I THOUGHT WE WERE GOING.  BUT WE GO TO THE STATEMENT, THE

8    OPINION OF DONNIE PHILLIPS, AND THAT'S JUST NOT, NOT THAT SIGNIFICANT

9    IN THIS TRIAL.

10          THE COURT:  MR. MONCIER, A RESPONSE?

11          MR. MONCIER:  WELL, FIRST OF ALL, HE POINTED OUT THAT THE

12   WITNESS IS A LAWYER.  THE WITNESS, OF COURSE, IMPROPERLY INSTRUCTED

13   AS TO WHAT HE COULD OR COULD NOT GO INTO, KNEW IT WAS HEARSAY.

14   AND I DID ANTICIPATE THAT HE WAS PROBABLY GOING TO SAY SOMETHING

15   TO THE EFFECT THAT DONNIE PHILLIPS HAD THIS MEMORY GAIN THAT, YES, I

16   REMEMBER HIM SAYING THAT, "DON'T COME IN, HE HAS A GUN."

17          THAT'S WHAT I ANTICIPATED WE WERE ABOUT TO HEAR.  I HAD NO IDEA

18   HE WAS GOING TO SIT THERE AND TESTIFY TO THE VERY THING THIS COURT

19   INSTRUCTED MR. DUFFY TO TELL HIM NOT TO TESTIFY TO.

20          THE COURT:  WELL, THE COURT'S MOTION DEALT WITH THE

21   OUTCOME OR FACT OR, I GUESS, THE OUTCOME OF THE INVESTIGATION OR

22   THE LACK OF CRIMINAL PROSECUTION ARISING FROM THE INVESTIGATION.

23   THE TESTIMONY, AS THE COURT RECALLS IT, DEALS MORE WITH, OR MR.

24   DUFFY'S CONTENTION IS, THE TESTIMONY WHICH THE COURT HAS TOLD THE

25   JURY TO DISREGARD WAS AN OPINION OF A PARTICULAR WITNESS THAT THE

1    SHOOTING WAS ACCIDENTAL.

2                    MR. MONCIER:  YES, SIR.

3                    THE COURT:  NOW, THAT IS DIFFERENT FROM SOMEONE UTTERING

4    CRIMINAL CHARGES WERE NOT BROUGHT.

5                    MR. MONCIER:  I ACKNOWLEDGE THE COURT'S DISTINCTION.

6                    THE COURT:  AND I'M NOT SURE THE JURY – I MEAN, MR. DUFFY'S

7    POINT MAYBE IS WELL-TAKEN OR HOW WOULD YOU RESPOND TO MR.

8    DUFFY'S POINT THAT A WITNESS CALLED DURING THE DEFENDANT'S CASE-IN-

9    CHIEF WHO PRESUMABLY OFFERS TESTIMONY FAVORABLE TO THE

10   DEFENDANT PROBABLY IS OF THE OPINION THAT IT WAS AN ACCIDENTAL

11   SHOOTING?  THAT'S A BRIEF SUMMARY OF A PORTION OF MR. DUFFY'S

12   ARGUMENT.

13                   MR. MONCIER:  THEY MAY WELL BE.  I DO NOT ARGUE WITH THAT.

14   BUT ON THE OTHER HAND, THEY CERTAINLY CAN'T TESTIFY TO THAT TO A

15   JURY.

16                   THE COURT:  WELL, THAT'S WHY THE COURT HAS INSTRUCTED

17   THE JURY NOT TO CONSIDER IT.  THE ISSUE IS WHETHER THAT – IS THAT

18   INSTRUCTION TO DISREGARD WHICH THE COURT HAD MADE THROUGHOUT

19   THE COURSE OF THIS TRIAL, IS THAT SUFFICIENT TO CURE THE JURY HAVING

20   HEARD THAT EVIDENCE OR DOES THE JURY HEARING THAT EVIDENCE

21   WARRANT A MISTRIAL AT THIS PARTICULAR STAGE OF THE PROCEEDINGS?

22                   MR. MONCIER:  WELL, IN CONJUNCTION WITH MR. PHILLIPS

23   TESTIFYING ABOUT HIS INTENSE INVESTIGATION PRIOR TO THE PRESS

24   CONFERENCE, AND THE INFERENCE IS THAT AT THE PRESS CONFERENCE

25   THERE WAS NO CHARGES BROUGHT, IT'S PERFECTLY OBVIOUS AS TO THAT.

1   AND THEN WE – REVISITING THE MATTER, IS THERE ANYTHING THAT THE TBI

2   HAS OVERLOOKED AT A DECEMBER CONFERENCE THAT HE MAKES, WHICH

3   AGAIN INDICATES THAT THERE WERE NO CHARGES BROUGHT AND THEN –

4            THE COURT:  HOW IS THAT DIFFERENT FROM YOUR QUESTION  TO

5   MR. CARSON YESTERDAY ABOUT "AFTER YOU SAW THE PROSECUTOR

6   JUSTIFYING THE ACCIDENTAL SHOOTING"?  DOES THAT NOT LEAVE THE SAME

7   IMPRESSION WITH THE JURY?

8            MR. MONCIER:  YES, SIR.

9            THE COURT:  POTENTIALLY?

10           MR. MONCIER:  POTENTIALLY, YES, SIR.

11           THE COURT:  ANYTHING FURTHER, MR. DUFFY?

12           MR. DUFFY:  NO, YOUR HONOR.

13           THE COURT:  ALL RIGHT.  THE COURT WILL TAKE THE MATTER

14   UNDER ADVISEMENT AND ANNOUNCE ITS RULING.  WHY DON'T YOU ALL PLAN

15   TO COME BACK AT 1:20.

16           MR. MONCIER:  YES, SIR.

17           THE COURT:  ASSUMING THE COURT DENIES THE MOTION FOR

18   MISTRIAL, WHERE – I MAY ALLOW – TO THE EXTENT, FOR EXAMPLE, MR.

19   DUFFY, TO AVOID THE PROBLEM WE JUST HAD, THE COURT WILL ALLOW YOU

20   A CERTAIN LEEWAY IN LEADING, IF YOU WANT TO ATTEMPT TO INTRODUCE

21   MR. – WHAT DONNIE PHILLIPS TOLD THIS WITNESS AND YOU WANT TO USE

22   THAT UNDER RULE 801(d) – IT WOULD BE (d)(1)(B) AS BEING CONSISTENT WITH

23   DECLARANT'S TESTIMONY AND OFFERED TO REBUT AN EXPRESS OR IMPLIED

24   CHARGE AGAINST THE DECLARANT OF RECENT FABRICATION, ET CETERA.

25           IN LIGHT OF THE MOTION IN LIMINE RULINGS, YOU PROBABLY OUGHT

1   TO BE A LITTLE MORE SPECIFIC AND HONE IN AND ALSO PERHAPS – WELL, I

2   THINK THAT MIGHT CURE CERTAIN THINGS.

3              MR. DUFFY:  I WILL ASK EXPRESSLY ABOUT WHETHER MR.

4   DONNIE PHILLIPS TOLD HIM ANYTHING ABOUT – WHAT DONNIE PHILLIPS TOLD

5   HIM THAT MARTY HOLLERED OUT THE TRAILER.

6              THE COURT:  LET ME ASK, GO AHEAD AND ASK NOW, MR.

7   MONCIER, DO YOU DISPUTE THE ADMISSIBILITY OF THAT STATEMENT UNDER

8   RULE 801(d)(1)(B) AS ABOVE?

9              MR. MONCIER:  IF THAT'S THE TOTALITY OF THE STATEMENT

10  THAT DONNIE SAID TO HIM, NO, I DO NOT.

11             THE COURT:  OKAY.

12             MR. MONCIER:  I BELIEVE THAT THAT, IF THAT'S THE TOTAL OF

13  WHAT THE STATEMENT WAS MADE, AND POSSIBLY I SHOULD TALK TO

14  GENERAL PHILLIPS BEFOREHAND TO FIND OUT.  WE DON'T WANT TO DO

15  DISCOVERY DURING THIS.  THIS IS THE FIRST TIME I'VE EVER HEARD OF THIS,

16  OF COURSE.

17      AND I'M NOT SUGGESTING THAT – WHAT IS 26(a)?  WHY SHOULDN'T THIS

18  HAVE BEEN DISCLOSED TO THE DEFENSE – OR TO THE PLAINTIFFS UNDER

19  26(a)?  I'VE NEVER HEARD OF THIS BEFORE.

20             MR. DUFFY:  WE DISCLOSED MR. PHILLIPS AS A WITNESS, AND WE

21  TALKED ABOUT – DAVID WIGLER TALKED ABOUT DEPOSING HIM NUMEROUS

22  TIMES.

23             MR. MONCIER:  MAYBE I HAVE MISREAD 26(a), BUT I BELIEVE IT IS

24  THE SUBSTANCE OF WHAT A WITNESS IS GOING TO TESTIFY TO THAT BEARS

25  UPON THE ISSUES IN THE CASE.

1          THE COURT:  WELL, I'M NOT SURE RULE 26 YOU COULD OUTLINE

2    EVERYTHING MIGHT BE CALLED – WITH RESPECT TO THIS PARTICULAR

3    STATEMENT OR ISSUE, MR. DUFFY IS OFFERING IT, HE SAYS, IN RESPONSE TO

4    SOMETHING THAT CAME UP DURING THE COURSE OF THIS TRIAL FROM MR.

5    DONNIE PHILLIPS.

6          MR. MONCIER:  AND UP UNTIL TODAY WE HAD BEEN LED TO

7    BELIEVE THAT, ABSENT HIS DECISION NOT TO CHARGE, THE ONLY THING THIS

8    WITNESS WAS GOING TO TESTIFY TO WAS THE FACT THAT HE DID NOT HAVE

9    ANY INFORMATION PERTAINING TO THE DRUG ACTIVITIES OF MR. MARTY

10   CARSON.  THAT'S WHAT WE'VE BEEN TOLD TIME AND TIME AGAIN.

11         NOW WE'RE BEING TOLD THAT SOMETHING THAT HAS BEEN IN ISSUE IN

12   THIS CASE SINCE DONNIE PHILLIPS' DEPOSITION WAS TAKEN, TO WHERE FOR

13   THE FIRST TIME HE CHANGED HIS STATEMENT FROM THE – THE ORAL

14   STATEMENT, WE'VE NEVER BEEN GIVEN NOTICE THAT THIS IS WHERE HE WAS

15   GOING TO GO WITH THIS WITNESS OR THE GENERAL SUBJECT MATTER, A

16   PRIOR CONSISTENT STATEMENT, FOR EXAMPLE, OF DONNIE PHILLIPS.

17         THIS HAS BEEN AN ISSUE IN THIS CASE SINCE DONNIE PHILLIPS'

18   DEPOSITION IN 2006, THE FACT THAT HE CHANGED HIS TESTIMONY FROM THE

19   STATEMENT HE GAVE TO THE TBI.

20         THE COURT:  MR. DUFFY, HOW DO YOU RESPOND TO THAT?

21         MR. DUFFY:  NOW, THE OBJECTION IS THAT –

22         THE COURT:  MR. MONCIER APPEARS TO BE SAYING THAT THE

23   SUM AND SUBSTANCE OF WHAT DONNIE PHILLIPS TOLD DISTRICT ATTORNEY

24   PHILLIPS, IF OTHERWISE ADMISSIBLE UNDER RULE 801(d)(1)(B) AS ABOVE,

25   SHOULD HAVE BEEN DISCLOSED AS PART OF THE PLAINTIFF'S RULE 26

1    DISCLOSURES.

2              MR. DUFFY:  THAT'S PREPOSTEROUS.  THERE IS NO WAY.  I MEAN,

3    JUST LOOK AT THE PLAINTIFF'S RULE 26 DISCLOSURES IN THE CASE.  I MEAN,

4    THERE'S GOING TO BE 50 WITNESSES, AND YOU DON'T KNOW WHAT THEY'RE

5    GOING TO SAY, AND YOU CAN'T – ALL YOU CAN SAY IN A RULE 26

6    DISCLOSURE IS THIS PERSON HAS KNOWLEDGE ABOUT THE INCIDENT.

7              I MEAN, SURELY, THE CONTENTION IS NOT THAT IT WAS LOST ON MR.

8    MONCIER THAT THIS WITNESS HAD KNOWLEDGE OF THE INVESTIGATION AND

9    WHAT VARIOUS OFFICERS WERE SAYING ABOUT THINGS.

10             THE DEGREE OF SPECIFICITY THAT MR. MONCIER IS CONSTRUING RULE

11   26 MEANS THAT NO WITNESS, PERHAPS OTHER THAN A PARTY, SHOULD BE

12   TESTIFYING IN THIS TRIAL.

13             THE INFORMATION ABOUT DONNIE PHILLIPS WAS MADE KNOWN TO ME

14   SOMETIME – YOU KNOW, I HONESTLY – I'M NOT EVEN SURE.  I BELIEVE THAT –

15   I DON'T EVEN KNOW IF IT WAS LAST WEEK OR THIS WEEK, ACTUALLY.  IT

16   WASN'T BEFORE LAST WEEK.

17             THE COURT:  ALL RIGHT.  LET ME SHIFT THE FOCUS SOMEWHAT.

18   WITH THIS PARTICULAR WITNESS – AND, AGAIN, OBVIOUSLY, THINGS WOULD

19   HAVE BEEN MUCH SIMPLER ABSENT PLAINTIFF'S MOTION IN LIMINE, BUT THE

20   COURT GRANTED THE MOTION IN LIMINE.  SO WE DO GET SOMEWHAT TO THIS

21   SLIPPERY SLOPE TESTIFYING ABOUT THE FACTS OF THE INVESTIGATION, BUT

22   NOT THE CONCLUSIONS OF THE INVESTIGATION.

23             WE GOT IN THAT SAME SLIPPERY SLOPE WITH INQUIRIES BY PLAINTIFF'S

24   COUNSEL, WHICH, YOU KNOW, LED AT LEAST ONCE, IF NOT TWICE, TO MR.

25   DUFFY ASKING FOR RELIEF FROM THAT MOTION, WHICH THE COURT DENIED.

1      I MEAN, AT SOME POINT FURTHER DISCUSSION ABOUT THE

2 INVESTIGATION DOES SPILL OVER REGARDLESS TO WHO'S ASKING THE

3 QUESTIONS INTO – FROM FACTS TO CONCLUSIONS.  WHERE ELSE DO YOU

4 WANT TO GO WITH THIS WITNESS OR HOW FAR ALONG THE INVESTIGATION?  I

5 MEAN, WE'RE TO DECEMBER NOW.

6      DO YOU WANT TO KEEP ASKING QUESTIONS ABOUT THE FACTS OF THE

7 INVESTIGATION WITH THIS WITNESS OR ARE YOU TO THE POINT WHERE YOU

8 WANT TO LISTEN TO DONNIE PHILLIPS' TESTIMONY OR ARE YOU TO THE POINT

9 WHERE YOU GOT THERE BECAUSE YOU WANTED TO ELICIT THE TESTIMONY

10 ABOUT WHAT DONNIE PHILLIPS SAYS?

11      MR. DUFFY:  YES, THAT'S WHERE I WAS HEADED NEXT.  I MEAN,

12 I'M GOING TO ASK HIM SPECIFICS, OF COURSE, ABOUT, YOU KNOW, NICOLE

13 WINDLE, WHY IT IS THAT HE MADE – REACHED THE AGREEMENT WITH

14 WITNESS WINDLE'S ATTORNEY TO DISMISS THE CHARGES IN EXCHANGE FOR

15 THE STATEMENT.

16      THE COURT:  WHY DON'T YOU JUST KIND OF BROADLY LIST THE

17 CATEGORIES SO I CAN GIVE THEM SOME THOUGHT?

18      MR. DUFFY:  WHAT WOULD BE HER MOTIVE FOR, AS I CALL IT,

19 SERVING UP A BIGGER FISH TO FRY?  WHAT WOULD BE HER MOTIVE IN

20 SHIFTING THE FOCUS OR BLAME FROM, YOU KNOW, THE METHAMPHETAMINE

21 SITUATION TO, AHA, YOU KNOW, YOU LET ME GO, I'LL GIVE YOU

22 INFORMATION THAT SHOWS MARTY CARSON COMMITTED MURDER.  SHE

23 THOUGHT IT WAS SOME – SHE HAD SOME KIND OF, YOU KNOW, BIG,

24 IMPORTANT INFORMATION, AND OBVIOUSLY –

25      THE COURT:  WHAT OTHER BROAD OR GENERAL CATEGORIES

1    BESIDES MS. WINDLE AND HER STATEMENT?

2              MR. DUFFY:  WHAT OTHER CATEGORIES?  LET'S SEE.  LET'S SEE

3    MY NOTES.  A BIGGER FISH TO FRY AND INFORMATION, RECTOR AND

4    CARPENTER ARE POTENTIALLY FACING FELONY MURDER CHARGES.  I MEAN,

5    THAT WAS SOMETHING THAT WAS ASKED OF THE GENERAL IN THE PRESS

6    CONFERENCE, AND SO WOULD CERTAINLY HAVE BEEN HEARD BY THE

7    DEFENSE ATTORNEYS FOR CARPENTER AND RECTOR.  HE WAS ACTUALLY

8    PRESENT FOR THE INTERVIEW OF NICOLE WINDLE, AND – LET'S SEE.  NO BABB

9    WITNESSES CAME FORWARD, NO LETNER WITNESSES.  I WANTED TO ASK HIM

10   ABOUT THE BLINDED BY THE LIGHTS QUESTION, BECAUSE I KNOW HE'S GOING

11   TO BE ASKED ABOUT THAT ON CROSS.  AND SUBJECT TO THAT WHICH I'M

12   BOUND TO BE FORGETTING, BUT THAT'S WHAT I HAVE IN MY NOTES, YOUR

13   HONOR.

14             THE COURT:  THANK YOU.  AND ASSUMING WE GO FORWARD, MR.

15   MONCIER, THE SAME – I MEAN, OBVIOUSLY, WE GENERALLY WOULD BE

16   LIMITED TO THE SCOPE OF THE DIRECT EXAMINATION.  BUT, AGAIN, I WILL

17   CAUTION YOU TO BE CAREFUL IN YOUR QUESTIONING AS WELL NOT TO – YOU

18   KNOW, HOPEFULLY TO AVOID GIVING RISE TO ARGUMENT BY MR. DUFFY

19   THAT YOU'VE OPENED THE DOOR TO FURTHER QUESTIONS ABOUT THE

20   INVESTIGATION BEYOND THE FACTUAL INQUIRING NECESSARY TO ADDRESS

21   THE ISSUES WHICH THIS JURY HAS TO ADDRESS IN THIS CASE.

22             MR. MONCIER:  YES, YOUR HONOR.  I DON'T KNOW WHETHER

23   YOU'RE GOING TO ALLOW HIM TO GO OVER THESE OTHER AREAS.  YOU'RE

24   CONSIDERING THAT, I TAKE IT?

25             THE COURT:  WELL, I WANTED TO HAVE AN IDEA SO AS TO SEE

1   HOW CLOSELY, IF AT ALL, THEY RELATED TO THIS SLIPPERY SLOPE OR LINE,

2   YOU KNOW, THAT THE COURT'S RULING ON YOUR MOTION OR ON PLAINTIFF'S

3   MOTION SAYS CANNOT BE CROSSED, GOING FROM WHAT I'M GENERALLY

4   CHARACTERIZING AS FACTS OF THE INVESTIGATION TO CONCLUSIONS OR

5   OUTCOME OF INVESTIGATION.

6            MR. MONCIER:  WE CERTAINLY OBJECT TO THESE DIFFERENT

7   ADDITIONAL THINGS THAT ARE SAID, AND WE'D LIKE TO BE HEARD ON THOSE

8   AT THE APPROPRIATE TIME BEFORE THOSE QUESTIONS COME, ONCE AGAIN,

9   ARE HARPOONED TO THE WITNESS ON THE STAND BY MR. DUFFY.

10           THE COURT:  WELL, OBVIOUSLY, I MEAN, I'D LIKE TO AVOID AS

11  MANY OBJECTIONS AS WE CAN DURING THE COURSE OF THE TRIAL.  I MEAN,

12  THE JURY HAS HEARD A LOT OF OBJECTIONS TODAY FROM BOTH SIDES AND A

13  LOT OF RULINGS BY THE COURT.  WE'VE PROBABLY HAD AS MANY TODAY AS

14  WE'VE HAD DURING THE FIRST FOUR DAYS OF THE TRIAL.

15       BUT DO YOU HAVE ANYTHING YOU WANT TO SAY ABOUT THESE RIGHT

16  NOW?  I MEAN, AGAIN, I CANNOT RULE ON – I'M NOT RULING ON OBJECTIONS

17  NOW, BUT IF YOU WANT TO OFFER YOUR COMMENTS THAT MIGHT HELP ME

18  WHEN SPECIFIC OBJECTIONS TO SPECIFIC QUESTIONS COME UP THIS

19  AFTERNOON.

20           MR. MONCIER:  WELL, FIRST OF ALL, A BIGGER FISH TO FRY

21  ARGUMENT –

22           THE COURT:  AND LET ME INTERRUPT BY SAYING, MY MAIN

23  PURPOSE FOR ASKING, MR. DUFFY, AND TYPICALLY I DON'T ASK COUNSEL TO

24  OUTLINE THEIR EXAMINATION OF A WITNESS, BUT GIVEN WHAT WE'VE

25  TALKED ABOUT TODAY I THOUGHT IT MIGHT BE HELPFUL, AND I APPRECIATE

1  MR. DUFFY DOING THAT.

2        THE GENERAL QUESTIONS MAY HAVE FORMED THE BASIS YOU MAY

3  BELIEVE MIGHT BE OBJECTIONABLE ON VARIOUS GROUNDS, BUT THEY DON'T

4  APPEAR, IN TERMS OF JUST THE GENERAL CATEGORY, THEY DON'T APPEAR

5  OBJECTIONABLE AS BEING NOT ALLOWED BASED UPON THE COURT'S RULING

6  ON THE MOTION IN LIMINE.  THAT WAS MY MAIN REASON FOR ASKING FOR A

7  GENERAL OUTLINE.

8        BUT CERTAINLY IF YOU FEEL THAT THEY CROSS THAT LINE THAT HAS

9  BEEN DRAWN IN THE RULING ON MOTION IN LIMINE, LET ME KNOW THAT.

10 BUT OTHERWISE IF YOU WANT TO OUTLINE YOUR GENERAL POTENTIAL

11 OBJECTIONS TO THESE GENERAL AREAS OF INQUIRY, GO AHEAD AND DO SO

12 NOW.

13        MR. MONCIER:  NO, WITH REGARD TO THE MOTION IN LIMINE.

14 ONCE AGAIN, I WASN'T HERE AND I DON'T WANT TO SPEAK SPECIFICALLY TO

15 THAT.  BUT I DO AGAIN KNOW THAT MR. DUFFY OUTLINED AND GAVE US

16 VERBALLY, IN THE COURT, ON THE RECORD, THE SCOPE OF WHAT HE WANTED

17 TO USE MR. PHILLIPS FOR, AND NONE OF THESE MATERIALS THAT WE'RE

18 SPEAKING OF NOW WERE SAID.

19        OBVIOUSLY, WE WOULD HAVE TAKEN MR. PHILLIPS' DEPOSITION HAD

20 HE GIVEN US NOTICE OF OTHER THAN THE MATTERS HE SAID.  AND THE

21 DIFFERENCE BETWEEN NICOLE WINDLE, FOR EXAMPLE, AND THE USE OF HER

22 PRIOR CONSISTENT STATEMENTS AND WHAT WE ARE HERE, IS, IS THAT WE

23 HAD GIVEN OR MR. DUFFY HAD ALL OF MS. NICOLE WINDLE'S PRIOR

24 STATEMENTS AND CONSISTENT STATEMENTS.

25        HERE WE'RE PUTTING INTO THIS TRIAL, DURING THE MIDDLE OF THE

1  TRIAL, WITHOUT ANY DISCOVERY, THINGS THAT HAVE NOT BEEN PRODUCED.

2  WE HAVE NO IDEA, THERE'S NOT ONE WORD ANYWHERE IN THE TBI

3  INVESTIGATION, PERTAINING TO THESE MATTERS THAT MR. DUFFY IS NOW

4  GOING INTO WITH THIS WITNESS THAT ARE FAR BEYOND WHAT HE HAD GIVEN

5  US NOTICE TO.

6         WITH REGARD TO BIGGER FISH TO FRY, I MEAN, THAT'S A CONCLUSION

7  ON SOMEBODY'S PART, THAT'S AN OPINION TESTIMONY, THAT'S EXPERT

8  TESTIMONY.  THAT'S SOMETHING THAT MAY BE ARGUED TO THE JURY.

9         BUT TO HAVE THIS DISTRICT ATTORNEY TESTIFY ABOUT THAT AS

10  SOMEHOW OF AN EXPERT WITNESS TO TRY TO DISCREDIT, TO TRY TO

11  DISCREDIT MS. WINDLE'S STATEMENT THAT HE HAD DETERMINED WAS

12  TRUTHFUL, BECAUSE HE GAVE HER IMMUNITY; IF IT WASN'T TRUTHFUL, THEN

13  SHE DIDN'T HAVE IMMUNITY.  GETTING INTO THE RECTOR AND CARPENTER,

14  ARE GENERALLY FACING FEDERAL MURDER CHARGES –

15         MR. DUFFY:  FELONY.

16         MR. MONCIER:  FELONY MURDER CHARGES.  I CAN'T POSSIBLY

17  UNDERSTAND WHAT THAT HAS TO DO WITH ANYTHING, BECAUSE RECTOR

18  AND CARPENTER GAVE STATEMENTS UPON THEIR ARREST.  THEY WEREN'T

19  FACING FELONY MURDER CHARGES AT THAT TIME.  THERE WAS NO

20  SUGGESTION TO THEM THAT THEY WERE FACING FELONY MURDER CHARGES,

21  AND HE DECIDED THAT THAT WASN'T GOING TO BE DONE.

22         SO FOR HIM TO SOMEHOW SPECULATE THAT THAT MIGHT HAVE BEEN

23  OUT THERE IS TOTALLY INAPPROPRIATE AND IRRELEVANT.

24         WITH REGARD TO THE FACT THAT THE "BLINDED OF THE LIGHTS"

25  QUESTION, THAT HE'S GOING TO EXPLAIN THAT, YOU KNOW, THAT – I'M SURE

1    HE'S GOT TO HAVE SOME EXPLANATION FOR THAT.

2              THE COURT:  WELL, THAT SEEMS TO BE THE EASIEST ONE,

3    BECAUSE YOU SPECIFICALLY ASKED ABOUT –

4              MR. MONCIER:  YEAH, I DID.

5              THE COURT:  – HIS MAKING THAT STATEMENT.  SO SEEMS LIKE

6    THAT WOULD PASS –

7              MR. MONCIER:  I THINK THAT THAT IS THE EASIEST ONE.

8    ANOTHER CATEGORY, SAID WHAT WOULD HER MOTIVE BE, WHAT WOULD

9    WINDLE'S MOTIVE BE.  I MEAN, THAT'S ALMOST LIKE A JOHN CLANCY

10   QUESTION IN A NOVEL SOMEWHERE, SPECULATIVE.

11            AND 602, YEAH, BY THE WAY, RULE 602 RESOLVES ALL OF THESE

12   THINGS, BECAUSE HE HAS NO PERSONAL KNOWLEDGE OF ANY OF THOSE

13   THINGS.

14            THE COURT:  WELL, HE HAS KNOWLEDGE AS TO WHY HE AGREED

15   TO DISMISS CHARGES AGAINST MS. WINDLE.

16            MR. MONCIER:  HE AGREED – OH, HE'S GOING TO ASK – EXCUSE

17   ME.  I PRESUMED – I DON'T KNOW, I DON'T KNOW WHY THAT'S RELEVANT.

18   HOW IS THAT RELEVANT TO THIS CASE?

19            THE COURT:  WELL, WASN'T THERE SOME TESTIMONY DURING MS.

20   WINDLE'S DEPOSITIONS AND/OR STATEMENTS ABOUT CHARGES NOT BEING

21   BROUGHT AGAINST HER?  I'M GOING ON RECOLLECTION NOW.

22            MR. MONCIER:  SHE TESTIFIED THOROUGHLY TO THE FACT THAT

23   SHE WAS TO GIVE A TRUTHFUL STATEMENT AND THAT PAUL PHILLIPS SIGNED

24   THE PAPERS, AT HER STATEMENT, DISMISSING THE CHARGES AGAINST HER.

25   SO WHAT DO WE NEED TESTIMONY FROM MR. PHILLIPS ABOUT?

1          MR. DUFFY:  BECAUSE THAT'S NOT WHAT HAPPENED.

2          THE COURT:  HE SAYS THAT'S NOT WHAT HAPPENED.

3          MR. MONCIER:  MAYBE MR. –

4          THE COURT:  WELL, LET ME DO THIS, AND YOU CAN DISCUSS THIS

5   WITH MR. PHILLIPS, MR. DUFFY, OR TAKE THIS IN CONSIDERATION IN ASKING

6   YOUR QUESTIONS.  IT DOES APPEAR TO ME THAT WHY HE AGREED TO DISMISS

7   THE CHARGES IS RELEVANT IN LIGHT OF THE PRIOR WINDLE TESTIMONY.  I'M

8   NOT SURE THAT I WOULD ALLOW TESTIMONY FOR HER MOTIVE.

9          I QUESTION THE RELEVANCE AND/OR THE POTENTIAL PREJUDICIAL

10  EFFECT OF TESTIMONY ABOUT RECTOR AND CARPENTER POTENTIALLY

11  FACING FEDERAL MURDER CHARGES.  IT APPEARS TO ME THAT IT WOULD BE

12  RELEVANT.

13         WHEN YOU SAY NO BABB WITNESSES CAME FORWARD, I ASSUME

14  YOU'RE SAYING SOME OF THE TESTIMONY THAT HAS BEEN BROUGHT

15  FORWARD TO THIS TRIAL WAS NOT BROUGHT FORWARD AS PART OF THE

16  INVESTIGATION?

17         MR. DUFFY:  CORRECT.

18         THE COURT:  THAT WOULD SEEM TO BE RELEVANT, AND THE

19  QUESTIONS ABOUT THE "BLINDED BY THE LIGHTS" PRESS CONFERENCE, IN

20  LIGHT OF MR. MONCIER'S QUESTIONS OF MR. CARSON, WOULD APPEAR TO BE

21  RELEVANT.  BUT I WOULD AVOID AND HOPEFULLY HAVE THIS WITNESS AVOID

22  TALKING ABOUT INVESTIGATORY CONCLUSIONS THAT WERE DISCUSSED AT

23  THE PRESS CONFERENCE.

24         MR. MONCIER:  YOUR HONOR, I WAS TRYING –

25         THE COURT:  THAT'S PROBABLY THE BEST I CAN DO UNTIL WE

1    GET IN THE CONTEXT OF THE TRIAL, AND IF THE COURT HAS TO RULE

2    OBJECTION BY OBJECTION, IT WILL.  I'M JUST TRYING TO, IN CERTAIN

3    RESPECTS, ASSIST YOU ALL.  BECAUSE I THINK IT AIDS BOTH OF YOUR CASES

4    WHEN THERE'S A FLOWING EVIDENTIARY TESTIMONY TO THE JURY NOT

5    INTERRUPTED OBJECTION BY OBJECTION.

6          BUT, AGAIN, AS I'VE ALREADY SAID, TO THE EXTENT WE HAVE TO DO

7    THAT, WE WILL.

8          MR. MONCIER:  WELL, ONCE AGAIN, I GO BACK.  HAD THERE BEEN

9    A PROPER 26(a) DISCLOSURE OF THESE SUBJECT MATTERS, THEN THIS WOULD

10   HAVE BEEN FERRETED OUT BY DISCOVERY AND BY MOTIONS IN LIMINE

11   WHERE WE WOULDN'T HAVE TO BE MAKING THESE OBJECTIONS AT THIS

12   POINT.

13         YOU KNOW, THESE ARE MATTERS THIS MORNING THAT WE HAVE GONE

14   INTO THAT ARE COMPLETELY OUTSIDE THE TBI INVESTIGATION.  I MEAN,

15   WE'RE SITTING HERE LITERALLY HEARING THINGS FOR THE FIRST TIME ON

16   THE FIFTH DAY OF THIS TRIAL.  I ROSE TO SPEAK, HOWEVER, JUST TO ONE OF

17   THE MATTERS, AND THAT IS –

18         THE COURT:  LET ME ASK ABOUT RULE 26.  I'M JUST – OBVIOUSLY

19   WE ALL LOOKED AT IT BEFORE.  RULE 26(a)(1)(A) REQUIRES THE DISCLOSING

20   THE NAME AND ADDRESS, ET CETERA, OF INDIVIDUALS LIKELY TO HAVE

21   DISCOVERABLE INFORMATION.

22         MR. MONCIER:  THAT'S CORRECT.

23         THE COURT:  DOES RULE 26(a)(1)(A) THEN REQUIRE AN

24   ADDITIONAL LISTING OF WHAT THAT POTENTIALLY DISCOVERABLE

25   INFORMATION IS?

1          MR. MONCIER:  AND THE NATURE OF THE – I DON'T HAVE IT

2    BEFORE ME – SUBJECT MATTER, THE NATURE OF THE SUBJECT MATTER OF THE

3    WITNESS'S TESTIMONY.

4          THE COURT:  ALL RIGHT.  IDENTIFYING THE SUBJECTS OF THE

5    INFORMATION?

6          MR. MONCIER:  THAT'S RIGHT.  SURE.  I MEAN, HE HAS ALWAYS

7    TOLD US THAT HE WAS GOING TO CALL MR. PHILLIPS FOR THOSE TWO

8    REASONS, ONE OF WHICH THE COURT RULED OUT.  I MEAN, ALL OF THIS

9    OTHER INFORMATION THAT WE'RE HEARING TODAY IS WAY OUTSIDE OF

10   THAT; SAME WAY WITH MR. VINSANT THIS MORNING.

11         THAT'S WHY WE'RE HAVING ALL OF THESE OBJECTIONS, IS BECAUSE

12   THIS WAS NEVER GOING TO BE MATTERS THAT WE WERE GOING INTO . THE

13   REASON I STOOD UP AT THE PODIUM, THOUGH, WAS NOT TO REITERATE MY

14   OBJECTIONS UNDER 26(a).

15         THE REASON I STOOD UP IS THAT MR. PHILLIPS, IN MY NOTES OF THE

16   PRESS CONFERENCE THAT WAS RECORDED, MADE A STATEMENT FOUR DAYS –

17   FIVE DAYS AFTER THE DEATH.  PHILLIPS SAID, "THE CIRCUMSTANCES OF THE

18   CASE DO NOT MEET THE STATUTORY REQUIREMENTS OF FELONY MURDER OR

19   ANY OTHER DEATH-RELATED OFFENSE."

20         SO TO GO IN AND SUGGEST – HE DETERMINED EARLY ON AND HE WAS

21   CORRECT –

22         MR. DUFFY:  I'LL WITHDRAW THE FELONY MURDER.

23         THE COURT:  THANK YOU.

24         MR. DUFFY:  IT'S NOT THAT BIG A DEAL.

25         THE COURT:  ALL RIGHT.  THEN THE ONLY OTHER ONE THAT THE

1  COURT IS INCLINED TO DISALLOW IS THE COMMENT ABOUT HER MOTIVE FOR

2  SERVING UP A BIGGER FISH TO FRY.  THE COURT IS INCLINED TO ALLOW

3  TESTIMONY ABOUT WHY THIS WITNESS AGREED TO DISMISS THE CHARGES,

4  THE FACT OF CERTAIN WITNESSES COMING OR NOT COMING FORWARD WITH

5  INFORMATION, AND QUESTIONS ABOUT BEING "BLINDED BY THE LIGHTS."

6       ALL RIGHT.  WE'LL SEE YOU ALL AT 1:20.

7       (RECESS HAD 12:43 P.M.; RECONVENED WITHOUT JURY 1:30 P.M.)

8            THE COURT:  ALL RIGHT.  THANK YOU.  BEFORE WE RESUME WITH

9  THIS WITNESS, THE COURT WILL RULE ON THE PLAINTIFF'S MOTION FOR A

10  MISTRIAL.  THE COURT WILL DENY PLAINTIFF'S MOTION FOR MISTRIAL WHICH

11  WAS PREMISED UPON THE CURRENT WITNESS'S TESTIMONY THAT DONNIE

12  PHILLIPS TOLD HIM IN DECEMBER OF '03 THAT HE, DONNIE PHILLIPS,

13  BELIEVED THE SHOOTING TO BE ACCIDENTAL.

14       FIRST, THE COURT IMMEDIATELY INSTRUCTED THE JURY TO DISREGARD

15  THAT PORTION OF THE WITNESS'S TESTIMONY; SECOND, THE TESTIMONY,

16  ALTHOUGH EXCLUDABLE, IN NO WAY RAN AFOUL OF THE COURT'S RULING

17  ON PLAINTIFF'S MOTION IN LIMINE.  THAT RULING EXCLUDED TESTIMONY

18  ABOUT THE CHARGING DECISION BY THE DISTRICT ATTORNEY; IN OTHER

19  WORDS, THE DECISION NOT TO BRING CRIMINAL CHARGES.  THE TESTIMONY

20  NOW EXCLUDED OF DONNIE PHILLIPS WAS MR. DONNIE PHILLIPS' OPINION AS

21  TO THE SHOOTING BEING ACCIDENTAL, NOT THE CHARGING DECISION OF THE

22  DISTRICT ATTORNEY.

23       THIRD, TO THE EXTENT THERE WAS AN INADVERTENT REFERENCE TO

24  THE OPINION OF DONNIE PHILLIPS, THAT, AS THE COURT NOTED PRIOR TO

25  LUNCH, LESS DIRECTLY RELATED, IF AT ALL, TO THE CHARGING DECISION

1  ISSUED THAN THE QUESTIONING OR IN THE RECORD OF MR. CARSON BY

2  PLAINTIFF'S COUNSEL AS FOLLOWS:  "AFTER YOU SAW THE PROSECUTOR

3  JUSTIFYING YOUR ACCIDENTAL SHOOTING."

4        IN ANY EVENT, THE COURT BELIEVES ANY HARM BY THAT TESTIMONY

5  CAN AND HAS BEEN CURED BY THE COURT'S INSTRUCTION TO THE JURY TO

6  DISREGARD THE TESTIMONY.  SO FOR ALL THESE REASONS, AS WELL AS FOR

7  THOSE EXPRESSED BY THE COURT PRIOR TO LUNCH, THE MOTION FOR

8  MISTRIAL WILL BE DENIED.

9        LET'S BRING OUR JURY IN, PLEASE.

10       (JURY RECONVENED IN COURTROOM AT 1:33 P.M.)

11            THE COURT:  THANK YOU.  AND, MR. DUFFY, YOU MAY CONTINUE

12  WITH DIRECT EXAMINATION OF THIS WITNESS.

13            MR. DUFFY:  THANK YOU, YOUR HONOR.

14  Q     GENERAL PHILLIPS, GOING BACK TO YOUR CONVERSATION WITH

15  DONNIE PHILLIPS DID DONNIE PHILLIPS TELL YOU ANYTHING ABOUT WHAT

16  MARTY HOLLERED OUT OF THE TRAILER ON THE NIGHT IN QUESTION?

17  A     YES.  ON DECEMBER THE 24TH DONNIE PHILLIPS SAID THAT MARTY WAS

18  IN THE TRAILER BY HIMSELF AND THAT HE HOLLERED OUTSIDE, "HE'S GOT A

19  GUN, DON'T, DON'T COME IN HERE."

20  Q     ALL RIGHT.

21  A     AND DONNIE –

22            MR. MONCIER:  OBJECT TO ANY OTHER STATEMENTS, YOUR

23  HONOR.  I BELIEVE THAT THAT'S THE STATEMENT THE COURT PERMITTED HIM

24  TO TESTIFY TO.

25            THE COURT:  WELL, GO AHEAD AND ASK YOUR NEXT QUESTION,

1    MR. DUFFY.

2              MR. DUFFY:  ALL RIGHT.

3    Q       NOW, SOMETIME AROUND THIS TIMEFRAME, DID YOU RECEIVE A

4    COMMUNICATION FROM THE ATTORNEY FOR NICOLE WINDLE?

5    A       YES.  I'M NOT EXACTLY SURE WHAT THE TIMEFRAME WAS, BUT THE

6    INVESTIGATION CONTINUED, AND I KNOW THERE WERE STATEMENTS THAT

7    WERE TAKEN DURING '04.  AND I WAS CONTACTED BY TOM BARKLEY, WHO

8    REPRESENTS NICOLE WINDLE.

9    Q       WHAT WAS THE OFFER IN CONNECTION WITH NICOLE WINDLE'S

10   STATEMENT TO THE TBI?

11             MR. MONCIER:  OBJECT TO THE HEARSAY, YOUR HONOR.

12             THE COURT:  YOU WANT TO REPHRASE, MR. DUFFY?

13             MR. DUFFY:  WHAT WAS THE AGREEMENT REACHED BETWEEN

14   YOURSELF ON BEHALF OF THE STATE OF TENNESSEE AND THE ATTORNEY FOR

15   NICOLE WINDLE?

16   A       I AGREED TO DISMISS THE CHARGES AGAINST HER.  I WANTED THE

17   INVESTIGATION TO BE THOROUGH.  THE AGREEMENT WAS THAT, IF WE

18   WOULD DISMISS THE CHARGES AGAINST HER IN THE DRUG CASE, WHICH HER

19   PARTICIPATION WAS RELATIVELY MINOR, THAT SHE WOULD SUBMIT TO A

20   FURTHER INTERVIEW BY THE TBI, WHICH THE CASE WAS DISMISSED, AND SHE

21   DID SUBMIT, WITH HER ATTORNEY PRESENT, TO THE INTERVIEW.

22   Q       NOW, WAS THE AGREEMENT TO DISMISS THE CHARGES ONLY AFTER –

23   ON THE CONCLUSION OF OR BASED UPON THE CONTENT OF HER STATEMENT?

24   A       NO.  THE AGREEMENT WAS THAT WE WOULD DISMISS THE CASE AND

25   SHE WOULD, WITH HER ATTORNEY PRESENT, ALLOW ANOTHER INTERVIEW BY

1   THE TBI. AND WE WANTED TO BE THOROUGH, AND SHE WAS OFFERING

2   ANOTHER INTERVIEW, SO WE DISMISSED – WE AGREED TO DISMISS THE CASE

3   IN ADVANCE AND LISTEN TO WHAT SHE HAD TO SAY.

4   Q       AND WAS HER LAWYER THERE PRESENT WITH HER WHEN SHE GAVE –

5   A       YES, HER ATTORNEY WAS THERE. I WAS THERE, MY MOST SENIOR

6   ASSISTANT WAS THERE, AND THE INTERVIEW WAS CONDUCTED BY BOB

7   DENNY, WHO'S THE SUPERVISOR FOR EAST TENNESSEE FOR THE TBI.

8   Q       ALL RIGHT, SIR. WERE YOU PRESENT FOR THAT INTERVIEW AS WELL?

9   A       YES.

10  Q       HOW MANY OFFICERS DID NICOLE WINDLE SAY WERE IN THE TRAILER

11  AT THE TIME SHE HEARD THE GUNSHOT?

12  A       SHE SAID DIFFERENT THINGS ABOUT THAT. SOMETIMES SHE SAID TWO

13  OFFICERS, SOMETIMES SHE SAID THREE OFFICERS.

14  Q       ALL RIGHT, SIR. DO YOU REMEMBER THE SEQUENCE OF THOSE

15  CHANGES; IN OTHER WORDS, WHICH WAS FIRST?

16  A       I KNOW THAT IN HER INTERVIEW, WHICH I WAS FAMILIAR WITH ON THE

17  NIGHT OF THE DEATH, THAT SHE SAID THREE OFFICERS; AND THEN IN THE

18  INTERVIEW THAT SHE GAVE AFTER WE DISMISSED THE CHARGES AGAINST

19  HER, SHE SAID TWO OFFICERS OR THREE OFFICERS. I THINK SHE ALSO SAID

20  DONNIE PHILLIPS MAY HAVE BEEN IN THERE.

21  Q       ALL RIGHT. SO WHAT DID YOU DO WITH THIS NEW INFORMATION – OR

22  LET ME ASK YOU. WOULD THAT BE KIND OF NEW INFORMATION?

23  A       NO, IT WASN'T. AND IT WAS NOT CONSISTENT WITH THE SCIENTIFIC

24  EVIDENCE IN THE CASE.

25  Q       AFTER RECEIVING THAT PIECE OF INFORMATION, WHAT ELSE WAS DONE

1    IN TERMS OF THE INVESTIGATION?

2    A        WELL, MANY INTERVIEWS TOOK PLACE.  EVERY TIME WE RECEIVED

3    ANY INFORMATION WE – I MEAN, IF WE RECEIVED IT, WE WOULD ASK THE TBI

4    TO FOLLOW UP ON IT.  THEN WE WOULD MAKE SURE THAT THEY DID FOLLOW

5    UP ON IT.  OF COURSE, IF THEY RECEIVED THE INFORMATION, THEY WOULD

6    INFORM US OF IT AND THEY WOULD FOLLOW UP.

7            AT ONE POINT, BECAUSE OF WHAT I WAS HEARING IN THE COMMUNITY,

8    I WENT TO SEE MRS. YANCEY TO SEE WHETHER OR NOT SHE WANTED TO

9    DISCUSS THE INVESTIGATION AND WHETHER SHE HAD INFORMATION THAT

10   WE NEEDED TO CHECK INTO.  AND I VISITED HER AT HER EMPLOYMENT,

11   ASKED HER IF I COULD SPEAK TO HER FOR A MOMENT, AND SHE WAS VERY

12   GRACIOUS AND SPOKE TO ME PRIVATELY.

13           AND I ASKED IF SHE WANTED TO COME DOWN, LET US TELL HER WHAT

14   THE INVESTIGATION INDICATED AT THIS POINT, ANSWER ANY QUESTIONS SHE

15   HAD AND TAKE ANY INFORMATION SHE HAD, BECAUSE MANY TIMES PEOPLE

16   WILL TELL FAMILY MEMBERS THINGS THAT THEY WON'T TELL US.  AND SHE

17   INDICATED THAT, YES, SHE WOULD LIKE TO DO THAT.

18           AND I ENCOURAGED HER TO BRING ANYBODY WITH HER THAT SHE

19   WANTED TO BRING, AND WE TALKED ABOUT HER OFF DAYS, THE DAYS THAT

20   SHE DIDN'T WORK AT THE HOSPITAL.  I HAD MY CALENDAR WITH ME, AND WE

21   SET AN APPOINTMENT.

22   Q       DID SHE KEEP THAT APPOINTMENT?

23   A        NO.  SHE CALLED – WELL, BEFORE SHE CALLED, I MADE ARRANGEMENTS

24   FOR THE LEAD AGENT, STEVE VINSANT, TO BE AT THAT APPOINTMENT AND

25   FOR THE SUPERVISOR FOR EAST TENNESSEE, BOB DENNY, TO BE THERE.  I

1    WANTED THEM BOTH TO BE THERE.

2        SHE CALLED SUBSEQUENTLY BEFORE THE APPOINTMENT, MAYBE THE

3    DAY BEFORE, AND SHE RESCHEDULED IT BECAUSE SHE WANTED TO BRING AN

4    ATTORNEY WITH HER WHICH WE – I THOUGHT WAS GREAT.  I HAD

5    ENCOURAGED HER BRING ANYBODY WITH YOU YOU WANT TO.  SO WE SET A

6    SECOND APPOINTMENT.

7        AND THEN, AGAIN, I ASKED THE LEAD AGENT FOR THE TBI TO BE THERE,

8    I ASKED THE SUPERVISOR FOR THE TBI TO BE THERE, AND THEN AN ATTORNEY

9    CALLED AND CANCELED THE SECOND APPOINTMENT ON HER BEHALF.

10   Q    ALL RIGHT.  TO THIS DAY HAS LORI YANCEY MET WITH YOU TO

11   PROVIDE ANY INFORMATION?

12   A    NO, SHE HASN'T.

13   Q    ABOUT A YEAR AFTER THIS INCIDENT, NOVEMBER, '04 TIMEFRAME, ARE

14   YOU AWARE OF WHETHER THERE WAS ANYTHING RUN IN ANY NEWSPAPER

15   CONCERNING THIS, THIS CASE, PUBLISHED BY MS. YANCEY?

16   A    YES.  I KNOW THAT A FULL-PAGE AD WAS RUN IN AT LEAST ONE OF THE

17   LOCAL NEWSPAPERS BY MS. YANCEY SOLICITING PEOPLE TO COME FORWARD

18   WITH INFORMATION, IF THEY HAD INFORMATION, ABOUT THE DEATH OF HER

19   HUSBAND.

20   Q    ALL RIGHT.  DID ANYONE FROM – DID MS. YANCEY CONTACT YOU TO

21   LET YOU KNOW WHETHER ANYONE HAD RESPONDED TO THAT AD?

22   A    NO, SHE DIDN'T.

23   Q    DID YOU HEAR FROM MR. MONCIER'S OFFICE ABOUT WHETHER ANYONE

24   HAD RESPONDED TO THAT AD AND COME FORWARD WITH SOME

25   INFORMATION?

1   A       NO.  ALTHOUGH, AFTER DEPOSITIONS WERE TAKEN, MR. MONCIER'S

2   OFFICE DID PROVIDE TO THE TBI AND TO OUR OFFICE THE DEPOSITION OF

3   MARTY CARSON AND ALSO A REPORT.  THAT WAS SOME TIME LATER.

4   Q       WHEN WAS THE FIRST THAT YOU HEARD ANYTHING FROM A

5   GENTLEMAN BY THE NAME OF RICHARD BABB?

6   A       WELL, VERY, VERY RECENTLY.  I LEARNED THAT A RICHARD BABB HAD

7   GIVEN A STATEMENT ALSO THAT NICK LETNER HAD GIVEN A STATEMENT.

8   BUT THAT WAS VERY RECENT, IN THE RECENT PAST.

9   Q       ALL RIGHT.  DID YOU LEARN THAT AS A RESULT OF MR. BABB OR MR.

10  LETNER CONTACTING YOUR OFFICE?

11  A       OH, NO, NO.  I THINK WE LEARNED OF THOSE STATEMENTS AS A RESULT

12  OF THE DISCOVERY PROCESS THAT WAS GOING ON IN THIS CIVIL CASE.  AND I

13  ASKED THE TBI TO INVESTIGATE MR. BABB'S STATEMENT.

14  Q       ALL RIGHT.  NOW, YOU TOLD US EARLIER THAT A FEW DAYS AFTER THIS

15  – OR, EXCUSE ME.  HOW MANY DAYS AFTER THE INCIDENT ITSELF WAS THE

16  PRESS CONFERENCE?  DO YOU REMEMBER WHEN THAT WAS?

17  A       WELL, THIS OCCURRED ON FRIDAY NIGHT, AND THE PRESS CONFERENCE

18  – AND THE FUNERAL, I BELIEVE, WAS ON TUESDAY, AND THE PRESS

19  CONFERENCE WAS WEDNESDAY MORNING.

20  Q       DO YOU RECALL IF SHERIFF CARSON WAS THERE AT THE PRESS

21  CONFERENCE?

22  A       YES.  THE SHERIFF WAS THERE, THE CHIEF OF POLICE OF ONEIDA, THE

23  CHIEF OF POLICE OF WINFIELD, AND BOB DENNY, THE SUPERVISOR FOR THE

24  TBI FOR EAST TENNESSEE WAS THERE.

25  Q       DID SHERIFF CARSON ATTEMPT TO INFLUENCE YOUR PRESS

1    STATEMENT?

2                    MR. MONCIER:  OBJECT TO THE LEADING QUESTION, YOUR

3    HONOR.

4                    THE COURT:  WHY DON'T YOU REPHRASE, PLEASE?

5                    MR. DUFFY:  ALL RIGHT.  DID MR. CARSON – WHAT DID MR.

6    CARSON TELL YOU, IF ANYTHING, IN CONNECTION WITH THE INFORMATION

7    THAT YOU DISCLOSED IN THE PRESS CONFERENCE?

8    A       I HAD NO CONVERSATION AT ALL WITH SHERIFF CARSON IN BETWEEN

9    THE TIME THAT I LEARNED OF THE INCIDENT AND THE PRESS CONFERENCE.

10   WE DIDN'T – I DIDN'T DISCUSS IT WITH SHERIFF CARSON AT ALL.  I DISCUSSED

11   THE INVESTIGATION WITH MY ASSISTANTS WHO HAD WORKED ON IT, AND I

12   DISCUSSED IT WITH THE TBI AGENTS.

13   Q       ALL RIGHT, SIR.  WAS THERE A QUESTION AND ANSWER PERIOD AFTER

14   THAT?

15   A       YES, THERE WAS.

16   Q       DO YOU REMEMBER RESPONDING TO SOME TYPE OF QUESTION WITH

17   INFORMATION ABOUT LIGHTS?

18   A       YES.  MARTY CARSON'S STATEMENT WAS – AND THIS WAS NOT IN THE

19   STATEMENT WHICH WE MADE TO THE PRESS, BU T IT WAS IN RESPONSE TO A

20   QUESTION THAT I WAS ASKED.  MARTY CARSON SAID THAT HE COULD SEE

21   LIGHTS AROUND THE DOOR OF THAT BACK BEDROOM.  THE STATEMENTS OF

22   OTHER OFFICERS INDICATED THAT THEIR PATROL CAR WAS POSITIONED ON

23   THAT FAR SIDE OF THE TRAILER WITH THE LIGHTS ON BRIGHT, SHINING

24   THROUGH THE WINDOW, WHICH WOULD HAVE BEEN THE OPPOSITE SIDE OF

25   THE ROOM FROM WHERE THE DOOR WAS.

1      MARTY CARSON SAID THE DOOR OPENED AND HE SAW A SHADOWY

2   FIGURE THAT WAS HOLDING SOMETHING WHICH HE TOOK TO BE A SHOTGUN.

3   LATER INVESTIGATION REVEALED THAT THERE WAS A SICKLE WITH A LONG

4   HANDLE THAT WAS STUCK THROUGH THE DOOR AND HOLDING UP PART OF

5   THE METH COOKING OPERATION.

6      SO, IN RESPONSE TO QUESTIONS, I MADE SOME REFERENCE TO THE

7   SHADOWY FIGURE BEING BACK-LIT.  IF THERE IS A FIGURE AND YOU CAN'T

8   SEE IT WELL AND THERE ARE BRIGHT LIGHTS SHINING FROM A PATROL CAR

9   THROUGH THE WINDOW BEHIND IT, THEN YOU COULD HAVE CONFUSION WITH

10  YOUR EYESIGHT, AND I THINK I MAY HAVE USED THE TERM "BLINDED."

11     WHAT I MEANT BY THAT IS, THE LIGHT AROUND THE FIGURE WOULD

12  BLIND YOU TO SEE WHAT THIS IS.  HE SAID THAT HE TOOK IT TO BE A MAN

13  HOLDING A SHOTGUN, AND I THINK THAT'S THE REFERENCE THAT I MADE IN

14  RESPONSE TO A QUESTION AT THE PRESS CONFERENCE.

15  Q      DID MARTY CARSON SPECIFICALLY SAY THAT HE WAS BLINDED BY

16  LIGHTS?

17  A      NO.

18     MR. MONCIER:  HE DOESN'T KNOW.  HE NEVER TALKED TO MARTY

19  CARSON, YOUR HONOR.

20     THE COURT:  LET'S MAKE – DON'T MAKE – WHAT'S YOUR

21  OBJECTION?

22     MR. MONCIER:  OBJECTION.

23     THE COURT:  NOW HAVING HEARD YOUR OBJECTION, I BELIEVE

24  THAT WOULD BE APPROPRIATE FOR CROSS-EXAMINATION –

25     MR. DUFFY:  THAT'S ALL THE QUESTIONS I HAVE.

1              THE COURT:  – WHICH WILL BEGIN NOW.  THANK YOU.

2                            CROSS-EXAMINATION

3    BY MR. MONCIER:

4    Q      MR. PHILLIPS, I UNDERSTAND THAT YOU HAVE BEEN A PROSECUTOR

5    FOR 30 YEARS; IS THAT CORRECT?

6    A      I THINK 32 YEARS, MR. MONCIER.

7    Q      AND THAT WOULD TAKE IT BACK, IF MY MATH IS CORRECT, TO ABOUT

8    1975?

9    A      YES.

10   Q      AND WHEN DID YOU BECOME A PROSECUTOR IN SCOTT COUNTY?

11   A      IN JANUARY OF 1976.

12   Q      JANUARY OF 1976, WHO WAS THE SHERIFF AT THAT TIME?

13   A      I'M SORRY?

14   Q      WHO WAS THE SHERIFF OF SCOTT COUNTY?

15   A      I BELIEVE THE SHERIFF WAS JULIUS LEWALLEN.

16              COURT REPORTER:  I'M SORRY?

17              THE WITNESS:  J-U-L-I-U-S, L-E-W-A-L-L-E-N.

18   Q      MR. PHILLIPS, YOU HAVE BEEN QUOTED FROM TIME TO TIME AS SAYING

19   THAT YOUR RELATIONSHIP WITH SHERIFF'S DEPARTMENTS IS A FORCED

20   MARRIAGE; IS THAT CORRECT?

21   A      EXCUSE ME?

22   Q      THAT YOUR RELATIONSHIP WITH SHERIFF'S DEPARTMENT IN YOUR

23   JURISDICTION IS A FORCED MARRIAGE?

24   A      I DON'T KNOW IF I HAVE SAID THAT OR NOT.  I THINK THAT'S THE

25   TRUTH.  I MEAN, I'M THE ELECTED DISTRICT ATTORNEY, THEY'RE THE

1    ELECTED SHERIFF.  WE HAVE TO TRY TO WORK WITH EACH OTHER.

2    Q        SO BACK IN 1976, WHEN YOU BECAME A PROSECUTOR IN SCOTT

3    COUNTY, A MARION CARSON BECAME THE SHERIFF IN 1978; IS THAT CORRECT?

4    A        I THINK, I THINK THAT'S RIGHT.

5                   MR. DUFFY:  YOUR HONOR?

6    A        (CONTINUING)  HE WAS ACTUALLY A DEPUTY UNDER JULIUS

7    LEWALLEN.

8                   MR. DUFFY:  OBJECT.

9    A        (CONTINUING)  AND THEN I THINK HE WAS THE NEXT SHERIFF.

10                  THE COURT:  DO YOU HAVE AN OBJECTION?

11                  MR. DUFFY:  I DO, YOUR HONOR.  I BELIEVE WE SHOULD TAKE IT

12   UP AT THE SIDE.

13                  THE COURT:  ALL RIGHT.  VERY, VERY QUICKLY, PLEASE.  EXCUSE

14   ME.

15            (DISCUSSION AT BENCH OFF THE RECORD.)

16                  THE COURT:  YOU MAY PROCEED, MR. MONCIER.

17   Q        YOU WOULD AGREE – WOULD YOU NOT – THAT THE CARSON FAMILY, OF

18   WHICH JIM CARSON AND MARTY CARSON ARE A PART OF, ARE A POLITICALLY

19   POWERFUL OR WERE A POLITICALLY POWERFUL FORCE IN SCOTT COUNTY

20   FROM 1980, ON, WOULDN'T YOU?

21   A        YES.  AS A MATTER OF FACT, ARZO CARSON WAS AN ADVISOR TO

22   SHERIFF JIM CARSON WHEN HE FIRST TOOK OFFICE, SO, YES, I WOULD SAY SO.

23   Q        AND YOU WOULD AGREE THAT AFTER MARION CARSON – THAT IS JIM

24   CARSON'S BROTHER; IS THAT CORRECT?

25   A        YES.  YES, IT IS.

1  Q        AND AFTER MARION CARSON WAS NOT IN OFFICE ANY LONGER, THEN

2  JIM CARSON TOOK OVER AS SHERIFF?

3  A        NO.  THERE WAS A SHERIFF IN BETWEEN.  THAT WAS SHERIFF JACK

4  CLAXTON.

5  Q        AND THEN JIM CARSON BECAME THE SHERIFF, AND WHEN HE BECAME

6  THE SHERIFF, WOULD YOU AGREE THAT A LARGE PART OF THE EMPLOYEES OF

7  THE SCOTT COUNTY SHERIFF'S DEPARTMENT WERE RELATIVES OF THESE

8  CARSON PEOPLE?

9  A        YES.

10  Q        WHAT PERCENTAGE?  I HAVE SEEN DIFFERENT REPORTS OF IT.

11  A        I REALLY DON'T HAVE ANY IDEA, MR. MONCIER.  BUT I DO KNOW THAT

12  IN SCOTT – IN THAT DEPARTMENT, AS WELL AS IN SOME OF MY OTHER

13  DEPARTMENTS, A LOT OF THE EMPLOYEES WERE RELATIVES.

14  Q        IS IT TRUE THAT APPROXIMATELY 75 PERCENT OF THE PEOPLE IN THE

15  SCOTT COUNTY SHERIFF'S DEPARTMENT WERE RELATIVES OF JIM CARSON?

16  A        I DON'T – I DON'T KNOW.  I MEAN, I WOULD THINK THAT'S HIGH, BUT I

17  DON'T KNOW.  I KNOW THAT THERE WERE LOTS OF RELATIVES WHO WORKED

18  THERE, AND THAT'S TRUE OF SOME OF MY OTHER COUNTIES AS WELL.

19  Q        NOW, AS I UNDERSTAND IT, THE TBI SOMETIME AROUND IN 2001

20  BROUGHT TO YOU THESE STATEMENTS OF THE LETNER FELLOW AND THE

21  GUNTER FELLOW THAT YOU SAY ARE INCONSISTENT AMONG EACH OTHER; IS

22  THAT CORRECT?

23  A        SORT OF.  I ASKED THEM TO INVESTIGATE, AND IN RESPONSE TO MY

24  REQUEST THEY BROUGHT ME THOSE STATEMENTS, YES.

25  Q        OKAY.  AND THEN YOU LOOKED AT THE STATEMENT, YOU DESCRIBED

1    THEM AS INCONSISTENT?

2    A        YES.

3              MR. MONCIER:  YOUR HONOR, I NOW MOVE THAT THE

4    STATEMENTS BE INTRODUCED INTO EVIDENCE, EXHIBITS 55 AND 56.

5              MR. DUFFY:  YOUR HONOR, I OBJECT.  IT'S HEARSAY.  HE CAN ASK

6    HIM ABOUT INCONSISTENCIES, I SUPPOSE, BUT HE CAN'T INTRODUCE THIS

7    EXTRINSIC EVIDENCE OF IT.

8              MR. MONCIER:  IT GOES, YOUR HONOR, TO HIS STATEMENT AS TO

9    INCONSISTENCIES.

10             THE COURT:  WELL, I'M NOT SURE THAT PROVIDES A SUFFICIENT

11   BASIS TO OVERRIDE THE COURT'S PREVIOUS RULING, BUT I WILL NOT RULE AT

12   THIS TIME AND TAKE IT UNDER ADVISEMENT.

13   Q        NOW, YOU SAID THAT THERE HAD BEEN PREVIOUS LAW MEN – AND I

14   DON'T WANT YOU TO BE SPECIFIC, LET ME WARN YOU AGAINST THAT.  BUT

15   THERE HAD BEEN ACTUALLY PREVIOUS SHERIFFS IN SCOTT COUNTY THAT

16   HAD BEEN PROSECUTED FOR DRUG DEALINGS, CORRECT?  DON'T GIVE ANY

17   NAMES OR ANY SPECIFICS.

18   A        YES, AND OTHER OF MY COUNTIES, UNFORTUNATELY.

19   Q        OKAY.  AND ACTUALLY, THOUGH, THOSE INVESTIGATIONS WERE DONE

20   BY THE FEDERAL BUREAU OF INVESTIGATION, CORRECT?

21   A        NOT IN EVERY INSTANCE.  SOMETIMES THEY WERE TBI

22   INVESTIGATIONS.

23   Q        IN SCOTT COUNTY, A FORMER SHERIFF WAS CONVICTED OF DRUG

24   DEALING AT THE INVESTIGATION OF THE FBI, CORRECT?

25   A        THAT'S CORRECT, YES, YES.

1    Q       NEVERTHELESS, WHEN THESE TBI AGENTS BROUGHT TO YOUR

2    ATTENTION THE ALLEGATION THAT THE SHERIFF'S SON WAS INVOLVED IN

3    METHAMPHETAMINE ACTIVITIES, DID YOU REFER THAT TO THE TBI?

4    A       NO, I DIDN'T.

5    Q       YOU REFERRED THAT TO THE TBI?

6    A       YES.

7    Q       NOW, IN THE FBI'S CASE, THEY CONVICTED A FORMER SHERIFF OF

8    SCOTT COUNTY OF DRUG DEALING BY A STING OPERATION, DIDN'T THEY?

9    A       I BELIEVE THAT'S CORRECT, YES.

10   Q       THEY CAUGHT HIM WITH THE GOODS, SO TO SPEAK?

11   A       SOMETHING LIKE THAT, YES.

12   Q       DID YOU ORDER THE TBI TO DO AN UNDERCOVER STING OPERATION

13   WITH REGARD TO MARTY CARSON?

14   A       NO, I DIDN'T.

15   Q       WELL, WOULD YOU EXPECT THAT THE TBI AGENTS INVOLVED IN

16   TAKING THESE STATEMENTS WOULD GO AND TELL MARTY CARSON ABOUT IT,

17   WOULD YOU EXPECT THAT TO HAPPEN?

18   A       NO, I WOULD NOT EXPECT THAT TO HAPPEN.

19   Q       THAT WOULD BE VERY UNUSUAL, WOULDN'T IT?

20   A       WELL, I WOULD NOT EXPECT THAT TO HAPPEN, NO.

21   Q       WOULD YOU BE SURPRISED IF IT HAPPENED?

22   A       YES, I'D BE SURPRISED IF IT HAPPENED.

23   Q       AND THE REASON YOU WOULD BE SURPRISED IF THIS HAPPENED IS,

24   WHEN A LAW ENFORCEMENT IS INVESTIGATING ANOTHER LAW

25   ENFORCEMENT, THE LAST THING YOU WANT TO HAVE THE OTHER LAW

1   ENFORCEMENT AGENCY OR AGENT KNOW IS THAT HE'S BEING

2   INVESTIGATED?

3   A       YES, THAT'S CORRECT.

4   Q       BECAUSE IF HE KNOWS HE'S BEING INVESTIGATED, HE'S GOING TO

5   CLEAN UP HIS ACT?

6   A       HE COULD, SURE.

7   Q       AND ABOUT THE ONLY WAY YOU'RE EVER GOING TO CONVICT A LAW

8   ENFORCEMENT AGENCY IS WHEN YOU CATCH THEM IN THE ACT?

9   A       YES, THAT'S CORRECT.

10  Q       BECAUSE PEOPLE TEND TO BELIEVE LAW ENFORCEMENT PEOPLE, DON'T

11  THEY?

12  A       WELL, I DON'T KNOW ABOUT THAT, BUT WORKING A CASE AGAINST A

13  LAW ENFORCEMENT AGENT WOULD BE ONE OF THE MOST SENSITIVE KINDS

14  OF INVESTIGATIONS, AND YOU'D WANT TO HAVE AS MUCH CONFIDENTIALITY

15  AS POSSIBLE.

16  Q       AND, FURTHERMORE, WHEN YOU BRING AN ACTION AGAINST A LAW

17  ENFORCEMENT AGENT, LAW ENFORCEMENT OFFICERS STICK TOGETHER,

18  DON'T THEY?  THEY SUPPORT EACH OTHER?

19  A       YES AND NO.  I HAVE FOUND THE TBI, IN THE INVESTIGATIONS IN MY

20  DISTRICT, TO BE VERY OBJECTIVE AND PROFESSIONAL.  NOW, OFFICERS

21  WITHIN A DEPARTMENT, THERE MIGHT BE MORE STICKING TOGETHER, AS YOU

22  SAY.

23  Q       THEY CALL IT THE BLUE LINE?

24  A       THE WHAT?

25  Q       BLUE LINE?

1    A      THE BLUE LINE, I THINK I HEARD THAT ON TELEVISION, YES.

2    Q      THE BLUE LINE IS AN OFFICER SUPPORTS ANOTHER OFFICER, RIGHT?

3    A      I'VE HEARD THAT ON TELEVISION.

4    Q      AND NEVER TESTIFIES AGAINST ANOTHER OFFICER –

5    A      THAT'S NOT BEEN MY EXPERIENCE IN DEALING WITH THE TBI BUT –

6    Q      OH, NO, NO, NO.  I'M TALKING ABOUT WITHIN THE DEPARTMENT.

7    A      YES, I'M FAMILIAR WITH THAT.

8    Q      SO BECAUSE OF THAT, WHEN YOU HAVE ALLEGATIONS OF DRUG

9    DEALING OF THE SHERIFF'S SON, YOU WOULD EXPECT THAT THE SHERIFF'S

10   DEPARTMENT IS GOING TO RALLY AROUND AND PROTECT THAT INDIVIDUAL,

11   THE SHERIFF'S DEPARTMENT?

12   A      WELL, ESPECIALLY WHERE THE ALLEGATIONS INVOLVED WERE FROM

13   TWO INDIVIDUALS WHO HAD ESCAPED FROM THE JAIL AND WERE INVOLVED

14   WITH METHAMPHETAMINE.  I MEAN –

15   Q      BUT THEY DIDN'T BRING UP THE PAST, IT WASN'T AN ALLEGATION OF

16   PRESENT DEALINGS OR THEIR ESCAPING; IT'S ABOUT WHAT HAD HAPPENED IN

17   THE PAST WITH MARTY CARSON, WASN'T IT?

18   A      WELL, I UNDERSTAND.  BUT I'M JUST SAYING THAT THE CREDIBILITY OF

19   – I MEAN, THESE PEOPLE WERE GIVING EXCUSES FOR WHY THEY ESCAPED

20   FROM THE JAIL, AND THEY WERE ADMITTEDLY INVOLVED IN

21   METHAMPHETAMINE.  THAT'S NOT – I WOULD NOT EXPECT LAW

22   ENFORCEMENT TO GIVE THE SAME WEIGHT TO THOSE ALLEGATIONS AS THEY

23   WOULD TO PEOPLE WHO ARE NOT INVOLVED IN METH AND HAD NOT ESCAPED

24   FROM THE JAIL.

25   Q      WELL, THERE'S NO EXCUSE FOR ESCAPING FROM A JAIL, IS THERE?  I

1    MEAN, EITHER THEY DID IT OR THEY DIDN'T?

2    A       I DON'T THINK THERE'S ANY EXCUSE FOR ESCAPING FROM THE JAIL, NO.

3    Q       AND THEY ADMITTED THAT THEY ESCAPED FROM THE JAIL?

4    A       YES.

5    Q       BUT THEY SAID THAT THEY HAD THE HELP FROM MARTY CARSON,

6    RIGHT?

7    A       NO.  I THOUGHT THEY SAID THAT THEY HAD – NO, THAT'S NOT WHAT I

8    RECALL THAT THEY SAID.

9    Q       WHAT THEY ALSO SAID, AND I THINK – I TAKE THAT BACK.  THEY SAID

10   THAT THEY WERE SCARED; IS THAT CORRECT?

11   A       YES.

12   Q       AND THEN THEY WENT ON TO DESCRIBE WHY THEY WERE SCARED, IS

13   BECAUSE MARTY CARSON KNEW THAT THEY KNEW WHAT MARTY CARSON

14   HAD BEEN DOING OVER THE PAST YEAR OR SO, THE REASON WHY THEY WERE

15   SCARED?

16   A       ONE OF THEM, ONE OF THEM SAID THAT THEY HAD INFORMATION FROM

17   A THIRD PARTY TO THAT EFFECT.  THE OTHER ONE SAID THAT THE

18   INFORMATION WAS DIRECTLY FROM THE OTHER ESCAPEE.  SO THAT'S

19   INCONSISTENT.

20   Q       WELL, THAT'S WHAT WE CALL CONSPIRACY, ISN'T IT, TO WHERE YOU

21   HAVE PEOPLE WHO ARE INVOLVED IN AN AGREEMENT SAYING WHAT THE

22   OTHER PEOPLE IN THE AGREEMENT ARE TELLING THEM, CO-CONSPIRACY

23   HEARSAY?

24   A       I DON'T CALL THOSE TWO STATEMENTS BEING IN FURTHERANCE OF A

25   CONSPIRACY.  I CALL THOSE TWO STATEMENTS INCONSISTENT AS THE

1   STORIES DID NOT MATCH.  ONE SAID THE INFORMATION WAS FROM A THIRD

2   PARTY, THE OTHER SAID THE INFORMATION WAS DIRECT FROM THE OTHER

3   ESCAPEE'S OWN KNOWLEDGE.

4   Q      OKAY.  BUT WHATEVER THE CASE IS, YOU WOULDN'T EXPECT THE TBI

5   AGENTS TO GO DOWN AND TELL MARTY CARSON WHAT SOMEBODY SAID?

6   A      NO, I WOULD NOT.

7   Q      AND THAT WOULDN'T BE PART OF WHAT YOU DESCRIBED AS

8   THOROUGH PROFESSIONALISM OF THE TBI?

9   A      IT WOULD NOT.

10  Q      YOU DON'T KNOW WHAT THE TBI DID TO FOLLOW UP ON THOSE

11  STATEMENTS, DO YOU?

12  A      THE ONLY THING I KNOW, MR. MONCIER, IS THAT IT WOULD HAVE COME

13  UP IN THE QUARTERLY REVIEW AND THAT THEY RECOMMENDED NO FURTHER

14  INVESTIGATION.

15  Q      OKAY.  NOW, CONCERNING THESE REVIEWS THAT YOU TESTIFIED

16  ABOUT, THE ROLE OF A PROSECUTOR IS TO DETERMINE WHETHER THERE IS

17  SUFFICIENT EVIDENCE TO BE ABLE TO OBTAIN A CONVICTION OF A CRIME BY

18  PROOF BEYOND A REASONABLE DOUBT; IS THAT CORRECT?

19  A      THAT'S CORRECT.

20  Q      AND YOU DON'T ACT IF YOU DO NOT HAVE PROOF THAT YOU BELIEVE

21  BEYOND A REASONABLE DOUBT, CORRECT?

22  A      THAT'S CORRECT, ESPECIALLY IN A MAJOR CASE.

23  Q      OKAY.  AND SO IF YOU HAVE A CRIMINAL CASE TO WHERE THERE ARE

24  ISSUES THAT YOU FEEL THAT YOU MIGHT HAVE PROBLEMS PROVING BEYOND

25  A REASONABLE DOUBT, THEN THAT'S ONE OF THE FUNCTIONS THAT YOU

1    PERFORM; IS THAT CORRECT?

2    A       THAT'S CORRECT.  IN OUR OFFICE, THAT PROCESS TAKES PLACE BY A

3    GROUP.  IT WOULD INCLUDE MY – IN A MAJOR CASE.  IT WOULD INCLUDE

4    MYSELF,  THE TEAM LEADER FOR THE COUNTY, A SENIOR ASSISTANT AND THE

5    TBI AGENT WHO'S INVESTIGATING THE CASE.

6    Q       AND, OF COURSE – EXCUSE ME, SIR.

7    A       IN THIS CASE, I HEAVILY INVOLVED THE SUPERVISOR, BOB DENNY.

8    Q       AND, OF COURSE, PROOF BEYOND A REASONABLE DOUBT IS PROOF TO A

9    MORAL CERTAINTY?

10   A       THAT'S CORRECT.

11   Q       NOW, THAT IS, OF COURSE, DIFFERENT THAN PREPONDERANCE OF THE

12   EVIDENCE?

13   A       YES, IT IS.

14   Q       AS A MATTER OF FACT, IT'S A LOT DIFFERENT, ISN'T IT?

15   A       I WOULD THINK SO, YES.

16   Q       NOW, MR. CARSON, DID I UNDERSTAND THAT THERE WAS –

17              THE COURT:  MR. PHILLIPS, YOU MEAN?

18              MR. MONCIER:  EXCUSE ME, I DID.  I APOLOGIZE.

19   Q       YOU KNOW ARZO CARSON, DON'T YOU?

20   A       YES, SIR.

21   Q       ARZO CARSON IS A RETIRED DIRECTOR OF THE TENNESSEE BUREAU OF

22   INVESTIGATION?

23   A       YES, SIR.

24   Q       AND YOU WERE AWARE THAT ARZO CARSON, SHORTLY AFTER YOUR

25   PRESS CONFERENCE, BEGAN TO LOOK INTO SOME OF THE THINGS THAT WERE

1    SAID DURING THAT PRESS CONFERENCE?

2    A     YES, SIR.  I ASKED HIM IF HE WOULD COME TO MY OFFICE AND DISCUSS

3    WITH ME ANY INFORMATION THAT HE HAD SO THAT THE TBI COULD LOOK

4    INTO IT.

5    Q     OKAY.  BUT YOU WERE AWARE THAT MR. CARSON IS THE ONE THAT

6    BEGAN TO EXAMINE SOME OF THE THINGS THAT YOU SAID AT THAT PRESS

7    CONFERENCE; YOU WERE AWARE OF THAT?

8    A     I'M AWARE THAT HE CONDUCTED SOME INTERVIEWS, YES.  I MEAN,

9    DONNIE PHILLIPS, FOR EXAMPLE, TOLD ME THAT HE TALKED TO HIM.

10   Q     I'M WAITING FOR A TRANSCRIPT, IS WHY I KEEP LOOKING BACK AT THE

11   DOOR –

12   A     THAT'S FINE.

13   Q     – AND I'M HAVING A HARD TIME, SO I'M GOING TO JUST GO ON INTO IT.

14   DO YOU RECALL STATING TO YOUR PRESS CONFERENCE THAT AFTER OFFICER

15   CARSON CAME DOWN THE HALL OF THE TRAILER THAT OFFICER CARSON

16   DUCKED INTO THE BATHROOM?  DO YOU REMEMBER SAYING THAT?

17   A     YES, I DO.

18   Q     DO YOU REMEMBER SAYING THAT OFFICER CARSON THEN SAY THAT HE

19   THOUGHT SOMEONE HAD COME OUT OF THE BACK ROOM AND WAS ARMED

20   AND WAS ADVANCING ON HIM WHEN HE SHOT?

21   A     YES, I RECALL THAT.

22   Q     AND YOU GOT THAT INFORMATION FROM YOUR CHIEF ASSISTANT –

23   FROM YOUR ASSISTANT, SARAH DAVIS; YOUR CHIEF ASSISTANT, JOHN

24   GALLOWAY, AND TBI AGENT STEVE VINSANT?

25   A     YES.  THE MATERIALS THAT THEY PUT TOGETHER FOR ME, WHICH

1     INCLUDED THE STATEMENTS THAT HAD BEEN TAKEN UP TO THAT POINT, YES.

2     Q       YOU GOT FROM THEM THE STATEMENT THAT MR. CARSON HAD SAID

3     THAT HE SAW THE PERSON COME FROM THE BACK ROOM, HE THOUGHT THE

4     PERSON HAD A SHOTGUN AND THE PERSON WAS ADVANCING TOWARD HIM,

5     WHEN HE FIRED THE SHOT; IS THAT CORRECT?

6     A       NO.  I THINK YOU'RE CONFUSING TWO DIFFERENT STATEMENTS.  MARTY

7     CARSON, ACCORDING TO THE STATEMENTS THAT I HAD, SAW THE DOOR TO

8     THE BACK BEDROOM OPEN, AND HE SAW A FORM, A SHADOWY – WHAT HE

9     THOUGHT TO BE A MAN HOLDING A SHOTGUN.  HE THEN DUCKED INTO THE

10    BATHROOM, WHICH HE SAID WAS DARK, AND HE WAS TRYING TO TAKE

11    COVER.

12    Q       YES, SIR.

13    A       HE SAID THAT THEN HE SAW A FORM IN THE DOORWAY WHICH HE TOOK

14    TO BE SOMEONE ARMED, ADVANCING, AND HE SHOT.

15    Q       OKAY.  HE SAW A FORM OF A BODY IN THE DOORWAY THAT HE TOOK TO

16    BE COMING TOWARD HIM?

17    A       YES, YES.  AND HE SHOT.

18    Q       THAT'S WHAT HE TOLD YOU?

19    A       THAT'S WHAT THE STATEMENT SAID.  I HADN'T INTERVIEWED MARTY

20    CARSON AT THAT TIME.

21    Q       SOMEBODY TOOK A STATEMENT FROM MR. CARSON THAT MR. CARSON

22    ACTUALLY SAW THE FORM OF A BODY IN THE HALLWAY – OR, EXCUSE ME – IN

23    THE DOORWAY OF THE BATHROOM  WITH WHAT HE BELIEVED TO BE A

24    SHOTGUN THAT WAS ADVANCING TOWARD HIM WHEN HE FIRED; SOMEBODY

25    TOOK THAT STATEMENT?

1    A       I THINK THE EXACT WORDS WERE THAT HE SAW THE BARREL OF WHAT

2    HE TOOK TO BE A SHOTGUN, HE THOUGHT SOMEONE WAS ADVANCING ON

3    HIM, AND HE FIRED.

4    Q       WELL, NOW –

5    A       AND HE THOUGHT THAT HE WAS THE ONLY PERSON IN THE TRAILER.

6    Q       LET ME ASK YOU –

7    A       THE ONLY OFFICER IN THE TRAILER.  EXCUSE ME.

8    Q       LET ME ASK YOU IF – THANK YOU – IF YOUR EXACT WORDS WERE NOT

9    "OFFICER CARSON THEN THOUGHT THAT SOMEONE HAD COME OUT OF THE

10   BACK BEDROOM AND WAS ARMED AND WAS ADVANCING TOWARD HIM AND

11   HE FIRED HIS WEAPON"?

12   A       I THINK THAT IS.  THAT WAS IN RESPONSE TO A QUESTION, AND, YES, I

13   THINK THAT IS WHAT I SAID.  THAT WAS MY UNDERSTANDING AT THE TIME.

14   Q       IT WOULD BE AWFULLY IMPORTANT AS TO HIM SEEING THAT FORM OF

15   A BODY COMING TOWARD HIM AS TO WHETHER IT WAS LIGHT OR DARK; YOU

16   WOULD AGREE WITH THAT?

17   A       YES.

18   Q       BECAUSE IF THE LIGHT IN THE HALL WAS ON, THEN IT WOULDN'T BE A

19   FORM OF A BODY, YOU COULD CLEARLY SEE WHO IT WAS HE SHOT, CORRECT?

20   A       NO, I DON'T AGREE WITH THAT.  I MEAN, I CAN EXPLAIN THAT ANSWER.

21   Q       I'M GOING TO ASK YOU ONE ANOTHER.

22   A       OKAY.

23   Q       DID YOU STATE A SECOND TIME, "ONE THING THAT COMPLICATED THIS

24   IS THAT ONE OF THE PATROL CARS WAS PARKED JUST OUTSIDE THE WINDOW

25   OF THIS BACK BEDROOM, AND THE HEADLIGHTS AND THE BRING LIGHTS OF

1    THE PATROL CAR WERE SHINING THROUGH THE WINDOW, AND SO IF YOU

2    WERE LOOKING AT THE DOOR, THE DOORWAY OF THE BACK BEDROOM, YOU

3    WERE BLINDED TO SOME EXTENT BY THESE LIGHTS"?

4    A       YES.

5    Q       WAS THAT AN ASSUMPTION THAT YOU MADE?

6    A       YES.  AND I'M – AND THAT IS AN ASSUMPTION BASED ON THE

7    INFORMATION THAT I HAD THAT THEY PLACED THE PATROL CAR AT THAT

8    WINDOW TO MAKE SURE NO ONE ESCAPED.  THEY HAD THE LIGHTS ON

9    BRIGHT, AND OFFICER CARSON SAID THAT HE OPENED THE DOOR AND SAW A

10   FORM.  HE ALSO SAID THAT BEFORE HE OPENED THE DOOR HE SAW THE

11   LIGHTS AROUND THE CRACKS OF THE DOOR AND COULD TELL PEOPLE WERE

12   IN THERE AND MOVING AROUND.

13   Q       ISN'T IT A FACT, MR. PHILLIPS –

14   A       YES.

15   Q       – THAT IMMEDIATELY BEFORE YOU EXPLAINED THESE HEADLIGHTS

16   BLINDING A PERSON THAT YOU SAID THAT, "MR. CARSON JUMPED INTO THE

17   BATHROOM, OFFICER CARSON SAW SOMEONE COME OUT OF THE BACK ROOM.

18   HE THINKS IT'S THE PERSON HE HAD PREVIOUSLY SEEN WITH THE SHOTGUN,

19   AND HE SHOT THE PERSON HE SAW COMING INTO THE BATHROOM?

20   A       YOU ARE CONFUSING THE SEQUENCE OF THE EVENTS.  NOW, I MAY

21   HAVE MISSPOKE, I DON'T KNOW, BUT –

22   Q       YOU MAY HAVE MISSPOKE WHEN YOU SAID MR. CARSON SAW A PERSON

23   COMING OUT OF THE BACK BEDROOM INTO THE BATHROOM AND HE AT THAT

24   TIME SHOT?

25   A       LET ME EXPLAIN.  WHAT I SAID WAS THAT HE WAS – WHEN HE OPENED

1   THE DOOR AND HE – OR THE DOOR OPENED, WHICHEVER IT WAS, AND HE SAW

2   THE PERSON HOLDING WHAT HE THOUGHT WAS A SHOTGUN, AND THAT

3   PERSON WAS BACK-LIT BY THE LIGHTS OF THE PATROL CAR, THAT HE WAS

4   BLINDED BY THE LIGHT.

5   Q        THAT'S YOUR ASSUMPTION?

6   A        WELL, THAT WAS MY ASSUMPTION BASED UPON THE INVESTIGATION

7   INDICATING THAT THERE WAS A PATROL CAR WITH LIGHTS ON BRIGHT

8   SHINING THROUGH THAT WINDOW DIRECT – ACROSS ON THE OPPOSITE WALL

9   FROM THE DOOR.

10  Q        DO PROSECUTORS MAKE ASSUMPTIONS LIKE THAT WITHOUT –

11  A        PROSECUTORS MAKE REASONABLE INFERENCES FROM EVIDENCE, JUST

12  LIKE JURORS DO.  AND THE FACT THAT MARTY CARSON SAID, "I SAW A

13  PERSON THAT I THOUGHT WAS A MAN HOLDING A SHOTGUN," AND THE FACT

14  THAT I KNEW THAT THERE WAS A PATROL CAR SHINING ITS BRIGHT LIGHTS

15  THROUGH THAT WINDOW, IT IS A REASONABLE INFERENCE TO SAY HE WAS

16  BLINDED BY THE BACK LIGHT OF THIS PERSON.  HE'S NOT ABLE TO SEE

17  CLEARLY THAT THIS IS WHAT THIS IS.  HE TAKES IT TO BE A PERSON HOLDING

18  A SHOTGUN.

19         HE ALSO HAS SAID THAT HE HEARD A SOUND THAT SOUNDED TO HIM

20  LIKE A SHOTGUN BEING RACKED.  WE KNOW FROM THE INVESTIGATION, I

21  KNEW FROM THE INVESTIGATION, THAT THE WINDOW HAD BEEN OPENED,

22  WHICH WAS A REASONABLE INFERENCE WAS THAT WOULD BE CONSISTENT

23  WITH THINKING HE HEARD A SOUND LIKE A SHOTGUN BEING RACKED.

24         BUT WHEN HE SAW THIS SHADOWY FIGURE, HE DARTED TO HIS LEFT

25  INTO WHAT HE SAID WAS A COMPLETELY DARKENED BATHROOM.  THEN HE

1    SEES WHAT HE TAKES TO BE THE BARREL OF A GUN AND HE FIRES.

2    Q       THEN HE SEES, AND WHAT YOU SAID AT YOUR PRESS CONFERENCE,

3    THEN HE SEES WHAT HE BELIEVES TO BE THE BARREL OF A GUN AND FIRES IT;

4    IS THAT WHAT YOU SAID AT THE PRESS CONFERENCE?

5    A       YES.  HE SEES, HE SEES, WHAT HE TAKES TO BE THE BARREL OF A GUN,

6    AND HE BELIEVES THAT HE'S BEING ADVANCED ON BY THE PERSON FROM THE

7    BEDROOM, ARMED WITH A SHOTGUN.  THAT'S WHAT I SAID.

8              MR. MONCIER:  YOUR HONOR, I DON'T KNOW QUITE HOW TO DO

9    THIS, BECAUSE THIS HAS ALL SORT OF COME UP AT THE PRESENT TIME.  I CAN

10   LET THIS WITNESS LOOK AT WHAT HE ACTUALLY SAID OR I CAN PLAY IT FOR

11   THE JURY.

12             THE COURT:  YOU'VE GOT A TRANSCRIPT.  SHOW HIM THE

13   TRANSCRIPT –

14             MR. MONCIER:  WELL, I DON'T HAVE A TRANSCRIPT OF THE THREE.

15   I WAS WAITING ON MY SECRETARY TO BRING IT IN, AND UNFORTUNATELY

16   THEY LEFT THE THIRD.  I CAN PLAY IT, I CAN PLAY WHAT HE SAID, AND THEN

17   LET HIM COMMENT ON IT.  THERE'S NO QUESTION THAT IT IS –

18             THE COURT:  CAN YOU PLAY JUST THAT PORTION?

19             MR. MONCIER:  YES, SIR.  OH, YES.

20             THE COURT:  ANY OBJECTION TO THAT, MR. DUFFY?

21             MR. DUFFY:  WELL, I THINK THAT THIS IS A WASTE OF TIME, TO BE

22   INTRODUCING EXTRINSIC THINGS OF WHAT THIS PERSON SAYS.

23             THE COURT:  WELL, LET ME SEE COUNSEL AGAIN UP HERE FOR A

24   MOMENT.  I NEED TO RELATE ONE THING.

25         (DISCUSSION AT BENCH OFF RECORD.)

1          THE COURT:  ALL RIGHT.  MR. MONCIER, IF YOU WANT TO ASK

2     ABOUT A PARTICULAR STATEMENT, YOU CAN HOOK IT UP TO WHERE YOU CAN

3     PLAY JUST THAT STATEMENT AT THE PRESS CONFERENCE, YOU CAN ASK THE

4     WITNESS ABOUT A PARTICULAR STATEMENT MADE AT THE PRESS

5     CONFERENCE.  PLEASE PLAY THAT STATEMENT ONLY THAT YOU WISH TO ASK

6     ABOUT.

7          MR. MONCIER:  I'M READY.

8       (TAPE RECORDING PLAYED TO JURY.)

9          THE COURT:  LET'S CUT THAT OFF FOR A SECOND.  I'M NOT SURE

10    THAT'S THE SNIPPET.

11         MR. MONCIER:  THAT'S NOT THE – THE NUMBERS AREN'T

12    SQUARING UP, YOUR HONOR.  THE NUMBERS THAT I HAD, I DID THIS VERY

13    HURRIEDLY DURING LUNCH.

14      (PAUSE)

15         MR. MONCIER:  I HOPE THIS IS KEYED, YOUR HONOR.  JUST A

16    MOMENT.

17         THE COURT:  CAN YOU MAYBE JUST ASK THE WITNESS YOUR

18    UNDERSTANDING OF WHAT WAS SAID AT THE PRESS CONFERENCE?

19         MR. MONCIER:  YOUR HONOR, NO.  HE'S – WHAT WAS SAID IS

20    WHAT WAS SAID.  EXCUSE ME JUST A MOMENT.  HAVE A DIFFERENT KEY HERE

21    POSSIBLY.

22      (PAUSE)

23         MR. MONCIER:  OKAY.  THIS IS THE CORRECT KEY, YOUR HONOR.

24      (TAPE PLAYED TO THE JURY AS FOLLOWS:  " . . . EFFORTS WERE ALSO

25    BEING MADE IN THE BACK ROOM TO HIDE THE ALLEGED METHAMPHETAMINE

1  LAB.  MARTY CARSON'S REPEATED INSTRUCTIONS TO COME OUT WERE NOT

2  FOLLOWED.  CARSON HEARD A SOUND THAT HE THOUGHT WAS A SHOTGUN

3  BEING RACKED.  SOMEONE PULLED THIS LONG SICKLE BLADE OUT OF THE

4  DOOR AND WAS HOLDING IT IN THE DOORWAY, WHICH CARSON THOUGHT

5  WAS A SHOTGUN.  CARSON JUMPED INTO A SMALL BATHROOM NEAR THIS

6  BACK BEDROOM.  WHILE MARTY CARSON THOUGHT HE WAS THE ONLY

7  OFFICER IN THE MOBILE HOME, ACTUALLY, SERGEANT YANCEY HAD COME IN,

8  PROBABLY OUT OF CONCERN FOR OFFICER CARSON'S SAFETY.  THE OFFICERS

9  ON THE OUTSIDE COULD HEAR THE SCREAMING AND CONFUSION AND

10 CARSON REPEATEDLY TELLING SOMEONE TO COME OUT OF THE BACK ROOM.

11 OFFICER CARSON THEN THOUGHT THAT SOMEONE HAD COME OUT OF THE

12 BACK BEDROOM AND WAS ARMED AND ADVANCING ON HIM, AND HE FIRED

13 HIS WEAPON.")

14 Q      IS THAT WHAT YOU SAID?

15 A      YES, SIR.

16 Q      HE THOUGHT SOMEONE HAD COME OUT OF THE ROOM AND WAS

17 ADVANCING ON HIM AND HE FIRED HIS WEAPON?

18 A      YES, SIR.

19        (TAPE PLAYED TO THE JURY AS FOLLOWS:  ". . . WERE SHINING THROUGH

20 THE WINDOW – (UNINTELLIGIBLE) . . . AND I THINK THE REASON THAT THE

21 CONFUSION OCCURRED . . . THE OFFICERS ON THE OUTSIDE HEARD ALL THE . . .

22 YELLING GOING ON IN THAT MOBILE HOME.  WE BELIEVE HE FEARED FOR

23 OFFICER CARSON'S SAFETY.  WHEN OFFICER CARSON HEARD A SOUND WHICH

24 HE THOUGHT WAS A SHOTGUN BEING RACKED, HE JUMPED INTO THIS LITTLE

25 BATHROOM THAT'S NEXT TO THE BEDROOM.  WHAT WE NOW KNOW IS THAT

1    SERGEANT YANCEY CAME DOWN THE SAME HALLWAY; IN OTHER WORDS, HE

2    CAME DOWN THE SAME WAY THAT MARTY HAD COME DOWN, BUT MARTY IS

3    NOW IN THE LITTLE BATHROOM, TAKING COVER.  AND SO HE GETS TO THE

4    DOOR, THE DOORWAY OF THIS BACK BEDROOM, AND THEN OFFICER CARSON,

5    IN THE DARKNESS, SEES SOMEONE THERE WITH A WEAPON, AND HE THINKS

6    THAT IT'S THE PERSON WHO'S COME OUT OF THE BACK BEDROOM WITH THE

7    WEAPON.")

8    Q        IS THAT WHAT YOU SAID?

9    A        YES, SIR.

10   Q        SO OFFICER CARSON HAD TOLD SOMEBODY THAT HE SAW SOMEONE

11   STANDING IN THE HALLWAY WITH WHAT HE BELIEVED TO BE A WEAPON,

12   CORRECT?

13   A        NO, SIR.

14   Q        THAT'S WHAT YOU JUST SAID, ISN'T IT?

15   A        NO, SIR.  I DIDN'T SAY THAT OFFICER CARSON SAID THAT.  I SAID, BASED

16   ON HIS STATEMENT, BASED ON ALL THE INVESTIGATION UP TO THAT POINT,

17   THAT WAS OUR REASONABLE INFERENCE OF WHAT HAD HAPPENED.

18   Q        OH, SO IT WAS YOUR ALL'S REASONABLE INFERENCE THEN THAT

19   OFFICER CARSON SAW SOMEONE STANDING IN THE DOORWAY OF THE

20   BATHROOM WITH THE WEAPON AND HE SHOT.  THAT WAS YOUR ASSUMPTION?

21   A        OR AT THE DOOR – IT'S NOT AN ASSUMPTION; IT IS AN INFERENCE, AND

22   I'D LIKE TO EXPLAIN WHY IT'S AN INFERENCE.

23   Q        LISTEN TO YOUR WORDS AGAIN, AND THEN I'M GOING TO LET YOU

24   EXPLAIN.

25   A        OKAY.

1    Q        YOUR WORDS.

2                THE COURT:  OKAY.  NORMALLY, I WOULD LET THE WITNESS

3    EXPLAIN HIS ANSWER, BUT WE'LL GO AHEAD AND PLAY THIS LAST SNIPPET,

4    AND THEN I'LL ALLOW THE EXPLANATION.

5                (TAPE RECORDING PLAYED TO JURY AS FOLLOWS:  ". . . WHEN OFFICER

6    CARSON HEARD A SOUND WHICH HE THOUGHT WAS THOUGHT WAS A

7    SHOTGUN BEING RACKED, HE JUMPED INTO THIS LITTLE BATHROOM THAT'S

8    NEXT TO THE BEDROOM.  WHAT WE NOW KNOW IS THAT SERGEANT YANCEY

9    CAME DOWN THE SAME HALLWAY; IN OTHER WORDS, HE CAME DOWN THE

10   SAME WAY THAT MARTY HAD COME DOWN, BUT MARTY IS NOW IN THE

11   LITTLE BATHROOM, TAKING COVER.  AND SO HE GETS TO THE DOOR, THE

12   DOORWAY OF THIS BACK BEDROOM, AND THEN OFFICER CARSON, IN THE

13   DARKNESS, SEES SOMEONE THERE WITH A WEAPON, AND HE THINKS THAT IT'S

14   THE PERSON WHO'S COME OUT OF THE BACK BEDROOM WITH THE WEAPON.

15   ONE THING THAT COMPLICATED THIS IS THAT ONE OF THE PATROL CARS WAS

16   PARKED JUST OUTSIDE THE WINDOW OF THIS BACK BEDROOM, AND THE

17   HEADLIGHTS, THE BRIGHT LIGHTS OF THE PATROL CAR, WERE SHINING

18   THROUGH THE WINDOW.  AND SO IF YOU WERE LOOKING AT THE DOOR, THE

19   DOORWAY OF THE BACK BEDROOM, YOU WERE BLINDED TO SOME EXTENT BY

20   THESE LIGHTS; THAT IS, WHEN THE DOOR WAS OPENED, YOU WERE BLINDED

21   BY THE LIGHTS.")

22   Q        NOW, WHEN YOU SAY THAT OFFICER CARSON SEES SOMEONE AND HE

23   THINKS IT'S THE PERSON WITH THE SHOTGUN, WERE YOU QUOTING SOME

24   STATEMENT THAT OFFICER CARSON HAD GIVEN TO MR. VINSANT OR TO YOUR

25   ASSISTANT OR WAS THAT AN ASSUMPTION ON YOUR PART?

1   A     NOT AN ASSUMPTION.  IT WAS A – IT WAS A REASONABLE INFERENCE

2   FROM ALL OF THE EVIDENCE THAT WE HAD IN THE CASE AT THAT TIME.

3   Q     AND THAT REASONABLE FACTS OF THE CASE ARE THAT MARTY CARSON

4   – OR, EXCUSE ME – THAT JOHN-JOHN YANCEY WAS SHOT AT AN AREA AWAY

5   FROM WHERE THE DOOR TO THE TRAILER WAS – WHERE THE DOOR TO THE

6   ROOM WAS, CORRECT?

7   A     ARE YOU TALKING ABOUT THE DOOR TO THE BEDROOM?

8   Q     YEAH.

9   A     THESE ARE VERY CLOSE QUARTERS.  THE DOOR TO THE BATHROOM

10   AND THE DOOR TO THE BEDROOM LITERALLY ALMOST TOUCH EACH OTHER.

11   YOU'RE TALKING ABOUT VERY CLOSE QUARTERS.  BUT I CAN EXPLAIN, MR.

12   MONCIER, WHY THE STATEMENT THAT YOU'RE AGGRIEVED BY WAS A

13   REASONABLE INFERENCE OF THE INFORMATION THAT WE HAD AT THAT TIME.

14   IF YOU WILL ALLOW ME TO, I CAN EXPLAIN THAT.

15   Q     SIR, YOU SAY I'M AGGRIEVED BY IT.  DID YOU NOT TELL THE WORLD,

16   INCLUDING THIS LADY RIGHT HERE, THAT MARTY CARSON HAD SEEN THE

17   PERSON IN FRONT OF THE DOOR AND THAT PERSON WAS ADVANCING ON

18   MARTY CARSON AT THE TIME HE SHOT?  DIDN'T YOU SAY THAT?

19   A     I SAID HE BELIEVED THAT A PERSON FROM THE BACK BEDROOM,

20   ARMED WITH A SHOTGUN, WAS ADVANCING ON HIM AND HE FIRED THE SHOT.

21   Q     AT THAT PERSON?

22   A     YES, SIR.  THAT'S WHAT I SAID.

23   Q     WHO IS IT THAT MARTY CARSON EVER SAID – TOLD THAT HE SAW

24   WHAT HE BELIEVED A PERSON ADVANCING TOWARD HIM WITH A SHOTGUN

25   AT THE TIME HE FIRED THE SHOTGUN, WHO IS IT HE TOLD THAT TO?

1    A       IN HIS INTERVIEW WITH THE TBI, HE SAID THAT WHEN HE DUCKED INTO

2    THE DARKENED BATHROOM, HE WAS ATTEMPTING TO TAKE COVER, HE WAS

3    TERRIFIED.  HE THOUGHT HE WAS THE ONLY PERSON IN THE TRAILER.  HE HAD

4    TOLD THE OTHERS TO STAY OUTSIDE.

5    Q       HE SAID THAT IN HIS INTERVIEW TO THE TBI, DID HE?

6    A       YES.

7    Q       YOU SURE ABOUT THAT?

8    A       YES.

9    Q       SURE ABOUT THAT AS YOU'D TELL ANYBODY ELSE, ARE YOU?

10   A       YES.  HE SAID THAT HE THOUGHT – WHAT I'M SURE OF IS HE SAID HE

11   THOUGHT HE WAS THE ONLY OFFICER IN THE TRAILER.

12   Q       AND HE TOLD THE –

13   A       AND HE SAW THE BARREL OF A GUN, WHICH HE TOOK TO BE A PERSON

14   FROM THE BACK BEDROOM, ADVANCING ON HIM.

15              THE COURT:  EXCUSE ME.  LET HER CHANGE THE TAPE.

16   Q       DID YOU EVER IN YOUR INTERVIEW SAY THAT HE SAW THE BARREL OF

17   A SHOTGUN STICK OUT SIX INCHES FROM THE DOOR AND HE FIRED ONE SHOT?

18   DID YOU SAY THAT  IN THAT INTERVIEW?

19   A       I DON'T KNOW.

20   Q       I'M GOING TO ALLOW, AFTER I EXCUSE YOU, I'M GOING TO GIVE YOU

21   MY COMPUTER, I'M GOING TO LET YOU GO OUT AND READ YOUR ENTIRE

22   INTERVIEW –

23              THE COURT:  LET'S ASK A QUESTION, NEXT QUESTION, MR.

24   MONCIER.

25              MR. MONCIER:  YES, SIR.

1    Q        THE FACT OF THE MATTER IS, YOU NEVER SAID ANYTHING ABOUT JUST

2    SEEING THE BARREL OF A GUN COME AROUND THE CORNER, DID YOU?

3    A        MR. MONCIER, WHAT I SAID WAS, HE THOUGHT THAT THE PERSON FROM

4    THE BACK BEDROOM WAS ADVANCING ON HIM WITH A FIREARM, AND THAT IS

5    A REASONABLE INFERENCE AND CONCLUSION FROM EVERYTHING THAT WE

6    KNEW AT THAT TIME THAT THE PRESS CONFERENCE TOOK PLACE.

7    Q        AND THAT RELATES INTO YOUR STATEMENT TO MS. YANCEY, TO THE

8    REST OF THE WORLD, THAT OFFICER CARSON SEES SOMEONE, AND HE THINKS

9    IT'S THE PERSON THAT HAD THE SHOTGUN AND HE SHOT AT HIM?

10   A        YES.

11   Q        HE SEES SOMEBODY; THAT'S WHAT YOU SAID?

12   A        WELL, THAT'S WHAT ALL OF THE EVIDENCE THAT WE HAD AT THAT

13   TIME INDICATED.

14   Q        DID MARTY CARSON TELL YOU THAT?  ISN'T IT A FACT THAT MARTY

15   CARSON DENIED SEEING ANYBODY?

16   A        WHAT HE SAID WAS THAT HE SAW THE BARREL OF A GUN AND HE

17   THOUGHT SOMEONE WAS ADVANCING ON HIM, THAT HE WAS IN FEAR FOR HIS

18   LIFE, THAT HE THOUGHT HE WAS THE ONLY OFFICER IN THERE, AND THAT HE

19   WAS – HE WAS COMPLETELY SURPRISED WHEN HE REALIZED THAT JOHN-JOHN

20   WAS THERE AND THAT HE HAD SHOT JOHN-JOHN.

21          I MEAN, WHAT I SAID – IN THE FIRST PLACE, WHAT YOU HAVE PLAYED

22   ARE RESPONSES TO QUESTIONS I WAS BEING ASKED BY REPORTERS, NOT IN

23   THE MAIN – NOT IN THE MAIN BODY OF THE STATEMENT WHICH I GAVE.  BUT

24   IT WAS REASONABLE CONCLUSIONS, REASONABLE INFERENCES, BASED ON

25   ALL THE INFORMATION THAT WE HAD AT THAT TIME.

1        AND NOT ONLY THAT, MR. MONCIER; THERE HAD BEEN NO EVIDENCE

2   WHATSOEVER OF ANIMOSITY BROUGHT TO OUR ATTENTION OF ANY KIND

3   BETWEEN THESE TWO PARTNERS.  ON THE CONTRARY, WE HAD A GREAT DEAL

4   OF EVIDENCE AT THAT TIME THAT THEY WERE ACTING AS PARTNERS AND

5   THAT IT WAS SERGEANT YANCEY'S IDEA TO CONDUCT THIS METH RAID AT

6   THIS LOCATION TO START WITH.  SO IT WAS A REASONABLE CONCLUSION AT

7   THAT TIME.

8   Q        AND EVERY BIT OF THAT INFORMATION CAME FROM MARTY CARSON?

9   A        NOT EVERY BIT OF IT.

10  Q        WELL, YOU'RE RELATING AND DEFENDING HIS STATEMENT AS THOUGH

11  IT'S TRUE, AREN'T YOU?

12  A        NO.

13  Q        AREN'T YOU?

14  A        MR. MONCIER, I TOOK INTO CONSIDERATION ALL OF THE EVIDENCE

15  THAT WE HAD AT THAT TIME THAT INCLUDED WHAT DONNIE PHILLIPS HAD

16  SAID, THAT CONCLUDED – INCLUDED WHAT OFFICER NEWPORT SAID, IT

17  INCLUDED SOME RESULTS THAT WE HAD FROM THE LAB, IT INCLUDED SOME

18  RESULTS THAT WE HAD FROM THE AUTOPSY, IT INCLUDED OUR OWN

19  KNOWLEDGE OF THE CLOSE WORKING RELATIONSHIP BETWEEN MARTY

20  CARSON AND SERGEANT YANCEY.

21       ON THE VERY DAY THAT SERGEANT YANCEY LOST HIS LIFE, ON THE

22  VERY DAY, THEY WERE WORKING TOGETHER ON A CHILD SEX ABUSE CASE

23  AND CONSULTED WITH MY ASSISTANT.  AND WE HAD A GREAT DEAL OF

24  EVIDENCE THAT THIS RAID ON THE METH LOCATION WAS SERGEANT

25  YANCEY'S IDEA AND IT WAS HIS INFORMANT AND HIS INFORMATION.

1       WE HAD NO REASON TO THINK THAT THIS WAS ANYTHING OTHER THAN

2  WHAT I SAID AT THE PRESS CONFERENCE.

3  Q       THAT IS, MARTY CARSON SAW SOMEONE ADVANCING ON HIM –

4            <u>THE COURT</u>:  WELL, I THINK THAT – WE'VE TALKED ABOUT THAT,

5  WHAT WAS SAID, SO LET'S – EITHER FOLLOW UP A DIFFERENT LINE OF

6  QUESTIONING OR MOVE ON TO ANOTHER AREA.

7  Q       OF COURSE, YOU DISCOUNTED AND DID NOT BELIEVE THE STATEMENT

8  OF MR. RECTOR AND MRS. RECTOR, DID YOU?

9  A       THOSE STATEMENTS WERE GIVEN TWO YEARS BEFORE, TWO YEARS

10  BEFORE, AND MARTY CARSON AND JOHN-JOHN, SERGEANT YANCEY, HAD

11  ACTED AS PARTNERS WORKING CLOSELY TOGETHER FOR THOSE TWO YEARS.

12  AND SERGEANT YANCEY HAD NEVER BROUGHT ANY SUSPICIONS TO MY

13  ATTENTION ABOUT OFFICER CARSON.

14  Q       I WILL ASK MY QUESTION AGAIN.

15  A       YES.

16  Q       YOU DISCOUNTED AND DID NOT BELIEVE THE STATEMENTS OF MR. AND

17  MRS. RECTOR, WHO WERE IN THE BACK BEDROOM, DID YOU?

18  A       OH, I'M SORRY.  I THOUGHT YOU WERE REFERRING TO NICK LETNER.

19  Q       NO.

20  A       EXCUSE ME.  MARK RECTOR AND PENNY CARPENTER HAD BEEN, AS

21  WELL AS NICOLE WINDLE AND RYAN CLARK, HAD ALL BEEN USING METH FOR

22  WEEKS.  WE DID NOT GIVE A GREAT DEAL OF WEIGHT TO WHAT THEY SAID –

23  Q       OKAY.

24  A       – THAT'S CORRECT.

25  Q       DID YOU GIVE ANY WEIGHT TO WHAT THE PATHOLOGIST SAID, THAT

1    THE BULLET WENT THROUGH JOHN-JOHN FROM LEFT TO RIGHT IN THE

2    OPPOSITE DIRECTION FROM THE BEDROOM DOOR?  DID YOU GIVE ANY

3    WEIGHT TO THAT?

4    A       YES.

5    Q       DID THAT BOTHER YOU?

6    A       WELL, I DON'T KNOW THAT IT – I DON'T KNOW WHETHER IT BOTHERED

7    ME AT THE TIME OF THE PRESS CONFERENCE.  IT DOESN'T, IT DOESN'T BOTHER

8    ME NOW, BECAUSE ALL THAT MEANS IS, IS THAT JOHN – SERGEANT YANCEY

9    HAD HIS LEFT SIDE TO THE DOORWAY TO THE BATHROOM AT THE TIME THAT

10   HE WAS SHOT.  HE MAY HAVE BEEN AT THE DOOR OF THE BACK BEDROOM.

11          ALL THE EVIDENCE WAS CONSISTENT WITH THE FACT THAT HE WAS

12   LOOKING FOR HIS PARTNER, MARTY, AND CONCERNED ABOUT THE WELFARE

13   OF HIS PARTNER, MARTY.

14   Q       WELL, DID YOU GIVE ANY CREDENCE TO THE FACT THAT JOHN-JOHN

15   YANCEY WOULD HAVE BEEN STANDING WITHIN A FOOT OF THE BEDROOM

16   DOOR THAT SUPPOSEDLY MARTY SAYS HAD OPENED AND SOMEBODY HAD

17   COME OUT OF AND WAS ADVANCING TO HIM AT THE TIME THAT JOHN-JOHN

18   YANCEY WAS SHOT?  DID YOU GIVE ANY CREDENCE TO THAT?

19   A       WE THOUGHT THAT WHAT WAS MATERIAL WAS WHAT WAS IN THE

20   MIND OF MARTY CARSON AT THE TIME HE PULLED THE TRIGGER.

21   Q       DID YOU GIVE ANY CREDENCE TO THE FACT THAT THE LIGHTS WERE

22   ON, ACCORDING TO A REPUTABLE LAW ENFORCEMENT OFFICER, JEREMY

23   CROSS, IN THE BATHROOM AND IN THE HALL AT THE TIME MARTY CARSON

24   SAID IT WAS DARK AND HE COULDN'T SEE?  DID YOU GIVE CREDENCE TO IT?

25   A       I DON'T KNOW THAT JEREMY CROSS HAD BEEN INTERVIEWED AT THE

1  TIME THAT I DID THE PRESS CONFERENCE.  I DON'T RECALL HIS INTERVIEW

2  BEING A PART OF THE INFORMATION I HAD AT THAT TIME.

3  Q      DID YOU GIVE ANY CREDENCE TO THE FACT THAT MR. CARSON, MARTY

4  CARSON, IN HIS STATEMENT TO THE TBI, SAID THAT THE LIGHT WAS ON IN THE

5  HALL?  DID YOU KNOW THAT?

6  A      I KNOW THAT HE SAID THAT, YES.

7  Q      YOU JUST DIDN'T BELIEVE IT?

8  A      NO.  I – I'M NOT SAYING THAT I DIDN'T BELIEVE IT.  I'M SAYING THAT

9  WE CONCLUDED, AT THE TIME OF THE PRESS CONFERENCE, WHAT I SAID IN

10  THE PRESS CONFERENCE.  BASED UPON ALL OF THE EVIDENCE, BASED UPON

11  THE FACT THAT THEY WERE ACTING AS PARTNERS, THEY WERE THERE ON

12  SERGEANT YANCEY'S SUGGESTION, AND WE HAD NO REASON TO THINK

13  ANYTHING DIFFERENT FROM WHAT WE SAID IN THE PRESS CONFERENCE.

14          AFTER THE PRESS CONFERENCE WE BEGAN TO HEAR QUESTIONS IN THE

15  COMMUNITY, AND THAT'S WHY I HAD THE SUBSEQUENT CONVERSATION

16  PERSONALLY WITH DONNIE PHILLIPS ON DECEMBER THE 24TH, AND THAT'S

17  ALSO WHY I ASKED MS. YANCEY IF SHE WANTED TO COME DOWN TO THE

18  OFFICE AND SHARE HER CONCERNS WITH US.

19  Q      LET'S TALK ABOUT THIS INVESTIGATION AFTERWARD.

20          THE COURT:  LET ME SEE COUNSEL UP HERE AGAIN FOR A

21  MOMENT.

22          (DISCUSSION AT BENCH OFF THE RECORD.)

23  Q      THE SAME AGENT, STEVE VINSANT, TOLD YOU THAT THE PHYSICAL

24  EVIDENCE DIDN'T MATCH UP WITH MARTY'S STATEMENT, DID HE?  HE TOLD

25  YOU THAT?

1    A       CAN YOU BE MORE SPECIFIC WHAT –

2    Q       HE TOLD YOU THAT THE AUTOPSY REPORT AND WHERE MARTY WAS AT

3    THE TIME HE WAS SHOT AND – OR WHERE JOHN-JOHN WAS AT THE TIME HE

4    WAS SHOT AND WHERE JOHN-JOHN'S BODY WAS AT THE TIME THAT HE WAS

5    ON THE FLOOR AND MARTY GOING OUT AND TURNING HIS BACK ON THE

6    THREAT, HE TOLD YOU THAT THAT BOTHERED HIM, DIDN'T HE?

7    A       HE MAY HAVE.  I MEAN, I DON'T RECALL.  HE MAY HAVE.

8    Q       HE TOLD YOU THAT THE FACTS THAT HE DEVELOPED WERE

9    INCONSISTENT WITH WHAT MARTY SAID; HE TOLD YOU THAT, DIDN'T HE?

10   A       I THINK HE SAID THAT SOME OF THE FACTS WERE INCONSISTENT WITH

11   WHAT MARTY SAID, YES.

12   Q       BY THE WAY, FINISH HERE, YOU DID LOOK AT THE PICTURE THAT HAD

13   THE TREE IN FRONT OF THE WINDOW, DIDN'T YOU?

14   A       I DON'T RECALL.

15   Q       YOU DID LOOK AT THE PICTURES OF THE INSIDE OF THE ROOM THAT

16   HAD CURTAINS ON THE WINDOW?

17   A       I LOOKED AT ALL THE PICTURES, MR. MONCIER, AFTER THEY WERE

18   AVAILABLE TO ME.  THEY WEREN'T AVAILABLE TO ME AT THE TIME OF THE

19   PRESS CONFERENCE.  I DON'T REMEMBER THE SPECIFIC PICTURES THAT – I

20   MEAN, I LOOKED AT ALL THE PICTURES.

21   Q       WAS THERE SOME –

22   A       THAT WERE MADE BY THE TBI.

23   Q       WAS THERE SOME RUSH FOR YOU TO TELL THE PEOPLE THESE

24   STATEMENTS THAT YOU MADE HERE?  WERE YOU IN A RUSH TO DO THAT IN

25   FIVE DAYS?

1    A      MR. MONCIER, WE FELT A RESPONSIBILITY TO REVEAL THAT THE METH

2    DEFENDANTS WERE NOT RESPONSIBLE FOR THE DEATH OF THE OFFICER –

3    Q      THAT'S FINE.

4    A      – AND WE FELT A RESPONSIBILITY TO RESPOND TO THE MEDIA

5    INQUIRIES.  BECAUSE MEDIA WERE REPORTING, BASED UPON LEAKS, THAT

6    THIS WAS A FRIENDLY FIRE SITUATION, THAT MARTY CARSON HAD

7    ACCIDENTALLY SHOT HIS PARTNER.  SO WE FELT SOME RESPONSIBILITY TO

8    MAKE AN OFFICIAL STATEMENT ABOUT IT.

9    Q      WHERE DO YOU RECKON THE LEAKS WERE COMING FROM?

10   A      I DON'T KNOW, ACTUALLY.

11   Q      THEY WERE COMING OUT OF THE SHERIFF'S DEPARTMENT, WEREN'T

12   THEY?

13   A      I DON'T KNOW.

14          THE COURT:  HE SAID HE DIDN'T KNOW.  ANYTHING FURTHER ON

15   CROSS-EXAMINATION?

16   Q      WELL, BACK, SO YOU WERE IN A RUSH TO GET YOUR STATEMENT OUT,

17   CORRECT?

18   A      I FELT THAT WE HAD A RESPONSIBILITY TO THE PUBLIC TO LET THEM

19   KNOW THAT THE METH COOKERS, AS SERIOUS AS THAT IS, WERE NOT

20   RESPONSIBLE FOR THE DEATH OF SERGEANT YANCEY; AND, SECONDLY, I

21   THOUGHT THAT IT WAS IMPORTANT THAT THERE BE AN OFFICIAL

22   STATEMENT.  BECAUSE, APPARENTLY, SOMEBODY WAS TALKING TO THE

23   PRESS, AND THEY WERE GETTING PIECEMEAL INFORMATION.

24   Q      WHAT I PLAYED ON THAT TAPE THAT THE JURY HEARD, THOSE WERE

25   THE WORDS THAT YOU SPOKE; IS THAT CORRECT?

1   A       YES, SIR, I THINK SO.

2                   THE COURT:  THANK YOU.  ANY REDIRECT?

3                   MR. DUFFY:  NO FURTHER QUESTIONS.

4                   THE COURT:  ALL RIGHT.  THANK YOU.  GENERAL PHILLIPS, YOU

5   MAY BE EXCUSED.

6                   THE WITNESS:  THANK YOU.

7       (WITNESS EXCUSED.)

8                   MR. DUFFY:  NEXT WITNESS IS SARAH DAVIS.

9                   THE COURT:  IF YOU'LL GET YOUR NEXT WITNESS, MR. DUFFY.

10                  SARAH DAVIS, DEFENDANT'S WITNESS, SWORN

11                  COURTROOM DEPUTY:  WOULD YOU PLEASE STATE AND SPELL

12  YOUR NAME FOR THE RECORD?

13                  THE WITNESS:  MY NAME IS SARAH DAVIS.  FIRST NAME IS

14  SPELLED S-A-R-A-H; D-A-V-I-S.

15                  DIRECT EXAMINATION

16  BY MR. DUFFY:

17  Q       MS. DAVIS, HOW ARE YOU EMPLOYED?

18  A       I WORK FOR THE DISTRICT ATTORNEY GENERAL'S OFFICE.

19  Q       WERE YOU EMPLOYED IN THAT CAPACITY IN NOVEMBER OF 2003?

20  A       I WAS.

21  Q       DID YOU KNOW MARTY CARSON?

22  A       YES.

23  Q       DID YOU KNOW JOHN YANCEY?

24  A       YES, I DID.

25  Q       HOW FREQUENTLY IN YOUR DAY-TO-DAY – WELL, LET ME STOP AND

1   ASK YOU, WHAT SORTS OF THINGS JUST BRIEFLY DID YOU WORK ON WITH

2   EITHER MR. CARSON OR MR. YANCEY?  I MEAN, WHAT DID THEY COME TO

3   YOUR OFFICE FOR?

4   A       THEY WORKED ON DRUG CASES, SO THEY WOULD COME TO MY OFFICE

5   TO ASK FOR ADVICE ON THEIR CASES, POSSIBLY TO GET A SEARCH WARRANT.

6   I MIGHT ASSIST THEM IN WRITING ONE.  MAY HAVE TALKED ABOUT

7   SOMETIMES WHETHER OR NOT CHARGES WERE APPROPRIATE, MAY HAVE

8   DISCUSSED DISPOSITIONS OF CASES THAT HAD ALREADY BEEN CHARGED.

9   Q       HOW OFTEN DURING THE TIMEFRAME OF, SAY, THE YEAR OR SO PRIOR

10  TO MR. YANCEY'S DEATH, HOW OFTEN WOULD YOU HAVE CONTACT WITH

11  EITHER MARTY OR JOHN OR BOTH?

12  A       MARTY AND JOHN-JOHN BROUGHT A LOT OF CASES, BROUGHT A LOT OF

13  DRUG CASES TO COURT, SO I WOULD SEE THEM EVERY WEEK IN COURT.  AND

14  IO WOULD – IT WAS NOT UNUSUAL FOR THEM TO SEE ME AT LEAST ONCE A

15  WEEK, FOR THEM TO STOP BY THE OFFICE.

16  Q       HOW ABOUT JOHN YANCEY?

17  A       BOTH OF THEM, BOTH MARTY AND JOHN-JOHN WOULD COME TO THE

18  OFFICE.

19  Q       WERE THEY TOGETHER?

20  A       MOST OF THE TIME, YES.

21  Q       WERE THERE ALSO OCCASIONS ON WHICH JOHN YANCEY WOULD BE BY

22  HIMSELF TALKING TO YOU?

23  A       THERE MAY HAVE BEEN.  I DON'T – I DON'T RECALL ANY RIGHT THIS

24  MOMENT.

25  Q       WHAT KIND OF A WORKING RELATIONSHIP DID YOU HAVE WITH, WELL,

1  LET'S SAY JOHN YANCEY?

2  A       I HAD A GOOD RELATIONSHIP WITH HIM.

3  Q       WHAT MAKES YOU THINK THAT?

4  A       WELL, WE GOT ALONG FINE, WE JOKED.  THERE WAS AN INCIDENT

5  ACTUALLY ON NOVEMBER 26TH, WHICH WOULD HAVE BEEN THE WEDNESDAY

6  BEFORE THE TRAGEDY, THAT I HAD HAD A REVOCATION HEARING IN

7  SESSIONS COURT.  THAT WAS THE DAY BEFORE THANKSGIVING.  AND THE

8  DEFENDANT WAS ON PROBATION FOR ASSAULT, AND HE HAD VIOLATED THE

9  CONDITIONS OF HIS PROBATION, AND SO WE WERE HAVING A REVOCATION

10  HEARING.

11       AND DURING THAT HEARING THE DEFENDANT TOOK THE STAND AND HE

12  BECAME VERY ANGRY ON THE STAND DURING CROSS-EXAMINATION.

13  Q       CROSS-EXAMINATION BY WHOM?

14  A       ME.  AND AFTER THE HEARING HIS PROBATION WAS REVOKED, I

15  BELIEVE THAT WAS THE LAST CASE OF THE DAY, AND JOHN-JOHN HAD BEEN

16  SITTING IN THE JURY BOX WATCHING THE PROCEEDING.  AND I DON'T

17  REMEMBER ANYONE BEING WITH HIM, AND HE CAME OVER TO ME AND HE

18  SAID, "SARAH, I WAS AFRAID HE WAS GOING TO COME OVER THAT STAND AND

19  GET TO YOU BEFORE I COULD."

20  Q       DID JOHN YANCEY TELL YOU ANYTHING ABOUT AN INVESTIGATION

21  THAT HE WAS CONDUCTING, SOME INVESTIGATION INTO MARTY CARSON'S

22  ACTIVITIES?

23  A       HE NEVER TOLD ME THAT.

24  Q       DID HE EVER SHARE WITH YOU OR DID HE EVER ASK YOU FOR ANY

25  ADVICE ABOUT WHO HE SHOULD TALK TO IF HE SUSPECTED SOMEBODY JUST

1   IN THE SHERIFF'S DEPARTMENT?  JUST IN GENERAL, DID HE EVER ASK YOU

2   ANYTHING LIKE THAT?

3   A       HE – EXCUSE ME.  IS YOUR QUESTION DID HE TALK TO ME ABOUT –

4   Q       DID HE EVER ASK YOU, WELL, WHAT SHOULD I DO, MS. DAVIS, IF I HAVE

5   INFORMATION ABOUT SOMEONE IN LOCAL LAW ENFORCEMENT?

6   A       I DON'T RECALL HIM EVER ASKING ME THAT QUESTION.

7   Q       WERE YOU AROUND MARTY AND JOHN-JOHN ENOUGH TO BE ABLE TO

8   TELL HOW THEY WORKED TOGETHER?

9   A       IN FRONT OF ME THEY GOT ALONG VERY WELL.  THEY SEEMED LIKE

10  VERY GOOD FRIENDS.

11  Q       SHORTLY AROUND THE TIME OF HIS DEATH DID YOU HAVE ANY

12  CONVERSATIONS WITH EITHER OF THEM ON THE PHONE?

13  A       YES, I DID.  THAT WEDNESDAY, NOVEMBER 26, WE DIDN'T STAY IN

14  COURT LATE BECAUSE IT'S THE DAY OF THANKSGIVING.  WE MADE AN

15  EFFORT NOT TO, YOU KNOW, TO BE THERE LATE AT NIGHT, AND I BELIEVE

16  THAT REVOCATION HEARING WAS THE LAST HEARING OF THE DAY.  AND

17  AFTER I WENT HOME I RECEIVED A PHONE CALL FROM JOHN-JOHN, AND HE

18  TOLD ME THAT HE AND MARTY – AND I COULD HEAR MARTY IN THE

19  BACKGROUND – WERE WORKING ON A CASE.

20          THEY HAD WENT OUT TO A CALL ABOUT A MOTHER WHO WAS VERY

21  UPSET BECAUSE SHE HAD LEARNED THAT HER SIXTEEN-YEAR-OLD SON HAD

22  BEEN MOLESTED BY HIS UNCLE AFTER HIS UNCLE HAD GIVEN HIM BEER AND

23  DRUGS.  AND THE SIXTEEN-YEAR-OLD, IT WAS THE SIXTEEN-YEAR-OLD'S

24  BIRTHDAY, AND HE HAD PUT IN HIS POCKET A TAPE RECORDER, BECAUSE HE

25  WANTED TO SEE WHAT HE ACTED LIKE UNDER THE INFLUENCE, AND SO HE

1    RECORDED THE MOLESTATION.

2          AND SO THEY CALLED ME AND, YOU KNOW, THEY DID NOT NORMALLY

3    WORK CHILD SEX ABUSE CASES, AND SO THEY WANTED TO KNOW IS IT OKAY

4    FOR US TO WORK THIS CASE AND, YOU KNOW, LET'S TALK ABOUT IT.  AND I

5    SAID SURE, YOU KNOW, WE'RE DEALING WITH A SIXTEEN-YEAR-OLD, NOT A

6    SMALL CHILD, IF YOU ALL ARE WILLING TO WORK IT, PLEASE DO.

7          AND WE TALKED ABOUT – I ASKED THEM, I SAID, HAVE YOU LISTENED

8    TO THE AUDIO TAPE, AND JOHN-JOHN SAID WELL, MARTY HAS.  AND I SAID,

9    WELL, DOES IT – ARE YOU ABLE TO TELL WHAT'S GOING ON BY LISTENING TO

10   THE TAPE, AND HE – MARTY SAID SOME THINGS TO HIM, AND HE TOLD ME,

11   AND THEN HE SAID, HERE, YOU JUST TALK TO MARTY.  AND HE HANDED THE

12   PHONE TO MARTY, AND I TALKED TO MARTY ABOUT THE CASE.

13   Q      DO YOU KNOW WHETHER OR NOT MARTY AND JOHN WORKED ANY ON

14   THAT CASE ON THE DAY OF JOHN'S DEATH?

15   A      YES, THEY DID.  THEY TOOK THE UNCLE, WHO WAS THE DEFENDANT,

16   THE PERSON CHARGED WITH THE MOLESTATION, THEY TOOK HIS STATEMENT

17   ON NOVEMBER 28TH,  ABOUT 2:54 – 2:55 P.M.

18   Q      DID MR. YANCEY TELL YOU ANYTHING ABOUT THE

19   METHAMPHETAMINE INVESTIGATION THAT HE WAS INVOLVED IN ON

20   WILLIAMS CREEK ROAD?

21   A      NO.

22              MR. DUFFY:  YOU MAY ASK.

23              THE COURT:  THANK YOU.  CROSS-EXAMINATION

24                          CROSS-EXAMINATION

25   BY MR. MONCIER:

1  Q       NOW, MS. DAVIS, YOU WERE AN ASSISTANT DISTRICT ATTORNEY UNDER

2  PAUL PHILLIPS; IS THAT CORRECT?

3  A       YES.

4  Q       AND YOU KNEW MARTY CARSON WELL, DIDN'T YOU?

5  A       YES.

6  Q       AS A MATTER OF FACT, YOU, IN YOUNGER YEARS, HAD DATED MARTY'S

7  BROTHER; IS THAT CORRECT?

8  A       NO.

9  Q       YOU WERE CLOSE FRIENDS OF MARTY'S BROTHER?

10  A       NO.

11  Q       OKAY.  WERE YOU CLOSE FRIENDS OF MARTY?

12  A       NO.  I ACTUALLY DIDN'T KNOW MARTY UNTIL I BEGAN WORKING FOR

13  THE DISTRICT ATTORNEY'S OFFICE IN SCOTT COUNTY.

14  Q       OKAY.  WERE YOU AS CLOSE WITH MARTY AS YOU WERE WITH JOHN-

15  JOHN?

16  A       YES.

17  Q       NOW, DID THERE COME A TIME – BY THE WAY, JOHN-JOHN ONLY

18  WORKED WITH MARTY FOR ABOUT A YEAR BEFORE HE WAS KILLED,

19  CORRECT?

20  A       I THINK THAT'S RIGHT.

21  Q       DID THERE EVER COME A TIME WHEN JOHN-JOHN ASKED TO SPEAK TO

22  YOU PRIVATELY WHEN HE AND MARTY WERE TOGETHER?

23  A       I DON'T REMEMBER HIM EVER ASKING ME TO SPEAK TO ME PRIVATELY

24  WHEN THEY WERE TOGETHER.

25  Q       THAT WOULD BE UNUSUAL, WOULDN'T IT?

1    A       IT WASN'T UNUSUAL FOR OFFICERS TO WANT TO SPEAK TO ME.  I SPOKE

2    TO OFFICERS EVERY DAY.

3    Q       THE QUESTION WAS, WOULD IT BE UNUSUAL FOR MARTY TO ASK TO

4    SPEAK TO YOU PRIVATELY WHEN HE AND – OR, EXCUSE ME – OR JOHN-JOHN

5    TO SPEAK TO YOU PRIVATELY WHEN HE AND MARTY WERE TOGETHER?  THAT

6    WOULD BE UNUSUAL, WOULDN'T IT?

7    A       I DON'T REMEMBER HIM EVER ASKING TO DO THAT.

8    Q       SO THAT WOULD BE UNUSUAL?

9    A       YES.

10   Q       HAVE ANY REASON WHY JOHN-JOHN WOULD WANT TO SPEAK TO

11   SOMEBODY IN YOUR OFFICE PRIVATELY WHEN HE WAS IN YOUR OFFICE WITH

12   MARTY?

13   A       I KNOW THERE WAS ONE TIME I WAS ASSISTING HIM MAYBE IN WRITING

14   A SEARCH WARRANT, AND JOHN-JOHN ASKED TO SPEAK WITH PAUL

15   PRIVATELY.

16   Q       VERY UNUSUAL, WASN'T IT?

17   A       NO.  OFFICERS WOULD COME IN AND SPEAK WITH PAUL, AND THEY

18   WOULD SPEAK WITH ME BY THEMSELVES AS WELL.

19   Q       SO YOU DO KNOW OF THAT THEN, CORRECT?

20   A       YES.

21   Q       AND YOU KNOW OF THAT EVENT BECAUSE YOU AND MR. PHILLIPS HAD

22   TALKED ABOUT IT?

23   A       I REMEMBER THE EVENT BECAUSE I REMEMBER THINKING WHAT'S HE

24   GOING TO TALK TO GENERAL PHILLIPS ABOUT THAT HE CAN'T TALK TO ME

25   ABOUT?

1   Q      OR TALK TO MARTY – IN MARTY'S PRESENCE?

2   A      I DIDN'T THINK THAT.  I JUST WAS WONDERING WHY HE WASN'T

3   TALKING TO ME.

4   Q      OKAY.  NOW, YOU TALKED TO MARTY AFTER THE – JOHN-JOHN'S DEATH,

5   DIDN'T YOU?

6   A      SURE.

7   Q      AND MARTY EXPLAINED TO YOU THAT HE HAD SEEN SOMEBODY IN THE

8   DOORWAY THAT HE THOUGHT HAD COME OUT OF THE BACK ROOM AND HE

9   FIRED AND IT WAS JOHN, IT WAS BY MISTAKE, IT WAS JOHN-JOHN?

10  A      I DON'T BELIEVE MARTY EVER TALKED TO ME ABOUT THAT.

11  Q      DID YOU HEAR MR. PHILLIPS' STATEMENTS AT THE PRESS CONFERENCE

12  THAT HE GAVE FIVE DAYS AFTER THE INCIDENT?

13          MR. DUFFY:  YOUR HONOR, I BELIEVE THIS IS GETTING PRETTY

14  FAR OUTSIDE OF DIRECT.

15          THE COURT:  I BELIEVE IT IS.  I'LL SUSTAIN THE OBJECTION.

16  WE'LL STAY WITHIN THE SCOPE OF THE DIRECT EXAMINATION.

17  Q      NOW, DID YOU KNOW A GENTLEMAN BY THE NAME OF CHITWOOD?

18  A      THERE ARE SEVERAL CHITWOODS IN SCOTT COUNTY.

19  Q      MARK CHITWOOD?

20  A      YES.

21          MR. DUFFY:  I STILL THINK IT'S GETTING OUTSIDE OF DIRECT,

22  YOUR HONOR.  I OBJECT.

23          MR. MONCIER:  I'LL WITHDRAW THE QUESTION.

24          THE COURT:  THANK YOU.

25  Q      WITH REGARD TO MARTY AND YOUR DISCUSSIONS WITH HIM, DID HE

1   TELL YOU THAT HE WAS TRYING TO GET OUT OF THE SCOTT COUNTY

2   SHERIFF'S DEPARTMENT?

3   A      DID MARTY TELL ME THAT?

4   Q      YES.  EXCUSE ME.  DID JOHN-JOHN TELL YOU THAT HE WAS TRYING TO

5   GET OUT OF THE SCOTT COUNTY SHERIFF'S DEPARTMENT?

6   A      NO, HE DIDN'T TELL ME THAT.

7   Q      NOTHING THAT JOHN-JOHN INDICATED TO YOU WAS THAT HE WAS

8   TRYING TO GET OUT OF BECAUSE OF ANY PARTICULAR CONCERNS HE HAD IN

9   THE SCOTT COUNTY SHERIFF'S DEPARTMENT?

10  A      NO.

11  Q      WERE YOU AWARE OF THE FACT JOHN-JOHN –

12          MR. DUFFY:  I OBJECT, YOUR HONOR.  MR. MONCIER'S GOING TO

13  BE TESTIFYING TO SOMETHING SHE'S ALREADY SAID SHE'S NOT AWARE OF.

14          THE COURT:  DON'T ASK IN REFERENCE TO FACTS.  IF YOU WANT

15  TO ASK THE QUESTION AGAIN –

16  Q      CERTAINLY, YOU WOULDN'T EXPECT JOHN-JOHN TO TELL YOU IF HE

17  WAS TRYING TO LEAVE THE SCOTT COUNTY SHERIFF'S DEPARTMENT, WOULD

18  YOU?

19  A      NO, NOT NECESSARILY.  PEOPLE, YOU KNOW, MAKE JOB CHANGES AND

20  THEY DON'T NECESSARILY TALK ABOUT IT UNTIL IT'S NAILED DOWN.

21  Q      IF MARTY WAS DOING ILLEGAL ACTIVITIES, WOULD YOU EXPECT HIM

22  TO TELL YOU THAT?

23  A      WOULD I EXPECT JOHN-JOHN TO TELL ME THAT?

24  Q      NO.  IF MARTY WAS DOING ILLEGAL ACTIVITIES, WOULD YOU EXPECT

25  HIM TO TELL YOU THAT?

1    A       NO.

2    Q       IF MARTY WAS INVOLVED WITH METHAMPHETAMINE AT THE SAME

3    TIME HE WAS ACTING AS A LAW ENFORCEMENT OFFICER, WOULD YOU EXPECT

4    HIM TO TELL YOU THAT?

5    A       NO.

6    Q       IF YOU HAD INFORMATION THAT MARTY WAS INVOLVED IN

7    METHAMPHETAMINE, WOULD YOU GO TO MARTY AND TELL HIM THAT YOU

8    HAD THAT INFORMATION?

9    A       I WOULDN'T – IF THERE WAS INFORMATION THAT HE WAS INVOLVED

10   WITH METHAMPHETAMINE, WE WOULD REQUEST AN INVESTIGATION.

11   Q       OKAY.  WOULD YOU EXPECT THAT INVESTIGATION TO TURN AROUND

12   AND TELL MARTY THAT THAT INFORMATION WAS BEING PROVIDED?  YOU

13   WOULDN'T EXPECT THAT, WOULD YOU?

14   A       I WOULD EXPECT THAT THEY WOULD INTERVIEW MARTY.

15   Q       YEAH.  BUT YOU WOULDN'T EXPECT THEM TO TELL THEM THAT THEY

16   HAD INFORMATION THAT HE WAS INVOLVED IN METHAMPHETAMINE?

17   A       YOU KNOW, I DON'T SEE WHY THEY WOULDN'T.

18   Q       SO YOU THINK THAT THAT WOULD BE THE APPROPRIATE THING TO DO,

19   IF THE TBI HAD INFORMATION THAT MARTY WAS INVOLVED IN

20   METHAMPHETAMINE?  WOULD YOU THINK THE APPROPRIATE THING TO DO

21   WOULD BE FOR THE TBI TO GO TELL MARTY THAT AND QUESTION HIM ABOUT

22   IT?

23   A       I THINK IT WOULD BE NORMAL PART OF AN INVESTIGATION TO

24   INTERVIEW THE PEOPLE WHO HAVE INFORMATION ABOUT THE INCIDENT.

25   NOW, IT MAY BE IF, YOU KNOW, DEPENDENT UPON THE INFORMATION, THAT

1    THEY MIGHT FIRST, BEFORE INTERVIEWING HIM, TAKE SOME OTHER STEPS.

2    Q       WELL, YOU JUST GOT THROUGH SAYING YOU EXPECTED MARTY WOULD

3    DENY IT, CORRECT?

4    A       I WOULD EXPECT HE WOULD, BUT IT'S NOT UNUSUAL FOR DEFENDANTS

5    TO MAKE ADMISSIONS.

6    Q       LAW ENFORCEMENT OFFICER?

7    A       YES.  I'VE SEEN LAW ENFORCEMENT OFFICERS MAKE ADMISSIONS.

8                   MR. MONCIER:  OKAY.  THANK YOU.

9                   THE COURT:  THANK YOU.  ANY REDIRECT?

10                          REDIRECT EXAMINATION

11   BY MR. DUFFY:

12   Q       AND DID YOU HAVE ANY INFORMATION OR DID JOHN OR – WELL, LET'S

13   STICK WITH THAT.  DID JOHN PROVIDE ANY INFORMATION THAT MARTY WAS

14   USING METHAMPHETAMINE OR DEALING IN IT, ET CETERA, BY THE TIME OF

15   HIS DEATH?

16   A       NO.

17   Q       LET ME ASK YOU, DOES METHAMPHETAMINE HAVE ANY EFFECT ON

18   ONE'S BEHAVIOR?

19   A       OH, ABSOLUTELY.  MAKES YOU VERY PARANOID.

20   Q       DID YOU SEE ANYTHING ABOUT MARTY CARSON THAT MADE YOU

21   THINK HE WAS ON METHAMPHETAMINE WHEN HE WAS COMING TO YOUR

22   OFFICE?

23   A       NO.

24                   MR. DUFFY:  THAT'S ALL.

25                   THE COURT:  ANYTHING FURTHER ON RECROSS?

1                        RECROSS EXAMINATION

2     BY MR. MONCIER:

3     Q      AND I TAKE IT WITH THIS, WHAT HE JUST ASKED YOU ABOUT JOHN-

4     JOHN, DID JOHN-JOHN TELL YOU THAT HE HAD TO LEAVE THE SHERIFF'S

5     DEPARTMENT THAT WEEK BECAUSE SOMETHING BAD –

6                 MR. DUFFY:  I OBJECT, YOUR HONOR.  MR. MONCIER –

7                 THE COURT:  I'LL SUSTAIN THE OBJECTION.  I BELIEVE I ALREADY

8     SUSTAINED THAT OBJECTION ON CROSS.  ALL RIGHT.  THANK YOU, MS. DAVIS.

9     YOU MAY BE EXCUSED.

10          (WITNESS EXCUSED.)

11                MR. DUFFY:  JIM CARSON.

12                THE COURT:  ALL RIGHT.  WHY DON'T WE – JURY NEED A BREAK

13    OR DO THEY WANT TO HEAR FROM ONE MORE WITNESS?

14                MR. DUFFY:  SHOULD BE A SHORT WITNESS.

15                THE COURT:  FAIRLY SHORT?  WELL, LET'S GO UNTIL 3:15, AND IF

16    WE'RE NOT DONE THEN, WE'LL TAKE A BREAK.  BUT SEE IF WE CAN GET HIM

17    DONE.  GO AHEAD, CALL THE NEXT WITNESS.

18          I TELL YOU WHAT, I'M GOING TO TAKE MY PREROGATIVE, CHANGE MY

19    MIND.  I'LL DISCUSS WITH COUNSEL THE REST OF THE SCHEDULE AND THEN

20    BE ABLE TO ADVISE YOU ALL.  I THINK MS. NORWOOD'S ALREADY TOLD YOU

21    YOU'RE NOT GOING TO GET THE CASE TODAY, SO WE'LL PROBABLY NEED TO

22    COME BACK TUESDAY, NOT MONDAY, BUT LET ME TALK TO COUNSEL A

23    LITTLE MORE.

24          I DON'T PLAN TO GO AS LATE TODAY AS WE DID YESTERDAY, BEING IT'S

25    FRIDAY AND GET YOU ALL OUT OF HERE A LITTLE BIT EARLIER.

1        BUT LET ME TALK WITH THEM SCHEDULING, AND WE'LL COME BACK AT

2    3:15, LET YOU KNOW WHERE THINGS ARE.  LET'S GO AHEAD AND TAKE OUR

3    BREAK.  I WILL SEE COUNSEL UP HERE A MOMENT.

4        (RECESS HAD AT 3:02 P.M.; RECONVENED WITHOUT JURY 3:20 P.M.)

5              THE COURT:  MR. DUFFY, ARE YOU READY FOR YOUR NEXT

6    WITNESS?

7              MR. DUFFY:  YES.

8              THE COURT:  DO YOU WANT TO GET HIM BACK IN?  LET'S GO

9    AHEAD AND BRING OUR JURY IN.  THANK YOU.  MR. CARSON, YOU CAN COME

10   ON UP TO THE WITNESS STAND, SIR, WHILE THE JURY'S COMING IN.

11        (JURY RECONVENED IN COURTROOM.)

12             THE COURT:  THANK YOU.  MR. DUFFY, YOU CAN ANNOUNCE

13   YOUR NEXT WITNESS.

14             MR. DUFFY:  JIM CARSON.

15        JAMES CARSON, DEFENDANT'S WITNESS, SWORN

16             COURTROOM DEPUTY:  WOULD YOU PLEASE STATE AND SPELL

17   YOUR FULL NAME FOR THE RECORD?

18             THE WITNESS:  JAMES CARSON, J-A-M-E-S, C-A-R-S-O-N.

19             THE COURT:  THANK YOU, SIR.

20                   DIRECT EXAMINATION

21   BY MR. DUFFY:

22   Q    MR. CARSON, WHAT DO YOU DO FOR A LIVING NOW, SIR?

23   A    RETIRED.

24   Q    WELL, BUT I BET YOU DO SOME KIND OF WORK, DON'T YOU?

25   A    WELL, FARM A LITTLE.

1    Q      WHAT DO YOU FARM?

2    A      GOT A FEW HEAD OF CATTLE.

3    Q      ALL RIGHT, SIR.  WERE YOU IN LAW ENFORCEMENT?

4    A      YES.

5    Q      WHEN DID YOU BEGIN LAW ENFORCEMENT?

6    A      1974.

7    Q      WERE YOU SHERIFF –

8              MR. MONCIER:  PLEASE THE COURT, IF HE'S GOING TO GO INTO HIS

9    BACKGROUND, WE OBJECT GOING INTO HIS BACKGROUND ON THE BASIS THAT

10   WE MENTIONED TO THE BENCH, UNLESS WE CAN INQUIRE INTO IT.  THAT'S

11   THE BEST WAY I KNOW TO SAY IT.

12             THE COURT:  WELL, IF IT'S JUST LIMITED TO BACKGROUND, THAT

13   WOULDN'T OPEN UP THE DOOR.  BUT JUST YOU BEGAN LAW ENFORCEMENT

14   1974.  WHY DON'T YOU GO HIS ELECTION AND THEN –

15   Q      WHEN WERE YOU SHERIFF –

16             THE COURT:  GO AHEAD.

17   Q      – WHEN WERE YOU THE SHERIFF, SIR?

18   A      1994.

19   Q      THROUGH?

20   A      2006.

21   Q      ALL RIGHT, SIR.  IS THIS YOUR SON THAT'S BEEN SEATED WITH ME ALL

22   WEEK?

23   A      YES, IT IS.

24   Q      DO YOU HAVE OTHER CHILDREN?

25   A      I HAVE TEN CHILDREN, TOTAL.

1   Q      AND ONE OF YOUR SONS, I BELIEVE, IS DECEASED?

2   A      YES, HE IS.

3   Q      WOULD THAT BE JAMES CARSON?

4   A      YES, IT WOULD BE.

5   Q      ALL RIGHT, SIR.  DO YOU REMEMBER WHEN, ABOUT WHAT TIME IT WAS,

6   WHEN YOU LEARNED THERE HAD BEEN AN INCIDENT OUT ON WILLIAMS

7   CREEK ROAD?

8   A      I DON'T KNOW JUST DIRECT WHAT TIME IT WAS.  I KNOW IT WAS AFTER

9   DARK.

10  Q      WHAT WAS GOING ON WHEN YOU GOT THERE, SIR?

11  A      WHEN I GOT THERE, I HAD TO WALK DOWN TO THE TRAILER FROM THE

12  MAIN ROAD, GET OUT OF TRAFFIC.  WHEN I GOT THERE, MARTY WAS SETTIN'

13  IN PATROL CAR, AND I GOT IN, SET DOWN WITH HIM.

14  Q      AND HOW LONG WERE YOU IN THAT PATROL CAR?

15  A      APPROXIMATELY TEN MINUTES.

16  Q      COULD YOU HAVE BEEN THERE AN HOUR?

17  A      NO, I WAS NOT.

18  Q      HOW DO YOU KNOW THAT?

19  A      I WAS JUST IN THERE A FEW MINUTES, PROBABLY TEN MINUTES.

20  Q      AND HOW LONG WERE YOU ON THE SCENE?

21  A      I WOULD SAY 30, 35 MINUTES, ON THE SCENE, TOTAL.

22  Q      WHERE DID YOU GO FROM THERE?

23  A      WE GOT OUT OF THE PATROL CAR, WENT IN THE TRAILER.

24  Q      I'M SORRY?

25  A      INSIDE THE TRAILER.

1   Q       NO.  WHEN YOU WENT FROM THE SCENE, WHEN YOU LEFT THE SCENE,

2   WHERE DID YOU GO?

3   A       HOSPITAL.

4   Q       ALL RIGHT.  WHILE YOU WERE BACK ON THE SCENE AND IN THE PATROL

5   CAR, WITHOUT TELLING US WHAT MARTY SAID, LET ME JUST ASK YOU IF YOU

6   DISCUSSED WITH MARTY THE POSSIBILITY THAT MARTY, MARTY'S SHOT, HAD

7   BEEN THE ONE THAT HIT JOHN-JOHN?

8   A       YES, I DID.

9   Q       AND DID YOU HIDE THAT INFORMATION FROM ANYONE?

10  A       NO, I DID NOT.

11  Q       WHOM DID YOU RELATE THAT INFORMATION TO?

12  A       TBI, STEVE VINSANT.

13  Q       DO YOU RECALL ABOUT HOW LONG YOU WERE AT THE HOSPITAL?

14  A       I WOULD SAY PROBABLY 30 MINUTES.

15  Q       AND FROM THERE WHERE DID YOU GO?

16  A       THE JAIL.

17  Q       DURING THE TIME THAT YOU WERE IN THE PATROL CAR, DID YOU HAVE

18  AN OPPORTUNITY TO OBSERVE YOUR SON'S DEMEANOR, WHAT EXACTLY HE

19  WAS LIKE?

20  A       HE WAS JUST ALL TO PIECES.

21  Q       DID YOU TRY TO COMFORT HIM?

22  A       WELL, I TRIED TO TALK TO HIM, BUT LIKE I SAY, HE WAS ALL TO PIECES

23  AND HE WAS CRYING.

24  Q       WHEN YOU WERE AT THE – STRIKE THAT.  DID YOU HIRE JOHN YANCEY

25  AS A DEPUTY?

1  A      YES, I DID.

2  Q      WAS JOHN A GOOD DEPUTY?

3  A      YES, HE WAS.

4  Q      DID YOU LIKE JOHN?

5  A      YES, I DID.

6  Q      OH, WELL, FROM, WELL, FROM ABOUT – LET'S SEE, WHAT WAS IT – DO

7  YOU KNOW AN INDIVIDUAL NAMED RICHARD BABB?

8  A      YES, I KNOW RICHARD BABB.

9  Q      ALL RIGHT, SIR.  OVER A SIX-YEAR SPAN OF TIME THERE, I THINK IT WAS

10  SIX YEARS, 2000 TO 2006, I THINK WAS WHAT HE TESTIFIED TO, DURING THAT

11  TIMEFRAME, WAS YOUR SON DOING METHAMPHETAMINE?

12           MR. WIGLER:  OBJECTION, YOUR HONOR.  PERSONAL KNOWLEDGE.

13           THE COURT:  REPHRASE THE QUESTION, ASK HIM IF HE KNOWS.

14  Q      TO YOUR KNOWLEDGE, WAS YOUR SON DOING METHAMPHETAMINE?

15  A      NO, HE NEVER WAS NOT.

16  Q      WHAT MAKES YOU SAY THAT WITH THAT TONE?

17  A      I THINK IF MY SON WAS DOING METHAMPHETAMINE I WOULD KNOW IT.

18  Q      DO YOU KNOW AN INDIVIDUAL BY THE NAME OF NICK LETNER?

19  A      YES, I DO.

20  Q      WAS NICK, IN AROUND 2001 TIMEFRAME, DID YOU GIVE NICK LETNER

21  ACCESS TO YOUR OFFICE?

22  A      I DID NOT.

23  Q      WAS HE A TRUSTY IN THAT TIME FRAME AT THE JAIL OR DO YOU KNOW?

24  A      I HAVE NO IDEA WHETHER –

25  Q      TO YOUR KNOWLEDGE DID TRUSTIES HANG OR FINISH SHEETROCK IN

1    THE JAIL OR IN THE SHERIFF'S OFFICE?

2    A        NOT TO MY KNOWLEDGE, THEY DON'T.

3              MR. DUFFY:  THAT'S ALL THE QUESTIONS I HAVE.  THANK YOU.

4              THE COURT:  THANK YOU.  CROSS-EXAMINATION?

5                                CROSS-EXAMINATION

6    BY MR. WIGLER:

7    Q        MR. CARSON, YOU SAID YOU GAVE SOME INFORMATION TO STEVE

8    VINSANT OF THE TBI, CORRECT?

9    A        YES.

10   Q        AND MR. VINSANT WAS CONDUCTING A JOINT INVESTIGATION WITH

11   ROBBY CARSON OF YOUR OFFICE, CORRECT?

12   A        YES.

13   Q        NOW, DID YOU KNOW, IN 2001, THAT YOUR SON, MARTY CARSON, HAD

14   BEEN ACCUSED OF BEING INVOLVED IN METHAMPHETAMINES?

15   A        NO, SIR, I DO NOT KNOW IT.

16   Q        DID YOU KNOW THAT NICK LETNER AND LONNIE GUNTER HAD GIVEN

17   STATEMENTS TO THE TBI ABOUT YOUR SON'S INVOLVEMENT IN ILLEGAL

18   ACTIVITIES BACK IN 2001?

19             MR. DUFFY:  OBJECT TO THE CHARACTERIZATION OF THE

20   QUESTION.

21             THE COURT:  WELL, THE QUESTION'S NOT EVIDENCE.  I'LL ALLOW

22   – WHY DON'T YOU RE-ASK IT, MR. WIGLER.

23             MR. WIGLER:  SURE.

24   Q        DID YOU KNOW THAT NICK LETNER AND LONNIE GUNTER, IN 2001, HAD

25   GIVEN STATEMENTS TO THE TBI CONCERNING ILLEGAL ACTIVITIES OF YOUR

1    SON, MARTY CARSON?

2    A       NO, I DID NOT KNOW THEY GIVE INFORMATION.

3    Q       MARTY DIDN'T TELL YOU THAT?

4    A       NO, MARTY DIDN'T TELL ME ANY.

5    Q       WOULD YOU EXPECT YOUR SON, MARTY CARSON, TO TELL YOU IF HE

6    WAS BEING INVESTIGATED FOR ILLEGAL ACTIVITIES IN 2001?

7    A       YES, I WOULD THINK HE WOULD.

8    Q       NOW, DO YOU HAVE TRUSTIES IN THE JAIL AT SCOTT COUNTY FROM

9    TIME TO TIME?

10   A       YES, WE DO.

11   Q       WHAT DOES A TRUSTY DO FOR THE JAIL IN SCOTT COUNTY, WHAT

12   KINDS OF THINGS?

13   A       CLEAN, CLEAN IN THE JAIL.

14   Q       PAINTING?

15   A       DO WHAT?

16   Q       PAINTING?

17   A       NO, THEY DON'T DO NO PAINTIN'.

18   Q       JUST CLEANING?

19   A       CLEANING.

20   Q       AND DO THEY CLEAN THE SHERIFF'S OFFICE IN THE JAIL?

21   A       I DON'T RECALL THEM CLEANING THE SHERIFF'S OFFICE, NO.

22   Q       NOW, WHEN YOU SAID THAT WHEN YOU GOT TO THE SCENE, DID I

23   UNDERSTAND YOU TO SAY, YOU FIRST WENT INTO A PATROL CAR WITH YOUR

24   SON?

25   A       YES, I GOT IN, SET DOWN.

1  Q        WHO ELSE WAS IN THAT VEHICLE?

2  A        I DON'T RECALL RIGHT AT FIRST IF HE WAS IN THERE WHEN I GOT IN,

3  RANDY LEWALLEN WAS IN THERE.

4  Q        FOR PART OF THE TIME RANDY LEWALLEN WAS IN THE CAR WITH YOU?

5  A        RANDY LEWALLEN WAS IN THE CAR WHILE I WAS IN THERE WITH

6  MARTY.

7  Q        DO YOU RECALL SOME INDIVIDUALS IN HIGHWAY PATROL UNIFORMS

8  COMING UP AND KNOCKING ON THE WINDOW?

9  A        NO, I DO NOT.

10 Q        AND YOU SAY YOU WERE ONLY IN THE CAR ABOUT TEN MINUTES?

11 A        APPROXIMATELY TEN MINUTES.

12 Q        DID YOU KNOW, AT THE TIME YOU STEPPED INTO THE VEHICLE, WHAT

13 HAD HAPPENED THAT NIGHT?

14 A        NO, I DIDN'T.

15 Q        DID YOU KNOW THAT JOHN-JOHN YANCEY WAS DEAD?

16 A        NO, I DIDN'T.

17 Q        DID YOU KNOW HE WAS HURT?

18 A        NOT AT THAT TIME, NO.

19 Q        WELL, WHAT DID YOU DRIVE OUT TO THE WILLIAMS CREEK ROAD AREA

20 TO DO THAT NIGHT?

21 A        I DROVE MY PATROL CAR.

22 Q        FOR WHAT PURPOSE?

23 A        WELL, ON THE SCENE THEY DIDN'T TELL ME WHAT OFFICER WAS HURT.

24 Q        YOU KNEW THAT A OFFICER WAS HURT?

25 A        I KNOWED A OFFICER WAS HURT, THEY DIDN'T TELL ME WHO.

1   Q       OKAY.  AND SO NATURALLY YOU ASKED MARTY CARSON, AS SOON AS

2   YOU GOT IN THAT PATROL CAR, WHO'S HURT?

3   A       YES.

4   Q       WHAT DID HE SAY?

5   A       HE SAID JOHN-JOHN.

6   Q       DID HE SAY, "I SHOT JOHN-JOHN"?

7   A       HE SAID HE HAD FIRED HIS WEAPON, HE WASN'T FOR SURE HE WAS THE

8   ONE SHOT JOHN-JOHN.

9   Q       DID HE SAY HE HEARD A SHOTGUN GO OFF?

10  A       HE SAID HE SAW WHAT APPEARED TO BE THE BARREL OF A SHOTGUN.

11  Q       MY QUESTION IS, DID HE SAY HE EVER HEARD A SHOTGUN FIRED?

12  A       NOT TO MY KNOWLEDGE.

13  Q       DID HE SAY THAT HE EVER SAW THE MUZZLE BLAST OF A SHOTGUN?

14  A       NO, HE DID NOT.

15  Q       FROM THAT DID YOU CONCLUDE ONE WAY OR ANOTHER THAT A

16  SHOTGUN HAD BEEN USED TO KILL JOHN YANCEY?

17  A       I HAD NO IDEA.

18  Q       WELL, DID YOU ASK YOUR SON, MARTY CARSON, DID YOU HEAR THE

19  SHOTGUN BLAST?

20  A       HE SAID HE HEARD A SHOT.

21  Q       DID YOU ASK HIM, DID YOU HEAR A SHOTGUN BLAST?

22  A       NO, I DID NOT.

23  Q       YOU KNOW THE DIFFERENCE IN SOUND BETWEEN A SHOTGUN AND A

24  HANDGUN, DON'T YOU, SHERIFF?

25  A       YES.

1  Q      YOU DIDN'T ASK YOUR SON WHETHER HE HEARD A SHOTGUN?

2  A      NO, I DID NOT.

3  Q      YOU DIDN'T ASK HIM WHETHER HE SAW THE MUZZLE FLASH OF A

4  SHOTGUN?

5  A      NO, I DID NOT.

6  Q      DID YOU ASK HIM WHETHER HE HEARD TWO SHOTS OR JUST THE ONE?

7  A      I ASKED HIM HOW MANY SHOTS; HE DIDN'T KNOW.  HE SAID HE HEARD

8  A SHOT.

9  Q      HE DIDN'T KNOW HOW MANY SHOTS?

10  A      DIDN'T KNOW HOW MANY – HEARD A SHOT, HE DIDN'T KNOW HOW

11  MANY SHOTS.

12  Q      NOW, THEN YOU GOT OUT OF THE CAR – HAVE I COVERED EVERYTHING

13  YOU TALKED ABOUT IN THE CAR?

14  A      AS FAR AS I KNOW.

15  Q      YOU GOT OUT OF THE CAR WITH RANDY LEWALLEN, CORRECT?

16  A      YES.

17  Q      AND YOU WALKED AROUND TO THE BACK OF THE TRAILER?

18  A      THAT'S NOT CORRECT.

19  Q      YOU WALKED TO THE FRONT DOOR OF THE TRAILER?

20  A      YES.

21  Q      OKAY.  AND YOU AND RANDY LEWALLEN ENTERED THE TRAILER?

22  A      YES.

23  Q      AND WHY DID YOU DO THAT?

24  A      WE WENT IN TO MAKE SURE THEY WAS NOBODY STILL IN THE TRAILER.

25  Q      OKAY.  OFFICER CROSS WAS IN THE TRAILER AT THAT TIME?

1    A    OFFICER CROSS, I AIN'T FOR SURE IT WAS OFFICER CROSS.  THERE WAS

2    AN OFFICER IN THE LIVING ROOM OF THE TRAILER.  I DON'T KNOW, CAN'T

3    REMEMBER WHO THE OFFICER WAS.

4    Q    AND THAT OFFICER HAD THE TRAILER SECURED, CORRECT?

5    A    HE HAD THE LIVING ROOM, YES.

6    Q    OKAY.  AND WHAT ELSE WERE YOU IN THE TRAILER WITH RANDY

7    LEWALLEN LOOKING FOR?

8    A    WE JUST WALKED BACK THROUGH THE TRAILER, AND I – WE, FROM

9    THERE, WENT OUTSIDE AND TALKED TO STEVE VINSANT.

10   Q    WELL, WHAT ELSE WERE YOU INSIDE THE TRAILER LOOKING FOR?

11   A    I WASN'T LOOKING FOR ANYTHING.

12   Q    YOU DIDN'T LOOK IN THE BATHROOM TO SEE IF YOU COULD SEE A

13   BULLET HOLE?

14   A    NO, I DIDN'T LOOK IN THE BATHROOM, NO.

15        MR. WIGLER:  PAGE 16, LINE TWO.

16   Q    DO YOU RECALL GIVING A DEPOSITION?

17   A    YES, I DO.

18   Q    MARCH 31, 2006.  HAVE YOU HAD A CHANCE TO REVIEW THIS

19   DEPOSITION?

20   A    (NO RESPONSE.)

21   Q    IS THAT YOU, MR. CARSON?

22   A    YES.

23   Q    JIM CARSON?  HAVE YOU HAD A CHANCE TO REVIEW THIS DEPOSITION?

24   SIR?

25   A    I'M A LOOKIN'.

1    Q        HAVE YOU READ THIS DEPOSITION SINCE IT WAS TAKEN?

2    A        NO, SIR.

3    Q        OKAY.  AT LINE TWO, ON PAGE 16, DID YOU SAY, "AND I LOOKED OUT

4    THE BATHROOM DOOR TO SEE IF I COULD SEE A BULLET HOLE, WHICH I

5    DIDN'T."

6    A        YES, I GUESS I SAID THAT.

7    Q        WELL, DO YOU RECALL LOOKING OUT THE BATHROOM DOOR TO SEE IF

8    YOU COULD SEE A BULLET HOLE?

9    A        I WAS IN THE BATHROOM, LOOKED OUT TO SEE IF I COULD SEE A

10   BULLET HOLE, YES.

11   Q        WHY WERE YOU LOOKING FOR A BULLET HOLE OUT THE BATHROOM

12   DOOR?

13   A        TO SEE IF I COULD SEE A SHOTGUN SLUG.

14   Q        DID YOU FIND ANY EVIDENCE OF A SHOTGUN HAVING BEEN FIRED?

15   A        NO I DID NOT.

16   Q        AND DID YOU FIND ANY EVIDENCE THAT A BULLET FROM MARTY'S GUN

17   HAD EXITED ANY WALLS OF THE TRAILER?

18   A        NO, I DID NOT.

19   Q        WERE YOU LOOKING FOR THAT AS WELL?

20   A        YES, SIR, I WAS.

21   Q        WHY WERE YOU LOOKING FOR THAT?

22   A        I WAS WANTING TO MAKE SURE THAT IF MARTY'S BULLET HAD EXITED

23   THE WALL, IT WOULD BE IMPOSSIBLE FOR HIM BEING THE ONE THAT SHOT

24   JOHN-JOHN.

25   Q        OKAY.  AND YOU DIDN'T FIND ANY EXITS OR BULLET HOLES EXITING

1    THE WALL WHATSOEVER, DID YOU?

2    A      NO, I DIDN'T.

3    Q      SO BY THE TIME YOU LEFT THAT TRAILER YOU KNEW THAT MARTY

4    CARSON, YOUR SON, HAD SHOT AND KILLED JOHN YANCEY?

5    A      I THOUGHT IT WAS A GOOD POSSIBILITY, YES.

6    Q      WELL, YOU KNEW IT HAD HAPPENED; ISN'T THAT FAIR TO SAY?

7    A      LIKE I SAID, I THOUGHT IT WAS A GOOD POSSIBILITY.

8    Q      AND YOU LET A MANHUNT FOR MARK NEW, ARMED WITH A SHOTGUN,

9    IN THE WOODS, GO ON FOR HOW MANY HOURS AFTER THAT, MR. CARSON?

10   A      I NEVER KNOWED THERE WAS ANYBODY LOOKING FOR A MARK NEW.

11   Q      MR. CARSON, DID YOU HAVE A POLICE RADIO AT THE TIME?

12   A      MY POLICE RADIO WAS – WHEN I GOT TO THE HOSPITAL, I TURNED IT

13   OFF.

14   Q      DID ANYBODY ASK YOU ABOUT A MARK NEW?

15   A      I ASKED THEM OVER AT THE JAIL THAT NIGHT, WAS ANYBODY A

16   LOOKIN' FOR A MARK NEW, AND THEY TOLD ME NO ONE.

17   Q      WHY DID YOU ASK THEM IF ANYBODY WAS LOOKING FOR MARK NEW?

18   A      I GOT A PHONE CALL THAT SAID, ARE YOU LOOKING FOR MARK NEW? I

19   SAID, FAR AS I KNOW, NOT.  SO I WENT OUT, AND THE OFFICERS WAS IN THERE.

20   I ASKED THEM, I SAID, IS ANYBODY LOOKING FOR A MARK NEW, AND THEY

21   SAID NO ONE.

22   Q      DID YOU HAVE ANY OPPORTUNITIES TO REVIEW THE STATEMENTS THAT

23   WERE TAKEN BY THE TBI IN THIS CASE?

24   A      NO, I DID NOT.

25   Q      WELL, DID YOU ASK TO SEE THEM AND THEY WEREN'T PROVIDED TO

1   YOU?  HOW –

2   A        NO, I DID NOT.

3   Q        YOU DIDN'T WANT TO SEE THEM?

4   A        NO.  I LET MY DETECTIVE, THE TBI, HANDLE THAT.

5   Q        YOU LET ROBBY CARSON AND THE TBI HANDLE IT?

6   A        CORRECT.  THEY WAS THE ONES WORKING.

7   Q        AND YOU HAD PLANNED TO PROMOTE YOUR SON, MARTY CARSON, TO

8   CHIEF DEPUTY BEFORE HE SHOT AND KILLED JOHN-JOHN?

9   A        THAT'S CORRECT.

10  Q        BUT YOU HADN'T TOLD ANYBODY ABOUT THAT PLAN; IS THAT

11  CORRECT?

12  A        YES.  ONE'S IN THE DEPARTMENT KNOWED IT.

13  Q        THE WHOLE DEPARTMENT KNEW IT?

14  A        I DON'T KNOW IF THE WHOLE DEPARTMENT DID.  THE BIGGEST PORTION

15  OF IT DID.

16  Q        WELL, DID JOHN-JOHN YANCEY KNOW THAT?

17  A        YES, HE DID.

18  Q        AFTER THIS KILLING –

19              MR. DUFFY:  OBJECTION, YOUR HONOR, TO THE

20  CHARACTERIZATION OF COUNSEL.

21              THE COURT:  WHY DON'T YOU REPHRASE?

22  Q        AFTER YOUR SON, MARTY, SHOT AND KILLED JOHN-JOHN, BEFORE YOU

23  PLACED IN EFFECT YOUR PROMOTION OF MARTY CARSON, DID YOU NOT

24  WANT TO LOOK AT THE INVESTIGATION OF THE SAME PERSON BEFORE HE

25  BECOMES CHIEF DEPUTY?

1    A        THE INVESTIGATION WAS OVER BEFORE I MADE HIM CHIEF DEPUTY.

2    Q        DID YOU TALK TO STEVE VINSANT ABOUT CONCERNS AND QUESTION HE

3    HAD ABOUT YOUR SON, MARTY CARSON?

4    A        I DIDN'T TALK TO STEVE VINSANT, NO.

5    Q        AND IT WAS ABOUT A MONTH AFTER JOHN-JOHN'S DEATH THAT YOU

6    PROMOTED MARTY CARSON TO CHIEF DEPUTY?

7    A        I DON'T KNOW.  I CAN'T TELL JUST WHAT THE TIME WAS.  MONTH,

8    MAYBE TWO MONTHS.  I DON'T KNOW.

9    Q        DID YOU EVER ASK YOUR SON, MARTY CARSON, WHY HE FIRED AWAY

10   FROM THE THREAT THAT HE SAID WAS HOLDING A SHOTGUN?

11   A        I NEVER ASKED HIM ABOUT WHY HE FIRED.

12   Q        DID YOU EVER ASK YOUR SON, MARTY CARSON, WHETHER THE LIGHTS

13   WERE ON IN THE HALLWAY?

14   A        NO, I DID NOT.

15   Q        DID YOU KNOW THAT HE'D TOLD AGENT VINSANT THAT NIGHT THAT

16   THE LIGHT IN THE HALLWAY WAS ON?

17   A        NO, I DID NOT.

18   Q        YOU WERE PRESENT FOR YOUR SON'S DEPOSITION, MARTY CARSON'S

19   DEPOSITION IN THE CASE?

20   A        YES.

21            MR. DUFFY:  YOUR HONOR, I OBJECT.  I THINK THIS IS GOING TOO

22   FAR OUT FROM THE SCOPE OF DIRECT AT THIS JUNCTURE.

23            MR. WIGLER:  GOES TO WHAT HE TOLD – WHAT MARTY CARSON

24   TOLD AGENT VINSANT.

25            THE COURT:  I'LL LET YOU FOLLOW UP BRIEFLY ON THE – WELL,

1    LET ME ASK.  THE LAST QUESTION RELATED TO WHETHER HE REVIEWED

2    STATEMENTS OF DISCUSSED WITH MR. VINSANT.  SO NOW YOU WANT TO ASK –

3    ASK HIM ABOUT WHAT MARTY CARSON TOLD VINSANT?

4              MR. WIGLER:  THIS IS A PRIOR INCONSISTENT STATEMENT OF MR.

5    CARSON, JIM CARSON, YOUR HONOR.

6              THE COURT:  OF THIS WITNESS?

7              MR. WIGLER:  YES.

8              THE COURT:  OKAY.  WELL, I'LL LET YOU ASK THEN.

9              MR. DUFFY:  I THOUGHT HE WAS LOOKING AT MARTY'S

10   DEPOSITION.

11             THE COURT:  THAT'S WHAT I THOUGHT.  I'M SORRY.  YOU MAY –

12   Q     MR. CARSON, MR. JIM CARSON, AT PAGE 24 OF YOUR DEPOSITION, LINE

13   TEN, DID YOU TESTIFY: "QUESTION:  WELL, DID YOU HEAR YOUR SON, MARTY,

14   TESTIFY YESTERDAY THAT HE TOLD AGENT VINSANT THE LIGHTS WERE ON IN

15   THE HALL?

16        "ANSWER:  I DON'T KNOW, YOU KNOW.  HE SAID HE DIDN'T KNOW,

17   DIDN'T HE?

18        "QUESTION:  IN HIS STATEMENT, DO YOU RECALL HE TOLD AGENT

19   VINSANT?

20        "ANSWER:  YES, YES.

21        "YOU WANT TO LOOK AT HIS STATEMENT?

22        "ANSWER:  NO.  I – I RECALL HIM SAYING."

23        SIR, DOES THAT REFRESH YOUR RECOLLECTION THAT YOU DID SEE

24   YOUR SON'S STATEMENT, WRITTEN STATEMENT, TO AGENT VINSANT?

25   A     I HAVE NO IDEA WHAT HE'S TOLD – IF HE SAID THE LIGHTS WAS ON OR

1    NOT.

2    Q       THAT WAS YOUR TESTIMONY IN THIS DEPOSITION, WASN'T IT?

3    A       THAT THE LIGHTS WERE ON?

4    Q       NO.  THAT YOU SAW YOUR SON'S STATEMENT TO AGENT VINSANT THAT

5    THE LIGHTS WERE ON?

6    A       I NEVER DID READ MY SON'S STATEMENT TO AGENT VINSANT.

7    Q       YOU DON'T KNOW ONE WAY OR ANOTHER WHAT YOUR SON TOLD

8    AGENT VINSANT ABOUT THE LIGHTS BEING ON?

9    A       NO, I DON'T.

10   Q       SIR, HOW LONG DID IT TAKE FOR YOUR VEHICLE TO REACH THE

11   WILLIAMS ROAD AREA AFTER YOU WERE CALLED?

12   A       I WOULD SAY 12 MINUTES.

13   Q       AND YOU WERE STILL THERE WHEN STEVE VINSANT GOT THERE?

14   A       STEVE VINSANT GOT THERE JUST AS I WAS FIXING TO LEAVE.

15   Q       WHAT DID YOU DO AFTER YOU WENT IN THE TRAILER AND LOOKED FOR

16   BULLET HOLES?

17   A       COME BACK OUT, OUTSIDE.

18   Q       DID YOU TALK TO ANYONE?

19   A       THE ONLY ONE I REMEMBER TALKING TO OUT THERE WAS STEVE

20   VINSANT.

21   Q       AND WHAT DID YOU DO AFTER YOU TALKED TO STEVE VINSANT?

22   A       TOOK MARTY TO THE HOSPITAL.

23   Q       WHEN YOU WERE LOOKING FOR THOSE BULLET HOLES OUTSIDE THE

24   BATHROOM, YOU WERE TRYING TO ESTABLISH THAT MARTY, YOUR SON

25   MARTY, DID NOT SHOOT JOHN-JOHN YANCEY; IS THAT CORRECT?

1    A        I THOUGHT IT'D BE A POSSIBILITY, YES.

2    Q        AND HOW LONG BEFORE JOHN-JOHN WAS SHOT WAS IT MADE KNOWN IN

3    THE DEPARTMENT THAT MARTY CARSON WAS BEING PROMOTED TO CHIEF

4    DEPUTY?

5    A        I'D SAY MONTH, TWO MONTHS.

6              MR. WIGLER:  THANK YOU.

7              THE COURT:  THANK YOU.  ANY REDIRECT?

8              MR. DUFFY:  VERY BRIEFLY, YOUR HONOR.

9                        REDIRECT EXAMINATION

10   BY MR. DUFFY:

11   Q        WHY DIDN'T YOU INTERROGATE YOUR SON AT THE SCENE, MR.

12   CARSON?

13   A        HE WAS IN NO SHAPE FOR ME TO INTERROGATE HIM.

14   Q        WITH RESPECT TO THE – OR YOU WERE ASKED ABOUT TALKING TO

15   STEVE VINSANT PRIOR TO MARTY'S PROMOTION.  DID YOU TALK TO PAUL

16   PHILLIPS PRIOR TO MARTY'S PROMOTION?

17   A        YES.

18   Q        DID YOU HEAR PAUL PHILLIPS PRESS CONFERENCE PRIOR TO MARTY'S

19   PROMOTION?

20   A        I WAS AT THE PRESS CONFERENCE.

21            MR. WIGLER:  OBJECTION.  THAT'S BEYOND THE SCOPE OF CROSS,

22   YOUR HONOR.

23            MR. DUFFY:  WELL, I THOUGHT THE –

24            THE COURT:  WELL, I'LL OVERRULE THAT OBJECTION.  YOU MAY

25   CONTINUE.

1    Q      AS A RESULT OF MARTY'S PROMOTION, WAS JOHN ALSO PROMOTED?

2    A      JOHN WAS GOING TO BE PROMOTED, YES.

3    Q      IS ROBBY CARSON THAT YOU WERE ASKED ABOUT, IS HE KIN TO YOU?

4    A      HE WOULD – IF HE'D BE ANY KIN, IT WOULD BE FAR, FAR OFF.  I'D SAY

5    PROBABLY EVERY CARSON IN THE COUNTY'S PROBABLY SOME WAY RELATED

6    SOMEHOW.

7    Q      AND YOU WERE ASKED ABOUT JEREMY CROSS.  IS THERE ANY REASON

8    JEREMY CROSS WOULD HAVE A BONE TO PICK WITH JIM CARSON?

9    A      YES.

10   Q      WHAT'S THAT?

11   A      BECAUSE I FIRED HIM.

12   Q      WAS THAT QUITE A BIT OF TIME AFTER THIS INCIDENT?

13   A      YES, IT WAS.

14   Q      IT WASN'T CONNECTED WITH IT, WAS IT?

15   A      NO WAY.

16          MR. DUFFY:  THAT'S ALL.

17          THE COURT:  ANY RECROSS?

18          MR. WIGLER:  NOTHING FURTHER, YOUR HONOR.

19          THE COURT:  ALL RIGHT.  THANK YOU, MR. CARSON.  YOU MAY BE

20   EXCUSED.

21       (WITNESS EXCUSED.)

22          THE COURT:  ANYTHING FURTHER, MR. DUFFY?

23          MR. DUFFY:  THE DEFENDANT RESTS, YOUR HONOR.

24          THE COURT:  ALL RIGHT.  THE DEFENDANT RESTS ON HIS

25   EVIDENCE.  DOES THE PLAINTIFF HAVE REBUTTAL EVIDENCE THAT SHE

1    WISHES TO PRESENT?

2              MR. MONCIER:  YES, YOUR HONOR, WE DO.  UNFORTUNATELY, I'M

3    NOT SURE.  DID THE COURT RULE WITH REGARD TO CHIEF MIKE CROSS?

4              THE COURT:  NO, I DON'T THINK WE ADDRESSED THAT.  THAT WAS

5    GOING TO BE READ THE STATEMENTS.  LET'S GET ANY LIVE TESTIMONY OUT

6    OF THE WAY.

7              MR. MONCIER:  WELL, THE ONLY OTHER LIVE TESTIMONY I HAVE,

8    YOUR HONOR, IS I HAVE AN INVESTIGATOR LISTENING TO THE ENTIRETY OF

9    THE TAPE OF PAUL PHILLIPS' PRESS CONFERENCE AS TO WHETHER OR NOT

10   CERTAIN STATEMENTS WERE MADE BY MR. PHILLIPS – OR BY MR., YES,

11   PHILLIPS, DURING THE PRESS CONFERENCE THAT'S NOT COMPLETED.  THAT

12   WOULD BE –

13             THE COURT:  THAT WOULD BE THE ONLY LIVE TESTIMONY?

14   WE'RE NOT GOING TO CALL THE OTHER WITNESS WE TALKED ABOUT?

15             MR. MONCIER:  OTHER THAN THAT, I'LL YIELD.

16             MR. WIGLER:  IN THE INTERESTS OF TIME, YOUR HONOR, I'LL

17   WITHDRAW THAT OTHER WITNESS.

18             THE COURT:  OKAY.  SO THE REBUTTAL WOULD BE LIMITED TO

19   POTENTIALLY ONE INVESTIGATOR WHO WOULD HAVE LIMITED QUESTIONS

20   ABOUT WHAT WAS SAID AT THE PRESS CONFERENCE?

21             MR. WIGLER:  YOUR HONOR, COULD WE HAVE JUST A BRIEF TWO-

22   MINUTE RECESS TO TALK ABOUT IT?

23             THE COURT:  ALL RIGHT.  WHY DON'T YOU ALL DISCUSS THAT A

24   LITTLE BIT, AND LET'S SEE.  I'M TRYING TO DECIDE WHETHER TO LET THE

25   JURY GO, AND MAYBE WE CAN TAKE UP SOME OTHER MATTERS.  BUT I DON'T

1   WANT TO COME BACK TUESDAY MORNING AND HAVE AN HOUR OR TWO OF

2   REBUTTAL.

3           MR. MONCIER:  OH, NO, NO, NO.  WE'RE –

4           THE COURT:  WHY DON'T YOU TALK TO MR. WIGLER JUST A

5   MOMENT, AND THEN YOU ALL CAN APPROACH THE BENCH.  EVERYBODY JUST

6   SIT BACK AND RELAX A MOMENT.  MR. WIGLER WANTED TO TALK TO YOU, I

7   GOT THE IMPRESSION.

8     (PAUSE)

9           MR. MONCIER:  YOUR HONOR, WE HAVE ONE BRIEF LIVE WITNESS,

10   WE HAVE ONE BRIEF READING OF A DEPOSITION, AND THEN WE HAVE THAT

11   REVIEW OF THE – I THINK IT'S A TOTAL OF 25 MINUTES OF PRESS CONFERENCE

12   THAT'S JUST NOT COMPLETED YET.

13           THE COURT:  I UNDERSTAND THAT.  BUT YOU'RE NOT GOING TO

14   PLAY THE WHOLE 25 MINUTES; YOU'RE GOING TO ASK A FEW QUESTIONS

15   ABOUT IT?

16           MR. MONCIER:  OH, NO, NO.  I'M GOING TO HAVE A PERSON LISTEN

17   TO IT WORD-FOR-WORD.

18           THE COURT:  AND WHAT IS THE DEPOSITION THAT YOU WISH TO

19   READ?

20           MR. MONCIER:  THE DEPOSITION IS MARTY CARSON, STATEMENTS

21   THAT HE MADE IN HIS DEPOSITION.

22           THE COURT:  WELL, CAN WE GO AHEAD AND PERHAPS – HOW

23   LONG WILL THAT TAKE?

24           MR. MONCIER:  VERY SHORT.

25           MR. WIGLER:  ONE – FOUR OR FIVE, SIX LINES.

1    THE COURT:  OKAY.

2    MR. DUFFY:  YOUR HONOR, I OBJECT TO – I DON'T SEE HOW

3  MARTY CARSON, WHO THEY CALLED TO THE STAND, HAS BEEN ON THE – HE

4  TOOK THE STAND.

5    THE COURT:  AND I DON'T WANT TO CUT YOU OFF, BUT IF WE'RE

6  GOING TO ARGUE FOR TEN MINUTES ABOUT FOUR OR FIVE LINES, I'M GOING

7  TO LET THE JURY GO.  THEN WE'LL GET EVERYTHING SET, GET YOU AN EARLY

8  BREAK FOR THE WEEKEND, AND THEN WE'LL TAKE UP ALL THIS AND REFINE

9  THE REBUTTAL TESTIMONY, WHICH I UNDERSTAND IT TO BE ONE LIVE

10  WITNESS WHO'S LISTENED TO THE TAPE, MAYBE A FEW LINES FROM A

11  DEPOSITION AND MAYBE ANOTHER STATEMENT.

12    SO WE'LL TAKE THAT UP OUTSIDE THE PRESENCE OF THE JURY SO THAT

13  WE CAN BE READY TO GO WITH REBUTTAL ON TUESDAY MORNING, WHICH

14  SHOULD BE VERY BRIEFLY – SHOULD BE VERY BRIEF.

15    YES, SIR, DID YOU WANT TO TALK ABOUT THAT BEFORE – LET ME KNOW

16  – GO AHEAD.

17    MR. DUFFY:  YOUR HONOR, I EARNESTLY REQUEST THAT WE

18  CONCLUDE THE PROOF TODAY.

19    THE COURT:  I UNDERSTAND THAT.

20    MR. DUFFY:  SEEING THAT IT'S SHORT.

21    THE COURT:  BUT WE'RE GOING TO TAKE IT UP OUTSIDE THE

22  PRESENCE OF THE JURY.  YOU WOULD HAVE TO HAVE EXCEPTIONAL CAUSE

23  TO CALL ANYBODY ADDITIONAL TO WHAT WE HAVE JUST OUTLINED AS YOUR

24  REBUTTAL TESTIMONY, WHICH IS ONE PERSON LISTENING TO THE GENERAL

25  PHILLIPS PRESS CONFERENCE.  I'M NOT RULING ON ADMISSIBILITY.  THEN ONE

1     STATEMENT AND ONE DEPOSITION.

2         BUT I'M NOT GOING TO – IF THERE'S GOING TO BE ARGUMENT ABOUT

3     PARTICULARLY TO THE STATEMENT OR THE DEPOSITION, I DON'T WANT TO

4     TAKE 30 MINUTES AND THEN COME BACK AND GIVE THEM FIVE MINUTES. SO

5     I'M GOING TO LET YOU ALL GO ON AND ASK YOU TO COME BACK NINE A.M.

6     TUESDAY. WE WILL HAVE BRIEF REBUTTAL, IT SOUNDS LIKE, AND THEN YOU

7     WILL HEAR CLOSING ARGUMENTS AND MY INSTRUCTIONS, AND YOU WILL

8     THEN BE ABLE TO TAKE THE CASE.

9         I VERY MUCH APPRECIATE YOU ALL COMING BACK NEXT WEEK. I

10     KNOW WE ALL TOLD YOU AND WE ENDEAVORED TO GET THIS CASE TO YOU

11     OR DONE THIS WEEK, BUT THAT DIDN'T HAPPEN. YOU ALL HAVE BEEN VERY

12     ATTENTIVE AND PATIENT WITH THE VARIOUS BREAKS AND INTERRUPTIONS

13     DURING THE COURSE OF THIS WEEK. SO WE'RE GOING TO TAKE THREE DAYS

14     OFF, BECAUSE MONDAY IS A FEDERAL HOLIDAY, VETERAN'S DAY, SO THE

15     COURTHOUSE IS CLOSED.

16         EVEN THOUGH WE'RE NEAR THE END OF THE CASE AND YOU'RE

17     ALMOST READY TO RECEIVE IT, I WANT YOU TO JUST HAVE A RELAXING

18     WEEKEND, AND THEN MONDAY AT WORK OR OFF OR WHATEVER IT IS YOU

19     WOULD DO ON MONDAY, I DON'T SEE ANY QUESTION THAT YOU WILL GET THE

20     CASE ON TUESDAY, OBVIOUSLY.

21         IN THE MEANTIME, PUT THE CASE ASIDE, DON'T TALK ABOUT IT AMONG

22     YOURSELVES OR WITH ANYONE ELSE. DON'T READ ANYTHING ABOUT THE

23     CASE OR LISTEN TO ANYTHING ABOUT THE CASE. THE CASE IS STILL OPEN,

24     YOU HAVE NOT RECEIVED THE CASE YET, SO PLEASE, PLEASE CONTINUE TO

25     KEEP AN OPEN MIND.

1    OBVIOUSLY, DON'T ENGAGE IN ANY DELIBERATIONS AND KEEP AN

2 OPEN MIND AND UNTIL YOU BEGIN DELIBERATING THE CASE SOMETIME ON

3 TUESDAY.  SO WITH THAT, THANK YOU AGAIN FOR YOUR ATTENDANCE THIS

4 WEEK, AND WE WILL SEE YOU TUESDAY AT NINE A.M.

5    (JURY RECESSED AT 3:54 P.M.)

6    THE COURT:  ALL RIGHT.  THANK YOU.  LET'S DISCUSS REBUTTAL.

7 FIRST, WHAT DO YOU WISH TO READ FROM THE MARTY CARSON DEPOSITION

8 ON REBUTTAL?

9    MR. WIGLER:  YOUR HONOR, IT'S VERY BRIEF, PAGE 39, LINES SIX

10 THROUGH 20.

11    THE COURT:  IF YOU COULD PUT IT ON THE SCREEN MAYBE.

12    MR. WIGLER:  SCROLL IT OUT A LITTLE BIT.

13    THE COURT:  WHAT IS THAT IN REBUTTAL TO?

14    MR. WIGLER:  YOUR HONOR, THERE HAS BEEN SO MUCH

15 TESTIMONY IN THE DEFENSE CASE-IN-CHIEF OF INCREDIBLY LIMITED

16 PROBATIVE VALUE CONCERNING ACCIDENT FROM A DISTRICT ATTORNEY

17 AND AN ASSISTANT DISTRICT ATTORNEY AND OTHER WITNESSES, AND WE

18 WANT TO BRING THE JURY'S FOCUS BACK TO THINGS THAT ARE NOT IN

19 DISPUTE, WHICH IS THAT PART OF THIS THAT IS REALLY AT ISSUE AS FAR AS

20 BEING ACCIDENT AND INTENTIONAL IS REALLY VERY LIMITED.

21    THERE WAS ALSO TESTIMONY, I BELIEVE, IN THE DEFENSE CASE-IN-

22 CHIEF ABOUT THE LIGHT TRIGGER PULL OF A GLOCK 40.  THAT'S NOT AN ISSUE

23 IN THIS CASE.  THE PULLING OF THE TRIGGER THAT HAS BEEN ESTABLISHED

24 HERE, THAT IT WAS INTENTIONAL, WHETHER IT WAS AN INTENT TO KILL JOHN

25 YANCEY IS THE QUESTION.  AND SO WHEN HE JURY FOCUSES ON ACCIDENT

1  VERSUS INTENTIONAL, WE THINK IT'S IMPORTANT THAT THEY SEE THIS

2  TESTIMONY.

3  THE COURT:  WELL, I UNDERSTAND THAT FROM A SUMMARY

4  STANDPOINT, BUT THE QUESTION IS, WHAT DOES THIS STATEMENT OR THIS

5  TESTIMONY REBUT THAT WAS PRESENTED BY THE DEFENDANT IN HIS CASE-

6  IN-CHIEF?

7  MR. WIGLER:  IT REBUTS THE BROAD AND GLOBAL EXPOSITION,

8  PARTICULARLY BY THE WONDERFUL IMAGE PRESENTED BY GENERAL

9  PHILLIPS, AND THE CREDIBILITY THAT HE OOZES AS A POLISHED ORATOR,

10  THAT THIS ENTIRE THING WAS AN ACCIDENT.  AND IT'S TO REBUT

11  PARTICULARLY HIS TESTIMONY ABOUT AN ACCIDENTAL EVENT WHEN, AS WE

12  KNOW, ONLY A LIMITED AMOUNT OF CONDUCT IS REALLY AT ISSUE AS FAR AS

13  THE –

14  THE COURT:  MR. DUFFY, WHAT'S YOUR RESPONSE?

15  MR. WIGLER:  IF I COULD SAY ONE MORE POINT.

16  THE COURT:  GIVE ME THE PAGE NUMBER AGAIN?

17  MR. WIGLER:  PAGE 39, LINES SIX THROUGH 20.

18  THE COURT:  WELL, LINES SIX THROUGH 20, OKAY, I'M SORRY.

19  ALL RIGHT.  THANK YOU.

20  MR. WIGLER:  AND IF I COULD JUST ADD THAT WE WERE LIMITED

21  TO EITHER CALLING MR. CARSON OR USING A DEPOSITION.

22  THE COURT:  I RECALL THAT.

23  MR. WIGLER:  AND SO THIS IS NOT REALLY SOMETHING WE COULD

24  USE EFFECTIVELY AT THAT TIME.

25  THE COURT:  YOUR RESPONSE, MR. DUFFY?

1    MR. DUFFY: A COUPLE THINGS, YOUR HONOR. FIRST, THEY

2 ASKED MARTY CARSON THAT. HE'S TESTIFIED. THEY ASKED HIM WHETHER

3 HE ACCIDENTALLY PULLED THE TRIGGER. HE SAID NO. THAT'S ALREADY IN.

4 WHAT THIS IS IS CLOSING ARGUMENT CLOAKED IN THE FORM OF REBUTTAL

5 EVIDENCE, QUOTE/UNQUOTE. THAT'S ALL IT IS. IT'S ALREADY BEEN

6 TESTIFIED TO.

7 Q    NUMBER TWO, THEY DIDN'T DESIGNATE ANY DEPOSITION TESTIMONY

8 TO READ AT TRIAL FOR MR. CARSON. I AGREED TO THE DEPOSITION

9 TESTIMONY BEING READ IN THEIR CASE. I OBJECT TO IT BEING READ IN

10 REBUTTAL.

11    THE COURT: IS THERE A REQUIREMENT THAT IT'S A DESIGNATION

12 FOR REBUTTAL? ASSUMING FOR THE SAKE OF ARGUMENT IT IS REBUTTAL,

13 HOW CAN ONE DESIGNATE BEFORE THE TRIAL STARTS WHAT THEY'RE GOING

14 TO READ AS REBUTTAL EVIDENCE? I'M NOT SURE THERE IS A REQUIREMENT

15 OF DESIGNATION OF REBUTTAL EVIDENCE BEFORE THE TRIAL STARTS.

16    MR. DUFFY: VERY WELL, YOUR HONOR. I UNDERSTAND THE

17 COURT'S REASONING THERE. THIS IS NOT IN REBUTTAL TO ANYTHING.

18 NOBODY GOT ON THE STAND AND SAID MARTY ACCIDENTALLY PULLED THE

19 TRIGGER, SO IT'S JUST NOT PROPER REBUTTAL.

20    THE COURT: OKAY. THANK YOU. WHAT I'M GOING TO DO, LET'S

21 GET ALL THE ISSUES OUT. THERE ARE SOME ISSUES ON DOCUMENTS, I WANT

22 TO HEAR THEM ALL. I MAY TAKE THE WEEKEND TO LOOK AT SOME OR ALL OF

23 THEM. STICKING WITH REBUTTAL, WHAT IS THE NEXT STATEMENT THAT YOU

24 WISH TO READ.

25    MR. MONCIER: CHIEF CROSS' STATEMENT THAT MR. YANCEY,

1   WHEN ASKED WHY HE WANTED TO LEAVE THE SCOTT COUNTY SHERIFF'S

2   DEPARTMENT, MR. YANCEY SAID, "I'VE GOT TO GET AWAY FROM THERE.

3   SOMETHING BAD IS GOING TO HAPPEN." THAT WAS MADE, THAT STATEMENT

4   WAS MADE, BY MR. YANCEY ON MONDAY OF THAT SAME WEEK THAT MS.

5   DAVIS HAS DESCRIBED MR. YANCEY'S STATEMENTS AND WHAT HE WAS

6   DOING.

7         THE COURT: LET ME INTERRUPT FOR JUST A MOMENT. OFF THE

8   RECORD.

9     (DISCUSSION OFF THE RECORD.)

10        THE COURT: I'M SORRY. GO AHEAD, MR. MONCIER.

11        MR. MONCIER: ALL OF THE TESTIMONY ABOUT CHALLENGING

12   MR. CHITWOOD'S TESTIMONY, ALL OF THE TESTIMONY ABOUT HOW JOHN-

13   JOHN, EVEN THE WEEK THAT HE WAS KILLED, SEEMED FINE TO THESE PEOPLE,

14   TESTIMONY OF MS. DAVIS THAT WAS JUST GIVEN, THE TESTIMONY OF MR.

15   CARSON THAT WANTED TO GET HIDA FUNDS AND WANTED TO GET OVERTIME,

16   ALL OF THESE THINGS THAT THEY WERE DOING, AT THE SAME TIME MR.

17   YANCEY WAS STATING TO CHIEF CROSS AND CHIEF CROSS RELATED TO THE

18   TBI IN THE INVESTIGATION THAT MR. YANCEY STATED, "I'VE GOT TO GET

19   AWAY FROM THERE. SOMETHING BAD IS GOING TO HAPPEN."

20       BUT THIS WASN'T STATED TO ANY OF THESE OTHER PEOPLE THAT ARE

21   ASSOCIATED AND CLOSELY RELATED TO SCOTT COUNTY. WE THINK THAT IN

22   REBUTTAL THAT IS APPROPRIATE FOR THE JURY TO NOW HEAR.

23        THE COURT: OKAY. THANK YOU.

24        MR. MONCIER: IT SHOWS THAT MR. YANCEY WAS SHARING

25   THINGS WITH PEOPLE HE TRUSTED, SUCH AS CHIEF CROSS AND SUCH AS MR.

1  CHITWOOD, THAT HE WAS NOT SHARING WITH ALL OF THESE PEOPLE SO

2  CLOSELY ASSOCIATED WITH MR. CARSON IN SCOTT COUNTY; AND THAT HE

3  WAS VERY WORRIED ABOUT STAYING IN SCOTT COUNTY, PARTICULARLY

4  WITH MARTY CARSON.

5       AND, OF COURSE, WE NOW HAVE MARTY CARSON SAYING THAT

6  NOBODY, INCLUDING JOHN-JOHN, KNEW THAT HE WAS GOING TO BE

7  APPOINTED TO CHIEF DEPUTY.  HERE WE HAVE HIS FATHER COMING HERE

8  TODAY, SAYS, YEAH, THE WHOLE DEPARTMENT KNEW ABOUT IT FOR TWO

9  MONTHS.

10       HERE THE VERY PERSON THAT JOHN-JOHN YANCEY BELIEVED WAS

11  INVOLVED IN METHAMPHETAMINE WAS FIXING TO BE PROMOTED TO BE HIS

12  CHIEF DEPUTY, AND IT'S OBVIOUS WHY THIS MAN HAD TO GET OUT OF THAT

13  SHERIFF'S DEPARTMENT.

14            THE COURT:  MR. DUFFY?

15            MR. MONCIER:  OR CERTAINLY THERE'S INFERENCES THAT CAN

16  ARGUE FROM THAT.

17            THE COURT:  MR. DUFFY?

18            MR. DUFFY:  NUMBER ONE, THERE'S NO REBUTTAL EXCEPTION TO

19  THE RULES OF EVIDENCE.  THIS WAS OFFERED IN THEIR CASE-IN-CHIEF WHEN

20  MR. CROSS WAS ON THE STAND.  I UNDERSTOOD IT TO BE AN EVIDENTIARY

21  RULING THAT THAT WAS NOT ADMISSIBLE.

22       NUMBER TWO, BY DEFINITION, REBUTTAL EVIDENCE CAN'T BE THE

23  EVIDENCE THE PLAINTIFF SOUGHT TO INTRODUCE IN HER CASE-IN-CHIEF.

24  THAT'S NOT PROPER REBUTTAL.  AND, NUMBER THREE, ALL OF THE

25  UNRELIABILITY REASONS THAT PROBABLY FACTORED INTO THE COURT'S

1    EVIDENTIARY RULING STILL EXIST.

2        I THOUGHT IT INTRIGUING TO HEAR MR. MONCIER NOW ARGUE AT

3    LEAST TO THE COURT – I'M CONFIDENT THIS WILL NOT BE THE ARGUMENT TO

4    THE JURY – THE ARGUMENT TO THE COURT THAT THIS SOMEHOW RELATES TO

5    THE PROMOTION.  THAT WAS SOMETHING I SAID, THAT WE DIDN'T KNOW

6    WHAT IT RELATED TO, IT COULD RELATE TO PROMOTION.  THE INFERENCE HE

7    WANTS TO DRAW WAS THAT SOMETHING BAD WOULD HAPPEN WOULD BE HIS

8    DEATH.

9            THE COURT:  EXCUSE ME JUST A MOMENT.  GO AHEAD MR. DUFFY.

10   THANK YOU.

11           MR. DUFFY:  I FEEL THAT IT WOULD BE SAFE FOR THE COURT TO

12   ASSUME THAT THE – THAT THE UTTERANCE OUT OF MR. MONCIER'S MOUTH,

13   WHEREVER HE MAY BE IN CLOSING ARGUMENT, THAT YOU HEARD, LADIES

14   AND GENTLEMEN OF THE JURY, HE HAD TO GET OUT OF THAT DEPARTMENT

15   BECAUSE SOMETHING BAD WAS GOING TO HAPPEN.  THAT'S WHAT WE'RE

16   GOING TO HEAR.

17       IT'S GOING TO BE HIGHLIGHTED, IT'S GOING TO BE STOOD OUT ON A

18   PEDESTAL –

19           THE COURT:  ARE YOU MAKING A PREEMPTIVE OBJECTION TO

20   THAT BEING SAID IN CLOSING?

21           MR. DUFFY:  I'M GOING TO THE IMPORT OF THIS PARTICULAR

22   RULING.

23           THE COURT:  YOU'RE SAYING IF THIS WERE INTRODUCED?

24           MR. DUFFY:  YES.

25           THE COURT:  WHAT IS IN EVIDENCE RIGHT NOW, I MEAN, MR.

1    CROSS, REMIND ME, MR. CROSS – I KNOW I EXCLUDED DURING THE CASE-IN-

2    CHIEF, "SOMETHING BAD IS GOING TO HAPPEN" FOR THE REASONS WE TALKED

3    ABOUT THEN.  CHIEF CROSS DID TESTIFY THAT MR. YANCEY CALLED ON THE

4    TWO OCCASIONS, INQUIRING AS TO OPENING?

5        MR. DUFFY:  CORRECT.

6        THE COURT:  THE SECOND ONE BEING JUST A WEEK BEFORE HIS

7    DEATH; IS THAT CORRECT?

8        MR. DUFFY:  THE WEEK OF.

9        THE COURT:  THE WEEK OF.  ALL RIGHT.  I JUST WANT TO GET

10   STRAIGHT WHAT'S IN EVIDENCE AND WHAT'S NOT.  GO AHEAD.

11       MR. DUFFY:  CORRECT.  WELL, THE REASON I'M BRING THAT UP

12   ABOUT THE CLOSING IS, BECAUSE I KNOW THAT'S WHAT'S GOING TO HAPPEN.

13   WHAT HE'S ASKING IS NOT A LITTLE SNIPPET; IT'S SOMETHING THAT WILL

14   REVERBERATE AS TO THE CLOSING ARGUMENT AND IS BEING ASKED TO BE

15   PUT IN UNDER THE GUISE OF REBUTTAL WHEN IT WAS – THIS IS NOTHING

16   MORE THAN APPEAL OF THE COURT'S EARLIER EVIDENTIARY RULING.  WE'D

17   OBJECT.

18       THE COURT:  OKAY.  THANK YOU.  NOW, LET'S GO AHEAD.

19   ANYTHING FURTHER ON THIS POINT, MR. MONCIER?

20       MR. MONCIER:  YES, JUST BRIEFLY.  MR. DUFFY MISCONSTRUES.  I

21   UNDERSTOOD THAT THE COURT AT THE TIME ALLOWED HIM TO TESTIFY THAT

22   ON MONDAY MR. YANCEY CALLED BACK, HE SAID TO MR. YANCEY, "I

23   THOUGHT YOU WERE HAPPY AT THE SCOTT COUNTY SHERIFF'S DEPARTMENT"

24   AND ASKED HIM WHY HE WAS LEAVING.  AT THAT POINT IN TIME, THE COURT

25   RULED THAT MR. YANCEY'S STATEMENT BACK TO HIM, "I HAVE GOT TO GET

1    OUT OF THERE, SOMETHING BAD IS GOING TO HAPPEN," WAS HEARSAY.

2           I ARGUED AT THE TIME THAT THE STATE OF MIND ADMISSION OF THIS

3    WAS INTRODUCED, AND AS I UNDERSTOOD THE COURT TO SAY, THE COURT

4    WAS OF THE OPINION AT THAT TIME THAT MR. YANCEY'S STATE OF MIND HAD

5    NOT BEEN PLACED INTO ISSUE; HOWEVER, THE COURT WOULD REVISIT THE

6    ISSUE AS TO REBUTTAL.

7           NOW, THE QUESTION NOW IS, HAS MR. YANCEY'S STATE OF MIND

8    BEFORE HIS DEATH BEEN PLACED IN ISSUE?  AND CLEARLY, IF NO ONE ELSE,

9    MS. DAVIS PLACED IT AT ISSUE, BECAUSE MS. DAVIS TESTIFIED ALMOST DAILY

10   THE WEEK PRIOR TO HIS DEATH AS TO HIS STATE OF MIND IN DOING THE

11   THINGS IN THE COURTROOM AND TALKING TO HER ABOUT A SEARCH

12   WARRANT AND THE SEX INVESTIGATION AND THOSE TYPES OF THINGS.  BUT

13   MS. DAVIS, YOU UNDERSTAND, IS CLOSELY ASSOCIATED WITH THE SCOTT

14   COUNTY SHERIFF'S DEPARTMENT.

15          THE STATEMENT IS NOT BEING OFFERED FOR THE TRUTH OF THE

16   MATTER STATED IN THE STATEMENT.  THE STATEMENT IS BEING OFFERED TO

17   SHOW THAT JOHN-JOHN YANCEY MADE THIS STATEMENT THAT IS

18   INCONSISTENT WITH THE EVIDENCE OFFERED BY THE DEFENDANT THAT THEY

19   WERE BEST OF FRIENDS AND EVERYTHING WAS HUNKY-DORY AND THAT THE

20   SHERIFF'S DEPARTMENT WAS HUNKY-DORY, AND MS. DAVIS, THAT THEY

21   WERE THE BEST OF FRIENDS AND MR. PHILLIPS AND THE FATHER AND

22   EVERYBODY ELSE IN THE CASE; THAT IN TRUTH AND IN FACT MR. JOHN-JOHN

23   YANCEY WAS MAKING STATEMENTS TO OTHERS, LIKE MR. CHITWOOD AND TO

24   CHIEF CROSS, THAT WERE DIFFERENT AND INCONSISTENT WITH WHAT THESE

25   PEOPLE THAT WERE CLOSELY ASSOCIATED WITH THE SCOTT COUNTY

1  SHERIFF'S DEPARTMENT WERE SAYING.

2      THE COURT:  WELL, LET ME ASK THIS.  I'M NOT SURE HOW I'LL

3  RULE ON THIS BUT YOU WANT TO READ IN HUBERT YANCEY TOLD CHIEF

4  CROSS, "I'VE GOT TO GET AWAY FROM THERE, SOMETHING BAD IS GOING TO

5  HAPPEN"?

6      MR. MONCIER:  THAT'S IT.  THAT'S HIS –

7      THE COURT:  WHAT ABOUT THE ADDITIONAL SENTENCE THAT

8  SAYS, "CHIEF CROSS ADDED HE DID NOT THINK THE STATEMENT WAS

9  RELATED TO HUBERT YANCEY'S DEATH"?

10      MR. MONCIER:  WELL, IT MIGHT NOT HAVE BEEN.  I'M NOT

11  SUGGESTING THAT JOHN-JOHN YANCEY KNEW HE WAS GOING TO BE KILLED

12  THAT FRIDAY.  THE POINT OF THE MATTER IS, JOHN-JOHN YANCEY WAS

13  UNCOMFORTABLE AND WANTED – FELT IN HIS MIND, THAT HE MADE A

14  STATEMENT TO THE EFFECT THAT HE HAD TO LEAVE THE SCOTT COUNTY

15  SHERIFF'S DEPARTMENT BECAUSE SOMETHING BAD WAS GOING TO HAPPEN,

16  WHICH IS CONTRARY TO ALL OF THE STATE OF MIND EVIDENCE THAT THE

17  DEFENSE HAS PUT IN, OH, EVERYTHING WAS JUST FINE.

18      THE COURT:  THANK YOU.  ANYTHING FURTHER ON THAT POINT,

19  MR. DUFFY?

20      MR. DUFFY:  YES, YOUR HONOR.

21      THE COURT:  AND MR. MONCIER'S MAIN ARGUMENT APPEARS TO

22  THE COURT TO BE – AND PUTTING ASIDE THE COURT'S EARLIER RULING –

23  THAT BASICALLY DEFENDANTS HAVE PUT IN EVIDENCE OF A GOOD WORKING

24  RELATIONSHIP BETWEEN THE TWO INDIVIDUALS AND THAT THEY WANT TO

25  OFFER THIS STATEMENT IN REBUTTAL TO THAT TYPE OF TESTIMONY.

1          MR. DUFFY:  CORRECT, YOUR HONOR.  THE STATEMENT COULD

2    ONLY BE RELEVANT UNDER THE STATE OF MIND IMPRESSION, UNDER THE

3    PLAINTIFF'S THEORY, IF WHAT WAS INTENDED BY THAT STATEMENT WAS

4    THAT MARTY CARSON – YANCEY WAS INVESTIGATING MARTY CARSON, AND

5    HE FEARED FOR HIS LIFE.  IT'S THE "BAD" REFERS TO THIS INCIDENT.

6          ANY OTHER STATE OF MIND OF JOHN YANCEY WOULD NOT BE

7    RELEVANT, WHETHER MARTY'S GETTING PROMOTED AND HE DOES OR DOES

8    NOT LIKE THAT.  UNLESS "BAD" REFERS TO METHAMPHETAMINE AND

9    MURDER, IT'S NOT RELEVANT.

10          AND THE ENTIRE PROBLEM WITH THE RELIABILITY OF THE STATEMENT

11   IS HOW VAGUE IT IS, "SOMETHING BAD IS GOING TO HAPPEN."  AND THEN

12   CHIEF CROSS SAYS, "WELL, I DIDN'T INFER FROM THAT THAT IT HAD

13   ANYTHING TO DO WITH THE DEATH."  WE DON'T HAVE ANY CONTEXT, WE'LL

14   NEVER HAVE ANY CONTEXT.

15          UNDER 403, REGARDLESS OF WHATEVER REMOTE PROBATIVE VALUE

16   THIS COULD HAVE, GIVEN THE VAGUE NATURE OF THE COMMENT, THE

17   PREJUDICIAL EFFECT IS OVERWHELMING, FAR OUT WEIGHS WHATEVER

18   PROBATIVE EFFECT IT WOULD HAVE.

19          THE COURT:  ALL RIGHT.  LET'S TALK ABOUT THE THIRD PIECE OF

20   REBUTTAL EVIDENCE THE PLAINTIFF DESIRES TO INTRODUCE.  COULD YOU

21   EXPLAIN AGAIN, MR. MONCIER?  YOU WANT TO PUT ON AN INVESTIGATOR

22   WHO HAS LISTENED TO THE PRESS CONFERENCE TO TESTIFY WHAT?

23          MR. MONCIER:  WELL, FIRST OF ALL, I HAVE AND I PLAN TO PLAY

24   IN MY CLOSING ARGUMENT THE STATEMENTS THAT MR. CARSON MADE AS TO

25   WHAT HAPPENED.

1          THE COURT:  I'M SORRY?

2          MR. MONCIER:  MR. PHILLIPS, MR. PHILLIPS.

3          THE COURT:  THANK YOU.

4          MR. MONCIER:  MR. PHILLIPS, HOWEVER, SAID, WELL, THAT'S NOT

5   WHAT HAPPENED.  WHAT I SAID WAS, THAT HE SAW A SHOTGUN BARREL

6   STICKING OUT FROM THE BEDROOM AND MAYBE ASSUMED.  MR. PHILLIPS

7   DIDN'T SAY THAT AT THE PRESS CONFERENCE.  THERE WAS NOTHING ABOUT

8   A SHOTGUN BARREL STICKING OUT OF A BEDROOM SAID BY MR. PHILLIPS IN

9   THE ENTIRETY OF THE 15 MINUTES OF CONVERSATION.

10         THAT WAS MR. PHILLIPS' EXPLANATION FOR WHAT THE WORDS HE

11   ACTUALLY SPOKE WERE.  THE WORDS HE ACTUALLY SPOKE WAS THAT

12   MARTY CARSON SAW A PERSON COME OUT OF THE BEDROOM, HE SAW THE

13   FIGURE, HE SAW IT WITH THE SHOTGUN, AND IT WAS ADVANCING TOWARD

14   HIM WHEN HE SHOT.  AND THAT'S THE STATEMENT THAT IS NOT CONTAINED

15   IN ANY OF THESE OTHER STATEMENTS, BUT MUST HAVE BEEN GIVEN TO THE

16   DISTRICT ATTORNEY'S OFFICE THROUGH THE DISCUSSIONS OF MS. DAVIS OR

17   SOMEONE ELSE.

18         AND WHEN MR. PHILLIPS TRIED TO EXPLAIN HIS ANSWER BY SAYING,

19   WELL, WHAT HE ACTUALLY SAID WAS, OR WHAT I SAID WAS, HE SAW A

20   SHOTGUN STICKING OUT A DOOR, THAT ISN'T IN THERE, IT'S NOT THERE.  HE'S

21   WRONG.

22         NOW, I'M CONFIDENT THAT WHAT MR. PHILLIPS PROBABLY HAS DONE

23   IS, MR. PHILLIPS HAS REVIEWED ALL OF THESE THINGS FOR HIS TESTIMONY,

24   INCLUDING MARTY CARSON'S STATEMENT GIVEN ON FEBRUARY THE 11TH OF

25   2007 TO THE TBI, AT WHICH TIME MARTY CARSON DOES SAY THAT.  AND HE'S

1    INTERLOPING WHAT MR. CARSON SAID IN FEBRUARY OF 2004, IN HIS TBI

2    STATEMENT.

3        HE'S TRYING TO SAY HE SAID THAT IN HIS PRESS CONFERENCE.  HE

4    DIDN'T SAY THAT, IT'S NOT THERE.

5        THE COURT:  WELL, WHAT ARE YOU WANTING – I MEAN, WHAT DO

6    YOU WANT TO DO?  I JUST WANT TO MAKE CLEAR.  YOU WANT TO PUT AN

7    INVESTIGATOR ON THE STAND AND ASK HIM WHAT?

8        MR. MONCIER:  "I HAVE LISTENED TO THE ENTIRETY OF THE PRESS

9    CONFERENCE FROM THE TIME HE WALKED INTO THE ROOM UNTIL THE TIME

10   THEY LEFT, AND PAUL PHILLIPS, NOR ANY OTHER PERSON, SAID ANYTHING

11   ABOUT SEEING A SHOTGUN BARREL STICKING OUT OF A BEDROOM PRIOR TO

12   MARTY CARSON SHOOTING OR AT ANY OTHER TIME."

13       THE COURT:  AND YOU'RE SAYING THAT IS IN REBUTTAL TO –

14       MR. MONCIER:  – TO PAUL PHILLIPS' TESTIMONY.

15       THE COURT:  – TESTIMONY THAT DID SAY THAT OR SOMETHING?

16       MR. MONCIER:  THAT'S RIGHT.  PAUL PHILLIPS SAID HE DID SAY

17   THAT.

18       THE COURT:  MR. DUFFY, WHAT IS YOUR RESPONSE TO THAT

19   REBUTTAL TESTIMONY PROFFER?

20       MR. DUFFY:  MY FIRST RESPONSE IS THAT THAT CONCERNS A

21   THIRD RING OF THE CIRCUS.  I MEAN, THAT, THAT IS OF SUCH LIMITED

22   RELEVANCE – THAT IS INFORMATION FOR CROSS-EXAMINATION.  MR.

23   MONCIER WENT OVER AND OVER AND OVER THAT VERY THING WITH MR.

24   PHILLIPS ON CROSS-EXAMINATION.  HE PLAYED PORTIONS OF THE TAPE, THE

25   PRESS CONFERENCE, WHICH I NOW HEAR HE WANTS TO PLAY IN CLOSING.

1       I THOUGHT THOSE WERE OFFERED FOR IMPEACHMENT, NOT

2   SUBSTANTIVE EVIDENCE.  THAT'S NOT REBUTTAL; THAT'S JUST MORE CROSS-

3   EXAMINATION.

4       ALL HE'S SAYING IS, JUDGE, I DIDN'T HAVE IT READY DURING THE

5   CROSS-EXAMINATION, SO I WANT TO PUT IT IN ON REBUTTAL, AND IT REBUTS

6   SOMETHING THAT IS A TANGENTIAL ISSUE.

7               MR. MONCIER:  THERE IS AN ALTERNATIVE, OF COURSE, AND

8   THAT'S WHAT I OFFERED TO GIVE MR. PHILLIPS THE OPPORTUNITY, TO GO OUT

9   AND LISTEN TO THE ENTIRETY OF IT AND TO COME BACK AND POINT TO US

10  AND SHOW US WHERE HE SAID THAT MARTY TOLD HIM THAT – OR MARTY,

11  THAT MARTY SAID THERE WAS A GUN POINTED OUT OF THE BEDROOM.

12              THE COURT:  WELL, YOU –

13              MR. MONCIER:  I GAVE HIM THE OPPORTUNITY.

14              THE COURT:  I UNDERSTAND.  I UNDERSTAND THAT.

15              MR. MONCIER:  AND I'LL BE HAPPY –

16              THE COURT:  WELL DID YOU –

17              MR. MONCIER:  I'LL BE HAPPY TO DO THAT OVER THE WEEKEND,

18  IS LET HIM DO IT AND CALL –

19              THE COURT:  WELL, THE POTENTIAL REBUTTAL TESTIMONY IS

20  GOING TO BE THE THREE THINGS WE TALKED ABOUT.

21              MR. MONCIER:  WHAT I WAS GOING TO SUGGEST –

22              THE COURT:  DID YOU PLAY, DID YOU PLAY THAT PORTION OF THE

23  TAPE THAT, I GUESS, DID NOT SAY WHAT YOU SAID?

24              MR. MONCIER:  HE SAID THAT DURING THE PRESS CONFERENCE HE

25  SAID THAT MARTY SAW A SHOTGUN COMING OUT OF THE BEDROOM.

1            THE COURT: I UNDERSTAND. AND THEN YOU PLAYED SNIPPETS?

2            MR. MONCIER: I PLAYED SNIPPETS OF WHAT HE ACTUALLY SAID,

3 BUT HE SAID THAT SOMEWHERE ELSE ON THERE, IN ANSWERING QUESTIONS

4 OR SUCH, HE SAID THAT, AND I'M MISCONSTRUING THOSE PORTIONS I SAID.

5            THE COURT: SO YOU WANT TO PUT SOMEBODY ON TO SAY, "I

6 LISTENED TO THE TAPE AND NOWHERE AT THE PRESS CONFERENCE WAS THIS

7 SAID"?

8            MR. MONCIER: THAT'S CORRECT, OR PUT MR. PHILLIPS BACK ON

9 AFTER HE'S HAD AN ENTIRE OPPORTUNITY TO READ THE ENTIRE PRESS

10 CONFERENCE AND ASK HIM, NOW THAT YOU'VE READ THAT, WOULD YOU

11 PLEASE POINT TO THE PART OF THAT – AND, OF COURSE, I'LL HAVE A

12 COMPLETE TRANSCRIPT BY TUESDAY MORNING, TOO – WHERE YOU SAID

13 THAT. AND HE'S GOING TO HAVE TO SAY, "I DIDN'T SAY THAT." BUT THE

14 ONLY WAY I CAN CROSS-EXAMINATION HIM, WHEN HE SAID THAT DURING HIS

15 EXAMINATION, TRYING TO EXPLAIN THE TIMES WHEN HE DID SAY WHAT

16 MARTY SAW, HE COMES UP WITH THIS OTHER PART OVER HERE, AND IT'S

17 IMPOSSIBLE WITHOUT GIVING HIM THE OPPORTUNITY TO REVIEW IT TO HAVE

18 HIM POINT TO WHERE HE SAID IT. HE SAID HE DID, AND I'VE GOT THE TAPE,

19 AND IT'S NOT THERE.

20      HE'S GOT AN OPPORTUNITY TO LOOK AT IT, AND EITHER I CALL HIM

21 BACK OR I CAN CALL AN INVESTIGATOR.

22            THE COURT: MR. DUFFY, NOW –

23            MR. MONCIER: ON THAT ONE QUESTION.

24            THE COURT: – ON THAT ONE QUESTION, EXPLAIN TO ME WHY OR

25 ARGUE WHY THAT IS NOT REBUTTAL TESTIMONY, PUTTING ASIDE HOW IT

1  COMES IN. IS IT REBUTTAL TESTIMONY TO REBUT THE DIRECT OR CROSS –

2  THE TESTIMONY, THAT LIMITED TESTIMONY PORTION OF THE DISTRICT

3  ATTORNEY?

4        MR. DUFFY: IT'S JUST CROSS-EXAMINATION. I MEAN, HE SAID,

5  I'LL LET YOU LISTEN TO THE TAPE, AND THERE'S NOT ANYTHING ON THERE.

6  IT'S JUST CROSS-EXAMINATION. IT'S DELAYED CROSS-EXAMINATION, THAT'S

7  ALL.

8        THE COURT: I UNDERSTAND EVERYBODY'S POSITION ON THAT

9  ONE. I'M PROBABLY GOING TO TAKE ALL OF THE MATTERS UNDER

10  ADVISEMENT AND LET YOU KNOW TUESDAY MORNING, SINCE THE ONLY

11  PERSON, LIVE PERSON WE MAY POTENTIAL INCONVENIENCE BY MY WAITING

12  UNTIL TUESDAY TO RULE, WOULD BE THE INVESTIGATOR, YOUR

13  INVESTIGATOR, WHO WILL LISTEN TO THE TAPE. SO HAVE HIM OR HER HERE

14  PREPARED TO TESTIFY AND I'LL LET YOU KNOW ABOUT THAT AND THE TWO –

15  AND THE STATEMENT AND THE DEPOSITION TESTIMONY.

16        MR. DUFFY: DOES THE COURT WISH TO TAKE UP THE AUTOPSY

17  REPORT?

18        THE COURT: YEAH. LET'S TAKE – BEFORE WE DO THAT, YES,

19  LET'S TAKE UP – HOLD ON JUST A SECOND. OKAY. WHILE I'M THINKING

20  ABOUT CLOSING, HERE'S WHAT THE COURT'S DECIDED. I WILL GIVE YOU AN

21  HOUR AND 15 MINUTES FOR YOUR CLOSING, I WILL GIVE – ALLOW, AS

22  REQUESTED, PLAINTIFF'S COUNSEL, ONE TO DO OPENING AND ONE TO DO

23  REBUTTAL. I WILL NOT ALLOW DIVIDING UP THE OPENING CLOSING.

24        SO THAT MEANS, ON YOUR HOUR AND 15 MINUTES, YOU MAY DIVIDE UP

25  TO 45 MINUTES FOR YOUR OPENING CLOSING AND UP TO 30 MINUTES FOR

1   YOUR REBUTTAL.  THAT WILL LEAVE 30 MINUTES SUFFICIENT AMOUNT OF

2   TIME TO RESPOND IN REBUTTAL TO WHATEVER MR. DUFFY MAY SAY DURING

3   HIS CLOSING ARGUMENT.

4       AND AS I BELIEVE I EXPLAINED TO YOU PERHAPS OFF THE RECORD, UP

5   TO 45 AND UP TO 30 MEANS, IF YOU USE – WELL, IT'S REALLY NOT UP TO 45.

6   I'M SORRY.  I'M DIVIDING IT 45 AND 30.  WHAT THAT MEANS, AS I EXPLAINED,

7   YOU USE – YOU USE MORE THAN 45, YOU'VE GOT WHATEVER'S LEFT OUT OF

8   YOUR HOUR AND 15 MINUTES; IF YOU USE LESS THAN 45, YOU'VE GOT UP TO 30

9   MINUTES ON REBUTTAL.  JUST SO WE'RE CLEAR ON THAT, AND THEN

10  EVERYBODY'S GOT A COPY OF MY INSTRUCTIONS TO ADHERE TO DURING

11  CLOSING ARGUMENTS.

12      ALL RIGHT.  LET'S TAKE UP – ACTUALLY, I HAVE, MY LIST, I HAVE A LIST

13  OF THREE DOCUMENTS I WANT TO TALK ABOUT.  WE'LL START WITH

14  PLAINTIFF'S 42A MARKED FOR IDENTIFICATION, WHICH IS THE SUPPLEMENT

15  TO THE AUTOPSY REPORT, AS I UNDERSTAND IT.  MR. DUFFY, YOU OBJECTED

16  TO ITS INTRODUCTION.  START WITH THAT ONE.

17      MR. DUFFY:  I DO, YOUR HONOR, ON A COUPLE OF BASES.  ONE IS

18  THAT THIS IS NOT AN EXHIBIT ON THEIR EXHIBIT LIST, AND I'M SINCERE

19  ABOUT THIS.  MR. WIGLER AND I MET AT HIS OFFICE AND WENT THROUGH AND

20  DECIDED UPON EXHIBITS IN WHICH WE STIPULATED TO AND WHICH WE

21  DIDN'T.  AND WE AGREED TO STIPULATE TO THE FIRST TWO PAGES OF THIS,

22  WHICH HAVE COME INTO EVIDENCE.

23      AND THEN MR. MONCIER COMES ON THE SCENE, AND ALL THE

24  AGREEMENTS THAT – THE COURT INSTRUCTED US, MR. WIGLER AND I, TO GO

25  MEET AND GO OVER EXHIBITS AND STIPULATE TO THAT WHICH WE CAN.  AND

1  NOW MR. MONCIER COMES ON THE SCENE, AND ALL THE AGREEMENTS

2  BETWEEN MR. WIGLER AND I ARE OUT THE WINDOW.

3       AND I'M REQUIRED TO, YOU KNOW, GO THROUGH AND LOOK AT

4  MARTY'S DEPOSITION DESIGNATIONS AND I'M REQUIRED AT SOME POINT TO

5  READ THROUGH ALL THIS.  THAT'S JUST NOT THE WAY YOU DO IT.  I MEAN,

6  IT'S NOT ON THE EXHIBIT LIST.

7       WE WENT THROUGH AND AGREED AND STIPULATED TO THIS, AND I

8  DON'T THINK MR. MONCIER CAN VETO WHAT, YOU KNOW, WHAT MR. WIGLER

9  AND I HAVE DONE.

10       MORE SIGNIFICANTLY, HOWEVER, IS THE REASON THAT MR. WIGLER,

11  AND THE REASON I EXPLAINED TO MR. WIGLER, THAT IT WASN'T EVEN

12  SERIOUSLY REQUESTED THAT THE REST OF THIS BE MADE AN EXHIBIT.  I

13  THINK MR. WIGLER DID SAY, WELL, I'D LIKE TO MAKE IT ALL AN EXHIBIT.

14  AND I EXPLAINED I DIDN'T WANT ALL OF THIS INFORMATION ABOUT SPLEENS

15  AND DRENCHED WITH BLOOD, WHICH IS REPEATED THROUGHOUT THIS

16  DOCUMENT, YOU KNOW, HEARTS AND CUT OPEN AND DISSECTIONS AND

17  SURGERY AND DRENCHED WITH BLOOD AND CAVITIES AND, YOU KNOW,

18  GUTS.  IT'S JUST – IT'S MORE PREJUDICIAL THAN PROBATIVE.

19       IT'S NOT PROBATIVE OF ANYTHING, REALLY, AND IT'S JUST ALL GUTS

20  AND BLOOD.  THAT'S WHY WE DIDN'T MAKE IT AN EXHIBIT.  THAT'S WHY WE

21  STIPULATED TO JUST THE FIRST TWO PAGES.

22            THE COURT:  THANK YOU.  RESPONSE?

23            MR. MONCIER:  WITH REGARD TO ALL OF THE OTHER STUFF, YOUR

24  HONOR, IT'S THE FIRST PAGE THAT I WANTED TO INQUIRE INTO WITH STEVE

25  VINSANT, ONLY THE FIRST PAGE.  I DIDN'T INTEND TO GO INTO ALL OF THE

1    REST OF IT.

2            MR. WIGLER:  THERE IS A CERTAIN AMOUNT OF MR. DUFFY'S

3    CONSTERNATION I UNDERSTAND AND ACKNOWLEDGE.  THE FACT IS, WE DID

4    GET TOGETHER, WE DID AGREE TO STIPULATE TO THE ADMISSIBILITY OF

5    CERTAIN DOCUMENTS.  THE ONES PARTICULARLY THAT I UNDERSTAND HIS

6    CONCERN ABOUT ARE THOSE TWO DRAWINGS OF THE SCENE THAT

7    SPECIFICALLY WE HAD AGREED WOULD BE ADMISSIBLE.

8            AND MR. MONCIER DID LOOK AT THEM AND SEE THINGS THAT WERE

9    INACCURATE THAT I HAD NOT CAUGHT, AND HE DEEMED AS MORE

10   IMPORTANT.  AND I CERTAINLY AM PLEASED AND I THINK WE'VE DEALT WITH

11   THEM, AND I APOLOGIZE TO THE COURT AND TO MR. DUFFY FOR THAT

12   ESCAPING MY ATTENTION, COMING UP AFTER THE FACT.

13           WITH RESPECT TO THIS AUTOPSY, THOUGH, WE AGREED IN OUR EXHIBIT

14   NOTEBOOKS TO REDACT AND FILL OUT – I THINK IT'S FOUR PAGES.

15   CERTAINLY THAT WAS DONE WITHOUT ANY OBJECTION.  WHAT I

16   UNDERSTAND CAME UP IN MR. VINSANT'S TESTIMONY IN THE DEFENSE CASE

17   WAS ORDERING ON OPINION TESTIMONY ABOUT BULLET ANGLES AND ENTRY

18   WOUNDS AND DISTANCES FROM THE VICTIM WHERE THE GUNSHOT WAS

19   FIRED, THINGS THAT ARE VERY SPECIFIC THAT MR. MONCIER FOUND ARE

20   DEALT WITH ON ONE PARTICULAR PAGE OF THE FULL AUTOPSY REPORT.

21           I THINK IF WE CAN IDENTIFY THAT PAGE – WE GAVE OUR EXHIBIT UP, SO

22   I DON'T HAVE IT IN FRONT OF ME.

23           MR. DUFFY:  HERE IT IS.

24           MR. WIGLER:  BUT IF MR. MONCIER COULD PICK OUT THAT ONE

25   PAGE, THEN WE COULD JUST SUPPLEMENT WITH THAT PAGE.  BUT THAT'S

1    SOMETHING, IN FAIRNESS, CAME UP AS A RESULT OF AGENT VINSANT'S

2    TESTIMONY, AND I COULD NOT HAVE PREDICTED THAT AT THE TIME WE

3    STIPULATED TO THE FOUR PAGES THAT WENT IN WITH NO OBJECTION.

4              THE COURT:  ALL RIGHT.  THANK YOU.  I UNDERSTAND THE

5    POSITIONS ON THAT DOCUMENT.  THE NEXT DOCUMENT IS PLAINTIFF'S 38-A,

6    WHICH I HAVE WRITTEN DOWN, THE DIAGRAM WITH MR. MONCIER'S

7    DRAWING OF THE GUN LINE.  PLAINTIFF PROFFERED THAT EXHIBIT, AND LET'S

8    HEAR FIRST, MR. DUFFY, YOU OBJECTED.  LET'S HEAR FIRST ON THE

9    OBJECTION TO THAT EXHIBIT.

10             MR. MONCIER:  WELL, I DID PROFFER IT, AND THEN MR. DUFFY

11   TURNED AROUND AND DISPLAYED IT TO THE JURY.

12             THE COURT:  ALL RIGHT.  I UNDERSTAND THAT.

13             MR. MONCIER:  I THOUGHT HE HAD ERASED IT.  AND MR. CARSON,

14   OF COURSE, SAID HE UNDERSTOOD IT.  I MEAN, IT'S A ROUGH DRAWING,

15   OBVIOUSLY.  BUT I'D MOVE IT'S ADMISSION.

16             THE COURT:  I UNDERSTAND YOU ARE, I UNDERSTAND YOU ARE.

17   I'M GOING TO HEAR THE OBJECTION NOW, BECAUSE I DIDN'T GIVE MR. DUFFY

18   A COMPLETE OPPORTUNITY TO MAKE HIS OBJECTION, AND I'M ALLOWING HIM

19   TO DO SO.

20             MR. DUFFY:  I WAS OPERATING ON THE UNDERSTANDING THAT

21   WAS –

22             THE COURT:  I HAVE IT ON MY LIST OF MATTERS TAKEN UNDER

23   ADVISEMENT.

24             MR. DUFFY:  OH, YEAH.  I THOUGHT THAT THAT WAS A TOOL, YOU

25   KNOW, LIKE A – LIKE YOU WOULD BE DRAWING A SKETCH OR LIKE THE

1  THINGS WE DREW ON THE SCREEN.  I DIDN'T KNOW THAT THAT WAS BEING

2  OFFERED AS AN EXHIBIT.  IT WAS SOMETHING THAT – IT IS A HYPOTHETICAL

3  PROJECTORY OF A BULLET DRAWN ON A DIAGRAM BY MR. MONCIER.  I DON'T

4  THINK THAT MAKES IT ADMISSIBLE EVIDENCE.  IT WAS A DEMONSTRATIVE

5  TOOL, NOT ANY ADMISSIBLE EVIDENCE.

6           THE COURT:  RESPONSE TO THAT?

7           MR. MONCIER:  OH, I THINK I ALREADY STATED, AND, OF COURSE,

8  THE DEFENDANT ADOPTED IT TOO –

9           THE COURT:  ALL RIGHT.

10          MR. MONCIER:  – WITH THE UNDERSTANDING IT'S NOT TO SCALE.

11  BUT THAT'S WHAT HE WAS TRYING TO EXPLAIN.  HE JUST COULDN'T EXPLAIN,

12  HAVE AN EXPLANATION FOR IT.

13          THE COURT:  THANK YOU.  AND THEN THE FINAL DOCUMENTS I

14  HAVE ARE PLAINTIFF'S 55 AND 56, WHICH ARE THE LETNER AND GUNTER

15  STATEMENTS.

16          MR. MONCIER:  MR. PHILLIPS STATED HIS OPINIONS THAT THOSE

17  WERE INCONSISTENT AND DEFENDED AND DISCREDITED THOSE ONCE AGAIN.

18  THE JURY CAN READ THEM AND FIND OUT IF THEY'RE INCONSISTENT JUST AS

19  WELL AS MR. PHILLIPS CAN.

20          AND ONCE HE WAS, ON DIRECT EXAMINATION, COMMENTED AND GAVE

21  HIS OPINION AS TO THE FACT THAT THEY WERE INCONSISTENT AND WHY HE

22  DIDN'T PLACE MUCH WEIGHT IN THEM, THEN LET THE JURY LOOK AT THEM

23  AND SEE WHETHER HE'S, ONCE AGAIN, SIMPLY TRYING TO DISCOUNT

24  EVIDENCE THAT WAS NOT ACTED ON.  I BELIEVE IT GOES TO MR. PHILLIPS' –

25  AS TO WHETHER OR NOT MR. PHILLIPS IS TRYING TO JUSTIFY DECISIONS THAT

1   HE MADE VERY QUICKLY, WITHIN FIVE DAYS.

2       HE'S TRYING TO NOW JUSTIFY THOSE IN RETROSPECT BY SAYING, WELL,

3   THOSE STATEMENTS ARE INCONSISTENT. THEY'RE NOT INCONSISTENT.

4         THE COURT: I UNDERSTAND THAT PORTION OF YOUR ARGUMENT.

5   LET'S ALSO KEEP IN MIND THAT, PER PLAINTIFF'S MOTION IN LIMINE AND THE

6   COURT'S RULING, MR. PHILLIPS' DECISIONS OR AT LEAST THE ULTIMATE

7   DECISION IS NOT BEFORE –

8         MR. MONCIER: WELL, I UNDERSTAND.

9         THE COURT: – NOT RELEVANT AND NOT BEFORE THE JURY.

10         MR. MONCIER: WELL, I UNDERSTAND THAT. BUT I THINK WHAT IS

11   BEFORE THE JURY IS THAT MR. PHILLIPS WAS TRYING TO DISCOUNT VARIOUS

12   FACTS THAT WERE IN THIS CASE FOR WHATEVER REASON THAT HE WISHED TO

13   DO SO, BUT HE WAS TRYING TO DO IT, AND THIS IS ANOTHER ONE OF THOSE

14   FACTS THAT HE DISCOUNTED BY SAYING THAT THEY WERE INCONSISTENT. I

15   MEAN, A JURY CAN READ THOSE STATEMENTS AND DETERMINE WHETHER –

16         THE COURT: HOW IS THIS DIFFERENT THAN MANY OF THE

17   STATEMENTS THAT HAVE BEEN USED IN THIS CASE FOR EXAMINATION,

18   CROSS-EXAMINATION PURPOSES, BUT ARE NOT IN EVIDENCE? THERE HAS

19   BEEN TESTIMONY ABOUT CONSISTENCY AND INCONSISTENCY IN MANY OF

20   THE OTHER STATEMENTS.

21         MR. MONCIER: NO. I BELIEVE THAT THE TESTIMONY THAT WE

22   PRODUCED, MR. DUFFY PRODUCED IT WITH A DIFFERENT SPIN. WHAT WE DID

23   IS, WE ESTABLISHED CERTAIN KNOWN FACTS, CERTAIN KNOWN FACTS WITH

24   MR. VINSANT, AND THEN WE ASKED WHETHER MR. – WHAT MR. CARSON SAID

25   ABOUT THOSE FACTS, WAS IT CONSISTENT OR INCONSISTENT WITH THE

1   KNOWN FACT.

2      AND MR. DUFFY CAME BACK AND SPUN THAT A LITTLE BIT DIFFERENT

3   AND TRIED TO SAY, WELL, WERE THE STATEMENTS OF FACTS INCONSISTENT

4   AMONG THEMSELVES, AND THERE WASN'T AN ANSWER ON THAT PARTICULAR

5   MATTER.

6      THIS IS A THIRD STEP, THOUGH, AND A THIRD VIEW TO WHERE GENERAL

7   – MR. PHILLIPS WAS PERMITTED TO TRY TO DISCOUNT THE SIGNIFICANCE OF

8   THE FACT THAT THE TBI HAD STATEMENTS FROM TWO INDIVIDUALS THAT

9   MARTY CARSON WAS INVOLVED IN METHAMPHETAMINE ACTIVITIES IN 2001.

10      OF COURSE, WE KNOW THAT THE TBI WENT TO MARTY CARSON AND

11   TOLD HIM ABOUT IT, WE KNOW THAT.  AND THEN MR. PHILLIPS, TO DISCOUNT

12   THE STATEMENTS, AND SAYING, WELL, YOU KNOW, THEY WERE

13   INCONSISTENT ANYWAY.

14      THEY AREN'T INCONSISTENT.  I MEAN, THEY DON'T TALK ABOUT

15   NECESSARILY THE SAME THING IDENTICALLY, BUT THE PEOPLE WERE

16   SEPARATED, AND BOTH OF THEM WERE SAYING THIS.

17      AND MY POSITION IS THAT ONCE HE WAS SAYING THAT THEY WERE

18   INCONSISTENT, THAT AT THAT POINT IN TIME IT MAKES RELEVANT FOR THE

19   JURY TO READ THEM AND SEE WHETHER THEY'RE INCONSISTENT OR NOT.

20      THE COURT:  THANK YOU.  MR. DUFFY?

21      MR. DUFFY:  YOUR HONOR, THAT DOESN'T CHANGE THE HEARSAY

22   CHARACTER OF THE EXHIBITS.  I MEAN, WE'RE TALKING ABOUT A WRITTEN

23   DOCUMENT THAT ARE OUT OF COURT DECLARATIONS, ONE OF THE PEOPLE

24   WHO HAVE NEVER EVEN BEEN ON THE STAND TO TESTIFY.

25      IN ANY EVENT, THEY WERE GONE OVER EXTENSIVELY BY BOTH SIDES,

1   ON DIRECT AND CROSS-EXAMINATION, AND WERE USED IN THE SAME

2   MANNER AS THE COURT HAS NOTED, AS ALL OF THE OTHER STATEMENTS.  I

3   DON'T SEE HOW THEY BECAME EITHER MORE RELEVANT OR – BUT

4   IRRESPECTIVE OF THAT, THAT DOESN'T CHANGE THE HEARSAY NATURE

5   ARGUMENT.

6           THE COURT:  THANK YOU.

7           MR. DUFFY:  AND FOR THE ACTUAL DOCUMENTS TO GO BACK TO

8   THE JURY WOULD BE MORE PREJUDICIAL, UNDER 403, THAN ANY VALUE THAT

9   – ANY PROOF IN THAT FORM OF A DOCUMENT WOULD HAVE AS OPPOSED TO

10  WHAT WAS READ TO THE JURY AND WOULD BE CONSIDERED IN TOTO WITH

11  ALL OF THE OTHER WITNESSES' TESTIMONY RATHER THAN HAVE A

12  DOCUMENT GO BACK TO THE JURY ROOM.

13          MR. MONCIER:  VERY BRIEFLY IN REBUTTAL, IN MY VIEW OF THE

14  EVIDENCE THAT WE HAVE IN THIS CASE TODAY, THE MOST DEVASTATING

15  EVIDENCE TO THE PLAINTIFF'S CASE WAS MR. PHILLIPS' DEFENSE OF MARTY

16  CARSON.  MY SKILLS WERE NOT EFFECTIVE ENOUGH TO STAND UP TO THE 30-

17  YEAR VETERAN PROSECUTOR, AND – BUT HE OBVIOUSLY WAS DEFENDING

18  MARTY CARSON'S VERSION OF WHAT HAPPENED AND DOING SO BY

19  CONCLUSIONS AND STATEMENTS.  HE DID THE SAME THING WITH REGARD TO

20  THE LETNER AND THE GUNTER STATEMENT.

21          MR. DUFFY SAYS THAT THOSE ARE HEARSAY STATEMENTS; THAT'S NOT

22  THE ISSUE.  THE ISSUE IS THAT MR. CARSON DISCOUNTED THOSE STATE – MR.

23  PHILLIPS DISCOUNTED THOSE STATEMENTS, BECAUSE HE DETERMINED THAT

24  THEY WERE INCONSISTENT, JUST LIKE HE DETERMINED THAT EVERYBODY

25  ELSE WAS INCONSISTENT IN THE CASE EXCEPT MARTY CARSON.  AND MARTY

1    CARSON WASN'T INCONSISTENT WITH THE FACTS, YOU KNOW, OR SUCH LIKE

2    THAT. HE WAS SIMPLY DEFENDING MARTY CARSON.

3        WE BELIEVE THAT THE JURY SHOULD HAVE THE OPPORTUNITY TO LOOK

4    AT THESE TWO STATEMENTS, NOT FOR THE TRUTH OF THE MATTER IN THE

5    STATEMENTS, BUT TO DETERMINE WHETHER OR NOT MR. PHILLIPS IS – HIS

6    CREDIBILITY OF WHEN HE SAYS THEY WERE INCONSISTENT AND THEREFORE

7    NOT RELIABLE.

8        THE COURT: ALL RIGHT. THANK YOU. LET'S TAKE A FIVE-

9    MINUTE BREAK AND SEE IF WE CAN COME BACK AND ADDRESS THE JURY

10    CHARGES. STAND IN RECESS FOR FIVE MINUTES, LET ME LOOK AT –

11        MR. MONCIER: OH, I'M SORRY. EXCUSE ME.

12        THE COURT: TAKE A FIVE-MINUTE.

13      (RECESS HAD 4:35 P.M.; RECONVENED AT 4:45 P.M.)

14        THE COURT: MR. CARSON, YOU'RE WELCOME TO STAY, AND MS.

15    YANCEY'S WELCOME TO STAY. I SAY, WE'RE GOING TO HAVE OUR CHARGE

16    CONFERENCE NOW. THE PARTIES AND CERTAINLY THOSE IN ATTENDANCE

17    WELCOME TO STAY, BUT THE PARTIES ALSO ARE NOT REQUIRED TO STAY FOR

18    THE CHARGE CONFERENCE.

19        MR. MONCIER: YOUR HONOR, I FOUND THE EXHIBIT THAT YOU

20    HAD ASSIGNED A NUMBER TO ON THE LIST. IT DID NOT HAVE THE NUMBER

21    ASSIGNED TO IT. THAT'S THE CHARGE THAT WE SPOKE OF. I WILL PLACE

22    THAT RIGHT THERE.

23        THE COURT: ALL RIGHT. THANK YOU. OKAY. THE PARTIES HAVE

24    THE FIRST DRAFT OF THE CHARGE, PROPOSED CHARGE TO THE JURY, BEFORE

25    THEM OR COUNSEL HAS BEFORE THEM. LET ME GO THROUGH FIRST WHAT

1    CHANGES WILL BE MADE BASED UPON YOUR DISCUSSIONS WITH MR. SLAGLE

2    THIS MORNING.

3        ON PAGE 23, TO MAKE SURE THE PAGES HAVEN'T CHANGED, ON PAGE 23

4    THE CHARGE ENTITLED "NATURE OF THE ACTION, SECTION 1983 CLAIM," MY

5    UNDERSTANDING THAT THE PARTIES, AS ORIGINALLY PROFFERED, THE LAST

6    PARAGRAPH AND SENTENCES TWO AND THREE SAYS, "THE DEFENDANT

7    CLAIMS THAT HE DID NOT ACT INTENTIONALLY DURING THE TIME IN

8    QUESTION.  DEFENDANT FURTHER CLAIMS THAT HE WAS NOT GUILTY OF ANY

9    FAULT OR WRONG-DOING IN REGARD TO THE INCIDENT SUED UPON."  WE ARE

10   CHANGING THAT LANGUAGE, DELETING THOSE TWO SENTENCES, AND

11   INSTEAD INSERTING THE FOLLOWING LANGUAGE:  DEFENDANT DENIED THAT

12   HE INTENDED TO SHOOT JOHN YANCEY.  DEFENDANT FURTHER DENIES THAT

13   HE ACTED SADISTICALLY OR MALICIOUSLY."

14       THE SECOND AGREED UPON CHANGE IS, ON PAGE 28, TWO, "UNDER

15   COLOR OF STATE LAW," WE ARE ADDING THE WORDS IN THE FIRST SENTENCE,

16   "ACTING AS" BETWEEN THE THIRD AND FOURTH WORDS, SO THAT THAT

17   CHARGE WILL READ, "BECAUSE DEFENDANT WAS ACTING AS AN OFFICIAL OF

18   THE SCOTT, COUNTY, TENNESSEE, SHERIFF'S DEPARTMENT."

19       THE THIRD AGREED UPON CHANGE IS ON PAGE 30.  WE ARE

20   ELIMINATING THE SECOND AND THIRD CATEGORIES OF COMPENSATORY

21   DAMAGES, SO INSTEAD OF HAVING A FIRST, SECOND AND THIRD, WE WILL

22   JUST SAY – EXCUSE ME A SECOND.

23       (DISCUSSION BETWEEN COURT/LAW CLERK OFF THE RECORD.)

24       THE COURT:  INSTEAD OF, ON PAGE 30, HAVING FIRST THOSE

25   DAMAGES SUSTAINED IMMEDIATELY BY THE INJURED PARTY, INCLUDING

1 COMPENSATION FOR THE FOLLOWING, ONE, TWO, THREE NUMBERED

2 PARAGRAPHS; WE WILL INSTEAD SIMPLY SAY, "FIRST, THOSE DAMAGES

3 SUSTAINED IMMEDIATELY BY THE INJURED PARTY, INCLUDING

4 COMPENSATION FOR THE MENTAL AND PHYSICAL SUFFERING ACTUALLY

5 ENDURED BY THE INJURED PARTY BETWEEN THE INJURY AND DEATH."

6 AND THEN ON PAGE 34, LINE 3, WE WILL CHANGE THE LAST WORD FROM

7 L-I-F-E TO L-I-V-E, SO THAT IT WILL SAY, "YOU SHOULD BE AWARE THAT MANY

8 PERSONS LIVE LONGER."

9 THOSE ARE THE CHANGES THAT ARE BEING MADE. NOW, LET'S TAKE UP

10 AREAS OF EITHER DISAGREEMENT OR POTENTIAL DISAGREEMENT, AND THEN I

11 WILL GO BACK, IF THERE'S ANYTHING ADDITIONAL YOU WANT TO BRING UP,

12 WE'LL DO THAT. BUT I KNOW CERTAIN THINGS ARE AT ISSUE OR

13 POTENTIALLY AT ISSUE, SO LET'S DEAL WITH THOSE FIRST.

14 PAGE 30, WE'RE BACK TO PAGE 30. MY UNDERSTANDING IS, MR. DUFFY,

15 YOU HAVE OBJECTION TO –

16 MR. DUFFY: NO, I BELIEVE IT WAS THE PLAINTIFF THAT

17 OBJECTED.

18 MR. WIGLER: YES, YOUR HONOR. THE SENTENCE BEGINNING,

19 "YOU MAY NOT SPECULATE"?

20 THE COURT: ALL RIGHT. ARE WE STILL ON YOUR PAGE 30?

21 MR. WIGLER: STILL ON MY PAGE 30 AT THE BOTTOM.

22 THE COURT: OKAY. WHAT ON PAGE 30 DOES THE PLAINTIFF

23 OBJECT TO?

24 MR. WIGLER: THE SENTENCE, "YOU MAY NOT SPECULATE AS TO

25 WHETHER CONSCIOUS PAIN AND SUFFERING ACTUALLY DID EXIST BETWEEN

1    THE INJURY AND DEATH." THERE'S NO DISPUTE IN THIS CASE THAT THE

2    DECEDENT SURVIVED THE GUNSHOT FOR A PERIOD OF TIME, WAS ABLE TO

3    SPEAK. AND CERTAINLY WITHIN THE COMMON KNOWLEDGE OF ANYONE

4    THAT IT'S PAINFUL TO BE SHOT AND THAT A PERSON CONSCIOUS OF THEIR

5    IMPENDING DEATH WOULD SUFFER SOME PAIN AND SUFFERING.

6            TO ADD, "THAT YOU MAY NOT SPECULATE," ABOUT SOMETHING THAT

7    WE ALL KNOW WOULD BE TRUE INVITES THE JURY TO NOT MAKE AN AWARD

8    BECAUSE OF THE VERY FACT THAT THE DECEDENT IS DEAD AND CAN'T

9    TESTIFY AS TO HIS PAIN. IT INVITES THE JURY TO REQUIRE SOMETHING THAT

10   CANNOT BE PRODUCED, AND THAT IS THE TESTIMONY OF THE DECEDENT

11   ABOUT HIS OWN PAIN.

12           THE COURT: SO YOU WOULD PROPOSE OR PLAINTIFF WOULD

13   PROPOSE ELIMINATING THAT ENTIRE "YOU MAY NOT SPECULATE"

14   PARAGRAPH?

15           MR. WIGLER: RIGHT. I THINK, IN FAIRNESS, YOU HAVE TO TAKE

16   OUT THE SECOND SENTENCE ALSO.

17           THE COURT: MR. DUFFY, WHAT'S YOUR POSITION AS TO THAT?

18           MR. DUFFY: WELL, YOUR HONOR. THE VERY REASON –

19           THE COURT: AND DURING THE – I'LL ALLOW YOU ALL TO REMAIN

20   SEATED DURING THE CHARGE CONFERENCE, SO – THERE'S SOME BACK AND

21   FORTH. APPRECIATE THE COURTESY.

22           MR. DUFFY: THE VERY REASON, IT WOULD BE SHEER

23   SPECULATION OR THERE COULD BE SOME SHEER SPECULATION THAT THE

24   JURY SHOULD BE CAUTIONED ABOUT, WAS BECAUSE OF THE EXTREMELY

25   SHORT DURATION, ACCORDING TO THE PROOF, OF THE TIME THAT HE

1  SURVIVED. THERE'S NO EVIDENCE OF PAIN AND SUFFERING.

2  AND I DISAGREE WITH THE STATEMENT THAT IT'S WITHIN COMMON

3  KNOWLEDGE THAT IT WOULD – I MEAN, HE COULD HAVE BEEN IN PAIN. I

4  MEAN, I DON'T THINK IT'S IN COMMON KNOWLEDGE TO KNOW WHAT IT FEELS

5  LIKE TO BE SHOT IN THE HEART AND EXPIRE WITHIN A MATTER OF SECONDS,

6  ACCORDING TO MARTY CARSON, OR PERHAPS MINUTES. I MEAN, THERE'S NO

7  – HE DOESN'T SAY ANYTHING OTHER THAN THE FIRST – HE UTTERS A COUPLE

8  OF WORDS, "HELP ME, I'M SHOT," AND AFTER THAT THERE'S NO PROOF OF ANY

9  – YOU KNOW, I MEAN, IF THERE WERE A WITNESS SAYING HE WAS WRITHING

10 AND GRIMACING AND MAKING GUTTURAL NOISES AND IN AGONY AND WHAT

11 NOT, BUT I DEFINITELY THINK THE JURY SHOULD BE CAUTIONED ABOUT

12 SPECULATING.

13 I DON'T SEE HOW IT WOULD BE ERROR TO TELL A JURY NOT TO

14 SPECULATE ABOUT SOMETHING, ESPECIALLY UNDER THOSE CIRCUMSTANCES.

15 MR. WIGLER: THIS INSTRUCTION, I BELIEVE, IS HERE FOR THE

16 CASE, SUCH AS AN AIRPLANE CRASH OR SOMETHING, WHERE IT'S NOT KNOWN

17 WHETHER THE DECEASED SURVIVED OR WHETHER DEATH WAS IN SOME PAIN,

18 AND THERE IT WOULD BE SHEER SPECULATION. BUT HERE WE'VE GOT NOT

19 ONLY MARTY CARSON'S TESTIMONY THAT HE WAS ABLE TO SPEAK; IT WAS

20 SOME PERIOD OF TIME BEFORE HIS EYES ROLLED INTO THE BACK OF HIS

21 HEAD. BUT WE'VE ALSO GOT NICOLE WINDLE'S TESTIMONY THAT SHE SAT

22 WITH HIM, SCREAMING FOR SOMEONE TO HELP HIM, WHILE HE SQUEEZED HER

23 HAND.

24 THE COURT: ALL RIGHT. I MEAN, WHY DON'T WE DO THIS? I

25 MEAN, THIS IS A PATTERN CHARGE, TPI SECTION 1430, AND I USUALLY LIKE TO

1 STICK WITH THE PATTERN CHARGES UNLESS PROOF DOESN'T CONFORM TO

2 THE CHARGE IN ANY FASHION.

3     I MEAN, MR. DUFFY WANTS – IF YOU WANT TO ARGUE DURING CLOSING

4 ARGUMENTS THERE WAS NOT PAIN AND SUFFERING, I GUESS, BASED UPON

5 THE RECORD, YOU COULD.  BUT WHY DON'T WE – MAYBE WE SHOULD NOT,

6 BASED ON MR. WIGLER'S POSITION, NOT SO SPECIFICALLY HIT THE JURY WITH

7 "YOU MAY NOT SPECULATE."

8     HERE'S WHAT THE COURT WILL DO.  GIVE ME JUST A MOMENT.

9     (PAUSE)

10     THE COURT:  I'M GOING TO REWRITE THIS SENTENCE TO READ AS

11 FOLLOWS:  WHILE YOU MAY NOT SPECULATE AS TO THE MATTER OF

12 CONSCIOUS PAIN AND SUFFERING BETWEEN INJURY AND DEATH, IF YOU FIND

13 THAT THERE WAS SUCH PAIN AND SUFFERING PRIOR TO DEATH, THEN YOU

14 MUST AWARD DAMAGES FOR IT."

15     ALL RIGHT.  THE NEXT MATTER AT ISSUE, I BELIEVE, IS – SHOULD STILL

16 BE ON PAGE 32, THE LAST BRACKETED PARAGRAPH ON PAGE 32, ABOUT

17 DEDUCTION OF DECEASED'S LIVING EXPENSES.  PLAINTIFF OBJECTS TO THAT

18 INCLUSION; IS THAT CORRECT?

19     MR. WIGLER:  YES, YOUR HONOR.  IT APPEARS FROM THE

20 BRACKETED CONCLUSION OF THIS PATTERN INSTRUCTION THAT IT'S ONLY TO

21 BE USED WHERE THERE'S SUFFICIENT EVIDENCE UPON WHICH THE JURY

22 COULD BASE THE DEDUCTION.  THERE IS NO PROOF IN THE RECORD OF LIVING

23 EXPENSES.  MR. DUFFY COULD HAVE CERTAINLY BROUGHT THAT OUT.

24 THEREFORE, IT'S MEANINGLESS.  IT WOULD INVITE SPECULATION IF

25 ANYTHING WOULD.

1      THE COURT:  MR. DUFFY?

2           MR. DUFFY:  WE'RE SWITCHING POSITIONS NOW.  NOW I'M –

3           THE COURT:  YOU CAN REMAIN SEATED.  ACTUALLY, IT WILL

4   PROBABLY HELP, BECAUSE YOU'LL BE CLOSER TO THE MICROPHONE.  JUST

5   PULL IT UP THERE.

6           MR. DUFFY:  I'M THE ONE HERE THAT SAYS IT CERTAINLY IS

7   WITHIN THE COMMON KNOWLEDGE OF MEMBERS OF THE JURY THAT THERE

8   ARE PERSONAL MAINTENANCE EXPENSES.  I'VE NEVER – I DIDN'T FEEL THE

9   NEED TO PUT ON ANY PROOF, BECAUSE I JUST THOUGHT THAT WAS A GIVEN.

10          THE COURT:  WELL, AT LEAST THE COURT, IN THE PATTERN JURY

11  INSTRUCTION – AND I DON'T HAVE THE BOOK IN FRONT OF ME TO SEE

12  WHETHER IT CITES TO SOMETHING ELSE, BUT THE INSTRUCTION WITHIN THE

13  PATTERN INSTRUCTIONS IS ONLY USED WHEN THERE'S SUFFICIENT EVIDENCE

14  UPON WHICH THE JURY CAN BASE THE DEDUCTION.

15      HAS THERE BEEN ANY EVIDENCE IN THIS TRIAL ABOUT THE DECEASED'S

16  LIVING EXPENSES?  PUT ASIDE FOR THE MOMENT WHETHER THE JURY SHOULD

17  BE ABLE TO USE THEIR COMMON SENSE.

18          MR. DUFFY:  WELL, YES, THERE'S BEEN PROOF IN THE RECORD

19  THAT HE'S 35 YEARS OLD, HE'S A POLICE OFFICER, HE HAS A FAMILY, HE HAS

20  THREE KIDS.  YOU KNOW, THAT, YOU JUST INFER FROM THAT PROOF THAT

21  THERE IS PERSONAL MAINTENANCE EXPENSES.

22          THE COURT:  NOW, WHAT'S YOUR RESPONSE TO THAT, MR.

23  WIGLER?

24          MR. WIGLER:  YOUR HONOR, THAT'S NO PROOF AT ALL.  IT COULD

25  BE THAT HE HAS A TRUST FUND THAT COVERS ALL THOSE EXPENSES.  IT'S

1  SHEER SPECULATION.

2  THE COURT:  WHAT WOULD YOUR DEFINITION BE OF SUFFICIENT

3  EVIDENCE OF LIVING EXPENSES?

4  MR. WIGLER:  OH, THE AMOUNT OF HIS MORTGAGE OR HIS RENT,

5  HOW MUCH HIS GROCERY BILLS ARE AND UTILITIES.  THERE'S NO PROOF OF

6  WHAT THOSE EXPENSES ARE.

7  THE COURT:  LET ME PONDER ON THIS.

8  MR. WIGLER:  AND NO PROOF THAT THEY CAME OUT OF HIS

9  INCOME.  IT COULD BE HIS SPOUSE WAS PAYING FOR THOSE BILLS, COULD BE

10  THAT THEY'D WON THE LOTTERY AND HAD A SUBSTANTIAL FORTUNE.

11  THERE'S JUST NO – THERE'S NO WAY TO SHOW.

12  MR. DUFFY:  LET ME ADD, YOUR HONOR, THAT THE PLAINTIFF

13  INTRODUCED THE W-2'S OF HIS INCOME, AND I AGREED TO LET AN EXHIBIT GO

14  BACK WITH LORI'S HANDWRITING ON IT AS TO – WHICH IS NOT REDUCED TO

15  PRESENT VALUE – OF THE SUM OF HIS EARNINGS OVER A PERIOD OF 35 YEARS.

16  AND WE WERE NOT PROVIDED IN DISCOVERY, OVER THE OBJECTION OF THE

17  PLAINTIFF, ANY INFORMATION ABOUT MS. YANCEY'S INCOME – WELL,

18  EXCUSE ME.  ANYWAY, MS. YANCEY'S TAX RETURNS OR INCOME OR ANY

19  INFORMATION ABOUT TRUST FUNDS.

20  THE COURT:  WELL, ON THAT, IN TERMS OF HER HANDWRITTEN

21  NOTATIONS, THE NEXT JURY CHARGE TALKS ABOUT PRESENT CASH VALUE IN

22  THE AWARD, AND YOU ADDRESSED THAT IN YOUR QUESTIONING AS WELL.

23  MR. DUFFY:  CORRECT.  I'M JUST SAYING THAT THERE IS – YOU

24  KNOW, IT WENT IN WITHOUT OBJECTION, THE W-2'S AND THAT INFORMATION.

25  I JUST TOOK IT AS A GIVEN THAT – I MEAN, I'VE NEVER NOT SEEN PERSONAL

1    MAINTENANCE EXPENDITURES DEDUCTED FROM THE – AN AWARD OF

2    DAMAGES FOR CASES OF THIS NATURE.

3              THE COURT:  LET ME DO A LITTLE MORE RESEARCH ON THIS ONE –

4              MR. DUFFY:  I THOUGHT IT WAS ALWAYS GIVEN.

5              THE COURT:  EXCUSE ME?

6              MR. DUFFY:  I THOUGHT IT WAS ALWAYS GIVEN.

7              THE COURT:  I'LL HOLD OFF ON THE DECISION ON THAT ONE.

8              MR. DUFFY:  SO I KNOW I DIDN'T CROSS-EXAMINE LORI YANCEY

9    ON, YOU KNOW, WHAT THINGS JOHN-JOHN BOUGHT.

10             THE COURT:  EXCUSE ME JUST A SECOND.

11        (DISCUSSION BETWEEN COURT/LAW CLERK OFF THE RECORD.)

12             THE COURT:  ALL RIGHT.  THE NEXT MATTER I HAVE ON MY LIST

13   IS PLAINTIFF'S PROPOSED JURY INSTRUCTION ON PAYMENT OF DAMAGES,

14   PLAINTIFF'S REQUESTED INSTRUCTION, WHICH I BELIEVE WAS SUBMITTED ON

15   – TODAY, DOCUMENT 118.  WHO WANTS TO TAKE THAT ONE UP?

16             MR. MONCIER:  I HAD, AT THE TIME, IF YOU'LL REMEMBER, EARLY

17   ON –

18             THE COURT:  YOU CAN STAY SEATED, MR. MONCIER.  JUST PULL

19   THE MICROPHONE OVER.

20             MR. MONCIER:  AT THE TIME, EARLY ON, MR. DUFFY HAD GONE

21   INTO THE FACT THAT SCOTT COUNTY WASN'T A PARTY TO THIS LAWSUIT AND

22   THOSE TYPE THINGS, AND I OBJECTED AT THE TIME, AND THE COURT SAID WE

23   WILL LOOK AT THAT IN TERMS OF AN INSTRUCTION.  THIS IS AN INSTRUCTION

24   THAT I HAVE USED.

25         I WAS ASKED EARLIER WHETHER I HAD ANY AUTHORITY FOR THIS

1   INSTRUCTION, AND I DON'T BELIEVE THAT THERE IS ANY PATTERN OR ANY

2   CASE THAT I KNOW THAT SPEAKS TOWARD WHETHER THIS IS OR IS NOT AN

3   APPROPRIATE INSTRUCTION.

4       MR. DUFFY OBJECTED TO USING THE WORD "INSURANCE."  YOU KNOW,

5   IT'S JUST AN INSTRUCTION THAT I HAD USED PREVIOUSLY IN THIS REGARD,

6   AND IF THE WORD "INSURANCE" IS THE OBJECTIONABLE PART, THEN I DON'T

7   OBJECT TAKING THAT OUT.

8       HOWEVER, WITH REGARD TO THE BALANCE OF IT, IS THAT IT IS

9   IMPROPER TO CONSIDER HOW THE JUDGMENT WOULD BE MADE, AND THAT

10   WOULD BE MATTERS FOR WHICH THERE IS NOT EVIDENCE IN THE RECORD,

11   AND THEY SHOULD NOT CONSIDER WHETHER HE WOULD PAY IT PERSONALLY

12   OR WOULD BE PAID BY SOME OTHER PERSON; YEAH, ESPECIALLY WHERE

13   THERE IS NO PUNITIVE DAMAGE CLAIM, ONLY COMPENSATORY DAMAGE

14   CLAIM.

15       THE COURT:  MR. DUFFY?

16       MR. DUFFY:  I DON'T HAVE A COPY OF THE INSTRUCTION. DO YOU

17   HAVE IT?

18       MR. MONCIER:  I DON'T HAVE ANOTHER COPY.  I GAVE IT TO YOU

19   THIS MORNING.

20       THE COURT:  HERE, WHY DON'T YOU LOOK AT MINE?  YOU CAN

21   COME ON UP.  DOCUMENT 118 FILED TODAY.

22       MR. MONCIER:  WELL, HE HADN'T GOT THIS ELECTRONICALLY.

23   WE HAND-DELIVERED IT TO HIM THIS MORNING.

24       THE COURT:  ALL RIGHT.  YOU CAN COME GET THIS ONE.

25       MR. DUFFY:  THIS REQUESTED INSTRUCTION, YOUR HONOR,

1    INVITES THE JURY TO INFER INSURANCE.  IT INVITES THE JURY TO INFER THAT

2    THERE IS OUT THERE SOME SOURCE FOR PAYMENT OF THE JUDGMENT OTHER

3    THAN FOR MARTY CARSON.  I THINK THAT IS PARTICULARLY UNFAIR TO

4    MARTY CARSON, BECAUSE IN THIS CASE, WITH THE NATURE OF THE

5    ALLEGATIONS, IT'S BASICALLY A MURDER CASE, THERE PROBABLY ISN'T ANY

6    INSURANCE COVERAGE.

7        I MEAN, THAT WOULD BE A WHOLE 'NOTHER ISSUE, A WHOLE 'NOTHER

8    BATTLE FOR THE PLAINTIFF AND THE INSURANCE COMPANY TO FIGHT IT OUT

9    SOMEWHERE ELSE.

10        THE COURT:  LET ME SEE IT BACK.

11    (PAUSE)

12        THE COURT:  ALL RIGHT.  THE COURT, RESPECTFULLY, WILL

13    DECLINE TO GIVE PLAINTIFF'S REQUESTED INSTRUCTION, DOCUMENT 118.

14    THE COURT DOES BELIEVE THAT, WHETHER WE PUT "INSURANCE" OR NOT,

15    THAT IT INVITES – BASICALLY, WHEN WE TELL THE JURY NOT TO CONSIDER

16    ALL THESE THINGS, THAT IT INVITES THE JURY POTENTIALLY TO CONSIDER

17    THINGS THEY SHOULD NOT CONSIDER.  THE COURT WILL USE THE PATTERN

18    INSTRUCTION ON DAMAGES.

19        LET ME ALSO MAYBE JUST GO AHEAD AND TELL YOU ALL A COUPLE

20    OTHER DECISIONS.  THE COURT ALSO WILL DECLINE TO GIVE PLAINTIFF'S

21    PROPOSED JURY INSTRUCTION "FALSE OR DECEPTIVE EXPLANATION FOR AN

22    EVENT MAY INDICATE CONSCIOUSNESS OF GUILT."  I UNDERSTAND THE

23    DEFENDANT OBJECTS TO THESE TWO CHARGES, CLAIMING THEY UNFAIRLY

24    SINGLE OUT THE DEFENDANT ON THE QUESTION OF CREDIBILITY.

25        THE COURT FURTHER NOTES THAT THE CHARGES AND INSTRUCTIONS

1  OR CASE EXCERPTS COME FROM CRIMINAL, NOT CIVIL CASES, AND THE COURT

2  BELIEVES THAT THE JURY CHARGE AS PROPOSED ADEQUATELY INSTRUCTS

3  THE JURY ON HOW TO DETERMINE WITNESS CREDIBILITY.

4      THE OTHER MATTER I UNDERSTAND AT ISSUE WAS DISCUSSED THIS

5  MORNING WAS THE DEFENDANT SEEKS THE ADDITION OF ADDITIONAL

6  CHARGES ON INFERENCES AND SUGGESTED ONE USED BY JUDGE PHILLIPS IN

7  CASE NUMBER 3:04-CV-501. PLAINTIFF SAYS THAT CHARGE IS UNNECESSARY.

8      THE COURT DID FIND, MR. SLAGLE DID FIND, A PATTERN FEDERAL JURY

9  PRACTICE INSTRUCTION ON INFERENCES, WHICH IS OF MORE LIMITED

10  FASHION THAN THE "INFERENCE DEFINED" CHARGE SUBMITTED BY

11  DEFENDANT COUNSEL THIS MORNING. LET ME – WHY DON'T THE THREE OF

12  YOU TAKE A LOOK AT THIS REAL QUICK AND SEE WHAT YOU THINK ABOUT IT.

13      (PAUSE)

14          MR. WIGLER: THAT'S FAIR ENOUGH, YOUR HONOR.

15          MR. DUFFY: THAT'S FINE.

16          THE COURT: WHY DON'T WE PUT THAT, MAYBE PUT THAT AFTER

17  PAGE TEN. PAGE TEN IS "ORDINARY OBSERVATIONS AND EXPERIENCES,"

18  PAGE 11 IS "WEIGHING CONFLICTING TESTIMONY." WE'LL JUST INSERT THAT

19  THERE OR MAYBE AFTER – ACTUALLY, AFTER PAGE 11.

20      PAGE 11 STARTS WITH "ALTHOUGH YOU MUST CONSIDER ALL THE

21  EVIDENCE," AND THEN – ACTUALLY, LET'S DO IT BETWEEN PAGE TEN, 11. THIS

22  WILL COME AFTER PAGE TEN, AND I WILL READ IT FOR THE RECORD.

23      INFERENCES FROM FEDERAL JURY PATTERN INSTRUCTION SECTION

24  104.20: "YOU ARE TO CONSIDER ONLY THE EVIDENCE IN THE CASE. HOWEVER,

25  YOU ARE NOT LIMITED TO THE STATEMENTS OF THE WITNESSES. IN OTHER

1  WORDS, YOU ARE NOT LIMITED TO WHAT YOU SEE AND HEAR THE WITNESSES

2  TESTIFY.  YOU MAY DRAW FROM THE FACTS THAT YOU FIND HAVE BEEN

3  PROVED, SUCH REASONABLE INFERENCES AS BEING JUSTIFIED IN LIGHT OF

4  YOUR EXPERIENCES.  'INFERENCES' ARE DEDUCTIONS OR CONCLUSIONS

5  WHICH REASON AND COMMON SENSE LEADS THE JURY TO DRAW FROM THE

6  EVIDENCE RECEIVED IN THE CASE."

7        NOW, THOSE, I BELIEVE, ARE ALL THE MATTERS DISCUSSED THIS

8  MORNING, BUT I'M NOW WILLING TO GO BACK AND SEE IF THERE'S ANYTHING

9  ELSE THAT EITHER SIDE WANTS TO BRING UP WITH RESPECT TO THE

10  PROPOSED JURY CHARGE.

11              MR. WIGLER:  IT JUST OCCURRED TO ME, JUDGE, THAT I DON'T

12  BELIEVE THERE ARE ANY SITUATIONS IN THE CASE.

13              THE COURT:  WELL, I HAD THE SAME THOUGHT WHEN I LOOKED

14  AT THAT.  THANK YOU FOR REMINDING ME.  ARE THERE ANY STIPULATIONS IN

15  THIS CASE?

16              MR. WIGLER:  WE HAD AGREEMENTS AS TO ADMISSIBILITY, BUT

17  NOT ANY TYPE OF STIPULATION.

18              THE COURT:  ALL RIGHT.  THERE AREN'T ANY – USUALLY WE LIST

19  THEM HERE AFTER WE DO THAT.  IF THERE AREN'T ANY, WE PROBABLY

20  SHOULD JUST TAKE OUT THE STIPULATION CHARGE.  MR. DUFFY, ANY ISSUE

21  WITH THAT, ON PAGE 12?

22              MR. DUFFY:  PROBABLY JUST STIPULATE THE PARTIES WERE

23  UNABLE TO STIPULATE.

24              THE COURT:  ALL RIGHT.  WE WILL REMOVE THE STIPULATIONS

25  CHARGE CURRENTLY ON PAGE 12.  THANK YOU FOR POINTING THAT OUT, MR.

1 WIGLER. ANYTHING ELSE WE NEED TO BRING UP WITH RESPECT TO THE JURY

2 CHARGES, MR. WIGLER OR MR. MONCIER, ON BEHALF OF THE PLAINTIFF, ANY

3 OTHER OBJECTIONS TO THE JURY CHARGE AS THE COURT INTENDS TO GIVE?

4      MR. WIGLER: NO, SIR.

5      MR. MONCIER: YOU DID UNDERSTAND THAT I'M WILLING TO, ON

6 MY PROPOSED DAMAGES, TAKE OUT THE FIRST SENTENCE CONCERNING

7 INSURANCE?

8      THE COURT: I AM.

9      MR. MONCIER: YES, SIR.

10      THE COURT: AND, MR. DUFFY, ANYTHING ELSE FROM

11 DEFENDANT'S STANDPOINT?

12      MR. DUFFY: NO, YOUR HONOR.

13      THE COURT: I ALSO UNDERSTAND THAT BOTH SIDES AGREE TO

14 WHAT WOULD BE CALLED A GENERAL VERDICT FORM. I WILL BRING THAT

15 DOWN ON MONDAY MORNING, BUT ESSENTIALLY IT WOULD SAY: "ONE, DO

16 YOU FIND THE DEFENDANT VIOLATED THE SUBSTANTIVE DUE PROCESS

17 RIGHTS OF MR. YANCEY," I'LL USE THE NAMES, "YES OR NO? IF NO, SIGN THE

18 VERDICT FORM; IF YES, WHAT AMOUNT, IF ANY, DO YOU AWARD IN

19 COMPENSATORY DAMAGES." THAT WHAT EVERYBODY'S THINKING?

20      MR. DUFFY: YES.

21      MR. MONCIER: THERE WAS ONE OTHER MATTER THIS MORNING I

22 DIDN'T GET TO SPEAK TO MR. SLAGLE ABOUT.

23      THE COURT: LET ME JUST DEAL WITH THAT. ANY –

24      MR. MONCIER: YES, SIR. NO, SIR.

25      THE COURT: MR. DUFFY, DO YOU UNDERSTAND WHAT THE

1   VERDICT FORM – OR ANTICIPATING IT LOOKED LIKE?

2           MR. DUFFY:  ALL I KNOW, IT'S GOING TO BE A GENERAL –

3           THE COURT:  GOING TO SAY, "ONE, DO YOU FIND THAT THE

4   DEFENDANT, MR. CARSON, VIOLATED THE SUBSTANTIVE DUE PROCESS RIGHTS

5   OF MR. YANCEY?  IF NO –"  IT WOULD BE A YES OR NO, "AND IF NO, SIGN THE

6   FORM; IF YES, GO TO QUESTION TWO."  QUESTION TWO WILL BE, "WHAT

7   AMOUNT, IF ANY, DO YOU AWARD IN COMPENSATORY DAMAGES?"

8           MR. DUFFY:  CORRECT, YOUR HONOR.

9           THE COURT:  ALL RIGHT.  AND I'LL LET YOU LOOK AT IT.  YOU'LL

10  ALL HAVE TIME TO LOOK AT IT MONDAY MORNING.

11          MR. WIGLER:  FOR THE BENEFIT OF MR. DUFFY AND MR. MONCIER

12  WHO WEREN'T AT THE TRIAL I HAD WITH YOUR HONOR THIS SUMMER, I WAS

13  SURPRISED AT THE OBJECTION TO USING THE JURY INTERROGATORY IN

14  CLOSING ARGUMENTS.  I HAVE NEVER COME ACROSS THAT BEFORE.

15          THE COURT:  WELL, HERE, IT'S EVEN – YOU MEAN IN TERMS OF

16  FILLING OUT THE VERDICT FORM?

17          MR. WIGLER:  NO.  I MEAN IN TERMS OF SHOWING IT TO THE JURY

18  OR TELLING THE JURY WHAT THEY'RE GOING TO BE ASKED.

19          THE COURT:  ON THE VERDICT FORM OR THE JURY CHARGES.

20          MR. WIGLER:  ON THE VERDICT FORM.  AS I RECALL, I TRIED TO

21  SHOW THAT TO THE JURY –

22          THE COURT:  WELL, THAT'S A GOOD POINT.  I SHOULD PROBABLY

23  HAVE THAT IN MY CLOSING INSTRUCTIONS.  THAT'S A PREFERENCE.  I'VE HAD

24  IT DONE BOTH WAYS, AND I'VE DECIDED THAT I DON'T WANT YOU TO PUT THE

25  ACTUAL VERDICT FORM ON THE SCREEN AND/OR FILL IT OUT FOR THE JURY.

1  UNLESS SOMEBODY CAN TELL ME I HAVE TO DO THAT, I DON'T REQUIRE THAT.

2  I'M NOT SURE IT MATTERS SO MUCH IN THIS CASE IN PARTICULAR,

3  BECAUSE YOU CAN CERTAINLY ARGUE TO THE JURY WHAT IT SAYS AND THAT

4  YOU SHOULD FIND THAT HE HAS OR HAS NOT VIOLATED SUBSTANTIVE

5  RIGHTS, AND IF HE HAS, WHAT FIGURE YOU SHOULD PUT IN ON LINE TWO.

6  BUT I DO NOT ALLOW YOU TO PUT ON THE SCREEN, HERE IS THE VERDICT

7  FORM AND CHECK A CERTAIN BOX OR FILL IN A CERTAIN LINE.

8  MR. MONCIER:  WHAT ABOUT THE OTHER THING YOU MENTIONED,

9  AND THAT IS PUTTING ON THE SCREEN PORTIONS OF YOUR CHARGE?  DO YOU

10  HAVE A PREFERENCE ON THAT?

11  THE COURT:  I HAVE A PREFERENCE YOU DO NOT.

12  MR. MONCIER:  DO NOT?

13  THE COURT:  I DON'T HAVE A PROBLEM WITH YOUR SAYING THAT

14  WE EXPECT THE COURT TO CHARGE YOU THIS, AND YOU CAN HAVE THE

15  DOCUMENT IN FRONT OF YOU, DON'T HAVE TO HAVE IT MEMORIZED.  BUT I DO

16  NOT WANT YOU TO PUT IT ON THE SCREEN.

17  MR. MONCIER:  THANK YOU.

18  THE COURT:  ANYTHING ELSE?

19  MR. MONCIER:  NO, SIR.

20  THE COURT:  ALL RIGHT.  WELL, IF NOT, WHY DON'T WE –

21  MR. MONCIER:  OH, OH, I DID WANT TO MENTION WHAT I DIDN'T

22  MENTION TO MR. SLAGLE THIS MORNING.  I NOTICE THAT HE FRAMES THE DUE

23  PROCESS ONLY UNDER THE 14TH AMENDMENT.  SHOULD WE NOT FRAME IT

24  UNDER THE FIFTH AND 14TH?

25  (DISCUSSION BETWEEN COURT/LAW CLERK.)

1    MR. MONCIER:  IN THE CHARGE, AS I RECALL, YOU JUST

2  MENTIONED DUE PROCESS UNDER THE 14TH AMENDMENT, AND MY QUESTION

3  IS, SHOULD WE NOT INCLUDE THE FIFTH AND 14TH AMENDMENT?  AND THE

4  REASON I SAY THAT IS THAT SOME CASES OF THE SIXTH CIRCUIT – AND I

5  THINK THIS COURT MAYBE PREVIOUSLY HAS RULED AS TO WHAT LENS OF

6  THE CONSTITUTION YOU LOOK AT THESE MATTERS.  FRANKLY, I THINK

7  THEY'RE BOTH.  I THINK IT'S THE FIFTH AND 14TH AMENDMENT.

8    I THINK THAT THE DUE PROCESS CLAUSE THAT WE'RE SPEAKING OF

9  MIGHT HAVE A DIFFERENT APPLICATION AFTER AN ARREST THAN PRIOR TO

10  AN ARREST, BUT THAT'S NOT AN ISSUE IN THIS CASE.  SO I THINK THAT IT

11  SHOULD BE BOTH.

12    THE COURT:  PAGE 23 CURRENTLY, "NATURE OF ACTION.

13  PLAINTIFF CLAIMS DAMAGES ALLEGED HAVE BEEN THE SAME AS THE RESULT

14  OF A DEPRIVATION" ET CETERA "OF A RIGHT SECURED BY THE 14TH

15  AMENDMENT OF THE UNITED STATES CONSTITUTION AND BY FEDERAL

16  STATUTE PROTECTING THE CIVIL RIGHTS OF ALL PERSONS WITHIN THE

17  UNITED STATES."

18    YOU'RE SUGGESTING THAT SHOULD SAY FIFTH AND 14TH AMENDMENT?

19    MR. MONCIER:  YES, SIR.

20    THE COURT:  MR. DUFFY?

21    MR. DUFFY:  THE 14TH IS CORRECT.  THE ONLY – THE DIFFERENCE

22  BETWEEN THE FIFTH AND 14TH IS THE FIFTH APPLIES TO FEDERAL

23  GOVERNMENT, THE FOURTH (SIC) APPLIES TO STATE AND LOCAL

24  GOVERNMENTS, SO THE 14TH IS CORRECT.

25    MR. WIGLER:  WELL, THEY'RE BOTH RIGHT, JUDGE.  AS I RECALL,

1  THE 14TH AMENDMENT SENDS THE FIFTH AMENDMENT TO THE STATES, SO, IN A

2  SENSE THEY'RE BOTH RIGHT.

3  MR. MONCIER:  I THINK WE ARE BOTH RIGHT.  I THINK THAT MR.

4  DUFFY'S STATEMENT IS GENERALLY A CORRECT STATEMENT OF THE LAW.  IF

5  WE WERE DEALING WITH A FEDERAL OFFICER, WE WOULD BE DEALING WITH

6  THE FIFTH AMENDMENT.  BUT I'M CONCERNED.  AS THE COURT KNOWS, I

7  PREVIOUSLY LOST A CASE IN THIS COURT VIEWING A CONSTITUTIONAL RIGHT

8  THROUGH THE FOURTH AMENDMENT RATHER THAN THE FIFTH AMENDMENT.

9  AND I'M JUST CONCERNED THAT BY LIMITING IT TO THE 14TH AMENDMENT,

10  SOMEHOW SOMEONE MIGHT CONSIDER THAT WE'RE VIEWING THE DUE

11  PROCESS CLAUSE THROUGH THE WRONG LENS.

12  BECAUSE I BELIEVE THAT THEY'RE THE SAME IN THIS INSTANCE, WITH

13  THE EXCEPTION OF THE FACT THAT THE DUE PROCESS IN THE 14TH

14  AMENDMENT WOULD HAVE DIFFERENT APPLICATIONS AS TO WHETHER A

15  PERSON WAS IN CUSTODY OR NOT IN CUSTODY.  BUT THE FIFTH AMENDMENT

16  WOULD NOT.

17  MR. DUFFY:  I DON'T THINK THERE'S ANY DIFFERENCE IN –

18  MR. MONCIER:  IF THERE'S NOT ANY DIFFERENCE, LET'S PUT FIFTH

19  AND 14TH AMENDMENT.

20  MR. DUFFY:  THE 14TH IS STATE; FIFTH'S FEDERAL.

21  THE COURT:  THAT WAS KIND OF THE WAY I LOOKED AT IT.  I

22  UNDERSTAND WHY MR. WIGLER SAYS THEY'RE BOTH RIGHT.  LET'S LEAVE IT

23  AS IS FOR NOW, BUT IF YOU WANT ME TO REVISIT THAT, WE'LL DO THAT

24  MONDAY – TUESDAY MORNING.  WHY DON'T WE PLAN TO BE HERE AT 8:30 SO I

25  CAN SHOW YOU THE VERDICT FORM, GO THROUGH THE ISSUES RAISED BY THE

1   REBUTTAL TESTIMONY AND THE DOCUMENTS. THEN WE'LL GO RIGHT INTO

2   REBUTTAL. HOPEFULLY IT WON'T TAKE – OR SHOULDN'T TAKE THAT LONG

3   REGARDLESS OF THE COURT'S RULINGS, AND THEN WE'LL GO IMMEDIATELY

4   INTO OPENING STATEMENTS – OR CLOSING ARGUMENTS.

5         MR. MONCIER: YES, SIR.

6         THE COURT: ALL RIGHT. EVERYONE HAVE A PLEASANT

7   WEEKEND, AND GOOD LUCK IN PREPARING THIS CASE FOR THE FINAL

8   CLOSING ARGUMENTS, AND WE'LL SEE EVERYONE ON TUESDAY MORNING.

9   AND I DO APPRECIATE, WHILE WITH ANY CASE THERE ARE OBJECTIONS AND

10   CONTENTIONS, BUT IT DOES APPEAR THAT COUNSEL ENDEAVORED TO

11   COOPERATE IN A VARIETY OF FASHIONS, BOTH BEFORE AND DURING THE

12   COURSE OF THIS TRIAL, WHICH THE COURT APPRECIATES.

13         MR. DUFFY: WE'RE ALL GETTING OLD.

14         THE COURT: SEE YOU ALL ON TUESDAY.

15      (WHEREUPON, NOVEMBER 9TH, 2007, COURT ADJOURNED AT 5:18 P.M.)

C E R T I F I C A T I O N

I CERTIFY THAT THE FOREGOING IS AN ACCURATE TRANSCRIPT OF THE

RECORD OF PROCEEDINGS IN THE TITLED MATTER.


*/s/ Donnetta Kocuba*                 *May 1, 2008*
DONNETTA KOCUBA, RPR-RMR            DATE
OFFICIAL COURT REPORTER
U.S. DISTRICT COURT
KNOXVILLE, TENNESSEE 37902